UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED REALTY ADVISORS, LP and JACOB
FRYDMAN,

                         Plaintiffs,

                 -against-

ELI VERSCHLEISER, RAUL DELFORNO, OPHIR
PARNASI, and ALEX ONICA,

                         Defendants.
------------------------------------------------------------------------x
JACOB FRYDMAN, UNITED REALTY ADVISORS,
LP, and PRIME UNITED HOLDINGS, LLC,

                         Plaintiffs,

                 -against-

ELI VERSCHLEISER, ALBERT AKERMAN, DAVID O.
WRIGHT,  MULTI CAPITAL GROUP OF COMPANIES,
LLC, RAUL DELFORNO,  OPHIR PINHASI, ALEX
ONICA, ALEX VEEN, SOFIA SVISCH, ALEXANDER
MERCHANSKY, and DOES 1 through 15 inclusive,

                         Defendants.
------------------------------------------------------------------------x

14 Civ. 5903 (JGK) (MHD)

**CONSOLIDATED SECOND
AMENDED COMPLAINT**

**JURY DEMAND**

14 Civ. 8084 (JGK) (MHD)

        Plaintiff Jacob Frydman ("Frydman") pro se, and plaintiffs United Realty Advisors, LP

("United Realty") and Prime United Holdings, LLC ("Prime United"), through their undersigned

attorney Lewis S. Fischbein, P.C., for their Consolidated Second Amended Complaint in the

above-captioned actions against defendants Eli Verschleiser ("Verschleiser"), Albert Akerman

("Akerman"), David O. Wright ("Wright"), Multi Capital Group of Companies, LLC ("Multi

Group"), Raul Delforno ("Delforno"), Ophir Pinhasi ("Pinhasi"), Alex Onica ("Onica"), Alex

Veen ("Veen"), Sofia Svisch ("Svisch"), Alexander Merchansky ("Merchansky"), and DOES 1 -

15 (the "Doe defendants"), allege as follows:

## NATURE OF THE CONSOLIDATED ACTIONS AND FACTUAL SUMMARY

1.      These consolidated actions are for civil damages under (a) the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 et seq.) ("RICO"); (b) the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030 et seq.) (the "CFAA"); (c) the Electronic Communications Privacy Act (18 U.S.C. §§ 2510 et seq.) (the "ECPA"); (d) the Stored Communications Act (18 U.S.C. §§ 2701 et seq.) (the "SCA"); and (e) New York state law for a variety of torts, breach of contract and indemnification, as well as for preliminary and permanent injunctive relief.

2.      Verschleiser, a convicted criminal himself, has headed an ongoing criminal enterprise (the "Ring"), which since at least December 2013 has consisted of Verschleiser, Multi Group, Delforno, Pinhasi and Onica, later joined by Akerman, Wright, Veen, Svisch, Merchansky, and one or more Doe defendants.  All the members of the Ring have worked together to commit various acts of mail or wire fraud for the Ring's common purpose.  That purpose or dual mission has been to harm Frydman and his companies (including United Realty and Prime United), by depriving them of customers and other business relationships, and to deceive the public both as part of that mission and independently, including by Ring members victimizing and fleecing others over more than a 10 year period.  In short, the Ring's business is inherently or at least primarily unlawful.

### The Ring Or Ring Members' Other Victims

3.      The Ring or Ring members' other victims have included (a) donors to two charities run by Verschleiser – Our Place in New York, Inc. ("Our Place"), which seeks contributions for helping drug-addicted Jewish youth return to mainstream society, and its subsidiary, Magenu; (b) Verschleiser's partners and employees in an on-line casino business known as

Hamptoncasino.com; (c) the New York state court system; and (d) at least one unsuspecting disabled person.

4.     Verschleiser, who claims to run Our Place and Magenu as legitimate charitable organizations, instead uses those entities as a front to generate contributions from unsuspecting donors and then use those funds for his own personal needs.  The charities maintain two sets of accounting records.  One set is maintained at the charities' offices in Brooklyn, New York, and the other is maintained separately by Verschleiser and fellow Ring members on the Multi Group computers.

5.     In late 2013, after Verschleiser and Frydman separated, Frydman discovered that during the period that he and Verschleiser were associated (2011 through 2013), Verschleiser and his assistant, Ahuva Ralberg (nee Slomovitz ("Slomovitz")), maintained a second set of the charities' books on the United Realty servers.  A review of those records indicates that thousands of dollars of charity funds were paid to Verschleiser and that his personal credit card expenses were paid with charity funds.  There is no reason to think that such looting is not continuing.

6.     According to Mend Stern ("Stern"), a former business associate of Verschleiser, and Judah Friedman, a former employee of Our Place, Verschleiser would write checks on the charities' bank accounts to ostensibly legitimate payees, but would forge their endorsements and take the checks to a check cashing business in Boro Park run by a man named Shraga, who would cash them for a cut of the proceeds, effectively laundering the money.  According to Stern, Shraga is a key link in Verschleiser's schemes as he will cash any check Verschleiser brings him for a fee knowing that Verschleiser is not the proper payee.

7.     Verschleiser, Stern and others were once partners in Hamptoncasino.com; Verschleiser was responsible for its New York operations.  His partners became concerned that

employees and vendors on the east coast were not being paid.  To evidence that Verschleiser was indeed making such payments, he sent copies of cashed checks made payable to such persons to his partners.  However, Verschleiser did not send the checks to the named payees; instead he took them to the check cashing operation run by Shraga, forged endorsements and obtained the money for himself.  As a result, Verschleiser was thrown out by his partners, Hamptonscasino.com was unable to sustain itself, and was forced to go out of business.  Before it did so, however, Verschleiser, together with his accomplice Veen, who himself has had three criminal charges filed against him in California between 1992 and 1996, and against whom there is a current open arrest warrant, stole all of the source code and website code belonging to that company and wrongfully used same to start a competing online casino business. Veen's social media profiles show he has involvement with online poker groups.

8.     Verschleiser also defrauded the New York state court system by suing a fictitious individual.  On May 28, 2013, a blog post titled "United Realty Partners Realty Scam, United Realty Partners, ELI VERSCHLEISER, Eli v, Eli Vershliser, Eli Verschliser New York, New York" appeared on RipoffReport.com under the name "Christopher Justice."  The post asserted that Verschleiser had previously been an infamous drug dealer in Brooklyn, New York.[1]

9.     On July 3, 2013, an article by Barbara Ross appeared in the New York Daily News titled, "Trump crony sues over ecstasy barb."  The text included: "Brooklyn developer who once partnered with Donald Trump to build a casino tower in Philadelphia has slammed a childhood acquaintance with a lawsuit for accusing him of being a crook and once being 'Brooklyn's infamous ecstasy dealer.' Eli Verschleiser, now head of billion-dollar United Realty Trust, says

---

[1] Plaintiffs allege that it was this Ripoff Report posting which Verschleiser used as the template for his vicious postings against Frydman and his companies, as many of the postings made by Verschleiser and the Ring mimic the language of this Ripoff Report against Verschleiser.

the posting by Christopher Justice on RipoffReport.com is a lie and he's demanding that Justice remove it and pay him $100,000 in damages. Justice could not be reached for comment. Verschleiser, 39, said through a spokesman that he knew two Christopher Justices growing up but he has never known an alleged drug dealer named Leon Coronas as Justice alleges."

10.     In fact there is no Christopher Justice.  That name was the nom de guerre of the person who posted the Ripoff Report posting about Verschleiser, believed to be a former business partner of Verschleiser's in his on-line casino business. Verschleiser knew that Christopher Justice was not a real person.

11.     On July 1, 2013, Verschleiser filed a civil suit in the Supreme Court, New York County, against a Christopher Justice seeking $100,000 in damages for the blog post's "defamatory" assertions.  The suit identified Justice as living at 720 Lenox Avenue, Apartment 27A, New York, New York 10039.  Verschleiser verified the content of the suit, including Justice's address, under oath.  On September 9, 2013, a process server named Travick Stewart averred that he visited the address, received confirmation from an unnamed party that Justice lived there and then posted the complaint on the door of the relevant apartment (27A) when nobody answered.

12.     However, there is no indication that a Christopher Justice ever lived at that address or that, if he did, he was ever aware of the lawsuit.  A variety of public record searches of the address were conducted to identify an individual named Christopher Justice.  Searches identified an elderly couple with the last name Justice (he died and she is 94 years old), but there is no record of a male child with the first name Chris or Christopher having lived there.

13.     On February 10, 2014, Verschleiser received a default judgment against Justice. Verschleiser's actions constitutes a fraud committed on the New York state court system.

14.     Contrary to Verschleiser's comments to the Daily News that "he has never known an alleged drug dealer named Leon Coronas," Verschleiser most certainly knew and associated with Leonidas T. Kourounis (AKA Leon Koronis; AKA Leon Coronis, AKA "Leon NYC") ("Kourounis").   According to Stern, Verschleiser and Kourounis were fellow ecstasy drug dealers.

15.     Kourounis was arrested in New York in February 2000, and subsequently charged with and later convicted of conspiracy to distribute controlled substances.  According to Stern, it was Verschleiser who set Kourounis up in a drug deal as an informant to avoid being arrested for his own drug trafficking.

16.     On April 11, 2001, in connection with Korounis' sentencing, Verschleiser wrote to the court as Chairman of an organization called "A Proactive Response To Today's Challenges," stating: "I am writing this letter on behalf of Leon Kourounis.…Please see Leon for the person we know him to be and understand the mistake that he made."  Kourounis was imprisoned for 24 months.

17.     Verschleiser also victimized Kourounis' brother Billy, who became disabled as a result of a car accident and received a settlement of approximately $30,000.  According to Stern, while Kourounis was in prison, Verschleiser defrauded Billy out of his settlement and used that money to pay for Verschleiser's wedding.

**The Ring's Dual Mission**

18.     The Ring has been on a mission to harm Frydman and his companies and to deceive the public virtually from the moment Verschleiser and Frydman split up as real estate partners in early December 2013 and they became competitors.  Verschleiser owns or controls (through

affiliates) Multi Group, a rival commercial real estate group.  Delforno, Pinhasi and Onica are IT professionals and former employees or consultants of United Realty.

19.     Among other unlawful activities to carry out that mission, the Ring has engaged in Internet scams on the public, especially existing and prospective investors in investment funds controlled by Frydman, among which is a public REIT.  It has done so by Verschleiser – helped by Veen, Svisch and Merchansky – making false and fraudulent claims against Frydman on fake websites, blogs and other Internet postings under a variety of names that misuse his name and likeness, and the names and marks of United Realty.  Veen, Svisch and Merchansky are all Ukrainian residents.  Veen is a long-time associate of Verschleiser who holds himself out as a vice president of Multi Group, and who is a "handler" and "fix-it man" for Verschleiser.

20.     According to Stern, Verschleiser originally met Veen because Veen was his ecstasy drug supplier.  Veen is married to Svisch, who went to high school with Merchansky, who is a Ukrainian computer programmer and website developer, and the person who hosts a number of the fake websites, blogs and other Internet postings of which plaintiffs complain.

21.     Veen's LinkedIn page states that he is a Vice President at Multi Group, yet nothing about Veen suggests that he has a background in law, finance, or real estate – skill areas that would seem to be relevant to the type of work in which Verschleiser and Multi Group are engaged.

22.     Veen and Svisch acted as intermediaries between Verschleiser and Merchansky.  The Ring's goal has been to cause investors and others not to invest or otherwise do business with Frydman and his companies by deceiving the public on the Internet, thereby harming plaintiffs.

23.     Verschleiser was forced out of those companies by Frydman as a result of a litany of "bad-boy" acts such as stealing company funds and wasting company assets.  Immediately

thereafter, the Ring engaged in the first phase of its mission – hacking.  Verschleiser and fellow

Ring members Delforno, Pinhasi and Onica seized control of the email servers and computer

networks of United Realty, Prime United and Frydman, among others.  They copied confidential

information.  They deleted company data.  They blocked Frydman and other employees from

accessing company servers and their email accounts.

24.     In particular, Verschleiser hacked into the United Realty email exchange server from

his home in Brooklyn, New York (IP address 100.2.2.26 and/or 108.29.11.176) and other

locations, using his true identity, Eli.V@urpa.com, as well as at least one alias which he has

admitted is his, 2good2b4@att.net, and also using Frydman's password credentials that were

supplied to Verschleiser by Delforno.

25.     Taking control of inter alia the email servers for an essentially uninterrupted eight-

day period allowed the Ring to engage in the next phase of its mission, which took place from

December 2013 to at least March 2014: looking at plaintiffs' emails to identify certain persons

with whom United Realty and Frydman were intending to do business and then sending

anonymous emails encouraging those persons not to go forward.  Verschleiser himself has

admitted to the hacking, which also involved Delforno, Pinhasi and Onica as IT professionals.

26.     The Ring has since ramped up its unlawful activity during the ensuing phase of its

mission, from at least March 2014 on, with no end in sight.  Acting anonymously, Verschleiser,

aided by at least Veen, Svisch and Merchansky, has made false and fraudulent claims against

Frydman all over the Internet, as indicated above.  Those postings use templates to generate the

same fake reports, blogs and other social media over and over again.

27.     In mid-September 2014, the Ring took that phase even further:  Verschleiser, aided

by one or more of the Doe defendants, created false advertisement flyers that labeled Frydman as

a "Fraudster" and "Lowlife" and distributed them under the hotel room doors of approximately 1,000 industry executives attending the National Real Estate Investment Securities (REISA) Conference at Caesars Palace in Las Vegas, where United Realty was a sponsor and Frydman a featured speaker.  The Ring also created false advertisement posters that so labeled Frydman and plastered them over the real convention posters displayed during the conference.  The flyers and posters drove recipients to a fake blog entitled "Jacob Frydman Fraud", which accused Frydman of being a "fraudster", "lowlife" and a "criminal."  Verschleiser has admitted that he was responsible for the dissemination of those materials.

28.     During the same phase, the Ring extended its unlawful activities to Verschleiser and Wright successfully recruiting Akerman, an employee of United Realty and Cabot Lodge Securities, LLC ("CLS," another Frydman affiliate of which Akerman was Chief Compliance Officer), as a mole within Frydman's organization.  They had Akerman breach his fiduciary duties and steal confidential and proprietary information of United Realty, CLS and the REIT both prior to and during the first half of December 2014, including a particularly highly confidential transaction agreement with a third party.  Verschleiser has admitted to such theft.

29.     Verschleiser was looking for a lawyer he could get to join the Ring to further his scheme to bring harm to Frydman and his companies.  Verschleiser recruited Wright, an upstate attorney, whom Verschleiser had located as a result of his search for any adversaries of Frydman.  Wright had previously represented a client in a matter adverse to Frydman.  Verschleiser and Wright's hatred for Frydman were their common ground.

30.     Verschleiser located Wright and initially recruited him to speak with Julia Marsh, a reporter for the New York Post who contacted Verschleiser regarding a suit filed by Frydman.  Verschleiser, wanting to shift the focus of Marsh's story away from him, offered up Wright to

provide disparaging and defamatory statements about Frydman to Marsh regarding a property built by a Frydman affiliate almost five years earlier, to be published in her article. Wright gladly participated, making such statements, which were reprinted in Marsh's New York Post article on November 17, 2014.

31.     Having joined the Ring, Wright was also willing to abandon his ethical obligations and violate the disciplinary rules, by concocting a baseless, sham state court derivative action against Frydman, Prime United (the owner of CLS) and others which was intended to falsely accuse Frydman of reprehensible conduct and then be immediately leaked to the media. In addition, Wright, Verschleiser and Akerman hoped to use that lawsuit to derail a transaction which would have brought Prime United $4 million, and which lawsuit was based on the documents which Verschleiser and Wright persuaded Akerman to steal and send them by email over the interstate wires. Wright communicated with Akerman over interstate phone lines and by email and received the stolen documents by email, thereby committing wire fraud.

32.     At the time Wright drafted his sham lawsuit he had no clients for it, but was acting as part of the Ring and as a co-conspirator with Verschleiser and Akerman. In fact, Wright had completed drafting the complaint before he ever met with or spoke to any of the United Realty limited partners who were later recruited to act as the plaintiffs in that lawsuit. On December 7, 2014 at 7:05 PM, Wright transmitted the draft complaint by email, using interstate wires, to a group of 10 individuals, including eight whom he hoped to recruit to act as plaintiffs.

33.     The first time Wright ever spoke to or met any of the persons which he and Verschleiser recruited to act as plaintiffs was at or after 8 PM on December 7, 2014, when Verschleiser caused his in-house attorney, Asher Gulko, to schedule a conference call on phone line 212-227-1001 (pin 1234#), using the interstate phone lines, so that, as Verschleiser wrote in

an email to Gulko, Wright could "speak with all or as many of the Limited Partners that he can. This is at minimum simply to update them on ***his plans*** and with his experience we all hope for David to succeed" (emphasis added).

34.     Wright filed his complaint in the Supreme Court, New York County, styled as *Fishoff Family Foundation v. Frydman*, Index No. 653838//14 (the "Fishoff Lawsuit"), based on the documents he and Verschleiser persuaded Akerman to steal.  The complaint is barely more than hyperbole and wildly outrageous and unsupportable allegations against Frydman, his companies and the independent directors of the REIT.  Verschleiser, Wright and Akerman conspired to file that complaint in order to disseminate the defamatory accusations against Frydman to the public and the press – again as part and parcel of the Ring's mission.  Wright accomplished just that when he filed the complaint and preliminary injunction papers (which included the transaction agreement and other confidential financial information) on NYSCEF on December 15, 2014.

35.     On January 5, 2015, this Court issued a temporary restraining order (later converted to a preliminary injunction) against Verschleiser, Multi Group, Akerman, the five Fishoff Lawsuit plaintiffs, Wright and others, prohibiting them from using or disclosing or further disclosing the confidential documents and information stolen by Akerman and Verschleiser.  It found that that the plaintiffs initiated the Fishoff Lawsuit based on the stolen confidential information and trade secrets of CLS and United Realty (01.05.15 Hearing Tr. 65).

36.     Notwithstanding the TRO prohibiting the further use, distribution or publication of the stolen documents, and the fact that the Fishoff Lawsuit was then "under seal," it was leaked to Investment News.  Frydman was contacted by Investment News and asked for comment.  He inquired how Investment News was aware of the Fishoff Lawsuit complaint since it was under seal.  The Investment News reporter disclosed that the complaint was "sent to him by email."

- 11 -

37.    Frydman deposed each of the five Fishoff Lawsuit plaintiffs or their principals, and to a man, they each testified under oath that:

- they had no basis for making the allegations set forth in the complaint or the (subsequent) amended complaint;

- they knew of no facts to support the allegations;

- they had no evidence to support the allegations;

- they did not know why, or the basis upon which, each of the allegations was made;

- they relied on their attorney to make sure that the allegations were true and correct;

- they did not suffer any damages as a result of any of the claims asserted in the complaint or the amended complaint;

- they did not meet or speak with Wright in advance of the complaint being drafted;

- they were not paying Wright's legal fees (but believed that Verschleiser was);

- they did not know how it was that Wright became the lawyer in the Fishoff Lawsuit (but assumed Verschleiser brought him in); and

- they did not provide Wright with any of the allegations or any of the facts on which to base the allegations made in the complaint.

38.    Notwithstanding that he had no input into the allegations of the complaint from any of the Fishoff Lawsuit plaintiffs, Wright verified the complaint under penalties of perjury, stating that "[t]he basis for my knowledge herein is (a) information supplied directly or indirectly by the clients, (b) documentary evidence provided by the clients and others, (c) public litigation records, and (d) public securities filings."

39.    Although the court in the Fishoff Lawsuit dismissed all the claims asserted against the independent REIT directors, the plaintiffs eventually dismissed the claims against the purchaser in the $4 million confidential transaction, and four of the five plaintiffs (using other counsel) voluntarily dismissed their claims against Frydman and all his affiliates, the transaction was lost

as a result of the wrongful initiation of the Fishoff Lawsuit because before being dismissed out, the purchaser pulled out of the deal.

40.      Verschleiser then had Akerman commence a baseless, sham state court action against Frydman, *Akerman v. Frydman*, Index No. 650351/15 (the "Akerman Lawsuit"), in early February 2015 fabricating a claim that he acted as a whistleblower rather than a thief.  Once again, Verschleiser did so in order to disseminate the Lawsuit's defamatory statements against Frydman to the public and the press.

41.      Similarly, in mid-February 2015, Akerman, acting at Verschleiser's request and using information supplied by him, manufactured claims against Frydman concerning a nominal transaction which occurred almost two years earlier.  Akerman did so in a scathing whistleblower complaint against Frydman and the REIT in a letter to the SEC Office of the Whistleblower (the "False Claims Letter"), on which he copied 17 third parties.  Verschleiser has admitted that he was responsible for the False Claims Letter.

42.      Just a week later, however, Akerman discontinued the Akerman Lawsuit with prejudice and retracted the False Claims Letter "based on apparent misrepresentations made to me by a third party," i.e., Verschleiser.

## JURISDICTION AND VENUE

43.      This Court has original jurisdiction over plaintiffs' RICO, CFAA, ECPA and SCA claims pursuant to 28 U.S.C. § 1331.

44.      This Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), which are so related to their federal claims as to form part of the same case or controversy.

45.     Venue in this District is proper under (a) 28 U.S.C. § 1965(a) because defendants reside, are found, have an agent, or transact their affairs in this District; (b) 28 U.S.C. § 1965(b) because the ends of justice require that any defendant residing in another District be brought before this Court; (c) 28 U.S.C. § 1391(b) as well in that a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this District; and (d) principles of pendent venue because all claims arise out of the same nucleus of operative facts.

## PARTIES

46.     Frydman is an individual, maintains his principal place of business within this District, and is a citizen and resident of the State of New York.

47.     Frydman is a principal in numerous businesses that invest in, develop or manage real estate which he operates as the "United Realty Group of Companies."  In particular, Frydman is the CEO and Chairman of United Realty Trust Incorporated, a public non-traded REIT ("United Realty Trust" or the "REIT"), and CEO and Chairman of United Realty, a private real estate investment and advisory firm which acts as an external advisor to the REIT.  The REIT is currently in process of a public offering of over $1 billion of its common stock.

48.     Frydman is also the CEO and Chairman of the board of Prime United, a financial services holding company which owns CLS, a FINRA member broker dealer which acts as the dealer manager for the offering of securities by the REIT to the public, and of CL Wealth Management, LLC ("CLWM"), an SEC Registered Investment Advisor.  In addition, Frydman is Chairman of CLS.

49.     United Realty is a Delaware limited partnership, with an office at 60 Broad Street, New York, New York 10004.

50.     Prime United is a Delaware limited liability company, with an office at 60 Broad Street, New York, New York 10004.

51.     Verschleiser is a citizen and resident of the State of New York with a residence at 3501 Avenue T, Brooklyn, New York 11234.  At all relevant times, Verschleiser has acted individually and on behalf of Multi Group.

52.     Verschleiser was arrested on April 16, 2012 for committing the offense of criminal impersonation of a police officer in the second degree (PL 190.25-3).  *See People of the State of New York v. Eliyahu Verschleiser*, Criminal Court of the City of New York, County of Queens, No. 2012QNO21085.

53.     That is not the first time Verschleiser had been arrested, indicted or convicted of a crime.  Verschleiser had previously been indicted by a federal grand jury for bank fraud under 18 U.S.C. § 1344 in connection with a "scheme to cause financial institutions to make payments upon forged, counterfeit and worthless checks, to obtain the proceeds of those checks and to conceal the proceeds of those checks."

54.     Rather than face those charges Verschleiser fled to a foreign country.  He returned approximately two years later and was convicted in a plea bargain of one count of failure to appear, in violation of 18 U.S.C. § 3146(a)(1) and (b)(l)(B).

55.     Akerman is a citizen and resident of the State of New York with a residence at 73 Marvin Avenue, Rockville Center, New York 11570, and was, until his termination for cause on December 15, 2014, a United Realty employee and chief compliance officer of CLS.

56.     Wright is an attorney and a citizen and resident of the State of New York, with an office at 1012 Park Street, Peekskill, New York 10566.

57.     Multi Group is a New York limited liability company used by Verschleiser to invest in and develop real estate, and which operates as an umbrella organization for other entities owned or controlled by Verschleiser, including Multi Capital, LLC, Multi Capital Group I, LLC, and Multi Investments, each having their principal place of business at 44 Wall Street, Second Floor, New York, New York 10005.

58.     It is noteworthy that Verschleiser chose "Multi Group" as the name for his umbrella entity.  "Multi Group," according to Wikipedia, is a "business conglomerate in Bulgaria mostly known for its alleged involvement in various scandals and organized crime.  Its founder is the Bulgarian businessman Iliya Pavlov, who was its leader until his assassination on March 7, 2003. In 1995, the Minister of Internal Affairs of the Republic of Macedonia, Ljubomir Frckoski, publicly claimed that 'a powerful multinational company from neighboring country' was behind the assassination attempt of Kiro Gligorov on 3 October 1995, with the Macedonian media pointing at Multigroup as a suspect."

59.     Delforno was the former head of IT for United Realty until February 14, 2014, and is a citizen and resident of the State of New York with a residence at 2952 West 33rd Street, Apartment 2D, Brooklyn, New York 11224.

60.     Pinhasi is a former IT executive with United Realty, and is a citizen and resident of the State of New York with a residence at 254 West 98th Street, Apartment 64, New York, New York 10025.

61.     Onica is a former IT consultant for United Realty, and a citizen and resident of the State of New York with a residence at 8 Riverside Drive, Apartment B1, Cranford, New Jersey 07016.

62.     Veen (aka Philip Alex Veen and Alex Philip Veen), is a United States citizen and a reputed drug dealer who claims to be associated with several companies, including Multi Group (since 2004), of which Verschleiser is the Founder and Chairman.  Veen is believed to currently reside in Ukraine.  His most recent address in this country is 27322 Country Place NW, Stanwood, WA 98292, which is apparently the current address of his mother and her husband.

63.     Svisch is Veen's wife, was a classmate of Merchansky, and is a resident of Ukraine.

64.     Merchansky is a computer programmer, website developer and a citizen and resident of Ukraine.  Merchansky goes by the nickname Sasha.  Merchansky formed and/or hosts and maintains 13 websites targeting Frydman and his companies, as detailed below.  Eight of these domains have been paid for and are exclusively controlled by the operator(s).  The other five are subdomains on free hosting sites on which content may be posted by outside web users.

65.     Plaintiffs are ignorant of the true names and capacities of the defendants sued as Does 1 through 15 inclusive, and therefore sue these defendants by such fictitious names.  Each of the Doe defendants is responsible in some manner for the conduct alleged, having agreed to become part of the Ring to commit various acts of mail or wire fraud for the common purpose of harming Frydman and his companies and deceiving the public.

## FACTUAL ALLEGATIONS

66.      In 2011, Frydman and Verschleiser, who had known each other for several years as a result of their involvement in New York real estate, but had not been in business together, joined forces to sponsor the REIT, through which they planned to raise in excess of $1 billion of equity for investment in real estate, and engage in other business interests.

67.     In pursuit of such business interests, Frydman and Verschleiser formed, and as of December 2, 2013 jointly owned or controlled, directly or through a variety of affiliates, more

than 20 entities (the "Entities"), including United Realty, Prime United, CLS, the REIT and United Realty Advisor Holdings, LLC ("URA Holdings").

68.     Prior to that date, Frydman was CEO and Chairman, and Verschleiser was President and a member of the board, of both the REIT and United Realty, and they held management or board positions with each of the other Entities.

69.     On December 2, 2013, due to Verschleiser's failure to adequately perform his company duties, among other things, and pursuant to the governing agreements of the Entities, Frydman removed Verschleiser as a manager of URA Holdings via a removal notice.  At the same time, Frydman, as manager of United Realty's general partner, terminated Verschleiser's employment with United Realty (as president) for cause by serving a termination notice.

**First Predicate Acts – Wire Fraud Via Initial Hacking**

70.     In violation of the non-solicitation provision of his employment agreement, Verschleiser immediately recruited Delforno, who was still employed by United Realty as head of all of its information technology, to provide necessary computer-related assistance for hacking.  Soon, also in violation of a non-solicitation provision of his Separation Agreement discussed below, Verschleiser employed Delforno in the same capacity in setting up his and his new organizations' – Multi Group, Our Place and Magenu – technology.

71.     Although Delforno continued to be employed by United Realty through February 14, 2014, he was expressly prohibited from accessing Frydman's email mailbox and that of every other United Realty employee from at least the fall of 2013.  Any such access exceeded Delforno's authority.

72.     Specifically, all United Realty employees are subject to the terms of its employee manual.  During the period of Verschleiser and Delforno's employment, the United Realty employee manual provided in relevant part:

a.  If through your employment with United Realty you have access to "personal identifying information" of any United Realty employee, you may not distribute or communicate this information to third parties, including clients, visitors, service providers, or the general public. Personal identifying information includes...personal email address, Internet identification name and/or passwords;

b.  Do not share United Realty passwords with anyone, including administrative assistants or secretaries. All passwords are to be treated as sensitive, Confidential United Realty information.…Don't reveal a password over the phone to ANYONE;

c.  United Realty and client data may only be stored and accessed from the United Realty Server(s). Under no circumstances are users authorized to store, retrieve or modify United Realty and/or client documents to or from data storage devices and directories other than those provided on the United Realty servers.…Users are prohibited from changing or circumventing access controls to allow themselves or others to perform actions outside their authorized privileges.…Users are not allowed to reconstruct or recreate information or software for which they are not authorized.…Users are prohibited from taking unauthorized actions to intentionally modify or delete information or programs.

73.     Nonetheless, in excess of his authority, Delforno gave Verschleiser Frydman's password credentials.

74.     On December 2, 2013, unknown to Frydman, immediately after being served with the termination notice, Verschleiser, using those credentials, accessed and hijacked United Realty's (and Prime United, Frydman and CLS's) hosted email exchange servers, Internet domain hosting servers and computer networks, giving him unfettered control over same.  In turn, that enabled Verschleiser to hack into and intercept the emails of United Realty employees, to create backups of its email data and trade secrets, and to download, copy and then delete all of that data from its email exchange servers.

75. On December 3, 2013, Frydman advised Intermedia.Net Inc. ("Intermedia"), an Internet service provider which hosted the email exchange servers used by inter alia United Realty, Prime United and CLS, that Verschleiser was fired and was not authorized to access the United Realty email exchange system, including its email exchange servers.

76. As a result, Intermedia excluded Verschleiser from accessing those servers and locked him out of Host Pilot, the Intermedia administrative control dashboard for the United Realty email exchange account, by, among other things, causing its administrator to "lock-out" Verschleiser's alias login, 2good2b4@att.net, on December 3, 2013 at 8:43:01 a.m. PCT.

77. However, at Verschleiser's wrongful direction, on December 4, 2013, at 2:05:05 p.m. PCT, Intermedia caused another of its administrators to "un-lock" Verschleiser's login, 2good2b4@att.net, giving him unfettered access to the United Realty email exchange servers and Host Pilot, by which, until December 10, 2013, Verschleiser regained exclusive, unlawful control of United Realty's email exchange servers.

78. As of least December 4, 2013, Verschleiser recruited Pinhasi, a former IT executive with United Realty, and Onica, a third party IT consultant who had previously worked for United Realty or its affiliates, to also provide necessary computer-related assistance for hacking, and disclosed Frydman's password credentials to them. On December 4, 2013, Verschleiser, with the help of Delforno, Pinhasi and Onica, wrongfully enabled Frydman's email account and changed the password on that account to one only Verschleiser knew, giving him the ability to access both the United Realty email exchange server and Frydman's email account undetected while denying Frydman rightful access. Verschleiser, with the same help, hijacked other United Realty employees' email accounts the same day as well.

79.     Meanwhile, as a public company with SEC reporting obligations, the removal of Verschleiser as manager of URA Holdings and termination of his employment as president of United Realty triggered a four-day period for the REIT to file a Form 8-K with the SEC disclosing those events.

80.      Verschleiser did not wish to have the basis of his termination publicly disclosed and negotiated a settlement which included rescinding of the removal and termination notices in exchange for his voluntary resignation from the boards of United Realty and the REIT.

81.     Just after midnight on December 4, 2013, Verschleiser and Frydman and certain of their respective affiliates executed a Sale and Purchase of Membership Interest Agreement (the "Separation Agreement").  Pursuant to the Separation Agreement, in exchange inter alia for Frydman's affiliates agreeing to make certain payments to Verschleiser and rescinding the termination and removal notices, Verschleiser voluntarily resigned from each and every position or office he held with United Realty, the REIT and each of the other Entities, and he and his affiliates sold and transferred to Frydman's affiliates all of his direct and indirect ownership interest in all but two of the Entities (the "Sold Entities").

82.     As a result, as of December 4, 2013, Verschleiser ceased being a manager, officer, director or employee of any of the Entities, and had no further right, title or interest in any of the Sold Entities, and agreed that he would not represent himself as being a manager, officer, director, member, employee, agent or representative of any of the Entities for any purpose.

83.     Verschleiser also agreed, at Section 10 of the Separation Agreement, that for a period of 18 months thereafter: (a) he will not, alone nor in concert with others, directly or indirectly, employ or solicit the employment of, or assist others in employing or soliciting the employment of, any individual employed by any of the Entities; and (b) he will not disparage or encourage or

induce others to disparage Frydman or his businesses.

84.     Verschleiser also, agreed at Section 25 of the Separation Agreement, "to restore all exchange servers, web hosting and the Entities' computer servers to their status on or before November 15, 2013 and to provide Frydman with all owner and administrative passwords by the close of business on December 5, 2013."

85.     Notwithstanding such undertaking, Verschleiser failed and refused to restore the United Realty email exchange servers, web hosting servers and computer network to their status on or before November 15, 2013.  As a result, through December 10, 2013, Frydman and other United Realty employees were shut out of their email accounts, were unable to send or receive any company emails, could not access Host Pilot, and could not gain access to United Realty's hosted Internet domain servers or the United Realty computer network.

86.     While in complete control of United Realty's technology, through December 10, 2013 (the "Initial Infiltration Period"), Verschleiser, helped by Delforno, Pinhasi and Onica, set the stage for an intensive long-term program to wrongfully access plaintiffs' confidential and proprietary information and trade secrets, intercept email communications, and conduct other improper activities in connection with United Realty's email exchange servers, networks and domains or subdomains with the intention of causing harm to plaintiffs.

87.     During the Initial Infiltration Period, Verschleiser, with such help, illegally hacked into and intercepted the emails of United Realty employees, created back-ups of its email data and trade secrets, and downloaded, copied and then deleted all of that data from its email exchange servers, permanently depriving United Realty of its important confidential and proprietary information, data and trade secrets.

88.     In furtherance of the Ring's mission, Verschleiser caused Onica to download the stolen back-ups of plaintiffs' email data and trade secrets, and copy them onto a portable hard drive which Onica gave to Pinhasi.  Pursuant to instructions from Verschleiser, Pinhasi took the portable hard drive containing all of the stolen backup files and had them uploaded on Multi Group's Intermedia exchange server and/or on Multi Group's new server located at offices rented by Multi Group, Magenu or one of Verschleiser's other companies, which were previously occupied by a company called Bug Off, a pest control company, and now Verschleiser's new Brooklyn location.

89.     One of numerous examples of Verschleiser hacking into Frydman's email account occurred on January 16, 2014.  Verschleiser accessed Frydman's email account using Frydman's login credentials on that day using Verschleiser's computer ELI-X1CARBON from the IP address 74.108.218.147 from his new Brooklyn location at 1:22 PM PST.  On that same day, two minutes earlier, Verschleiser accessed his Magenu account using his Multi Group login credentials from the same IP address and location.  On that same day, Frydman accessed his email account using his own credentials at various times between 1:12 PM and 1:34 PM PST from his offices on Wall Street in Manhattan from his IP address 38.104.167.138.

90.     Verschleiser also created aliases and distribution list members through which he would continue to have undetectable access to United Realty's email exchange servers and be able to intercept plaintiffs' data long after the Initial Infiltration Period.

91.     In that regard, on December 9, 2013, without authorization, Verschleiser accessed the United Realty exchange server and created a Distribution List 'eli.v@urpa.com' to forward unread emails which were to go to Frydman's and other employees' mailboxes, so that

Verschleiser was able to and did divert, intercept and forward to himself emails that were being sent to Frydman and other company employees contemporaneously with their transmission.

92.     On December 10, 2013, without authorization, Verschleiser wrongfully and illegally created another Distribution List named 'Ahuva.s@urpa.com' to forward unread emails which were to go to Frydman's and other employees' mailboxes so that Verschleiser and Slomovitz were able to and did divert, intercept and forward to themselves emails that were being sent to Frydman and other company employees contemporaneously with their transmission.

93.     Late one evening during the period of December 5 to December 10, 2013, Frydman discovered Pinhasi sitting at a desk in Frydman's offices accessing data from the company server. When Frydman asked Pinhasi what he was doing, Pinhasi said he was acting on behalf of Verschleiser.

94.     Verschleiser hacked into the United Realty email exchange server from his home in Brooklyn, New York (IP address 100.2.2.26 and/or 108.29.11.176) and other locations, using his true identity, Eli.V@urpa.com and subsequently eli.v@multigroups.com, as well as Frydman's login and his password credentials which Verschleiser obtained from Delforno, and at least one alias he has admitted is his, 2good2b4@att.net, through Host Pilot.

95.     Verschleiser used an alias and at times logged in as Frydman so that neither Frydman nor anyone else at United Realty would know that Verschleiser had wrongfully accessed and backed up company email accounts.

96.     The initial hacking was thus carried out by email and through the Internet, thus by use of the wires.

97.     The hacking thus comprised a scheme or artifice to defraud or for obtaining United Realty and Frydman's property by means of false or fraudulent pretenses.

98.     Verschleiser spent dozens of hours manipulating Host Pilot through his known log-in "Eli.V@urpa.com" as well as his alias "2good2b4@att.net", which he conceded in discovery in state court litigation belong to him.  The level of technical skill necessary to do what Verschleiser did in Host Pilot is way beyond the skill of the typical email user.

99.     Verschleiser has often stated that he began his career in the on-line casino business, and the on-line pornography business, and gained his intricate knowledge of computers and information technology as a result of those endeavors.  However at a deposition on July 23, 2014, Verschleiser, under oath, denied that he had ever accessed the Company's Host Pilot, and at times he even denied that he knew what Host Pilot was.

100.    Thousands of pages of logs evidencing Verschleiser's technological knowledge of accessing and manipulating settings in Host Pilot exist, and at least one email from Delforno to Verschleiser, dated December 4, 2013, exists providing step-by-step instructions on how to change "permissions" on Host Pilot, including a screenshot of its permissions settings.

101.    The hacking during the Ongoing Interception Period was carried out by email, and through the Internet, thus by use of the wires.

**Second Predicate Acts – Wire Fraud Via Subsequent Hacking**

102.    In fact through at least March 2014 (the "Ongoing Interception Period"), unbeknownst to plaintiffs, Verschleiser, still helped by Delforno without authorization, Pinhasi and Onica, accessed Frydman's email account at will.  At times they logged into that email account as themselves or aliases which they created, including from Verschleiser's computer named ELI-X1-CARBON.  At other times they used various services provided by companies that enable the masking or encryption of IP identities, logging in to Frydman's email account as Frydman from IP addresses used by Verschleiser so as to disguise themselves as Frydman.  At

all times they did so the purpose of infiltrating Frydman's email account un-noticed and intercepting his emails.

103.    In that regard, on January 9, 2014, without authorization, Verschleiser had Delforno access the United Realty exchange server to create an active directory under the name 'catchall@urpa.com' and then cause a POP/IMAP email forwarding system to be created for 'CatchAll@urpa.com' such that Verschleiser, Slomovitz and Delforno were able to and did divert, intercept and forward to themselves emails that were being sent to Frydman and other company employees contemporaneously with their transmission.

104.    The actions of Verschleiser, Delforno, Pinhasi and Onica during the Initial Infiltration and Ongoing Interception Periods are more particularly detailed in the timeline of events through March 28, 2014 attached as Exhibit A and incorporated here by reference.

105.    Intermedia determined that during the period of January 12 to February 11, 2014, a computer workstation called "RDELFORNO-X1", i.e., Delforno's, accessed Frydman's email account 78 times, and another computer workstation "ELI-X1CARBON", i.e., Verschleiser's, accessed that account 46 times.

106.    Using services provided by Surfeasy, a company that enables those wishing to hide their on-line identities to mask their IP addresses, Verschleiser or one or more Doe defendants established anonymous email accounts and identities – specifically "informedconsumer@mail.com" and friendsofEli@gmx.com". They did so in order that Verschleiser could transmit "anonymous" disparaging emails to persons with whom Frydman was dealing, whose identities could only have been obtained by hacking into his email account.

107.    By virtue of the illegal hacking, Verschleiser learned that Frydman was negotiating a $10 million loan to finance the acquisition of a medical office building in Myrtle Beach, South

Carolina, as well as the identity of the bank, Bancorp, and the identities and email addresses of the individual bankers with whom he was dealing.

108.    Also by virtue of the illegal hacking, Verschleiser discovered that Frydman was negotiating a new corporate headquarters sublease for space in the building at 180 Maiden Lane, as well as the identity and email address of the sub-landlord, Opera Real Estate, with whom United Realty was then in final negotiations to execute a very favorable $1.4 million sublease at below market rent.

109.    Armed with that information, on February 10 and 11, 2014, Verschleiser sent or directed to be sent highly disparaging and defamatory "anonymous" emails from informedconsumer@gmail.com, using the same Surfeasy IP address that he used to hack into Frydman's email during that same period, to the bankers and the sub-landlord, each stating:

"As an informed consumer we wish you to be one as well.  You are about to enter into an agreement with an individual who alledgedly [sic] does anything and everything NOT to pay his vendors and or circumvent any written agreement he or his affiliated entities have.  As long as it is to his benefit he 'may' pay in partial, but as soon as he chooses to he will 100% stop paying and choose to litigate the matter.  Do a simple Nexus Lexus search and look closely into his litigous [sic] nature and background.  Do a google search 'Jacob Frydman Fraud' 'Jacob Frydman Lawsuit' and think twice.  Ask yourself, why so many company [sic] names over such a short period of time?  Every two to 4 years a new 'venture'?  Be an informed consumer, dont [sic] get hurt.  Speak to ANY ex employee, any ex creditor, from bank to local phone company, from office supplies company to landlords.  The record speaks for itself.  Speak not to someone currently doing business with Mr Frydman, speak to 3 former companies that did, former employees, or partners that have.  Be an informed consumer, dont [sic] get hurt."

110.    As a result, both the $10 Million loan and the $1.4 million sublease were lost.

111.    The hacking during the Ongoing Interception Period was carried out by email and through the Internet, thus by use of the wires.

112.    The hacking thus comprised a scheme or artifice to defraud or for obtaining United Realty and Frydman's property by means of false or fraudulent pretenses.

**Expenditures, Other Losses And Damage As A Result Of The Hacking**

113.     Also, on or about December 2, 2013, when Frydman was first locked out of his email mailbox, Plaintiffs retained Alpha Group, a technology investigation firm, to assist in conducting a damage assessment concerning Verschleiser's hacking.  Those services cost plaintiffs in excess of $20,000 through in or about March 2014.

114.     Shortly afterwards, plaintiffs also retained Precision IT, a New York IT consulting services and tech support services firm, to assist in conducting a damage assessment and restore conditions to prior to the interruption of service caused by the hacking.  Those services cost plaintiffs in excess of $20,000 during 2014.

115.     During June 2014, plaintiffs retained Global Digital Forensics, Inc., a forensic computer investigation firm, to assist as well in conducting a damage assessment concerning Verschleiser's hacking.  Those services cost plaintiffs in excess of $24,000 during 2014.

116.     In or about February 2015, plaintiffs retained Defensative, a security service provider, to also assist in conducting a damage assessment concerning Verschleiser's hacking.  Those services cost plaintiffs in excess of $4,500 during 2015.

117.     In addition, Frydman and other United Realty personnel spent many hours of valuable time away from day-to-day responsibilities assisting in investigating the hacking, at a cost to plaintiffs in excess of $250,000 through in or about March 2014.

118.     Plaintiffs incurred damage in excess of $500,000 through in or about March 2014 as a result of Verschleiser's deletion and theft of privileged and confidential files, data and other information from their computers, which exceeded 10 in number, representing the value of that information and the cost of recreating it.

**Verschleiser Files The First Defamatory Lawsuit**

119.    Meanwhile, on December 18, 2013, Verschleiser and two of his companies filed a

baseless, sham state court lawsuit, *DJZV Holdings, LLC v. Frydman*, Index No. 654346/13 (the

"First Defamatory Lawsuit"), falsely asserting that Frydman failed to return investor funds in the

amount of $4.9 million, when in fact, Verschleiser knew that Frydman had previously instructed

Citibank to immediately return those funds by wire transfer and that the funds had been returned.

120.    Verschleiser was well aware that Frydman instructed Citibank to return those funds

by wire transfer because he had intercepted private emails between Frydman and Joseph

LoParrino ("LoParrino"), United Realty's Chief Accounting Officer, and LoParrino and

Citibank, through which Verschleiser learned that LoParrino forwarded Frydman's wire

instructions to Citibank to return said funds by immediate wire transfer.  Verschleiser attached

those intercepted instructions as an exhibit to the complaint in the First Defamatory Lawsuit.

121.    Verschleiser disclosed the information he learned as a result of his interception of

Frydman and LoParrino's emails to his lawyer, Jay Itkowitz ("Itkowitz"), and his wife, Jennifer

Zoldan ("Zoldan").

122.    Indeed, Verschleiser tried to force Citibank to not make those wire transfers (thereby

hoping to give credence to his false accusations) by having his lawyer and his wife demand that

it not do so because Verschleiser wrongfully asserted rights to those funds.

123.    Because Verschleiser had no rights to the accounts which held the funds which were

being returned to investors, having given them up in the Separation Agreement, Citibank refused

to honor his lawyer and his wife's demands, and the funds were returned to the investors before

the First Defamatory Lawsuit was filed.  Verschleiser nonetheless initiated it.

124.    Less than a month later, on January 13, 2014, Justice Bransten dismissed the Lawsuit

with prejudice (based on the existence of an arbitration agreement).

125.    As he admitted was his purpose in a telephone call to Frydman on December 18, 2013, Verschleiser initiated the Lawsuit for the sole purpose of fabricating a basis for the later dissemination of information intended to defame Frydman and his companies.

126.    Verschleiser effected his defamatory purpose by immediately leaking the First Defamatory Lawsuit to reporters at the *Real Deal, Law 360* and *Investment News*.

127.    In turn, those publications republished the aforementioned false accusations. For one thing, on December 22, 2013 the Real Deal published an article wherein it reported: "Eli Verschleiser, formerly of United, alleged in New York state court that United and Its CEO Jacob Frydman improperly transferred $6.9 million of investors' funds after Verschleiser resigned. Frydman still controls the funds, the suit says."

128.    The statement is false and fraudulent in that United and Its CEO Jacob Frydman did not improperly transfer $6.9 million of investors' funds. To the contrary, all investor funds were returned prior to the initiation of the First Defamatory Lawsuit.

129.    On or about April 17, 2014, Verschleiser sent a written defamatory statement to the *Real Deal* stating:

"He [Frydman] lost in court and the judge did not award him the injunction. I ultimately decided to resign as the President and Treasurer of United Realty Trust due to the fraud and actions of my ex-partner Mr. Jacob Frydman as outlined in my lawsuits against him.

130.    The *Real Deal* re-published Verschleiser's defamatory statement that day.

131.    The statement is false and fraudulent in that the state court has yet to rule on Frydman's injunction application; Verschleiser did not resign as the President and Treasurer of United Realty Trust due to the fraud of Frydman; and Frydman did not commit any fraud or take any other wrongful actions.

132.    As detailed below, Verschleiser has on two other occasions also initiated or caused the initiation of baseless, sham lawsuits against Frydman or his companies for the same defamatory purpose.

133.    As soon as he files or cause to be filed these baseless lawsuits, Verschleiser leaks copies of the complaint to the media.

**Verschleiser Manufactures Fake Evidence**

134.    Verschleiser appealed Judge Bransten's dismissal, and filed a motion for reargument. In that motion, Verschleiser fabricated supposed "new evidence" in the form of two bogus letters, each dated November 29, 2013 (the "November 29th Letters"), the first entitled "Notice of Removal" (of Frydman) and the second purporting to terminate Frydman's employment (*see* Index No. 654346/13, NYSECF Doc. Nos. 62-63 (Motion Seq. 003, Verschleiser mov. aff., Exhs. C-D)), pursuant to which Verschleiser falsely claimed that it was not Frydman who removed or terminated Verschleiser on December 2, 2013, but rather it was Verschleiser who removed and terminated Frydman first, on November 29, 2013.

135.    Specifically, Verschleiser submitted a February 18, 2014 moving affidavit proffering the November 29th letters and averring in paragraphs 11 through 13 that:

> On November 29, 2013, following a series of breaches, misrepresentations, and "bad boy acts"…Frydman was removed for cause as a Manager of United Realty Holdings, LLC....In addition, the General Partner of United Realty Advisors, LP terminated Frydman's employment with United Realty Advisors, LP….After being served with the Notice of Removal for Cause and the Notice of Termination of Employment, Frydman allegedly served me with substantially similar notices….

136.    Verschleiser's affidavit was false and fraudulent and constitutes the perpetration of a fraud on the court.

137.    In truth, the November 29th Letters did not exist on November 29, 2013.  The pdf files of those Letters in native file format reveal metadata that prove that the letters were actually

created on December 3, 2013, *after* Verschleiser received and then copied the December 2, 2013

removal and termination notices from Frydman.

138.     On February 24, 2014, an email was sent by or at the direction of Verschleiser from

"FriendsOfEli@gmx.com" to Craig Gould ("Gould"), the CEO of CLS, which stated:

> If you haven't seen Eli's filing last week jump online and take a look…Look at Eli's letter
> terminating Jacob…Be careful – you might want to exit before the sexual harassment suits,
> class action suits, Eli and [M]orty's suits all coming!  Warning you, better have insurance
> protecting you!  You've been warned.It will be a messy 30 days.  Be careful!

139.     The email directed Gould to the November 29th Letters.

140.     On April 14, 2014, Verschleiser transmitted an email to David Newman, a member of

the board of directors of the REIT, attaching the November 29th Letters and stating: "I was told

that I should share this with you as it is likely to become a very public story in the near future. It

seems apparent that the board is unaware of any of this.…"

141.     As noted, the November 29th Letters were fake.  In them Verschleiser falsely and

fraudulently stated inter alia that Frydman made unauthorized distributions to himself; made

fraudulent disclosures to the SEC; fraudulently induced investors, including Alan Stahler

("Stahler"), to make loans to the Company; conspired to defraud investors; made materially

dishonest representations of fact at public conventions and conferences; acted in a morally

reprehensible manner; and dealt with employees in a sexist, condescending and vulgar sexual

manner.

142.     Each of those statements were false in that Frydman did not make unauthorized

distributions to himself; did not make fraudulent disclosures to the SEC; did not fraudulently

induce investors, including Stahler, to make loans to the Company; did not conspire to defraud

investors; did not make materially dishonest representations of fact at public conventions and

conferences; did not act in a morally reprehensible manner; and did not deal with employees in a sexist, condescending and vulgar sexual manner.

143.    Verschleiser knew that the statements made by him about Frydman in the (fake) November 29th Letters were false and fraudulent, and were intentionally made by Verschleiser to deceive the readers of said letters, with the intent of harming plaintiffs.

**Third Predicate Acts – Wire Fraud Via Internet Scams**

144.    Since at least as early as March 21, 2014, Verschleiser, helped by Veen, Svisch, Merchansky and one or more of the Doe defendants, has sought to perpetuate Internet scams on the public, and specifically on unsuspecting existing and prospective investors and business associates of Frydman using his name and likeness and the name and marks of his businesses on websites, blogs and other postings under a variety of names that misuse and infringe upon his name and likeness, and the names and marks of United Realty.  Those postings use templates to generate the same fake reports, blogs and other social media with the intent to cause and causing existing and prospective investors and business associates of Frydman not to do business with him and his companies.

145.    In today's digital world, Frydman's existing and prospective investors and business associates typically undertake some level of due diligence by searching the Internet through web browsers such as Google, Yahoo and Bing, where, since at least March 21, 2014, they have encountered a barrage of seemingly endless websites, blogs and other postings created and published, transmitted or distributed by or at the direction of Verschleiser.

146.    The websites, blogs and other postings are made to look like legitimate online postings containing "reviews" in which individuals claim to have been defrauded, cheated or otherwise wrongly treated by Frydman.

147.    None of the postings emanates from a legitimate organization and several of the websites are fake.

148.    The postings are variations based on templates, often with identical content appearing on numerous seemingly unrelated websites and blogs.

149.    For example, many sites use the same photo of Frydman with the word "FRAUD" emblazoned on, over and/or under the photo.

150.    Since March 21, 2014, Verschleiser, alone or with the assistance of Veen, Svisch, Merchansky and one or more of the Doe defendants, has made at least 170 such false and fraudulent and disparaging posts in a continuous, ongoing scheme to deceive the public and cause injury to Frydman and his businesses, including the plaintiff companies.

151.    On March 21, 2014, Verschleiser posted or caused to be posted a false and fraudulent report allegedly by an "Ex Employee Whistle Blower" entitled "Jacob Frydman," with the subheading, "Jacob Frydman, Jake Frydman, Jake the snake Frydman, Jacob A Frydman, United Realty Partners, United Realty Trust,...Master of deception, Megalomaniac, Scam, Fraud, Thief, Criminal, Ponzi," on Ripoffreport.com, stating:

**Jacob Frydman** is trying to raise money from the public through a Non Traded REIT, **United Realty Trust**. He has induced many to work for his failing company by promising them stock as an incentive which he never delivers. His partner who funded the company resigned and sued him for stealing and fraud. Jacob Frydman will wine you, dine you, then screw you. He does not pay his bills, even the smallest of them. He will not reimburse you. He will sign documents and then completely ignore and define them to his liking. Look closely at his track record. You will see the truth by doing some simple homework on Jacob Frydman or the dozens of failed businesses and companies he has created every few years and over the course of his career. He may have one or two success stories, but when digging deeper the truth of the success is ultimately uncovered as a failure. Can it be a scam? Is it like Madoff on a small scale? Is there a fraud taking place? How many banks are screwed? Is there a criminal hiding within? Protect yourself as the poor innocent people get hurt daily in this fictitious world of Wall Street wannabes. Ask your lawyer to do the homework before investing with any suspect.

The post is false and fraudulent in that Frydman does issue promised stock and does pay his bills.

152.     On April 12, 2014, Verschleiser posted or caused to be posted a false and fraudulent

report on ComplaintsBoard.com stating that Jacob Frydman and United Realty:

> will not return your money when you ask for it back.  be aware.  look up the ceo jacob
> frydman and it seems like he is not honest or a wall street thief.

The post is false and fraudulent in that Frydman does make redemptions and is not a thief.

153.     On April 12, 2014, Verschleiser made or caused to be made a false and fraudulent

post on ScamGuard.com from his home IP address 108.29.11.176 about the REIT entitled "They

take your investment in the stock they sell and then dont [sic] let you get the money back,"  using

the name and mark of United Realty without permission, containing a screenshot of the REIT's

website with a pair of hands emblazoned on it pulling plugs on either side of buildings depicted

on the website, and stating:

> This company is supposed to be public and audited by earnst [sic] and young. they promise
> to give you your money back and when you request it they say you can not get it back. it is a
> non- traded reit that i now see has many problems. i will call the sec to complain. Please help
> me it is all of my retirement money.

The post is false and fraudulent in that Verschleiser never invested with Frydman's REIT nor

sought any redemptions and Frydman does return money when redemptions are requested.

154.     On April 14, 2014, Verschleiser posted or caused to be posted a false and fraudulent

report on REITwrecks.com stating that "i searched Jacob Frydman and see fraud cases with this

ceo of United Realty."  The post is false and fraudulent in that there are no fraud cases against

Frydman as CEO of United Realty.

155.     On April 17, 2014, Verschleiser posted or caused to be posted another false and

fraudulent report on Ripoff Report.com stating that "Jacob Frydman will do anything to hurt

anyone."  The post is false and fraudulent in that Frydman will not do anything to hurt anyone.

156.   On June 27, 2014, Verschleiser posted or caused to be posted a false and fraudulent report on a blog on WordPress.com entitled "jacobfrydmanfraud," using the likeness (a photo) and name of Frydman without permission, and containing the following immediately under the photo: "Biggest real estate FRAUD man – Jacob Frydman."  The post is false and fraudulent in that Frydman does not commit fraud, and is not the "Biggest real estate FRAUD man."

157.   On September 5, 2014, Verschleiser supplemented or caused to be supplemented the aforementioned blog entitled "jacobfrydmanfraud" with a false and fraudulent report as follows:

> The CEO Jacob Frydman (AKA Jake The Snake) has many lawsuits against him especially for FRAUD…. Everything in his United Realty Trust prospectus is bullshit. He claims to have a track record. Look closely at each one….As a master in LITIGATION the con man Jake the Snake mobster wanna be Frydman aka Jacob Frydman has so many liens against him because he sues, loses in court and then still fights. the liens he may ultimately settle as a way to get a discount. But the records show it all. From the smallest few hundred dollars to the larger ones where he screws lawyers and lawfirms that represent him.

The post is false and fraudulent in that nothing in the REIT prospectus is bullshit, Frydman is not a snake, con man or mobster, he has no liens against him, and he does not have many lawsuits against him for fraud.

158.   On September 12, 2014, Verschleiser further supplemented or caused to be supplemented the same blog with a false and fraudulent report as follows:

> Would a lender make a loan to Jacob Frydman and his United Realty Trust ?  Many lenders have been alledaagly [sic] screwed by United Realty Trust s CEO Jacob Frydman.   MANY.

The post is false and fraudulent in that many lenders have not been screwed by Frydman as the REIT's CEO, allegedly or otherwise.

159.   On June 27, 2014, Verschleiser posted or caused to be posted a false and fraudulent report on another blog on WordPress.com entitled "jacob frydman criminal," using the likeness (a photo) and name of Frydman without permission, containing the word "FRAUD" emblazoned on the photo and containing the following below the photo: "#Jacob Frydman #Real estate

#Fraud #Criminal #Scam # Alert." The post is false and fraudulent in that Frydman is not a criminal, and does not commit fraud.

160. On June 28, 2014, Verschleiser posted or caused to be posted a false and fraudulent report on a blog entitled "JACOB FRYDMAN SCAM," using the likeness (a photo) and name of Frydman without permission, and containing the following above the photo: "Don't Become A Victim Of Real Estate & Mortgage Fraud!! REMEMBER THIS FACE!" The post is false and fraudulent in that Frydman does not commit fraud.

161. On June 29, 2014, Verschleiser made or caused to be made a false and fraudulent post on Twitter from "Jacob Frydman @FRAUD_man: STOP Real Estate Fraud!! DON'T TRUST THAT SCUMBAG", using the likeness (a photo) and name of Frydman and containing the word "FRAUD" emblazoned on the photo. The post is false and fraudulent in that Frydman does not commit fraud, and is not a scumbag.

162. On July 12, 2014, Verschleiser posted or caused to be posted a false and fraudulent report on REITwrecks.com entitled "United Realty Trust Jacob Frydman Fraud by PutJacobInJail," stating as follows:

> look into the CEO before giving them money. He clearly has many issues relating to FRAUD. Jacob Frydman of http://www.urpa.com has been sued many times for fraud
>
> One lawsuit alleges that Mr. Frydman defaulted on his personal guaranty of a $12 million loan PAF Capital made to McDonald Ave. Acquisition LLC. The suit claims that after defaulting on his guaranty, Mr. Frydman represented to PAF Capital that he could not afford to honor his guaranty and provided PAF Capital with what they now believe are fraudulent financial statements in an effort to get PAF Capital to settle with Mr. Frydman for a significant haircut. He can end up in Jail.

The post is false and fraudulent in that Frydman does not have issues with fraud, the claims asserted in the referenced lawsuit were dismissed, and Frydman is not likely to end up in jail.

163.   On July 12, 2014, Verschleiser posted or caused to be posted a false and fraudulent report on a blog entitled "JacofFrydmanFraud",  using the likeness (a photo) and name of Frydman without permission, containing the word "FRAUD" above the photo and the words "JACOB FRYDMAN SCAM Posted by jacob" below it, stating:

> It is amusing to see that the SEC and FINRA lets a complete fraud take place with a public company http://www.United Realtyrealtytrust.com Jacob Frydman steals old peoples money, has his friends and lawyers on his independent board, then buys notes with other notes and gives it to the public in exchange for cash he NEVER paid for it.

The post is false and fraudulent in that it was not posted by Frydman, Frydman does not commit fraud, he is not perpetuating a scam, there is no fraud taking place at the REIT, Frydman does not steal old people's money, and he does pay his notes and obligations.

164.   On July 15, 2014, Verschleiser posted or caused to be posted another false and fraudulent report on ScamGuard.com entitled "Jacob Frydman and United Realty - Beware: The too good to be true United Realty - Frydman new scam," using the name and mark of United Realty without permission, containing a screenshot of the REIT's website emblazoned with a pair of hands pulling plugs on either side of buildings depicted on the website, and stating:

> The CEO has many lawsuits against him especially FRAUD….Jacob Frydman steals peoples [sic] money….

The post is false and fraudulent in that Frydman does not have many lawsuits against him for fraud and does not steal people's money.

165.   On September 6, 2014, Verschleiser posted or caused to be posted a false and fraudulent report on Scamorg.com stating:

> This is the Filing the REIT just filed. This means that NONE of the money raised is going to real estate. It means he took out loans, preffered [sic] loans, and outside investors (NOT THE REIT) to buy the property, and put in a few dollars from the REIT.  So you ask WHERE IS THE money Jake Frydman raises???????????   He pays it to his other companies.  United Realty Capital, United Realty Advisors, and all the other United Realty Companies he can suck cash from. READ AND UNDERSTAND THE FINANCIALS OF THIS COMPANY

PLEASE PROTECT YOURSELF FROM FRAUD.

The post is false and fraudulent in that money raised is going to real estate, Frydman does not

pay out REIT money to his other companies, and there is no fraud going on at United Realty.

166.    On September 9, 2014, Verschleiser posted or caused to be posted another false and

fraudulent report on Reitwrecks.com entitled "Re: United Realty Trust Jacob Frydman Fraud" by

[sic] United Realty Trust » stating

> **Ask Yourself** why the CEO Jacob Frydman http://en.wikipedia.org/wiki/Jacob_Frydman(aka
> Jake the Snake) has dozens of lawsuits against him for fraud and stealing. Dozens of
> litigations many many with Fraud. Makes you wonder whats [sic] next. Madoff ???? Jake
> Frydman hires Architects, Contractors, Electricians, and Plumbers etc, for his house he calls
> Ledge Rock and then sues them all .....Why? to scare them and not to pay them. Read these
> litigations and you will be in shock! As a master in LITIGATION the con man Jake the
> Snake mobster wanna be Frydman aka Jacob Frydman has so many liens against him because
> he sues, loses in court and then still fights. the liens he may ultimately settle as a way to get a
> discount. But the records show it all. From the smallest few hundred dollars to the larger ones
> where he screws lawyers and lawfirms that represent him. He hires lawyers, leases copy
> machines, gets Internet service, hires executives and employees (dozens of them) and
> SCREWS them ALL. READ the lawsuits. There are probably hundreds more in arbitration
> but just have your lawyer get you a copy of these lawsuits and weep for those that their
> money is gone already. THE PARTIAL LIST (when you read them highlight the word
> FRAUD).... Everything in his United Realty Trust
> http://www.urpa.com/bio_frydman.htmlprospectus is bullshit. He claims to have a track
> record. Look **VERY** closely at each one.  The DHL building is only fractionally owned by
> him and he has many lawsuits against him in that deal because he is a thief and a con artists
> [sic]. He is not "the guy" who did the deal, he just lucked out and owns a share in the deal.
> He pretends to have done the old global crossing building **BUT** once again the guy only got a
> small piece of the deal as he was at the right place at the right time. He was even sued by the
> main owners of these two deal BOTH of the DEALS the Majority partners sued him. JUST
> read the "Tunnel Associates, LLC" litigation and see for yourself who did the DHL deal and
> who owns and controls it.....not to difficult to read english.  The global crossing deal he
> claims he did, just take one look at the article and lawsuits
> http://www.nydailynews.com/archives/money/nypd-horses-ousted-building-dispute-article-
> 1.639493 ask yourself, **is my money safe here**?
.
The post is false and fraudulent, as it was not posted by United Realty; Frydman does not have

dozens of lawsuits against him for fraud and stealing; Frydman does not hire architects,

contractors, electricians, and plumbers etc, for his house he calls Ledge Rock and then sues them

all; Frydman is not a con man, a Snake, mobster, or wanna be; Frydman does not have any liens

against him; Frydman does not hire lawyers, lease copy machines, get Internet service, hire

executives and employees (dozens of them) and screw them all; nothing in the REIT prospectus

is bullshit; Frydman does not have many lawsuits against him in the DHL deal; Frydman is not a

thief or con artist; he is either the sole or one of the "control" persons in both the DHL deal and

the Global Crossings deal; and Frydman was never sued by the "main owners" or "Majority

partners" in the DHL deal or the Global Crossings deal.

167.    On September 12, 2014, Verschleiser posted or caused to be posted yet another false

and fraudulent report on Reitwrecks.com entitled "Re: United Realty Trust Jacob Frydman

Fraud" by [sic] United Realty Trust," stating:

> Would a lender make a loan to Jacob Frydman and his United Realty Trust
> http://www.unitedrealtytrust.com ? Many lenders have been alledaagly [sic] screwed by
> United Realty Trust s CEO Jacob Frydman. MANY.

The post is false and fraudulent in that it was not posted by United Realty Trust and many

lenders have not been screwed by Frydman as the REIT's CEO, allegedly or otherwise.

168.    During September 2014, Verschleiser posted or caused to be posted a false and

fraudulent report on Scam.com entitled "United Realty Trust REIT," stating

> The CEO Jacob Frydman (AKA Jake The Snake) has many lawsuits against him **mostly**
> doing **FRAUD**.  If you just write in google search Jacob Frydman Fraud , or Jacob Frydman
> Lawsuit you will see so many that you will save your money.  Please do not get hurt and give
> them your money.  You worked for it. Don't let the liar salesman sell you his big return on
> real estate.

The post is false and fraudulent in that Frydman is not a Snake, does not have many lawsuits

against him mostly doing fraud and is not a liar salesman.

169.    During September 2014, Verschleiser created or caused to be created a fake LinkedIn

account under Frydman's name, violated his privacy rights and used the likeness (a photo) and

name of Frydman without permission in the process, with the word "FRAUD" emblazoned on

the photo, and stating that Frydman's employment is "SCAM at REAL ESTATE."   The

LinkedIn account is false and fraudulent in that it is fake.

170.    During September 2014, Verschleiser created or caused to be created a fake "United

Realty Trust Employee Review" on Ebosswatch.com entitled "United Realty Trust - "'Bad

Boss'", stating:

> United Realty Partners is run by a fellow named Jacob Frydman who is guaranteed to fire
> you or push you out within 9 months. Jacob Frydman will never let you do the job you know
> how to do as he always knows better. There maybe some fraud going on there as well.  When
> I was employed at United Realty Partners and CLS Securities (a Broker Dealer owned by
> Jacob Frydman and his partners) it was nice when Jacob did not show up or was traveling.
> those days everyone at our offices was relaxed and also was able to get work done. As soon
> as Jacob Frydman came in the entire situation went bad. He tried to control everything.
> Thinking he was the best thing since sliced bread. Also he gets drunk and talks crap to the
> girls, which is possible sexual harassment.

The "Employee Review" is false and fraudulent in that it is fake.

171.    During September 2014, Verschleiser created or caused to be created another fake

"United Realty Trust Employee Review" on Ebosswatch.com entitled "United Realty Trust –

'Feel under pressure waiting for FBI to raid the company'", stating:

> ….Its kind of interesting that the Fraud on Wall Street still goes on and nothing is done about
> it.… Did anyone do their homework on Jacob Frydman.

The "Employee Review" is false and fraudulent in that it is fake.

172.    During September 2014, Verschleiser created or caused to be created yet another fake

"United Realty Trust Employee Review" on Ebosswatch.com entitled "United Realty Trust –

'Under investigation for Fraud by FINRA and SEC'", stating:

> The company is run by a man who has been sued for fraud over 20 times by 20 different
> parties all in the past 10 years. Jacob Frydman seems to only know how to get by by stealing
> from others.

The "Employee Review" is false and fraudulent in that it is fake.

173.    During September 2014, Verschleiser created or caused to be created still another fake "United Realty Trust Employee Review" on Ebosswatch.com entitled "United Realty Trust – 'A public company with a bad CEO that is likely a target of investigations with the government and the SEC'", stating "If the CEO Jacob frydman would leave it would be wonderful place to work."  The "Employee Review" is false and fraudulent in that it is fake.

174.    The foregoing postings were made and the foregoing fake websites exist on the Internet, thus by use of the wires.

175.    The postings and fake websites thus comprised a scheme or artifice to defraud or for obtaining United Realty and Frydman's property by means of false or fraudulent pretenses.

176.    Plaintiffs reserve the right to add introduce such additional posts and websites containing false and fraudulent information with respect to Frydman, United Realty and his other businesses at trial.

### Fourth Predicate Acts – Wire Fraud Via False Advertisement Flyers And Posters

177.    The primary distribution channel pursued by Frydman and United Realty for the sale of shares in the REIT is through the independent broker dealer network.

178.    There are approximately 3,500 independent broker dealer firms in the United States, and each firm has one or more (some firms have more than 15,000) registered representatives who sell securities to their clients.

179.    Generally, a sponsor makes presentations at events hosted by associations which support independent broker dealers and at conferences attended by the broker dealers to introduce them to investment opportunities being offered by the sponsor.

180.    A sponsor must obtain a selling agreement with a broker dealer, which enables the broker dealer to become part of the selling group of soliciting brokers.  Only then can a sponsor

present its offering to the registered representatives of that broker dealer, who then may introduce the investment product to suitable clients.

181.    During 2011 when plaintiffs commenced registration of the REIT, the non-traded REIT and direct participation program industry raised approximately $8 billion.  During 2012, the raise was approximately $10 billion.  During 2013, the raise was approximately $24 billion. During 2014, the raise was approximately $25 billion.  The raise is expected to continue at $25 billion for 2015.

182.    While the amount of capital has tripled, the number of sponsors has significantly declined.

183.    Given the amount of capital being raised, the number of contracting sponsors, the various investment objectives and the performance metrics of the REIT, Frydman and/or United Realty should be able to raise several hundred million dollars of equity annually.

184.    There are several industry associations focusing on the nontraded REIT space, the largest of which is REISA (n/k/a ADISA).  It holds several conferences and conventions annually, the largest of which is held in the fall in Las Vegas.

185.    In 2014, the fall REISA conference was held at Caesars Palace & Convention Center on September 14 through 16.

186.    Approximately 1,000 individuals, all associated in one way or another with the non-traded REIT industry, registered to attend that conference.  Many of the attendees were product related specialists, due diligence officers or principals associated with independent broker dealers, as well as registered representatives looking to learn about new offerings.

187.   The fall REISA conference is the premier showcase for sponsors to introduce their investment products and opportunities.  Sponsors spend significant money and time preparing for the conference.

188.   Frydman through United Realty is a sponsor of the fall REISA conference and was scheduled to speak twice during the fall 2014 conference, the second time, in a special session for the entire conference, known as "Shark Tank."

189.   Verschleiser, with the help of one or more of the Doe defendants, decided to "crash" the conference in order to damage Frydman and his businesses, by distributing false advertising flyers and plastering false posters over real ones, which directed the recipient or reader, including broker dealers, registered representatives and other conference attendees, to one of Verschleiser's false and fraudulent blogs that spew vituperative falsehoods against Frydman.

190.   In particular, Verschleiser created or caused to be created false and fraudulent advertisement flyers which labeled Frydman as a "Fraudster" and "Lowlife" and sent those advertisement flyers through the mails or over the wires to one or more Doe defendants in Las Vegas, to be distributed under each hotel room door of approximately 1,000 industry executives attending the conference.

191.   On the early morning of September 15, 2014, one or more of the Doe Defendants distributed the flyers under the hotel room doors of all the conference participants.

192.   The false and fraudulent flyers stated:

**Would you invest with a fraudster?**

**Google:**

**Jacob Frydman Fraud**
**And save yourself from this lowlife.**
**Btw, he is the CEO of United Realty Trust**

- 44 -

193.     In addition, one or more of the Doe defendants plastered similar false and fraudulent advertisement posters over the 35 or more real convention posters hanging throughout the Caesars Palace convention center public spaces on September 16, 2014 commencing approximately one hour before Frydman's main conference presentation.

194.     The real posters were provided in the common space of the convention center to direct attendees to the various events, including Frydman's speaking engagement.  As attendees began coming into the convention center to go to the session at which Frydman was scheduled to speak they were greeted with the 35 or more false and fraudulent advertising posters which had the same language as the advertisement flyers distributed the prior day.

195.     Verschleiser also sent the advertisement posters through the mails or over the wires to one or more Doe defendants in Las Vegas for such plastering.

196.     The posters and flyers thus comprised a scheme or artifice to defraud or for obtaining United Realty and Frydman's property by means of false or fraudulent pretenses.

**Fifth Predicate Acts - Wire Fraud Via Additional Internet Scams**

197.     Since the fall 2014 REISA conference, Verschleiser, with the help of Veen, Svisch, Merchansky and one or more of the Doe defendants, has "upped the ante" by creating numerous additional websites and posts containing false and fraudulent information with respect to Frydman, United Realty and his other businesses (the "additional defamatory statements"), and which, in most cases, illegally use his name and likeness and the names and marks of United Realty and Frydman's other companies.

198.     One such website, a fake one named "unitedrealty-trust.com" having the URL http://unitedrealty-trust.com/, as if it were the website of United Realty Trust, inter alia describes the REIT independent directors and a former president as follows:

Robert S. Levine, a shady attorney sits on the "independent" board of United Realty Trust. Mr Levine has been involved in numerous closely held companies with Jacob Frydman, and has been a party to the Fraud thereto.

Dr. Daniel Z. Aronzon M.D., F.A.A.P. is an independent director. Mr. Aronzon is a scum laude graduate of Union where they cut his balls off.  He obviously has no clue how to read english or would see what Jacob Frydman has been involved in

David B. Newman is an independent director, and a Senior Managing Director and investment banker at Brock Securities LLC. Brock an unheard of likely unsuccesful [sic] "Investment Banking" firm.  Says much about this guy.

Rick J. Vitale [former president]: Used Car Salesman It has been said that Rick sucks Frydmans (sic) Dick all too often.

The website is false and fraudulent in that it is fake.

199.    Merchansky has admitted that since on or about October 2014, he has been working under Veen's direction to develop, host, maintain and/or operate certain websites including jacobfrydmancriminal.com; Jacob-frydmancriminal.com; Jacob-frydman.org; unitedrealty-trust.com; jacobfrydmanthief.com; jacobfrydmanfraud.com; united-realtytrusts.com; and unitedrealtyfrydman.com (the "now-Ukrainian websites").  By then, Verschleiser decided to have the now-Ukrainian websites hosted on servers located outside the United States, specifically in Ukraine.  They ostensibly had previously been hosted in this country.

200.    On information and belief, Veen's instructions to Merchansky originated with Verschleiser.  Veen is an officer of Multi Group, is a long-time associate of Verschleiser and has admitted to Frydman that "we have a mutual friend," i.e., Verschleiser.

201.    Merchansky received his instructions – and payment for his work – from Veen directly or from Svisch on Veen's behalf, including to register the now-Ukrainian websites through the Public Domain Registry.  Svisch provided Merchansky with content for the now-Ukrainian websites.

202.     Each of the now-Ukrainian websites is associated to the same name servers: NS1.RX-NAME.NET; NS2.RX-NAME.NET; and NS3.RX-NAME.NET, and each of those websites is hosted on the same IP address, 194.54.83.230, which is located in Ukraine.

203.     The additional (and initial) defamatory statements were published using several anonymous names or aliases, including "United Realty Trust", "JACOB FRYDMAN CRIMINAL", "Jacob Frydman", "jacob_frydman_scam", "JAKE THE SNAKE", "JAKE", "HIS ALIAS", "JAK", JACOB FRYDMAN UNITED REALTY TRUST", "LENDERS SCREWED BY JACOB FRYDMAN", "Former Employee",  "jacobfrydmanfraud", "Ex Employee Whistle Blower", and "PutJacobInJail".

204.     The additional (and initial) defamatory statements include and are that Frydman and/or his business United Realty is:

a.   is a "Fraudster";
b.   is a "cheat";
c.   is a "lowlife";
d.   is a "criminal";
e.   is a "liar salesman";
f.   committed "Fraud";
g.   is "dishonest";
h.   has many lawsuits against him;
i.   is the "Biggest real estate FRAUD man";
j.   is a "thief and a liar";
k.   misappropriates investor money;
l.   is a "scumbag";
m.   files fraudulent financial statements;
n.   is a "con artist";
o.   is a "con man";
p.   is a "mobster";
q.   operates a "Ponzi" scheme;
r.   intentionally defrauds vendors and service providers;
s.   uses business organizations for concealment of fraudulent activities;
t.   is "dishonest";
u.   engages in sexual harassment of his employees;

v.   steals from others

205.   The additional (and initial) defamatory statements at least currently appear, or

appeared at the following "URLs":

i.   http://55luther.com/2012/08/09/a-succinct-depiction-about-united-realty-trust-jacob-frydman-and-his-experiences-in-real-estate/

ii.   http://aegstaubsauger.info/2012/07/16/overview-of-jacob-frydman-along-his-working-period-and-support-given-to-various-real-estate-investors/

iii.   http://aperfecttouchofamherst.com/2012/07/14/details-about-the-mr-jacob-frydman-history-and-his-achievements-are-described-for-the-public-reference/

iv.   http://biztonsagtechnika.net/2012/08/09/overview-of-jacob-frydman-along-his-working-period-and-support-given-to-various-real-estate-investors/

v.   http://boardreader.com/jump/s10809/f565985/47a919819d36877b05d2625885c5bd6e/aHR0cDovL3d3dy5zY2FtLmNvbS9zaaG93dGhyZWFkLnBocD90TYxNzI4OCNwb3N0N0MTc4Njg1Ng==

vi.   http://boardreader.com/jump/s10809/f565985/47a919819d36877b05d2625885c5bd6e/aHR0cDovL3d3dy5zY2FtLmNvbS9zaaG93dGhyZWFkLnBocD90TYxNzI4OCNwb3N0N0MTc4Njg1Ng==

vii.   http://californiapenalcode6254.com/2012/08/09/get-to-know-about-the-different-public-relations-when-you-work-under-the-united-realty-trust-jacob-frydman/

viii.   http://capaprograms.org/2012/08/09/legal-battle-ensues-between-jacob-frydman-of-united-realty-trust-and-paf-capitalllc/

ix.   http://cascadeplumb.com/2012/08/09/jacob-frydman-of-united-realty-trust-and-wa-route-9a-llc-are-sued-by-paf-capital-llc/

x.   http://cctldguy.com/2012/08/09/united-realty-trust-incorporated-will-not-be-possible-now-unless-the-law-suits-are-settled-quickly/

xi.   http://centrocana.com/2012/08/09/jacob-frydman-was-really-a-poor-man-after-getting-the-sad-news-about-the-breach-of-him/

xii.   http://dxgcamcorders.info/2012/08/09/paf-capital-llc-alleges-jacob-frydman-of-united-realty-trust-is-guilty-of-fraud/

xiii.   http://edhardybackpack.info/2012/08/09/the-legacy-of-jacob-frydman-united-realty-trust-and-how-did-he-do-it-alone/

xiv.   http://ekgmonitors.info/2012/08/09/how-to-reduce-the-difficulties-faced-by-people-while-communicating-real-estate-investors-like-jacob-frydman/

xv.   http://fastestmeansof.com/2012/08/09/want-to-learn-more-about-the-procedure-of-getting-funds-from-the-united-realty-trust-jacob-frydman/

xvi.   http://footgratuit.com/2012/08/09/jacob-frydman-of-united-realty-trust-being-sued-for-providing-fabricated-financial-statements/

xvii.   http://geniuswiki.com/page#/mrjacobfrydman9/Jacob+Frydman

xviii.    http://grenadiersbnb.com/2012/07/18/get-to-know-about-the-different-public-relations-when-you-work-under-the-united-realty-trust-jacob-frydman/

xix.    http://heartofnebraska.org/2012/08/09/paf-capital-llc-alleges-that-fraud-has-been-committed-by-jacob-frydman-of-united-realty-trust/

xx.    http://highfiberdurham.com/2012/08/09/recent-ventures-of-jacob-frydman-united-realty-trust-and-the-outcomes-that-they-had/

xxi.    http://imcnyc.com/2012/07/16/united-realty-trust-incorporated-cannot-be-for-now-because-of-the-law-suits-alleging-fraud/

xxii.    http://jacobfrydman9.zoomshare.com/

xxiii.    http://jacobfrydmancriminal.com/aliases.html

xxiv.    http://jacobfrydmancriminal.com/gallery.html

xxv.    http://jacobfrydmancriminal.com/history.html

xxvi.    http://jacobfrydmancriminal.com/home.html

xxvii.    http://jacobfrydmancriminal.com/overview.html

xxviii.    http://jacobfrydmancriminal.com/team.html

xxix.    http://jacobfrydmancriminal.files.wordpress.com/2014/06/1.jpg?w=640

xxx.    http://jacobfrydmancriminal.wordpress.com

xxxi.    http://jacobfrydmancriminal.wordpress.com/2014/06/27/jacob-frydman/

xxxii.    http://jacobfrydmancriminal.wordpress.com/2014/06/27/jacob-frydman/#comments

xxxiii.    http://jacobfrydmancriminal.wordpress.com/about/

xxxiv.    http://jacobfrydmancriminal.wordpress.com/tag/jacob-frydman-real-estate-fraud-criminal-scam-alert/

xxxv.    http://jacobfrydmancriminal.wordpress.com/type/image/

xxxvi.    http://jacobfrydmanfraud.weebly.com/

xxxvii.    http://jacobfrydmanfraud.weebly.com/about.html

xxxviii.    http://jacobfrydmanfraud.weebly.com/blog/jacob-frydman-real-estate-fraud

xxxix.    http://jacobfrydmanfraud.weebly.com/blog/jacob-frydman-real-estate-fraud#comments

xl.    http://jacobfrydmanfraud.weebly.com/contact.html

xli.    http://jacobfrydmanfraud.wordpress.com/

xlii.    http://jacobfrydmanfraud.wordpress.com/2014/06/27/jacob-frydman/

xliii.    http://jacobfrydmanfraud.wordpress.com/about/

xliv.    http://jacobfrydmanfraud.wordpress.com/author/jacobfrydmanfraud/

xlv.    http://jacobfrydmanofunitedrealtytrust.hpage.co.in/jacob_frydman_of_united_realty_trust_30018791.html

xlvi.    http://jacobfrydmanscam.blogspot.com/

xlvii.    http://jacobfrydmanscam.blogspot.com/2014/06/dont-become-victim-of-real-estate.html

xlviii.    http://jacobfrydmanscam.blogspot.com/2014_06_01_archive.html

xlix.      http://jacobfrydmanscam.blogspot.com/search/label/%23alert

l.    http://jacobfrydmanscam.blogspot.com/search/label/%23fraud

li.   http://jacobfrydmanscam.blogspot.com/search/label/%23jacob%20frydman

lii.  http://jacobfrydmanscam.blogspot.com/search/label/%23nyc

liii. http://jacobfrydmanscam.blogspot.com/search/label/%23real%20estate

liv.  http://jacobfrydmanscam.blogspot.com/search/label/%23scam

lv.   http://jacobfrydmanunitedrealtytrust.podbean.com/

lvi.  http://jacobfrydmanunitedrealtytrust.podbean.com/author/jacobfrydmanunitedrealtytrust/

lvii.     http://jacobfrydmanunitedrealtytrust.webspawner.com/

lviii.    http://jpsportinggoodsshoxforwomen.info/2012/07/16/the-formation-of-united-realty-trust-incorporated-can-be-a-big-question-mark-now/

lix.  http://jyhadcardgame.info/2012/07/14/jacob-frydman-was-really-a-poor-man-after-getting-the-sad-news-about-the-breach-of-him/

lx.   http://kappasigmahawaii.org/2012/07/17/united-realty-trust-incorporated-will-not-be-possible-now-unless-the-law-suits-are-settled-quickly/

lxi.  http://knottings.com/2012/08/09/instant-support-given-by-online-executives-to-communicate-the-jacob-frydman-along-duties-performed-as-investor/

lxii.     http://mlpjoust.com/2012/07/15/how-to-reduce-the-difficulties-faced-by-people-while-communicating-real-estate-investors-like-jacob-frydman/

lxiii.    http://molalla-ed-foundation.org/2012/07/13/some-of-the-information-of-mr-jacob-frydman-autobiography-are-briefed-out-for-future-business-achievers/

lxiv.     http://mortonrutledgefc.org/2012/08/09/the-history-and-success-story-of-jacob-frydman-united-realty-trust-and-how-did-they-do-it/

lxv.      http://movelaughplay.com/2012/08/09/there-is-no-way-that-united-realty-trust-incorporated-will-be-started-now/

lxvi.     http://mrcoonline.com/2012/08/09/know-the-ideas-from-jacob-frydman-who-is-known-for-the-creativity-and-man-power/

lxvii.    http://mrjacobfrydman9.fotopages.com/

lxviii.   http://mrjacobfrydman9.insanejournal.com/

lxix.     http://mrjacobfrydman9.insanejournal.com/profile

lxx.      http://municater.com/2012/08/09/paf-capital-llc-is-suing-jacob-frydman-of-united-realty-trust-for-fraud/

lxxi.     http://mymortgagesaver.com/2012/08/09/people-are-now-helping-jacob-frydman-to-become-a-normal-man-and-clear-all-debts/

lxxii.    http://mystickyrice.com/2012/08/09/decisions-that-instilled-triumphs-and-tribulations-for-mr-jacob-frydman-and-how-he-got-over-them/

lxxiii.   http://mytriplive.com/2012/08/09/heavy-damages-are-claimed-from-jacob-frydman-of-united-realty-trust-by-paf-capital-in-a-lawsuit/

lxxiv.    http://nashvillealzheimersgolfclassic.org/2012/08/09/know-about-the-several-claims-against-jacob-frydman-from-paf-capital/

lxxv.     http://natashabastidas.com/2012/08/09/deal-with-people-like-jacob-frydman-with-the-best-business-skills/

lxxvi.    http://natemitchell.org/2012/08/09/who-is-jacob-frydman-united-realty-trust-and-who-can-he-help-you-get-awesome-returns/

lxxvii.   http://no-rip.net/2012/07/13/the-real-competencies-involved-in-the-issue-of-mr-jacob-frydman-and-how-he-takes-precautions/

lxxviii.  http://nquotes.com/2012/07/14/jacob-frydman-has-to-face-the-law-suits-or-settle-the-issue-amicably-with-paf-capital/

lxxix.    http://nynightcfseminar.com/2012/07/19/want-to-learn-more-about-the-procedure-of-getting-funds-from-the-united-realty-trust-jacob-frydman/

lxxx.     http://nypost.com/2014/11/17/real-estate-honcho-stiffs-contractors-over-measly-amounts/

lxxxi.    http://ojovideophone.info/2012/07/20/a-brief-introduction-about-real-estate-business-and-united-realty-trust-jacob-frydman/

lxxxii.   http://openwiki.com/ow.asp?What-Are-The-Different-Ways-That-A-Person-Can-Get-Hold-Of-Information-About-Mr%2E-Jacob-Frydman%3F

lxxxiii.  http://pawpawgoodies.com/2012/08/09/what-are-the-other-activities-that-the-jacob-frydman-united-realty-trust-is-active-in/

lxxxiv.   http://penngolfclassic.org/2012/08/09/who-is-jacob-frydman-united-realty-trust-and-how-is-he-the-best-in-the-realtor-market/

lxxxv.    http://planosofia.com/2012/07/17/the-starting-of-united-realty-trust-incorporated-can-be-delayed-by-months-by-the-law-suits/

lxxxvi.   http://provenstrategiesfor.com/2012/07/18/it-is-not-a-matter-of-when-but-if-as-far-as-permission-for-united-realty-trust-incorporated-is-concerned/

lxxxvii.  http://rlm20k.info/2012/07/24/jacob-frydman-of-united-realty-trust-is-being-sued-in-court-on-counts-of-fraud/

lxxxviii. http://roganforever.com/2012/08/09/paf-capital-llc-files-a-law-suit-against-jacob-frydman-of-united-realty-trust/

lxxxix.   http://rulesforrenegadessummit.com/2012/07/13/some-information-that-a-person-should-know-about-mr-jacob-frydman-and-his-present-situation/

xc. http://ryanleaf.info/2012/07/13/real-estate-business-and-the-triumphs-and-failures-of-mr-jacob-frydman-as-a-business-man/

xci.http://seriescope.com/2012/07/24/get-in-touch-with-the-jacob-frydman-united-realty-trust-and-give-a-head-start-to-your-career/

xcii.     http://sfgiantsparade.info/2012/07/16/united-realty-trust-incorporated-can-be-started-afterwards-if-the-matter-is-settled-amicably/

xciii.    http://sonyreader.info/2012/07/17/there-is-no-way-that-united-realty-trust-incorporated-will-be-started-now/

xciv.     http://spy--ware.com/2012/07/15/know-the-ideas-from-jacob-frydman-who-is-known-for-the-creativity-and-man-power/

xcv.        http://studioomonline.com/2012/07/18/the-success-story-of-the-ceo-of-united-realty-trust-jacob-frydman/

xcvi.       http://studioomonline.com/2012/07/18/the-success-story-of-the-ceo-of-united-realty-trust-jacob-frydman/

xcvii.      http://sv420m.info/2012/07/15/people-are-now-helping-jacob-frydman-to-become-a-normal-man-and-clear-all-debts/

xcviii.     http://telechacals.info/2012/07/13/decisions-that-instilled-triumphs-and-tribulations-for-mr-jacob-frydman-and-how-he-got-over-them/

xcix.       http://telechacals.info/2012/07/13/decisions-that-instilled-triumphs-and-tribulations-for-mr-jacob-frydman-and-how-he-got-over-them/

c.    http://thegilliamsection.com/2012/08/09/the-company-provides-all-the-latest-news-about-the-current-market-which-involves-jacob-frydman-news/

ci.   http://therealdeal.com/blog/2014/04/17/feud-between-united-realty-ceo-firms-ex-president-turning-ugly%E2%80%A8/

cii.  http://therealdeal.com/blog/2014/11/17/united-realtys-jacob-frydman-mired-in-suits-over-hyde-park-home/

ciii.       http://tintenherz.info/2012/07/15/know-about-the-several-claims-against-jacob-frydman-from-paf-capital/

civ.http://tmobileiphone2011.info/2012/07/15/deal-with-people-like-jacob-frydman-with-the-best-business-skills/

cv.  http://uilleannpipesforsale.info/2012/07/18/united-realty-trust-incorporated-cannot-be-started-without-settling-the-lawsuit/

cvi.http://unitedrealtytrust.weebly.com/  (which links to unitedrealtytrust.com)

cvii.       http://unitedrealtytrust.weebly.com/about.html

cviii.      http://unitedrealtytrust.weebly.com/gallery.html

cix.http://unitedrealtytrust.yolasite.com

cx.  http://unitedrealtytrust.yolasite.com/contact-us.php

cxi.http://unitedrealtytrust.yolasite.com/links.php

cxii.       http://unitedrealtytrust.yolasite.com/resources/Jacob-Frydman.jpg

cxiii.      http://unitedrealtytrust9.weebly.com/

cxiv.       http://unitedrealtytrustjacobfrydman.yolasite.com/

cxv.        http://votejoshrobertson2010.com/2012/07/18/other-activities-done-by-united-realty-trust-jacob-frydman-and-his-educational-qualification/

cxvi.       http://wallinside.com/post-1884309.html

cxvii.      http://watchmyselfflogmyself.com/2012/07/17/too-early-to-write-an-obituary-for-united-realty-trust-incorporated-but-the-time-will-come/

cxviii.     http://westcoastequineonline.com/2012/07/14/instant-support-given-by-online-executives-to-communicate-the-jacob-frydman-along-duties-performed-as-investor/

cxix.       http://whitecollarfraud.blogspot.com/2012/09/real-estate-investor-who-fled-country.html

cxx.        http://www.arto.com/section/blog/ViewEntry.aspx?id=5679721&EntryID=4507068

cxxi.       http://www.businessreviewusa.com/press_releases/paf-%E2%80%90%E2%80%91capital-%E2%80%90%E2%80%91llc-%E2%80%90%E2%80%91sues-%E2%80%90%E2%80%91for-%E2%80%90%E2%80%91fraud

cxxii.      http://www.carolinasuarez-garcia.com/2012/08/09/united-realty-trust-incorporated-cannot-be-for-now-because-of-the-law-suits-alleging-fraud/

cxxiii.     http://www.complaintsboard.com/complaints/united-realty-trust-inc-fraud-and-ponzi-c725684.html

cxxiv.      http://www.congoo.com/news/addstorycomment.aspx?st=279183306&Channel_ID=23&Category_ID=158

cxxv.       http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1397280497

cxxvi.      http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1397280879

cxxvii.     http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1397281010

cxxviii.    http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1409973214

cxxix.      http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1409973483

cxxx.       http://www.ebosswatch.com/Company/Reviews/United-Realty-Trust/1397280050/0

cxxxi.      http://www.geniuswiki.com/page#%2Fmrjacobfrydman9%2FJacob%2BFrydman

cxxxii.     http://www.glassdoor.com/Reviews/Employee-Review-United-Realty-Partners-RVW4040838.htm

cxxxiii.    http://www.glassdoor.com/Reviews/Employee-Review-United-Realty-Partners-RVW4682451.htm

cxxxiv.     http://www.glassdoor.com/Reviews/Employee-Review-United-Realty-Partners-RVW5044063.htm

cxxxv.      http://www.glassdoor.com/Reviews/United-Realty-Partners-Reviews-E794582.htm

cxxxvi.     http://www.kiwibox.com/jacobfrydman/mypage/

cxxxvii.    http://www.law360.com/articles/497084/fund-transfer-in-200m-un-plaza-deal-draws-investor-suit

cxxxviii.   http://www.law360.com/articles/589209/amid-1b-ipo-reit-founder-accuses-ex-partner-of-fraud

cxxxix.     http://www.litinsider.com/motionDetails.jsp?id=1202659672665&Evunp_Holdings_v_Jacob_Frydman&slreturn=20141020031939

cxl.http://www.livelogcity.com/users/jacobfrydman9/

cxli.       http://www.marketwatch.com/story/paf-capital-llc-sues-for-fraud-2012-07-03

cxlii.      http://www.marketwire.com/press-release/paf-capital-llc-sues-for-fraud-1676279.htm

cxliii.     http://www.marketwire.com/press-release/paf-capital-sues-for-fraud-1673348.htm

cxliv.      http://www.metacafe.com/watch/8794258/mr_jacob_frydman/

cxlv.       http://www.picowiki.com/unitedrealtytrustjacobfrydman/index.php/The-Smart-
Growth-Of-The-CEO-Of-United-Realty-Trust-Jacob-Frydman

cxlvi.      http://www.podbean.com/podcast-detail?pid=144510

cxlvii.     http://www.reitwrecks.com/forum/viewforum.php?f=19

cxlviii.    http://www.reitwrecks.com/forum/viewforum.php?f=2

cxlix.      http://www.reitwrecks.com/forum/viewtopic.php?f=19&t=840

cl.  http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=822

cli. http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=841

clii.       http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=841

cliii.      http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=841&sid=c462d4ecf9fe
652189536061b960b6af

cliv.       http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=854

clv.http://www.reitwrecks.com/forum/viewtopic.php?f=20&t=843

clvi.       http://www.reitwrecks.com/forum/viewtopic.php?f=31&t=842

clvii.      http://www.reitwrecks.com/forum/viewtopic.php?t=822&p=3596

clviii.     http://www.reitwrecks.com/forum/viewtopic.php?t=841&p=3792

clix.       http://www.reitwrecks.com/forum/viewtopic.php?t=842&p=3784

clx.http://www.ripoffreport.com/r/Jacob-Frydman/Hyde-Park-New-York/Jacob-Frydman-
Jake-Frydman-Jake-the-snake-Frydman-Jacob-A-Frydman-United-Realty-Partn-1132636

clxi.       http://www.ripoffreport.com/reports/specific_search/Jacob+Frydman

clxii.      http://www.scam.com/showthread.php?t=617288

clxiii.     http://www.scamorg.com/united-realty-trust-inc-a3

clxiv.      http://y6u7.com/2012/08/09/other-activities-done-by-united-realty-trust-jacob-
frydman-and-his-educational-qualification/

clxv.       https://twitter.com/FRAUD_man

clxvi.      https://twitter.com/FRAUD_man/status/483314759652347904

clxvii.     https://twitter.com/FRAUD_man/status/483315261135933440

clxviii.    https://twitter.com/FRAUD_man/status/483315970464034817

clxix.      https://www.blogger.com/profile/09509411744856969823

clxx.       https://www.facebook.com/pages/Scam-Victims-United/130347739735

clxxi.      jacobfrydmanofunitedrealtytrust.webstarts.com

206.    The additional (and initial) defamatory statements currently appear, or appeared at

least at the following identified paid domain websites attacking Frydman and/or his companies:

jacobfrydmancriminal.com
jacob-frydman.org
unitedrealty-trust.com
jacobfrydmanthief.com
jacobfrydmanfraud.com

united-realtytrusts.com
unitedrealtytrusts.com
unitedrealtyfrydman.com

207.     The eight websites identified in the preceding paragraph as paid domains are all

registered through the Public Domain Registry and are associated to the same name servers:

NS1.RX-NAME.NET, NS2.RX-NAME.NET, NS3.RX-NAME.NET – just as with the now-

Ukrainian websites.

208.     The first paid website attacking Frydman was the domain Jacobfrydmancriminal

.com, which was registered on June 23, 2014.

209.     The additional (and initial) defamatory statements also currently appear, or appeared

at least at the following identified free hosting websites attacking Frydman and/or his companies:

unitedrealtytrust.weebly.com
jacobfrydmanfraud.wordpress.com
jacobfrydmanfraud.weebly.com
jacobfrydmancriminal.wordpress.com
jacobfrydmanfraudalert.tumblr.com

210.     Four of the five free websites were set up after the foregoing first paid website was

registered:

jacobfrydmancriminal.wordpress.com
jacobfrydmanfraud.weebly.com
jacobfrydmanfraud.wordpress.com
jacobfrydmanfraudalert.tumblr.com

211.     The posts made to the sites listed in the preceding paragraph are dated June 27, 2014,

June 28, 2014 and August 12, 2014.

212.     The following websites which are not controlled by Verschleiser contain similarly

defamatory and disparaging content about Frydman and his companies, which Verschleiser

posted or caused to be posted:

http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=841

http://www.congoo.com/news/addstorycomment.aspx?st=279183306&Channel_ID=23&Cat
egory_ID=158
http://www.scamorg.com/united-realty-trust-inc-a3
http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1397280497

213.    In December 2014, Verschleiser registered or caused to be registered jacob-

frydman.org, thus reverting to using paid websites to attack Frydman and his companies.

214.    A sudden surge in domain registration occurred in February of 2015.  One domain,

unitedrealty-trust.com, was registered on February 3, 2015 and then five domains,

unitedrealtyfrydman.com, united-realtytrusts.com, unitedrealtytrust.com,

jacobfrydmanthief.com, and jacobfrymanfraud.com, were registered on February 17, 2015.

215.    The foregoing 13 paid and free websites all utilize matching infrastructure – including

IP addresses, name servers, and registrars – as well as similar language, content, and images.

This indicates that the websites are likely operated the same person(s) or entity.  Indeed, they are

the same or virtually the same as the now-Ukrainian websites.  All of the paid domains servers

are hosted on the same IP address, which is located in Ukraine: 194.54.83.230. The name of the

hosting company associated with the domains is Omnilance Ltd.  All domains connected to the

attack websites' associated name servers (ns1.rx-name.net, ns2.rx-name.net, ns3.rx-name.net).

216.    Registrations for all but one website (unitedrealty-trust.com) use Ukrainian phone

numbers, all of which are active Ukrainian mobile numbers.  At least two of the phone numbers

(380-939-30-995 and 380-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) are directly associated with Merchansky.  The other

phone numbers associated with these websites (380-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 and 380-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) are all

Ukrainian phone numbers.  The phone number 380.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 was included in the domain

records for five of websites, jacobfrydmanfraud.com, jacobfrydmanthief.com,

unitedrealtytrusts.com, unitedrealtyfrydman.com, and united-realtytrusts.com.  This phone

number is linked to a Facebook account for Sasha Merchansky.

217.    All of the domains registered on February 17, 2015 utilize the Ukrainian email service, Ukr.net, and include ivalera2015(@)ukr.net, ivalera2016(@)ukr.net, ivalera2017(@)ukr.net, your_hot_problem(@)mail.ru, jacobfrydmanscam(@)gmail.com.  The associated IP address for ivalera2016(@)ukr.net. is  212.42.77.238, which geo-locates to the Ukraine and is associated with Ukr.net.  Cyrillic characters were also noted on the website www.jacobfrydmancriminal.wordpress.com, which connects the paid domains to the free hosting sites, and reinforces the conclusions that all of the attack websites are connected to the same sponsor and are all connected to the Ukraine.

218.    The foregoing postings were made and the websites controlled by Verschleiser exist on the Internet, thus by use of the wires.

219.    The postings and websites thus comprised a scheme or artifice to defraud or for obtaining United Realty and Frydman's property by means of false or fraudulent pretenses. Plaintiffs reserve the right to introduce additional posting and websites at trial.

**Sixth Predicate Acts – Wire Fraud Via Causing Akerman To Secretly
Breach His Fiduciary Duties Causing The Loss Of Confidential Information**

220.    On October 8, 2014, Prime United, CLS and CLWM entered into a highly confidential agreement for a transaction with a third party (the "Transaction Agreement").

221.    Verschleiser and Wright recruited Akerman, who held an extremely sensitive position as CLS Chief Compliance Officer, to steal and deliver confidential and proprietary information and trade secrets belonging to United Realty, Prime United and CLS (the "Stolen Trade Secrets").

222.    The Stolen Trade Secrets include without limitation:

a.  the Transaction Agreement, a very sensitive non-public document awaiting FINRA approval;

b.   a proprietary shareholder list of investors in the REIT who are CLS clients, including their names, addresses, social security numbers and other confidential private information;

c.   a proprietary list of soliciting broker-dealers and registered representatives comprising the United Realty selling group involved in the current $1 billion REIT offering, including their contact information; and

d.   non-public financial information regarding the performance of CLS, the REIT and other of Frydman's companies.

223.    Prior to and during the first half of December 2014, Akerman sent several emails to Verschleiser supplying the foregoing Stolen Trade Secrets.  Plaintiffs found those and other incriminating emails (the "Akerman emails") on Akerman's work computer after they fired him on December 15, 2014, believing him to have been responsible for misappropriating the Transaction Agreement and other sensitive financial documents described in and attached to the Fishoff Lawsuit filed earlier that day.

224.    Verschleiser has since used or intends to use the Stolen Trade Secrets, among other things, to:

a.   Contact each of the REIT's shareholders and inundate them with disparaging statements of the type and nature which Verschleiser has posted on the Internet;

b.   Cause the third party to "walk away" from the Transaction; and

c.   Contact each broker dealer that is a member of the United Realty selling group and inundate them with the same or similar disparaging statements, in order to get them to drop out of the selling group.

225.    Akerman was under increasing financial pressure.  Beginning in late 2013, he consistently came to Frydman with requests for money, who acceded to one or more requests.

226.    None of that was enough to keep Akerman loyal.  He needed more, and he began communicating with Verschleiser seeking money.  Indeed, the Akerman emails reflect that he was in regular contact with Verschleiser from at least spring 2014 prior to the filing of the Fishoff Lawsuit.

227.    Verschleiser and Wright solicited Akerman to secretly work for them and to use his

position of trust and confidence with CLS and the other plaintiffs to steal confidential information for them to use against plaintiffs.

228.    The Akerman emails also reflect that Verschleiser also solicited him to source a broker-dealer that he would run for Verschleiser, all while Akerman was employed by CLS.

229.    In exchange for Akerman breaching his duties of loyalty, according to the emails discovered by plaintiffs on Akerman's company computers after his termination, Verschleiser promised to advance Akerman (at least) $100,000.

230.    The Akerman emails were transmitted over the Internet, thus by use of the wires.

231.    The Akerman emails thus comprised a scheme or artifice to defraud or for obtaining United Realty and Frydman's property.

**Verschleiser's Admissions Of Culpability To Gould**

232.    On December 16, 2014 Gould attended a holiday party where Verschleiser was among the attendees.

233.    Verschleiser – who is neither a plaintiff nor a defendant in the Fishoff Lawsuit nor a person who ordinarily would have any knowledge of its filing the prior afternoon – approached Gould at the party and told him that Akerman was not responsible for the derivative plaintiffs obtaining CLS's internal documents used in their filings in the Fishoff Lawsuit – but that it was he, Verschleiser, who obtained those confidential documents.

234.    Verschleiser admitted to Gould that he still had access to United Realty and CLS's computer systems; that he never stopped hacking into their email exchange servers; and that it was through this hacking that he obtained the confidential documents which showed up as exhibits to the complaint in the Fishoff Lawsuit, including the Transaction Agreement.

235.    What's more, Verschleiser admitted to Gould that he was responsible for

disseminating the severely disparaging materials distributed at Caesar's Palace during the

September 2014 REISA conference.  Specifically, Verschleiser admitted that he arranged for the

distribution of the flyers referring to Frydman as a "fraudster" and "lowlife."

**The Fishoff Lawsuit – The Second Defamatory Lawsuit**

236.    The Akerman emails reflect that at least as early as December 4, 2013, Verschleiser

solicited five limited partner investors which he originally brought into United Realty to bring

the Fishoff Lawsuit, through on-going communications among inter alia Verschleiser, Akerman,

Wright and those investors, and that he tried to solicit other investors.

237.    The Fishoff Lawsuit (or the "Second Defamatory Lawsuit") includes without

limitation the following defamatory statements:

a.  "In connection with the creation of United Realty…the limited partners invested approximately $4.9 million" (complaint, para. 14);

b.  "Prime United has agreed to [the Transaction] for such a low price, not based on any exercise of business judgment, but because (a) Prime United's managing member,…Frydman, desperately needs money, and (b) because…  Gould has some relationship with [the Transaction third party]" (para. 23);

c.  "…Frydman has been discovered to have a number of unsatisfied judgments against various of his controlled entities – indeed he has not even been able to satisfy a judgment docketed against his personal residence" (para. 24);

d.  "…Frydman has recently been sued by several parties for millions of dollars for non-payment of loans and other breaches by entities he controls" (para. 24);

e.  "…Frydman has taken compensation vastly in excess of any reasonable valuation of his services" (para. 24);

f.  "…Frydman has taken business assets for personal use, such as putting his housekeeper and stepson Alex Libin on the payroll…" (para. 24);

g.  "a Justice of the Supreme Court has recently found that…Frydman engaged in transfers of approximately $1.3 million in connection with a Little Neck assisted care facility. The effect of those transfers – including draining $600,000 from bank accounts rendering a company insolvent, and forging an endorsement on a $700,000 check – was to defraud creditors" (para. 24);

h.  "In connection with the resignation of his former partner, from United Realty… and related entities, Frydman is believed to have borrowed up to $4 million - - a personal debt he apparently intends to re-pay to himself using the proceeds of the [Transaction]" (para. 24)

i.  "Jacob Frydman plans to use the proceeds from the [Transaction] to pay off a number of his own debts, individually and through a number of entities that he controls, leaving the Limited Partners with no remedy because Frydman is (a) insolvent and (b) judgment-proof" (para. 25);

j.  "In fact,…the proceeds of [Transaction]… represent an asset of United Realty…, an asset that Frydman has no power to sell" (para. 26);

k.  "[The Transaction]…constitutes a breach of the LP Agreement…" (para. 32):

l.  "The [Transaction] also violates the explicit terms of the Irrevocable Commitment dated September 17, 2012" (para. 34);

m.  "…Frydman plans to use the proceeds of the [Transaction], to pay his own expenses  and expenses of other entities he controls, unrelated to United Realty …" (para. 36);

n.  "At the same time as… Frydman has admitted his plans to dissipate LP assets, his own history establishes that, when given the opportunity, he will do so" (para. 38);

o.  "Frydman was found [by Justice Joan A. Madden of the New York State Supreme Court] to have dissipated over $1 million on the Savoy - Little Neck project, then lying about it under oath" (para. 38);

p.  "…Frydman was…found [by Justice Madden] to have transferred huge sums of money in connection with imminent sale of partnership assets" (para. 39);

q.  "The Court also found that…Frydman had endorsed a $722,000 check intended for the Savoy Little Neck limited partnership, but deposited it into another entity, apparently to defraud the creditors of that…partnership" (para. 41);

r.  "The Court also observed what has become a familiar pattern in…Frydman's business dealings: an almost impenetrable web of entities serving no apparent purpose - except to insulate Frydman from creditors" (para. 42);

s.  "the Court found that…Frydman had told at least three different versions of the facts concerning a $425,000 transfer, two of those inconsistent versions being under oath (i.e., perjury)" (para. 43);

t.  "Significantly, Frydman failed to list the Savoy - Little Neck Project in the REIT Prospectus in the section describing his background in clear violation of SEC rules and regulations" (para. 44);

u.  "The significance of Frydman's litigation history - completely undisclosed and almost impossible to gleam from the web of entities he creates - is that a creditor will not have any remedy of law against him" (para. 47);

v.  "in the Savoy-Little Neck case, even the lawyers he hired, were not able to penetrate the layers of unnecessary LLC's, and by the time they figured out under which corporate shell the money was stolen, the three-year statute of limitations had run" (para. 47);

w.  "Frydman cheated, or attempted to cheat, almost every single creditor, vendor and business associate on [a particular] project" (which was completed in 2010, almost two years before United Realty was formed) (para. 49)

x.  "Frydman carried out the project, at least in part, using assets he stole from various other entities, including at least $100,000 that he took from United Realty… and/or its affiliates" (para. 49)

y.  "Frydman cheated, or tried to cheat every contractor in the project" (para. 51)

z.  "Frydman took at least $100,000 in assets from United Realty…and used those assets… for his personal residence. Although he undoubtedly took more money, and in many different ways, here are the thefts that are known…" (para. 53);

aa.  " Larson has never provided any services to or for United Realty…or any affiliate, and she operated out of Frydman's personal residence as his 'housekeeper,' yet she received a paycheck and email address from the Company" (para. 55);

bb.  "The problem with this conduct… is that it violates New York's ban on champerty – purchasing a Note just to sue, and not legitimately to enforce it" (para. 70);

cc.  "It is estimated that Frydman wasted his own time, and the resources of United Realty… easily in excess of $500,000 in his effort to cheat Spiezio and Franchese out of the property -- all for naught" (para. 72);

dd.  "there is no benefit to United Realty…from the expenditure of assets on the Parker Note Litigation, and the expenditure of partnership assets constitutes waste and

mismanagement by Frydman, arising from his gross negligence or willful misconduct" (para. 76);

ee. "Further, notwithstanding having grossly overpaid for a non-performing asset on information and belief, Frydman and his affiliates continue to reap fees unjustly from United Realty…pursuant to ancillary services agreements that obligate United Realty…to continue to pay Frydman and his affiliates" (para. 82);

ff. "Frydman has also deliberately failed to file many 8-K Forms with the SEC in connection with the pending litigation(s), as required by law" (para. 83);

gg. "defendants knew but failed to disclose the pending litigation that had been commenced on or about April 26, 2010 against Allied Beacon for claims related to fraud…" (para. 99);

hh. "In fact, the Note was never Frydman's to assign, and it is apparently worthless; Frydman has caused the expenditure of at least $500,000 in litigations costs, wasted countless hours of his own time, and exposed the REIT to regulatory action and litigation" (para. 103);

ii. "Frydman failed to honor his fiduciary duties and communicate to any of the Limited Partners or the Board of Directors, the issues surrounding the internal disputes and/or any possibility that there would be a minimal shortfall in the amount of funds for the transaction, and that as a result, the transaction would be lost" (para. 107);

jj. "The effect of this change was to unfairly, and without legal authority, give to the General Partner a greater share of profit-sharing than had been agreed in the original LP Agreement" (para. 113);

kk. "Frydman also took for himself 'compensation' amounting to over $750,000 dollars during the past year. This compensation is grossly excessive, and amounts to theft of partnership property" (para. 114); and

ll. "It is believed that much of the money used by…Frydman recently to construct   his multi-million dollar home in Hyde Park, New York, was taken from corporate assets" (para. 115).

238.    The quoted statements, verified by Wright as being true, are false and fraudulent, and were made in connection with Verschleiser's intention to cause the filing of the Second Defamatory Lawsuit solely to disseminate it to the public and the press.

239.    Indeed, Frydman was contacted by *Investment News* shortly after that Lawsuit was filed, told that it had been emailed to *Investment News* and asked for comment about it. Verschleiser was responsible for the email.

240.    To illustrate, the complaint and amended complaint in the Fishoff Lawsuit blatantly misrepresented the contents of Justice Madden's February 11, 2014 Decision and Order (the "Decision") determining summary judgment motions in *Peckar & Ambramson, P.C. v. Lyford Holdings, Ltd.*, Index No. 100005/09 (Sup. Ct. N.Y. Co.).

241.    Towards the very outset of the Decision, Justice Madden made clear that the ensuing description of events was based on the plaintiff law firm's *allegations* rather than on any factual *findings*:   "*The following allegations are asserted in the complaint* unless otherwise noted [which was not the case]" (Decision at 2; emphasis added).  Justice Madden noted that Frydman was no longer in the case; he was a "dismissed defendant" (*id*.).

242.    In particular, Justice Madden made clear that the supposed fraudulent transfers the Fishoff Lawsuit mischaracterizes as grounded in findings of fact were instead contentions of the plaintiff law firm remaining to be proven (*id*. at 4).

243.    The third party to the Transaction Agreement terminated it on April 23, 2015 as a result of the theft of the Transaction Agreement, the filing of the Second Defamatory Lawsuit and/or its dissemination to the public and the press.

**The Theft Or Use Of Confidential Information Breached Contractual Duties**

244.    Verschleiser and Akerman are subject to various agreements which expressly prohibit the theft or use of proprietary information.

245.    Verschleiser and Akerman each entered into an employment agreement with United Realty containing non-solicitation, non-disparagement and confidentiality provisions, and Verschleiser's Separation Agreement contains the first two provisions.

246.    Akerman executed a subscription agreement and limited partnership agreement with United Realty containing confidentiality provisions.

247.    The actions of Verschleiser and Akerman in respect of the Stolen Trade Secrets are express breaches of the above referenced agreements.

**Prime United Is Entitled To Indemnification For
The Fishoff Lawsuit And Loss Of The Transaction**

248.    Akerman's subscription agreement also contains a provision giving United Realty and its affiliates such as Frydman and Prime United certain indemnification rights for inter alia breach of confidentiality, including indemnification for expenses incurred in connection with this action, the Fishoff Lawsuit and the Third Defamatory Lawsuit by Akerman described below and for the loss of the Transaction.

249.    On January 30, 2015, United Realty exercised its (and its affiliates') indemnification rights with respect to expenses incurred in the Fishoff Lawsuit, and made demand on inter alia Akerman for $115,000 through that date.  Additional and increased demands will be forthcoming as expenses are incurred.

**The Akerman Lawsuit – The Third Defamatory Lawsuit**

250.    Verschleiser then had Akerman, in express violation of the TRO issued in this action, take certain of the allegations in the Second Defamatory Lawsuit (which had been sealed the day

after it was filed, but not before Verschleiser leaked it to the press) and redraft that Lawsuit as a claim by Akerman against Frydman – the Akerman Lawsuit (or the "Third Defamatory Lawsuit") for the sole purpose of disseminating it to the public and the press.  Akerman filed that baseless, sham Lawsuit on February 6, 2015, verifying the complaint.

251.    The Third Defamatory Lawsuit contains additional unfounded accusations against Frydman, including that he is under investigation by FINRA, and that he misappropriates investor and public funds.  It includes without limitation the following defamatory statements:

a.  at para. 32 of the amended complaint: "Between the dates of March 31, 2014 and October 31, 2014, there were numerous transactions by or directed by… Frydman that were cause for concern, and in some instances, in complete violation of law";

b.  at para. 42(e): "…Frydman has taken business assets for personal use";

c.  at para. 43: "Frydman is (a) insolvent and (b) judgment proof";

d.  at para. 45: "Frydman and Gould were under investigation by FINRA";

e.  at para. 60: "Frydman…wrongfully exerted dominion and control over Plaintiff's property"; and

f.  at paras. 86, 105: "Frydman caused a false and defamatory U5 to be filed with FINRA."

252.    Within minutes of the filing of the Third Defamatory Lawsuit, Frydman received a telephone call from a reporter at the *Real Deal* informing him that the complaint filed in the Third Defamatory Lawsuit was just emailed (*i.e.*, leaked) to the *Real Deal*.  Verschleiser was responsible for the email.

253.    The *Real Deal* then proceeded to re-publish the defamatory falsehoods contained within the allegations of the complaint in the Third Defamatory Lawsuit.

254.    Verschleiser also leaked the complaint to *Investment News,* which then proceeded to re-publish the defamatory falsehoods contained within the allegations of the complaint in the Third Defamatory Lawsuit.

255.    As a result of the *Real Deal* and *Investment News* articles*,* United Realty was bombarded with inquiries from soliciting broker dealers for the REIT, resulting in several terminating or suspending selling agreements with United Realty.  During just the three days after the articles were published, that resulted in the cancelation of subscriptions which were not yet accepted representing in excess of $650,000 of the REIT's common stock.

**The False Claims Letter**

256.    On February 13, 2015, a week after the commencement of the Third Defamatory Lawsuit, Verschleiser had Akerman send the False Claims Letter to the SEC Office of the Whistleblower and copied 17 third parties on the False Claims Letter, including the IRS, FINRA, Ernst & Young, Proskauer Rose, industry due diligence firms Fact Right and Buttonwood Investment Services, Brock Capital, and the Department of the Treasury.

257.    The sole purpose of copying the False Claims Letter to the third parties was to defame Frydman and United Realty, so as to further negatively impact their ability to attract new selling group participants.

258.    Indeed, the False Claims Letter is yet another fabrication, created by Akerman and Verschleiser in the hope that the Letter would insulate Akerman from liability.

259.    Akerman sent the False Claims Letter on February 13, 2015, *more than two months* after he stole the Stolen Trade Secrets.  Akerman claimed that he didn't really "steal" any documents, but instead was simply taking them in his role as a whistleblower.  Yet the Stolen Trade Secrets that Akerman stole had *nothing* to do with the Parker Avenue transaction which

was the subject of the False Claims Letter.  In fact, not a single one of the documents comprising the Stolen Trade Secrets was attached to or referenced in the False Claims Letter.

260.   Just a week later, however, Akerman discontinued the Third Defamatory Lawsuit with prejudice and retracted the False Claims Letter "based on apparent misrepresentations made to me by a third party," i.e., Verschleiser.

**Verschleiser Admits Responsibility For The False Claims Letter**

261.   On February 13, 2015, at approximately 4 p.m., Verschleiser telephoned Gould and said, among other things, that the False Claim Letter was going to be sent later that day: you'll see…a letter today that's going to FINRA, the SEC, everybody. All about 30 parties in your copy on that letter. But that's just to show you what's going to happen."

**Recent Defamation By Verschleiser**

262.   On March 11, 2015 at 3:56 a.m., Verschleiser sent an email to Frydman from his eli.v@multigroups.com email address and copied Defendant Fishoff, and at 4:18:08 a.m. republished the email to inter alia several of the United Realty limited partners or their principals and the independent directors of the REIT.

263.   The email made the following defamatory statements:

Seemingly you are too scared to meet me in front of the board of directors and the money partners in our companies. This has been telling to all of your immoral, unethical and criminal tactics which as you have seen will not deter my attorneys from pursuing you, until you are brought to justice. It is unfortunate for the investors that I brought into this mess. I mistakenly did not make a few phone calls prior to introducing and allowing you into my world (and into my office - which I thankfully got you out of).

Just as I got you removed from my office a year ago so too you will no longer be related to United, Cabot or all of the affiliated entities. It may take another year but the end is what counts.

When I originally removed you for cause, and fired you I should have left it that way. Thinking that I was protecting the innocent bystanders and all the moneys WE put in was my second mistake in our relationship (remember the QuickBooks don't lie which shows the 14+

million WE put in versus the few hundred thousand you stole from the company and then "put back into it" as your so called investment.

I am always ready to meet you in front of the board and any of our investment partners (whom you are now screwing too).

264.    At the time of his republishing the email, Verschleiser sent an additional email to Frydman, Abe George, Esq., Pinny Rand, Mark Appel, Benny Fishoff, Elan Jaffa, Steven Vegh, Daniel Aronzon, M.D., Verschleiser's cousin Eli J. Verschleiser, David Newman, Esq., and Robert S. Levine, Esq. falsely and fraudulently stating inter alia, "As it turns out we are not the only ones you stole from over the past 20 years. Seemingly we are just a small minority of individuals in an endless ocean of victims."

265.    On May 6, 2015, Verschleiser directly or with the assistance of other members of the Ring sent a defamatory mass-email blast to certain of plaintiffs' employees, other representatives, various REIT investors and broker dealers with whom Frydman and his companies do business stating:

> *Fraud Alert -  Know the Thief amongst You! Master of disguise, Creative Evil. Hurts anyone. You may have heard about some of the odd stories about Jacob Frydman, BUT you do NOT know the truth until you take a few minutes to really look at the evidence. You will be saving money and aggravation if you take a few moments to see some judgements, court findings, judges and DA's comments on the Fraudman - Jacob Frydman. Learn More at: United Realty Fraud. or simply google "Jacob Frydman Fraud " His own house has dozens of liens against it as he simply cant do anything without screwing someone. Be Forewarned. Copyright © 2015 For The People, All rights reserved. You are receiving this email as an associate of Jacob Frydman.*

266.    On May 8, 2015, Verschleiser directly or with the assistance of other members of the Ring sent a defamatory mass-email blast to certain of plaintiffs' employees stating:

> *--- Food for thought. Is there a possibility that some of the dozens and dozens of previous Frydman Employees left for a reason? Or you are much "better than them" Is it odd that FOUR CFO's and 1 comptroller were at the helm in a 24 month period? hmmm, must be that they just didnt like the office furniture .... One Last One: How can it be that so many people are out to get Frydman? or are you too scared to actually read some of the hundreds of lawsuits against the man for fraud. You may be a co-conspirator by simply knowing and*

*sitting around. Is your life worth that little. Be Smart. Be responsible. Be thoughtful. Make an informed and educated decision. READ THE LAWSUITS www.United-RealtyTrusts.com---*

267.    On June 10, 2015, Verschleiser directly or with the assistance of other members of

the Ring sent a defamatory mass-email blast to certain of Frydman's REIT investors with the

subject line: "Subject: Copy of Is your investment in United Realty truly safe & secure ? check

again....", with the United Realty Trust logo, but with the words "DO NOT" inserted before the

word "Trust" and the word "Fraud" substituted for the word REIT:



and the body of the email stating:

> *Are you aware of the Fraud in United Realty, the REIT you OWN shares of?*
> *You deserve to READ the public lawsuits filed against the CEO Jacob Frydman.Obviously,*
> *he will tell you a story "and evidence" his side as truth and innocent, however when you read*
> *the public lawsuits he has lost in for years of fraudulent activity, you will ask the Broker*
> *WHY he sold you this stock when there are so many more stable investments out there.*
> *PLEASE look into this and protect your investment. Click here for ALL the info:*
> *www.unitedrealty-trust.com.*

Followed with:

 

And the body continuing:

> *Did you know that the CEO's company has borrowed over FIVE million dollars*
> *from YOUR REIT to pay his bills? Jacob Frydman the CEO has smoke surrounding him for*
> *20+ years. "Where there's Smoke, there's Fire". Did you know: There is an asset on books*
> *that does not belong to REIT, yes you read that correctly! Did you know: Jacob Frydman the*
> *CEO accused of Fraud 621 times in 144 lawsuits. Did you know: A New York Judge recently*
> *found Frydman to have stolen over 700k in a case from 2002. Did you know: The ex-CFO in*
> *2011 sued Frydman for his thievery of company assets and WON! Did you know: If you ask*

*any attorney to "Lexis Nexus search" Jacob Frydman, they will yell at you for investing into a company run by this con-man. ALL THIS INFO PUBLICLY AVAILABLE AND RETRIEVABLE ON THIS WEBSITE: http://www.unitedrealty-trust.com/history.html*

268.     On June 10, 2015. Verschleiser directly or with the assistance of other members of the Ring sent a defamatory mass-email blast to certain of Frydman's REIT investors, employees, members of the REIT's board of directors, and broker dealers with which Plaintiffs do business, with the subject line: "Is your investment in United Realty safe?", and with the body stating:

*If you did some homework on United Realty Trust and its CEO, you would likely ask your broker WHY you were sold the stock. Spend a few minutes and decide for yourself by reading publicly available court documents. Not by listening to the CEO who would obviously tell you otherwise. Just read some of his history: http://www.unitedrealty-trust.com/history.html or like an interesting book soon to be published on this man of greed, you can read it all.*

269.     The mass emails referenced in the preceding paragraphs are believed to have been sent to the persons on the confidential and proprietary lists of REIT investors and broker dealers which were stolen by Akerman and provided to Verschleiser and Wright, whose further use or dissemination was prohibited by the January 5, 2015 TRO, which was converted into a preliminary injunction.  As Verschleiser was and presumably still is in possession of the stolen lists, plaintiffs believe that he initiated the mass emails.

**Allegations Relevant To Injunctive Relief**

270.     As a result of the conduct set forth above, plaintiffs have been, and absent injunctive relief will continue to be, irreparably harmed.

271.     Plaintiffs have no adequate remedy at law for such conduct.

## ALLEGATIONS COMMON TO ALL RICO COUNTS

272.     Verschleiser, directly and through Multi Group, and plaintiffs are engaged in the commercial real estate business.  They all raise capital from investors and invest that capital in real estate transactions.  They all use intermediaries, including third party broker dealers, to

source additional investors.  They all seek to originate investment transactions through owners who have properties for sale, real estate brokers and intermediaries, such as lenders and special servicers who hold real assets in their REO portfolios, as well as through title companies and qualified 1031 intermediaries.  They all seek to finance those transactions with debt which they source directly or indirectly from lenders such as banks, insurance companies and other financial institutions, through investors and non-traditional lenders, and through intermediaries such as mortgage brokers.  They all seek tenants for their properties directly and through intermediaries such as leasing brokers. They all work with and retain professionals such as lawyers, accountants, appraisers, architects and engineers.  They all work with and retain property management companies, contractors, title companies, insurers and consultants.  They all work with and retain marketing professionals in marketing their projects, and placing advertisements, public relations materials and Internet postings with media outlets.  They all work with elected officials, town boards, planning boards, zoning boards, building inspectors, and a variety of governmental agencies.  They all compete for high quality employees.  In many cases, due to the size or complexity of the projects they are involved with, they "partner-up" with institutional investors, such as pension funds, endowments and other real estate developers as joint venture partners.

273.    Simply stated, the commercial real estate business is a business of capital and relationships in addition to skill and acumen.

274.    No matter how qualified a real estate investor or developer may be, without the ability to build relationships with other participants in the industry, raise capital, source deals, contract with professionals, and get a fair hearing from governmental officials and agencies, a real estate investor and developer has no likelihood of success.

275.     A real estate investor/developer's reputation is his single most important asset. Investors, lenders, intermediaries, professionals, tenants, contractors and all of the other participants upon which a real estate investor or developer relies to succeed need to determine where to invest their limited resources, especially their capital and their time.

276.     In today's digital world, before someone invests money, lends money, agrees to enter into a contract to "tie-up" a real estate asset and take it off the market for the period it takes to close, commit their time and resources to a project, "partner-up," provide goods or services, or rent space, they generally start by running a simple Internet search on the person with whom they are about to transact business.

277.     It takes years to build a good reputation, but it only takes a few false blog posts to destroy it and therefore one's business.

278.     The Ring has manipulated and continues to manipulate the market to deprive plaintiffs and their affiliates of capital and business relationships and opportunities by denying Frydman and his businesses capital, investors, lenders, transaction opportunities, tenants, the ability to work with professionals, intermediaries, elected officials, governmental agencies and the like.

279.     Such scheme constitutes a fraud upon everyone that Frydman and his businesses rely on to transact business.  It is fraud upon existing and prospective investors and intermediaries, including third party broker dealers, who source investors, because they are falsely told that Frydman will "steal their money and not return it."  It is a fraud upon owners who have properties for sale, real estate brokers and intermediaries, such as lenders and special servicers who hold real estate assets in their portfolios, because they are falsely told that Frydman will not close on these transactions, or that he will "screw them."  It is a fraud on lenders such as banks,

insurance companies and other financial institutions, non-traditional lenders and intermediaries such as mortgage brokers, because they are falsely told that Frydman will not repay his debts.  It is a fraud upon prospective tenants, and brokers representing prospective tenants, because they are falsely told that Frydman will not honor his agreements, that he is not responsible for those transactions which make up his successful track record, and that that he is a thief, fraudster, criminal, scam artist, Ponzi schemer, and the like.  It is a fraud upon prospective professionals such as lawyers, accountants, appraisers, architects and engineers because they are falsely told that Frydman will not honor his agreements or pay their bills.  It is a fraud upon elected officials, town boards, planning boards, zoning boards, building inspectors, and a variety of governmental agencies because it falsely paints Frydman as a criminal and fraudster with whom they should not be doing business.  It is a fraud upon prospective employees because it falsely paints Frydman as a person that they would not want to work with.  It is a fraud upon prospective partners because it falsely portrays Frydman as an unethical "lowlife" and "fraudster" who they would not want to associate or partner with.

### *Culpable Persons*

280.    Verschleiser, Delforno, Pinhasi, Onica, Akerman, Wright, Veen, Svisch, Merchansky, and the Doe defendants are each an individual, and Multi Group is an entity, capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. § 1961(3).

281.    Each of those defendants is a "Culpable Person" under RICO.

### *Enterprise*

282.    Together Verschleiser, Multi Group, Delforno, Pinhasi, Onica, Akerman, Wright, Veen, Svisch, Merchansky, and the Doe defendants have been and continue to be an association-in-fact operating as an "enterprise" – the Ring – as defined in 18 U.S.C. § 1961(4).

283.    The Ring consists of a group of persons associated together for a common purpose of engaging in a course of conduct – to hurt Frydman and his companies (including United Realty and Prime United), by depriving them of customers and other business relationships, *and* to deceive the public both as part of that mission and independently, by victimizing others, including Ring members fleecing and/or defrauding donors to two charities run by Verschleiser; Verschleiser's partners and employees in an on-line casino business; the New York state court system; and at least one unsuspecting disabled person – which has functioned then as a continuing unit.

284.    As such, the Ring's business is inherently or at least primarily unlawful.  All the members of the Ring have worked together to commit various acts of mail or wire fraud for the foregoing common purpose.  Each member has had some part in directing the affairs of the Ring in connection with the matters complained of herein, that he or she used his or her own methods and means and exercised discretion over the particular aspect of its operations with which he or she was involved, whether it was hacking, establishing anonymous or fake websites and blogs, creating their content or secretly breaching fiduciary duties.

285.    As an amalgam of unrelated individual defendants and a corporation the Ring is distinct from each defendant.

*Interstate Commerce*

286.    The activities of the enterprise, i.e., the Ring, affect interstate commerce through the use of the wires (which carry Internet email and website communications and Internet postings), mail or other instrumentalities of interstate commerce in carrying out each of the predicate acts listed above and in furtherance of its mission.  Each defendant could reasonably foresee that the wires and mails would be used in furtherance of that mission.

***Pattern of Racketeering***

287.     Verschleiser, Multi Group, Delforno, Pinhasi, Onica, Akerman, Wright, Veen, Svisch, Merchansky, and the Doe defendants have violated the provisions of 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of an enterprise – the Ring – through a pattern of racketeering activity.

288.     The pattern of racketeering activity commenced on or about December 2, 2013 and continues through the present day.

289.     The pattern of racketeering activity has consisted of multiple predicate acts which are related and continuous and have the same or similar purposes, results, participants, victims, methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events, the last of which occurred within 10 years after the commission of a prior act of racketeering activity as described above, and as such constitute a "pattern of racketeering" as defined in 18 U.S.C. § 1961(5).

290.     As the Ring's business is inherently or at least primarily unlawful, a threat of continuing criminal activity beyond the period in which the predicate acts set forth above were performed is presumed.

291.     Moreover, the pattern of racketeering activity has continued on a consistent basis since December 2, 2013, has seen no cessation, and in fact has been escalating with greater frequency over time, which evidences such a threat of continuing criminal activity.   Indeed, the predicate acts set forth above were the regular way of operating the Ring, and their very nature – repetitive – also implies a threat of continued criminal activity.

*Racketeering Activity*

292.    The predicate acts set forth above constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1) in that they involve mail fraud and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343.

*Injury*

293.    Plaintiffs are each a "person" who sustained injury to his business or property by reason of defendants' violation of 18 U.S.C. § 1962(c).

294.    The pattern of racketeering activity conducted by the defendants in violation of 18 U.S.C. § 1962(c) has caused injury to the business and property of plaintiffs as contemplated by 18 U.S.C. § 1964(c), as set forth under each separate count.

*Statute of Limitations*

295.    The complained-of unlawful activities are ongoing.  The doctrine of continuing tort or injury applies to the claims asserted here.  Therefore, there is no time bar to this action other than the 10-year outer limit for civil RICO.

*Standing to sue*

296.    Plaintiffs' standing to bring civil RICO claims will be established by them showing violations of 18 U.S.C. § 1962 by the defendants with such violations directly causing injury to plaintiffs' business or property, as set forth under each separate count.

## COUNT I

## RICO VIOLATIONS - SECTION 1962(c)

297.    The preceding allegations are realleged as if fully set forth here.

298.    This Count is by plaintiffs against Verschleiser, Multi Group, Delforno, Pinhasi, Onica, Akerman, Veen, Svisch, Merchansky, and the Doe defendants and by Frydman against Wright as well.

299.    Pursuant to and in furtherance of their mission, the defendants committed multiple related acts of racketeering activity in the form of the predicate acts set forth above, constituting a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

300.    The defendants, each of whom has been associated with the Ring, have conducted or participated, directly or indirectly, in the conduct of the enterprise's, i.e., the Ring's, affairs through such pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

301.    The defendants' mission constitutes a fraud upon everyone that Frydman and his businesses rely on to transact business, as set forth above.

302.    As a direct and proximate result of the defendants' violations of 18 U.S.C. § 1962(c), including because Multi Group and Verschleiser are direct competitors of plaintiffs, plaintiffs have been injured in their business and property in that they have been denied valuable business opportunities and have suffered other damage to their business and property.

303.    Specifically, plaintiffs and/or their affiliates lost a $10 million mortgage loan being negotiated with Bancorp, lost a $1.4 million lease being negotiated with Opera Real Estate, lost joint venture or merger opportunities, lost numerous prospective selling agreements, lost numerous prospective investors and lenders, lost real estate, licensing or other business opportunities, lost sales of common stock of the REIT, have had members of the REIT's selling group terminate or suspend selling agreements, as set forth below, and otherwise have suffered severely as shall be proved at trial.

304.    As a result of defendants' violations of 18 U.S.C. § 1962(c), plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million.

305.    18 U.S.C. § 1964(c) creates a private right of action for treble damages for the criminal wrongs complained of here.

## COUNT II

## CONSPIRACY TO VIOLATE SECTION 1962(c) OF RICO - SECTION 1962(d)

306.    The preceding allegations are realleged as if fully set forth here.

307.    This Count is by plaintiffs against Verschleiser, Multi Group, Delforno, Pinhasi, Onica, Akerman, Veen, Svisch, Merchansky, and the Doe defendants and by Frydman against Wright as well.

308.    The defendants conspired to violate 18 U.S.C. § 1962(c), i.e., to conduct or participate, directly or indirectly, in the conduct of the enterprise's, i.e., the Ring's, affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

309.    In that regard, each defendant knew of and agreed to facilitate the mission or objective of the Ring.  Indeed, each or nearly each defendant committed at least two predicate and with knowledge that those acts were in furtherance of the Ring's mission.

310.    As a direct and proximate result of the conspiracy, including because Multi Group and Verschleiser are direct competitors of plaintiffs, plaintiffs have been injured in their business and property in that they have been denied valuable business opportunities and have suffered other damage to their business and property.

311.    As a result of defendants' violations of 18 U.S.C. § 1962(d), plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million.

312.    18 U.S.C. § 1964(c) creates a private right of action for treble damages for the criminal wrongs complained of here.

## COUNT III

## VIOLATIONS OF THE CFAA
## 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C), 1030(a)(6)

313.    The preceding allegations are realleged as if fully set forth here.

314.    This Count is by plaintiffs against Verschleiser, Delforno, Pinhasi and Onica,

315.    Plaintiffs' email exchange server is hosted on a "protected computer", as that term is defined in 18 U.S.C. § 1030(e)(2)(B), in that it is hosted by Intermedia on a data storage or communications facility directly relating to and operating in connection with an electronic, magnetic, optical, electrochemical or other high speed data processing device performing logical, arithmetic, and/or storage functions, which is connected to the Internet and which is used in or affects interstate commerce and communication.

316.    Verschleiser, Pinhasi and Onica intentionally accessed United Realty's protected computer without authorization, and thereby obtained information from it in violation of 18 U.S.C. § 1030(a)(2)(C), and caused damage and loss in violation of 18 U.S.C. § 1030(a)(5)(C), in that they used Frydman's password credentials to access such computer without plaintiffs' permission, after their employment or consulting arrangement with United Realty and their permission to access such computer had been terminated, at times using their former credentials.

317.    Delforno intentionally accessed United Realty's protected computer without authorization, and thereby obtained information from it in violation of 18 U.S.C. § 1030(a)(2)(C), and caused damage and loss in violation of 18 U.S.C. § 1030(a)(5)(C), and "exceed[ed] authorized access" as that term is defined in 18 U.S.C. § 1030(e)(6), in that from the earlier of the date of his breach of duty of loyalty and February 14, 2014 when he was fired as an employee of United Realty (such earlier date being the "cut-off date"), he used Frydman's password credentials to access such computer without plaintiffs' permission and prior to the cut-off date he accessed the company's email exchange server with authorization, but exceeded his authority in accessing Frydman's or other employees' emails, because he was expressly not authorized to access their email accounts.

318.    The foregoing acts of Verschleiser, Pinhasi, Onica and Delforno each constitutes

knowingly accessing a protected computer without authorization or exceeding authorization with the intent to defraud and by means of such conduct furthers the intended fraud and obtains information of value in violation of 18 U.S.C. § 1030(a)(4), as each was aware his access was without permission (and Delforno was aware his pre-cut-off date access exceeded permission) and each obtained such access in order to steal plaintiffs' information.

319.   As set forth above, Delforno impermissibly disclosed Frydman's password credentials to Verschleiser, who in turn impermissibly disclosed them to Pinhasi and Onica, who in turn impermissibly disclosed them to one or more Doe defendants.  They did so with the intent to defraud plaintiffs as Delforno, Pinhasi and Onica were aware their disclosure was in violation of United Realty's employee policies, Verschleiser was aware his disclosure was without permission, and each made such disclosure in order to steal plaintiffs' information.

320.   The act of Delforno in so disclosing Frydman's password to Verschleiser, the act of Verschleiser in so disclosing it in turn to Parnasi and Onica, and the act of Pinhasi and Onica in so disclosing it to one or more Doe defendants each constitutes knowingly trafficking in passwords to affect interstate commerce with the intent to defraud in violation of 18 U.S.C. § 1030(a)(6).

321.   Multiple unauthorized accesses into Frydman's email by those defendants, as evidenced by Intermedia's logs, demonstrate that Frydman's passwords were trafficked among those defendants.

322.   Moreover, Delforno was never authorized to use his authority, when he had same, to alter, copy, distribute, disclose to persons outside of United Realty, or delete any electronic communications, attachments, data, information, trade secrets or the like.

323.   Verschleiser, Delforno, Pinhasi and Onica's actions as set forth above in blocking

Frydman and other United Realty employees from accessing their email accounts constitute an interruption.

324.    Verschleiser,  Delforno, Pinhasi and Onica's actions as set forth above in altering, deleting, or otherwise impairing the integrity or availability of data or information as a result of copying, downloading and thereafter deleting files, data and information constitute impairing the integrity or availability of data or information in violation of 18 U.S.C. § 1030.

325.    As a result of d efendants' illegal conduct plaintiffs suffered loss by (a) incurring costs to investigate and respond to defendants' offenses constituting damage to a computer, including hiring external computer forensic consultants to conduct a damage assessment; and (b) spending many hours of valuable time away from day-to-day responsibilities assisting in investigating the offenses, resulting in costs in excess of $5,000 in one or more one-year periods, as detailed above.

326.    As a result of defendants' illegal conduct plaintiffs suffered damage by defendants' deletion and theft of privileged and confidential files, data and other information from plaintiffs' computers which exceeded 10 in number.  The value of such information and the development costs of recreating it is estimated to be in excess of $500,000.

327.    Verschleiser, Delforno, Pinhasi and Onica caused losses to plaintiffs exceeding $5,000 in value in one or more one-year periods, as proscribed by 18 U.S.C. § 1030(c)(4)(A)(i)(I), (vi), including for costs of responding to an offense, conducting a damage assessment and restoring conditions prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service, as well as damage resulting from the deletion of files, data and other information estimated to be in excess of $500,000.

328.    Verschleiser, Delforno, Pinhasi and Onica are liable, jointly and severally, to plaintiffs for such losses and damage pursuant to 18 U.S.C. § 1030(g).

## COUNT IV

### CONSPIRACY TO VIOLATE THE CFAA - 18 U.S.C. § 1030(b)

329.    The preceding allegations are realleged as if fully set forth here.

330.    This Count is by plaintiffs against Verschleiser, Delforno, Pinhasi and Onica,

331.    Verschleiser, Delforno, Pinhasi and Onica conspired to violate 18 U.S.C. § 1030(a) by agreeing to intentionally access plaintiffs' protected computers without authorization, or as to Delforno prior to the cut-off date by exceeding his authority as above set forth, in violation of 18 U.S.C. § 1030(b), committing one or more overt acts in furtherance of the agreement and intentionally participating in the furtherance of a plan or purpose to gain such access.

332.    As a direct and proximate result of the conspiracy, Verschleiser, Delforno, Pinhasi and Onica caused losses to plaintiffs exceeding $5,000 in value in one or more one-year periods, as well as damage resulting from the deletion of files, data and other information estimated to be in excess of $500,000.

333.    Verschleiser, Delforno, Pinhasi and Onica are liable, jointly and severally, to plaintiffs for such losses and damage pursuant to 18 U.S.C. § 1030(g).

## COUNT V

### INTERCEPTING COMMUNICATIONS
### IN VIOLATION OF THE ECPA – 18 U.S.C. § 2511(1)(a)

334.    The preceding allegations are realleged as if fully set forth here.

335.    This Count is by plaintiffs against Verschleiser and Delforno.

336.    Verschleiser and Delforno's actions in intercepting emails that were being sent to Frydman or other United Realty employees as set forth above constitute the intentional

interception of protected communications in violation of the ECPA, 18 U.S.C. § 2511(1)(a).

337.    The actions were done intentionally, as they were done knowingly and purposefully; the actions constitute "interceptions" as in each instance they were an acquisition of the contents of a wire or electronic communication through the use of any electronic, mechanical or other device as defined at 18 U.S.C. § 2510(4); and the interception of emails were contemporaneous with their transmissions, in that Verschleiser and in at least one instance Delforno set up distribution groups and accounts and established POP/IMAP email forwarding rules causing emails intended for Frydman and other United Realty employees to be forwarded to them instead.

338.    Verschleiser and Delforno are liable, jointly and severally, to plaintiffs for the actual damages they suffered in an amount to be determined at trial believed to be not less than $12 million (*i.e.*, the loss of the Bancorp loan and Opera Real Estate sublease), and punitive damages as the interception was willful, pursuant to 18 U.S.C. § 2520.

## COUNT VI

## DISCLOSING THE CONTENTS OF INTERCEPTED COMMUNICATIONS  IN VIOLATION OF THE ECPA –  18 U.S.C. § 2511(1)(c)

339.    The preceding allegations are realleged as if fully set forth here.

340.    This Count is by plaintiffs against Verschleiser.

341.    Verschleiser's actions set forth above in disclosing to Itkowitz and Zoldan the contents of intercepted emails between Frydman and LoParrino, and between Loparrino and Citibank, constitute the intentional disclosure to another person of the contents of a communication knowing or having reason to know that the information was obtained through the unlawful interception of the communication in violation of the ECPA, 18 U.S.C. § 2511(1)(c).

342.    Verschleiser is liable to plaintiffs for the actual damages they suffered in an amount

to be determined at trial believed to be not less than $50,000, and punitive damages as the interception was willful, pursuant to 18 U.S.C. § 2520.

## COUNT VII

## VIOLATIONS OF THE SCA – 18 U.S.C. § 2701(a)

343.     The preceding allegations are realleged as if fully set forth here.

344.     This Count is by plaintiffs against Verschleiser, Delforno, Pinhasi and Onica.

345.     Verschleiser, Delforno, Pinhasi and Onica's actions set forth above in accessing email messages and attachments of plaintiffs, including their employees, digitally stored on the United Realty exchange servers ("plaintiffs' accessed emails") constitute intentionally accessing without authorization, or intentionally exceeding authorization to access, a facility through which an electronic communication service is provided – the servers operated by Intermedia, plaintiffs' hosted email exchange service provider – and thereby obtaining, altering or preventing authorized access to a wire or electronic communication while it is in electronic storage in such system in violation of the SCA, 18 U.S.C. § 2701(a).

346.     With the exception of certain emails sent by Frydman to or received from Delforno while Delforno was an employee of United Realty, none of Verschleiser, Delforno, Pinhasi or Onica was a sender or intended recipient of plaintiffs' accessed emails.

347.     Verschleiser, Pinhasi and Onica's access to plaintiffs' accessed emails was not authorized by plaintiffs.

348.     Delforno's access to plaintiffs' accessed emails prior to the cut-off date exceeded his authority to access because he was expressly not authorized to access Frydman and other employees' email accounts, and from the cut-off date Delforno was not authorized to access plaintiffs' accessed emails.

349.     Verschleiser, Delforno, Pinhasi and Onica's actions by virtue of blocking Frydman and the other United Realty employees from accessing their emails as set forth above constitutes prevention of authorized access.

350.     Verschleiser, Delforno, Pinhasi and Onica's actions in accessing, reading, creating copies of and thereafter downloading the numerous files referenced above constitutes obtaining access.

351.     Verschleiser, Delforno, Pinhasi and Onica's actions, by deleting numerous files after downloading them including without limitation 'Jacob_Frydman_12-06-2013.pst'; 'Eli_Verschleiser_12-06-2013.pst';' 'URPA_Backup_ Joseph_Santacruz_12-01-2013.pst'; 'Asher_Gulko_12-06-2013.pst'; 'Monica_Frydman_12-06-2013.pst'; 'Cathy_Larson_12-08-2013.pst', and 'Jacob_Frydman_12-09-2013.pst', constitutes further prevention of authorized access and alteration of access.

352.     Verschleiser, Delforno, Pinhasi and Onica used the contents of illegally accessed electronic communications while in electronic storage to create the myriad fake websites, blogs and Internet postings, including without limitation photos of Frydman and information about United Realty which was not available on its website.

353.     None of those defendants had a property or possessory interest in the facility utilized to access and download the stored emails, attachments and data or to reproduce or access the emails accessed, backed-up and downloaded on the dates set forth above.

354.     Verschleiser, Delforno, Pinhasi and Onica are liable, jointly and severally, to plaintiffs for the actual damages they suffered in an amount to be determined at trial believed to be not less than $160 million, and punitive damages as their actions were willful, pursuant to 18 U.S.C. § 2707.

## COUNT VIII

### LIBEL PER SE (VERSCHLEISER, AKERMAN AND WRIGHT)

355.    The preceding allegations are realleged as if fully set forth here.

356.    This Count is by plaintiffs against Verschleiser, Akerman and Wright (the "Libel Defendants").

357.    Verschleiser filed the First Defamatory Lawsuit, which was a sham, knowing that he had no basis to do so and asserting defamatory statements in that Lawsuit solely to disseminate them to the public and the press.

358.     Verschleiser, Akerman and Wright initiated, filed or conspired to file the Second Defamatory Lawsuit, which was a sham, knowing that they had no basis to do so and asserting defamatory statements in that Lawsuit solely to disseminate them to the public and the press.

359.    Verschleiser and Akerman initiated, filed or conspired to file the Third  Defamatory Lawsuit and the False Claims Letter, which were sham, knowing that they had no basis to do so and asserting defamatory statements in that Lawsuit and Letter solely to disseminate them to the public and the press.

360.    After the initiation of each of the First Defamatory Lawsuit, the Second Defamatory Lawsuit, the Third Defamatory Lawsuit and/or the False Claims Letter, Verschleiser leaked each Lawsuit and that Letter to media outlets, including without limitation *Real Deal*, *Law 360*, *Investment News* and the New York Post, and on the Internet as well.

361.    The Libel Defendants are not entitled to immunity for the defamatory statements because the Lawsuits and the Letter were brought solely for the purpose of cloaking said statements with the appearance of privilege.  Further, the Libel Defendants' statements were not made in furtherance of any litigation objective and were not reasonably related to the subject matter of the proceedings.

362.    The statements were written defamatory statements of fact concerning plaintiffs and were and are false.

363.    The statements each amount to libel per se under the law as they are direct attacks upon the business, trade or profession of Frydman and upon the business reputation of the other plaintiffs, and damages are therefore presumed.

364.    The statements were published without privilege or authorization to a third party.

365.    In publishing those defamatory statements, the Libel Defendants wrongfully and willfully intended by such publication to injure Frydman's personal and business reputation and to injure the other plaintiffs' business reputations and good names.

366.    At the time the Libel Defendants uttered and caused to be published the libelous matter set forth above, they acted with actual malice because they knew the statements were false or, in the alternative, they failed to ascertain the accuracy of the statements and instead published them with reckless or grossly negligent disregard for the truth whether they were true or not.

367.    As a direct result of the foregoing defamatory statements, Frydman has suffered injury to his personal and business reputation, and the other plaintiffs have suffered injury to their business reputations and good names, and have been damaged in an amount to be determined at trial believed to be in excess of $160 Million.

368.    In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, plaintiffs are also entitled to recover punitive damages.

**COUNT IX**

**TRADE LIBEL**

369.    The preceding allegations are realleged as if fully set forth here.

370.    This Count is by plaintiffs against Verschleiser, Akerman, Wright, Veen, Svisch, Merchansky, and the Doe defendants (the "Trade Libel Defendants").

371.    The defamatory statements made by those defendants in the sections above entitled "Second Predicate Acts – Wire Fraud Via Subsequent Hacking", Verschleiser Files The First Defamatory Lawsuit",  "Verschleiser Manufactures Fake Evidence", "Third Predicate Acts – Wire Fraud Via Internet Scams", "Fourth Predicate Acts – Wire Fraud Via False Advertisement Flyers And Posters", "Fifth Predicate Acts - Wire Fraud Via Additional Internet Scams",  The Fishoff Lawsuit – The Second Defamatory Lawsuit",  "The Akerman Lawsuit – The Third Defamatory Lawsuit", "The False Claims Letter", and "Recent Defamation by Verschleiser" constitute trade libel as The Trade Libel Defendants knowingly published false matters that are derogatory to plaintiffs' businesses and which were calculated to prevent or interfere with relationships between plaintiffs and others to plaintiffs' detriment.

372.    The statements were written defamatory statements of fact concerning plaintiffs and were and are false, were published to third persons, were published with actual malice and resulted in damages to plaintiffs.

373.    The statements were published without privilege or authorization to a third party.

374.    As set forth above, the statements played a material and substantial part in inducing others not to deal with plaintiffs, with the result that special damages, in the form of lost dealings, were incurred, including the $10 million Bancorp loan and the $1.4 million Opera Real Estate sublease, and including the following as a result of the statements:

- Scott Haag, investor, $241,052.63 in REIT shares redeemed

- Christina Opinski, investor, $51,215.58 in REIT shares redeemed

- Anthony and Maryellen Strollo, investors, $170,526.32 in REIT shares redeemed

- Frank Rizzo, investor, $26,950.99 in REIT shares redeemed

- Isabelle Kirschenbaum, investor, $27,500 in REIT shares redeemed

- Jeffrey Burns, investor, $136,835.08 in REIT shares redeemed (the foregoing redeeming shareholders starting with Haag are collectively the "Redeeming Shareholders")

- Karl Birkenfeld, a registered representative with CLS, which is the dealer manager on the financial services products sold by Frydman's companies, lost a $1.5 million sale of REIT stock to Scott Kirtland of Stirling Insurance Services

- Bernard Lherrisson and Confrence Gbaje, both registered representative with Aegis Securities, a broker dealer with whom Frydman's companies had a selling agreement, lost a $700,000 sale of REIT stock to John Kindle

- Martin Barth, a registered representative with Meyers Associates, a broker dealer with whom Frydman's companies have a selling agreement, lost a $50,000 sale of REIT stock to his client

- Francis P. Carson, a registered representative with Trustmont Financial Group, a broker dealer with whom Frydman's companies had a selling agreement, lost a $30,000 sale of REIT stock to his client

- David Levinson, a registered representative with Newport Coast Securities, with whom Frydman's companies had a selling agreement, lost a $250,000 sale of REIT stock to his client

- Ed Suzuki, a registered representative associated with Newport Coast Securities with whom Frydman's companies do business and have a selling agreement, reported that he lost approximately five client sales as a result of the email blast campaign of May and June 2015 which represented lost REIT sales of $1,000,000

- Each of the following persons with whom Frydman's companies do business and have or had a selling agreement have lost sales of REIT stock to their clients, in an amount believed to exceed $10 million: (i) Stacy Skytte with Newport Coast Securities; (ii) Jason Vanclef with Vanclef Financial; (iii) Todd Rustman with Niagara International Capital Limited; (iv) Jeff Noard with CLS; and (v) Greg McClosky with Newport Coast Securities (the foregoing lost REIT buyers starting with Birkenfeld's are collectively the "Lost REIT Buyers")

- Concord Investment Services, LLC, a broker dealer with 106 registered representatives with whom Frydman's companies had a selling agreement, dropped United Realty as a result of the False Claims Letter and the email blast campaign, which represents a loss of approximately $10 million in REIT stock, and more than $10 million in 1031 syndications

- Sandlapper Securities, LLC, a broker dealer with 45 registered representatives with whom Frydman's companies had a selling agreement, dropped United Realty as a result of the False Claims Letter and the email blast campaign, which represents a loss of approximately $4 million in REIT stock, and more than $6 million in 1031 syndications

- Trustmount Financial Group, a broker dealer with 150 registered representatives with whom Frydman's companies had a selling agreement, dropped United Realty as a result of the False Claims Letter and the email blast campaign, which represents a loss of approximately $10 million in REIT stock, and more than $10 million in 1031 and other syndications

- Dynasty Capital Partners, a broker dealer with whom Frydman's companies had a selling agreement, dropped United Realty as a result of the False Claims Letter and the email blast campaign, which represents a loss of approximately $5 million in REIT stock, and Reg. D syndications (the foregoing broker dealers starting with Concord Investment Services are collectively the "Lost Broker Dealers")

- Each of the following persons with whom Frydman's companies were in discussion to execute a selling agreement and/or who were conducting their due diligence elected not to do business with Frydman and his companies, including the REIT, which represents a loss of prospective REIT stock in an amount believed to exceed $100 million: (i) Marty McNees with Madison Avenue Securities; (ii) Travis Hicks with International Financial Group; (iii) Jonathan French with Crown Capital; (iv) Paul Ring with Centaurus; (v) Rob Crowe with Summit Financial; (vi) Robert Binkele with JP Turner; (vii) Don Waage with Colorado Financial Services; (viii) Nathan Wahl with SCF; (ix) Lemar McGee with Voya Financial; (x) Dan Hill with  DH Hill; (xi) Craig Convington with Triad Advisors; (xii) Jeff Rosenthal with Triad Advisors; (xiii) Brett Robison with Triad Advisors; (xiv) Curtis Sathre with JRL; (xv) Todd Vandeburg with IFG; (xvi) Larry Labine with Newbridge Securities; (xvii) Amy Gunter with ProEquities; (xviii) Brian Kovack with Kovack Securities; (xix) Kurt Tesh with Kalos Financial; (xx) Jim Goedtke with American Portfolios; (xxi) Matt Reynolds with D.A. Noyse Wealth Management Advisors; (xxii) Jenifer Szaro with LSM Financial; (xxiii) Jerry Dempsey with Dempsey Lord Smith, LLC; (xxiv) Will Thimes with Capital Markets, Inc.; (xxv) Tim Highland with Investment Planners, Inc.; (xxvi) Todd Jessop with Lifemark Securities Corp.; (xxvii) James Lockhart with Harbor Light Securities, LLC; (xxviii) Dean McDermott with McDermott Advisors; (xxix) Rick Medland with Harbour Investments, Inc.; (xxx) Brenda Smith with CV Brokerage; (xxxi) Andy Christofferson at  Berthel Fisher & Company Financial Services, Inc.; and (xxxii) others that plaintiffs will introduce at the trial on the merits (the foregoing prospective selling group members are collectively the "Lost Prospective Selling Group Members")

375.    As a result of such trade libel, plaintiffs have been damaged in an amount to be

determined at trial believed to be not less than $160 million.

376.    In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, plaintiffs are also entitled to recover punitive damages.

## COUNT X

### LIBEL PER SE (VERSCHLEISER, VEEN, SVISCH, MERCHANSKY, AND THE DOE DEFENDANTS)

377.    The preceding allegations are realleged as if fully set forth here.

378.    This Count is by plaintiffs against Verschleiser, Veen, Svisch, Merchansky and the Doe defendants (the "Libel Per Se Defendants").

379.    The defamatory statements made by the Libel Per Se Defendants in the sections above entitled "Second Predicate Acts – Wire Fraud Via Subsequent Hacking", "Verschleiser Manufactures Fake Evidence", "Third Predicate Acts – Wire Fraud Via Internet Scams", "Fourth Predicate Acts – Wire Fraud Via False Advertisement Flyers And Posters", "Fifth Predicate Acts - Wire Fraud Via Additional Internet Scams", and "Recent Defamation by Verschleiser" constitute libel per se.

380.    The statements were written defamatory statements of fact concerning plaintiffs and were and are false, were published to third persons, were published with actual malice and have harmed and will continue to harm plaintiffs' reputations, including lowering those reputations and/or deterring investors and other business associates and prospective investors and business associates and others from investing with, associating and/or dealing with plaintiffs.

381.    The statements were published without privilege or authorization to a third party.

382.    The statements each amount to libel per se under the law as they are direct attacks upon the business, trade or profession of Frydman and/or falsely impute criminal activity to him and are direct attacks upon the business reputation of the other plaintiffs, and damages are therefore presumed.

383.    As a result of the Libel Per Se Defendants' statements constituting libel per se, plaintiffs have been damaged in that they have suffered humiliation, embarrassment, injury to reputation and standing in the community, mental suffering, and anguish and anxiety, in an amount to be determined at trial believed to be not less than $160 million.

384.    In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, plaintiffs are also entitled to recover punitive damages.

## COUNT XI

## MISAPPROPRIATION OF TRADE SECRETS

385.    The preceding allegations are realleged as if fully set forth here.

386.    This Count is by plaintiffs against Verschleiser, Delforno, Pinhasi, Onica and Akerman and by Frydman against Wright.

387.    The actions of Verschleiser, Delforno, Pinhasi and Onica in hacking into plaintiffs' email exchange servers and stealing or causing the theft of highly confidential information relating to whom plaintiffs were then transacting business, and specifically, that plaintiffs were then negotiating with Bancorp for a $10 million loan, and with Opera Real Estate to sublease new corporate facilities at 180 Maiden Lane, and then improperly using that information to plaintiffs' detriment constitutes the misappropriation of trade secrets.

388.    As a result of that hacking, Verschleiser, learned of the identities of Bancorp and Opera Real Estate in breach of his Separation Agreement and employment agreement or as a result of discovery by improper means.

389.    That information was confidential, proprietary and protected so as to constitute trade secrets.

390.    Verschleiser acquired said trade secrets through a breach of confidence, by fraud and bad faith, or by unfair means, specifically his and Deforno, Pinasi and Onica's hacking activities.

391.    Verschleiser used or disclosed said trade secrets to the detriment of plaintiffs by sending or directing the sending of "anonymous" emails allegedly from informedconsumer@mail.com to representatives of both Bancorp and Opera Real Estate with the intent and for the purpose of injuring plaintiffs and their businesses.

392.    As a result of the misappropriation of trade secrets by Verschleiser, Delforno, Pinhasi, and Onica, plaintiffs have been damaged in that they lost a $10 million loan and a $1.4 million, below market sublease.

393.    As a result of such misappropriation, plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $12 million.

394.    Verschleiser, Akerman and Wright all conspired to steal the Stolen Trade Secrets.

395.    Verschleiser and Wright effected the scheme through Akerman, who at the time was the chief compliance officer of CLS, and had access to the Stolen Trade Secrets, particularly the Transaction Agreement.  Akerman learned of the Stolen Trade Secrets in breach of his employment agreement and his confidential relationship with or duty to plaintiffs or as a result of discovery by improper means.

396.    Pursuant to their conspiracy, Verschleiser, Akerman and Wright illegally used and disclosed the Stolen Trade Secrets in connection with the initiation of the Second Defamatory Lawsuit, and Verschleiser and Akerman did so in connection with the initiation of the Third Defamatory Lawsuit.

397.    Pursuant to their conspiracy, Verschleiser, Akerman and Wright illegally used and disclosed the Stolen Trade Secrets in leaking the Second Defamatory Lawsuit to the media and Verschleiser and Akerman did so in leaking the Third Defamatory Lawsuit to the media.

398.    As a result of the misappropriation of trade secrets by Verschleiser, Akerman and Wright, plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $50 million.

399.    In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, plaintiffs are also entitled to recover punitive damages.

### OTHER FACTS COMMON TO TORTIOUS INTERFERENCE
### WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS

400.    Plaintiffs sponsor pooled real estate investment vehicles and funds, and raise capital primarily through the independent broker dealer network.

401.    Plaintiffs and their affiliates have many existing business relationships with numerous FINRA member broker dealers, thousands of registered representatives associated with such broker dealers, and hundreds of existing investors, in addition to other business relationships with persons engaged in the various areas of the real estate business.

402.    In addition, plaintiffs consistently seek to develop new business relationships with the intention of entering into new contractual and other business relationships with hundreds of broker dealers, thousands of registered representatives associated with such broker dealers, and prospective investors, in addition to other prospective business relationships.

403.    Plaintiffs have personnel devoted to market and develop new business relationships.

404.    Plaintiffs have been well positioned to raise capital, acquire assets and develop business relationships, but have been stymied by the illegal, wrongful malicious and intentional acts of Verschleiser and other defendants as complained of here.

405.    Plaintiffs have contractual and prospective contractual relationships with (a) independent broker dealers; (b) registered representatives associated with independent broker dealers; (c) clients of such registered representatives who have invested in, and who may invest in, investment opportunities sponsored by Frydman and his businesses; (d) owners of real estate assets who have properties for sale, real estate brokers and intermediaries, lenders and special servicers, title companies and qualified 1031 intermediaries who have access to real estate assets which potentially could be attractive acquisitions for Frydman and his businesses; (e) banks, insurance companies and other financial institutions, through investors and non-traditional lenders, and through intermediaries such as mortgage brokers who have access to debt and equity capital which potentially could be lent to or invested with Frydman and his businesses; (f) tenants and leasing brokers who have access to tenants who are in the market to rent space potentially from Frydman and his businesses; (g) FINRA member broker dealers and registered investment advisors in connection with the potential acquisitions or mergers by or with Prime United and its affiliates; (h) professionals such as lawyers, accountants, appraisers, architects and engineers, property management companies, contractors, title companies, insurers and consultants who provide services to real estate investors and which potentially could be retained by Frydman and his businesses; (i) employees, potential employees, head hunters and recruiters; and (j) institutional investors, such as pension funds, endowments, and other real estate developers, who provide joint venture capital, institutional capital and/or joint venture opportunities to Frydman and his businesses, each of whom search Frydman's name and the names of his businesses on search engines and view the prominent display of websites, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and other defendants.

406.     Plaintiff Prime United and its affiliates entered into the Transaction Agreement which was the subject of the Second Defamatory Lawsuit, and which Verschleiser, Akerman and Wright intentionally interfered with by conspiring to steal the Stolen Trade Secrets, which included the Transaction Agreement, filing the Second Defamatory Lawsuit and/or disseminating it to the public and the press.

## COUNT XII

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL OR BUSINESS RELATIONS

407.     The preceding allegations are realleged as if fully set forth here.

408.     This Count is by plaintiffs against Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants and by Prime United against Akerman and Wright.

409.     Verschleiser and through him Veen, Svisch, Merchansky and the Doe defendants have known of the existing contractual or business relationships between the persons or classes of persons identified above and plaintiffs and their businesses, including without limitation of the existence of valid selling agreements, investor subscriptions, loan agreements, subleases and other contracts between plaintiffs and third parties.

410.     Verschleiser Veen, Svisch, Merchansky, and one or more of the Doe defendants have wrongfully created, posted, published and/or transmitted numerous fake or otherwise disparaging websites, blogs and other Internet postings as set forth above.

411.     As a result, the persons or classes of persons with whom plaintiffs have existing contractual or business relationships are deceived or confused when searching for information on the Internet on Frydman and his businesses.  In so searching, such persons or classes of persons have been and continue to be exposed repeatedly to false, derogatory, defamatory, negative and intentionally misleading "information" about Frydman and his businesses.

412.    The statements made in the websites, blogs and other Internet postings created, posted, published and/or transmitted by Verschleiser Veen, Svisch, Merchansky, and one or more of the Doe defendants about Frydman and his businesses, including without limitation United Realty, were and are false.

413.    With respect to plaintiffs' existing contracts, Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants intended to procure and improperly procured breaches of said contracts without justification.

414.    With respect to plaintiffs' existing business relations, Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants acted intentionally and with the sole purpose of harming plaintiffs or used dishonest, unfair or improper means.

415.    As a result of such conduct, third parties in privity of contract or in existing business relations with plaintiffs suspended, breached or terminated contracts and suspended or terminated existing business relations with plaintiffs including the Redeeming Shareholders, the Lost REIT Buyers and the Lost Broker Dealers listed above.

416.    There would not have been such suspension, breach or termination but for such conduct.

417.    By virtue of such conduct, which includes tortious, intentional, malicious and/or criminal acts, Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants interfered and continue to interfere with plaintiffs' existing contractual or business relationships with investors, soliciting broker dealers, registered representatives associated with soliciting broker dealers, real estate owners, tenants, brokers, lenders, contractors, professionals, employees and other persons or classes of persons identified above with whom plaintiffs and their businesses have such relations.

418.    As a result, plaintiffs have suffered damages to their existing contractual or business relations.

419.    Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants' tortious interference with plaintiffs' existing contractual or business relations has damaged them in an amount to be determined at trial believed to be not less than $160 million.

420.    In addition to such damages, plaintiffs seek punitive damages as a result of the egregious conduct committed by Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants.

421.    As set forth above, plaintiff Prime United and its affiliates have entered into a contract to effect the Transaction Agreement which was the subject of the Second Defamatory Lawsuit, and which Verschleiser, Akerman and Wright intentionally interfered with by conspiring to steal the Stolen Trade Secrets, which included the Transaction Agreement, filing the Second Defamatory Lawsuit and/or disseminating it to the public and the press, which in turn caused the third party to the Transaction Agreement to terminate it with Prime United and its affiliates.

422.    In doing so, Verschleiser, Akerman and Wright were aware of the existence of the Transaction Agreement and intended to procure and improperly procured its breach without justification.

423.    There would not have been such termination but for the conduct of Verschleiser, Akerman and Wright.

424.    As a result, Prime United has suffered damages by the loss of the Transaction Agreement.

425.     Verschleiser, Akerman and Wright's tortious interference with the Transaction Agreement has damaged Prime United in an amount to be determined at trial believed to be not less than $4 million.

426.     In addition to such damages, Prime United seeks punitive damages as a result of the egregious conduct committed by Verschleiser, Akerman and Wright.

## COUNT XIII

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL OR BUSINESS RELATIONS

427.     The preceding allegations are realleged as if fully set forth here.

428.     This Count is by plaintiffs against Verschleiser, Delforno, Pinhasi, Onica, Veen, Svisch, Merchansky, and the Doe defendants (the "Tortious Interference Defendants").

429.     Plaintiffs and their affiliates have had numerous opportunities to enter into contracts with prospective broker dealers who considered joining the selling group; with broker dealers considering selling their businesses or merging; with licensors of branded trademarks considering entering into licensing agreements; with sellers of assets, including without limitation real property assets; with investors who were considering entering into investment subscription agreements; with lenders considering entering into loan transactions with plaintiffs and their affiliates; with sub-landlords considering entering into leases with plaintiffs and their affiliates; with prospective employees and consultants considering entering into agreements with plaintiffs and their affiliates; and with other prospective contracting parties.

430.     Verschleiser and through him the other Tortious Interference Defendants have known of such opportunities or at a minimum have known that plaintiffs actively pursue new contractual and business relations.

431.    As set forth above, the Tortious Interference defendants have intercepted emails and wrongfully created, posted, published and/or transmitted numerous fake or otherwise disparaging websites, blogs and other Internet postings.

432.    As a result, the persons or classes of persons with whom plaintiffs have prospective contractual or business relationships are deceived or confused when searching for information on the Internet on Frydman and his businesses.  In so searching, such persons or classes of persons have been and continue to be exposed repeatedly to false, derogatory, defamatory, negative and intentionally misleading "information" about Frydman and his businesses.

433.    As set forth above, the statements made as a result of the intercepted emails and in the websites, blogs and other Internet postings created,  posted, published and/or transmitted by the Tortious Interference Defendants about Frydman and his businesses, including without limitation United Realty, were and are false.

434.    The Tortious Inteference Defendants acted intentionally and with the sole purpose of harming plaintiffs or used dishonest, unfair or improper means.

435.    As a result of such conduct, Bancorp and Opera Real Estate, third parties in prospective contractual or business relations with plaintiffs suspended or terminated those relations, as did the Lost Prospective Selling Group Members.

436.    But for such conduct, those third parties would not have suspended or terminated those relations, which would have ripened into actual contracts or business relations.

437.    By virtue of such conduct, which includes tortious, intentional, malicious and/or criminal acts, the Tortious Interference Defendants interfered and continue to interfere with plaintiffs' prospective contractual or business relationships with investors, soliciting broker dealers, registered representatives associated with soliciting broker dealers, real estate owners,

tenants, brokers, lenders, contractors, professionals, employees and other persons or classes of persons identified above with whom plaintiffs and their businesses have such relations.

438.     As a result, plaintiffs and their affiliates have suffered damages to their prospective contractual or business relations.

439.     The Tortious Interference Defendants' tortious interference with plaintiffs' prospective contractual or business relations has damaged them in an amount to be determined at trial believed to be not less than $160 million.

440.     In addition to such damages, plaintiffs seek punitive damages as a result of the egregious conduct committed by Verschleiser and the Doe defendants.

### COUNT XIV
### (by Frydman in the Alternative to the Trade Libel and Second Libel Per Se Counts)

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

441.     The preceding allegations are realleged as if fully set forth here.

442.     This Count is by Frydman against Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants in the alternative to the Trade Libel and Second Libel Per Se Counts above to the extent they are asserted by him.

443.     The wrongful, intentional, malicious and/or criminal actions of Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants in creating, posting, publishing and/or transmitting numerous fake or otherwise disparaging websites, blogs and other Internet postings as set forth above constitute extreme and outrageous conduct, in that it is so extreme and outrageous that it transcends the bounds of decency so as to be regarded as atrocious and intolerable in a civilized society.

444.   Such conduct has been undertaken by Verschleiser, Veen, Svisch, Merchansky, and the other Doe defendants with the intent to cause, or in disregard of a substantial probability of causing, severe emotional distress to Frydman.

445.   As a direct and proximate result of such conduct, Frydman has suffered and will continue to suffer severe emotional distress.  It is foreseeable that a causal connection would exist between such conduct and the resulting injury to Frydman of severe emotional distress.

446.    Verschleiser, Veen, Svisch, Merchansky, and the Doe defendants' intentional infliction of emotional distress damaged Frydman in an amount to be determined at trial believed to be not less than $50 million.

447.   In addition to such damages, Frydman seeks punitive damages as a result of the egregious conduct committed by Verschleiser and the Doe Defendants.

<u>**COUNT XV**</u>

**BREACH OF CONTRACT (VERSCHLEISER)**

448.   The preceding allegations are realleged as if fully set forth here.

449.   This Count is by United Realty and Frydman against Verschleiser.

450.   As noted, Verschleiser entered into an employment agreement with United Realty containing non-solicitation, non-disparagement and confidentiality provisions, and into a Separation Agreement with inter alia Frydman containing the first two provisions.

451.   As noted, Verschleiser also agreed at Section 25 of the Separation Agreement, "to restore all exchange servers, web hosting and the Entities' computer servers to their status on or before November 15, 2013 and to provide Frydman with all owner and administrative passwords by the close of business on December 5, 2013."

452.   Verschleiser breached the foregoing provisions of his employment agreement and

the Separation Agreement as set forth above.

453.   United Realty performed all of the terms and conditions of Verschleiser's employment agreement on its part to be performed

454.   Frydman performed all of the terms and conditions of the Separation Agreement on his part to be performed.

455.   As a result of Verschleiser's breaches of his employment agreement and the Separation Agreement, United Realty and Frydman have been damaged in an amount to be determined at trial believed to be not less $160 million.

## COUNT XVI

### BREACH OF CONTRACT (AKERMAN)

456.   The preceding allegations are realleged as if fully set forth here.

457.   This Count is by United Realty against Akerman.

458.   As noted, Akerman entered into an employment agreement with United Realty containing non-disparagement and confidentiality provisions and a subscription agreement and limited partnership agreement with United Realty containing a confidentiality provision.

459.   Akerman breached the foregoing provisions of his employment, subscription and limited partnership agreements as set forth above.

460.   United Realty performed all of the terms and conditions of those agreements on its part to be performed.

461.   As a result of Akerman's breaches of those agreements, United Realty has been damaged in an amount to be determined at trial believed to be not less $6 million.

## COUNT XVII

### INDEMNIFICATION

462.     The preceding allegations are realleged as if fully set forth here.

463.     This Count is by plaintiffs against Akerman.

464.     As noted, Akerman's subscription agreement contains a provision giving United Realty and its affiliates such as Frydman and Prime United certain indemnification rights for inter alia breach of confidentiality, including indemnification for expenses incurred in connection with this action, the Fishoff Lawsuit and the Third Defamatory Lawsuit by Akerman and for the loss of the Transaction.

465.     Plaintiffs are thus entitled to payment by Akerman for their legal fees and costs incurred in connection with this action, the Fishoff Lawsuit and the Third Defamatory Lawsuit and for the loss of the Transaction in the amount of its $4 million proceeds.

## COUNT XVIII

### BREACH OF DUTY OF LOYALTY (AKERMAN)

466.     The preceding allegations are realleged as if fully set forth here.

467.     This Count is by United Realty against Akerman.

468.     During the term of his employment with United Realty, Akerman owed it a duty of loyalty.

469.     During the term of such employment, Akerman acted contrary to United Realty's interests as set forth above, in breach of his duty of loyalty.

470.     As a result of Akerman's breaches of that duty, United Realty has been damaged in an amount to be determined at trial believed to be not less than $20 Million.

## COUNT XIX

### BREACH OF DUTY OF LOYALTY (DELFORNO)

471.     The preceding allegations are realleged as if fully set forth here.

472.     This Count is by United Realty against Delforno.

473.     During the term of his employment with United Realty, Delforno owed it a duty of loyalty.

474.     During the term of such employment, Delforno acted contrary to United Realty's interests as set forth above, in breach of his duty of loyalty.

475.     As a result of Delforno's breaches of that duty, United Realty has been damaged in an amount to be determined at trial believed to be not less than $10 Million.

## COUNT XX

### CONVERSION

476.     The preceding allegations are realleged as if fully set forth here.

477.     This Count is by United Realty against Verschleiser, Delforno, Pinhasi and Onica,

478.     On or after December 2, 2013, Verschleiser, Delforno, Pinhasi and Onica assumed the right of ownership over personal property of United Realty, including without limitation email communications and attachments and backup files made and copied after December 2, 2013, including 'Jacob_Frydman_12-06-2013.pst'; 'Eli_Verschleiser_12-06-2013.pst';' 'URPA_Backup_ Joseph_Santacruz_12-01-2013.pst'; 'Asher_Gulko_12-06-2013.pst'; 'Monica_Frydman_12-06-2013.pst';  'Cathy_Larson_12-08-2013.pst',  and  'Jacob_Frydman_12-09-2013.pst'.

479.     The assumption by those defendants of right of ownership over such personal property was without authorization by United Realty, and they have continued to exercise  ownership

and dominion to the exclusion of United Realty over such property even though it has made a demand for return of such property and those defendants have been under an obligation to return such property.

480.    As a result of those defendants' acts of conversion, United has been damaged in an amount to be proved at trial believed to be in excess of $500,000.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray this Court enter judgment in their favor on each and every Count set forth above and award them relief, including without limitation as follows:

(i)    With respect to Count I, that (a) defendants Verschleiser, Multi Group, Delforno, Pinhasi, Onica, Akerman, Veen, Svisch, Merchansky, and the Doe defendants be adjudged to have violated Section 1962(c) of RICO and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $160 million, and that such damages be trebled to not less than $480 million, and (b) that defendant Wright be adjudged to have violated Section 1962(c) of RICO and ordering him to pay a judgment to plaintiff Frydman in the amount of his actual damages as determined at trial believed to be not less than $50 million, and that such damages be trebled to not less than $150 million;

(ii)   With respect to Count II, that (a) Verschleiser, Multi Group, Delforno, Pinhasi, Onica, Akerman, Veen, Svisch, Merchansky, and the Doe defendants be adjudged to have violated Section 1962(d) of RICO and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $160 million, and that such damages be trebled to not less than $480 million, and (b) that Wright be adjudged to have violated Section 1962(d) of RICO and ordering him to pay a judgment to Frydman in the amount of his actual damages as determined at trial believed to be not less than $50 million, and that such damages be trebled to not less than $150 million;

(iii)  With respect to Count III, that Verschleiser, Delforno, Pinhasi and Onica be adjudged to have committed violations of the CFAA and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their losses exceeding $5,000 in value in one or more one-year periods as determined at trial, as well as in the amount of their damage resulting from the

deletion of files, data and other information as determined at trial believed to be in excess of $500,000;

(iv)     With respect to Count IV, that Verschleiser, Delforno, Pinhasi and Onica be adjudged to have engaged in a conspiracy to violate the CFAA and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their losses exceeding $5,000 in value in one or more one-year periods as determined at trial, as well as in the amount of their damage resulting from the deletion of files, data and other information as determined at trial believed to be in excess of $500,000;

(v)     With respect to Count V, that Verschleiser and Delforno be adjudged to have intercepted communications in violation of the ECPA and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $12 million, as well as an amount of punitive damages to be determined at trial;

(vi)     With respect to Count VI, that Verschleiser be adjudged to have disclosed the contents of intercepted communications in violation of the ECPA and ordering him to pay a judgment to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $50,000, as well as an amount of punitive damages to be determined at trial;

(vii)     With respect to Count VII, that Verschleiser, Delforno, Pinhasi and Onica be adjudged to have committed violations of the CFAA and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $160 million, as well as an amount of punitive damages to be determined at trial;

(viii)     With respect to Count VIII, that Verschleiser, Akerman and Wright be adjudged to have committed libel per se and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $160 million, as well as an amount of punitive damages to be determined at trial;

(ix)     With respect to Count IX, that Verschleiser, Akerman, Wright, Veen, Svisch, Merchansky and the Doe defendants be adjudged to have committed trade libel and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to

be not less than $160 million, as well as an amount of punitive damages to be determined at trial;

(x)     With respect to Count X, that Verschleiser, Veen, Svisch, Merchansky and the Doe defendants be adjudged to have committed libel per se and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $160 million, as well as an amount of punitive damages to be determined at trial;

(xi)     With respect to Count XI, that (a) Verschleiser, Delforno, Pinhasi and Onica be adjudged to have misappropriated trade secrets, and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $12 million, as well as an amount of punitive damages to be determined at trial, (b) that Verschleiser and Akerman conspired to misappropriate the Stolen Trade Secrets, and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $50 million, as well as an amount of punitive damages to be determined at trial, and (c) that Wright also conspired to misappropriate the Stolen Trade Secrets, and ordering him to pay a judgment to Frydman in the amount of his actual damages as determined at trial believed to be no less than $20 million, as well as an amount of punitive damages to be determined at trial;

(xii)     With respect to Count XII, that (a) Verschleiser, Veen, Svisch, Merchansky and the Doe defendants be adjudged to have tortuously interfered with existing contractual or business relations and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of their actual damages as determined at trial believed to be not less than $160 million, as well as an amount of punitive damages to be determined at trial, and (b) Verschleiser, Akerman and Wright be adjudged to have conspired to tortuously interfere with existing contractual or business relations and ordering those defendants to pay a judgment, jointly and severally, to Prime United in the amount of its actual damages as determined at trial believed to be not less than $4 million, as well as an amount of punitive damages to be determined at trial;

(xiii)     With respect to Count XIII, that Verschleiser, Delforno, Pinhasi, Onica, Veen, Svisch, Merchansky and the Doe defendants be adjudged to have tortuously interfered with prospective contractual or business relations and ordering those defendants to pay a judgment, jointly and severally, to plaintiffs in the amount of

their actual damages as determined at trial believed to be not less than $160 million, as well as an amount of punitive damages to be determined at trial;

(xiv)   With respect to Count XIV, asserted by Frydman in the alternative to the Trade Libel and Second Libel Per Se Counts to the extent asserted by him, that Verschleiser, Veen, Svisch, Merchansky and the Doe defendants be adjudged to have committed intentional infliction of emotional distress and ordering those defendants to pay a judgment, jointly and severally, to Frydman in the amount of his actual damages as determined at trial believed to be not less than $50 million, as well as an amount of punitive damages to be determined at trial;

(xv)    With respect to Count XV, that Verschleiser be adjudged to have committed breach of contract and ordering him to pay a judgment to United Realty and Frydman in the amount of his actual damages as determined at trial believed to be not less than $160 million;

(xvi)   With respect to Count XVI, that Akerman be adjudged to have committed breach of contract and ordering that he pay a judgment to United Realty in the amount of its actual damages as determined at trial believed to be not less than $6 million;

(xvii)  With respect to Count XVII, that Akerman be adjudged to have indemnified plaintiffs and ordering that he pay a judgment for their legal fees and costs incurred in connection with this action, the Fishoff Lawsuit and the Third Defamatory Lawsuit and for the loss of the Transaction in the amount of its $4 million proceeds;

(xviii) With respect to Count XVIII, that Akerman be adjudged to have breached his duty of loyalty and ordering that he pay a judgment to United Realty in the amount of its actual damages as determined at trial believed to be not less than $20 million;

(xix)   With respect to Count XIX, that Delforno be adjudged to have breached his duty of loyalty and ordering that he pay a judgment to United Realty in the amount of its actual damages as determined at trial believed to be not less than $10 million;

(xx)    With respect to Count XX, that Verschleiser, Delforno, Pinhasi and Onica be adjudged to have committed conversion and ordering that they pay a judgment, jointly and severally, to United Realty in the amount of its actual damages as determined at trial believed to be not less than $500,000;

(xxi)   Entry of a permanent injunction against defendants and all those acting in concert with them in accordance with the terms of the January 5, 2015 TRO, subsequently converted to a preliminary injunction;

(xxii)   Entry of a preliminary and permanent injunction under the CFA against Verschleiser, Delforno, Pinhasi and Onica restraining them and all those acting in concert with them from: (a) using, distributing, selling, licensing, offering for sale, or otherwise disclosing United Realty and Frydman's confidential, proprietary and trade secret information, as gained during the course of their employment with United Realty, and by reason of their hacking into United Realty's email exchange server and other computers and systems, and (b) accessing the computer systems, servers and files of United Realty and Frydman, without proper, express and written authorization to so;

(xxiii)   Entry of a preliminary and permanent injunction under RICO, the SCA and the common law tort Counts against Verschleiser, Delforno, Pinhasi, Onica, Veen, Svisch, Merchansky and the Doe defendants directing restraining them and all those acting in concert with them:

    a.   from the continued access, storage, dissemination and publication of the emails and attachments which they illegally obtained and ordering them to immediately return to plaintiffs all unlawfully accessed stored communications, including without limitation each of the following Backup files (in electronic form) made and copied after December 2, 2013: 'Jacob_Frydman_12-06-2013.pst'; 'Eli_Verschleiser_12-06-2013.pst';' 'URPA_Backup_Joseph_Santacruz_12-01-2013.pst'; 'Asher_Gulko_12-06- 2013.pst'; 'Monica_Frydman_12-06-2013.pst'; 'Cathy_Larson_12-08-2013.pst', and 'Jacob_Frydman_12-09-2013.pst', including all copies thereof in their possession or under their control; and

    b.   from creating, publishing, distributing or posting or further doing so all disparaging, or false, misleading or deceptive statements of fact, or representations of fact regarding Frydman or United Realty or any of Frydman's businesses, products or services in any and all postings on any website, domain, blog or other Internet post, and that same be permanently removed from the Internet, including that they take all necessary steps to remove same;

(xxiv)   Entry of any other appropriate preliminary and permanent injunction against defendants; and

(xxv)   Awarding plaintiffs reasonable attorney's fees, interest, the costs associated with the prosecution of this action, and such further relief as the Court may deem just.

**JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial with respect to all claims for relief in this Complaint triable before a jury as a matter of right.

Dated: New York, New York
      July 10, 2015

 

_____

Jacob Frydman
*Plaintiff pro se*
60 Broad Street, 34th Floor
New York, New York 10004
(212) 388-6800
Jacob.F@urpa.com

 

Lewis S. Fischbein, P.C.

 

By:_____
   Lewis S. Fischbein (LF 3349)

*Attorney for Plaintiffs United Realty Advisors, LP*
*  and Prime United Realty Holdings, LLC*
60 Broad Street, 34th Floor
New York, New York 10004
(212) 752-3374
LFischbein@wsmblaw.com