UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

JACOB FRYDMAN, ET AL.,

                    **Plaintiffs,**            14-cv-08084 (JGK)
                                               14-cv-05903 (JGK)
         - against -
                                               OPINION AND ORDER
ELI VERSCHLEISER, ET AL.,

                    **Defendants.**
────────────────────────────────

JOHN G. KOELTL, District Judge:

      This case involves two consolidated actions, United Realty
v. Verschleiser, No. 14cv5903 (S.D.N.Y. Jul. 30, 2014), and
Frydman v. Verschleiser, 14cv8084 (S.D.N.Y. Oct. 7, 2014).
These actions are the latest chapter in a long-running and
acrimonious dispute between Jacob Frydman and Eli Verschleiser,
former partners in a Real Estate Investment Trust ("REIT").
Each party has used judicial and extra-judicial scorched earth
practices to torment the other party.

      Before the Court are two motions to dismiss the plaintiffs'
Consolidated Second Amended Complaint ("the Complaint").  The
first motion to dismiss is brought by Verschleiser, Multi Group
of Companies LLC ("Multi Group"), Raul Delforno, Ophir Pinhasi,
and Alex Onica.  The second motion is brought *pro se* by
defendant David O. Wright, an attorney.  In short, the
defendants argue that the Court should abstain from exercising
jurisdiction in favor of a pending state court action and,

1

alternatively, that many of the plaintiffs' causes of action should be dismissed for failure to state a claim.

For the reasons explained below, the Court elects not to abstain from exercising jurisdiction; the motion to dismiss the Complaint filed by Verschleiser, Multi Group, Delforno, Pinhasi, and Onica is **denied in part and granted in part**; and the motion to dismiss brought by Wright is **granted in full**.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678

2

(2009).  While the Court should construe the factual allegations
in the light most favorable to the plaintiff, "the tenet that a
court must accept as true all of the allegations contained in
the complaint is inapplicable to legal conclusions." Id.  When
presented with a motion to dismiss pursuant to Rule 12(b)(6),
the Court may consider documents that are referenced in the
complaint, documents that the plaintiff relied on in bringing
suit and that are either in the plaintiff's possession or that
the plaintiff knew of when bringing suit, or matters of which
judicial notice may be taken.  See Chambers v. Time Warner,
Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Kerik v.
Tacopina, 64 F. Supp. 3d 542, 549-50 (S.D.N.Y. 2014).

**II.**

**A.**

The consolidated actions before this Court are for
injunctive relief and civil damages under (a) the Racketeer
Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et
seq. ("RICO") based on predicate acts of mail fraud, 18 U.S.C.
§ 1341, and wire fraud, 18 U.S.C. § 1343; (b) the Computer Fraud
and Abuse Act, 18 U.S.C. §§ 1030 et seq. (the "CFAA"); (c) the
Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq.
(the "ECPA"); (d) the Stored Communications Act, 18 U.S.C. §§

2701 et seq. (the "SCA"); and (e) state law for a variety of
torts, breach of contract, and indemnification.

The following factual allegations are taken from the
Complaint and are accepted as true for purposes of the motions
to dismiss.

From 2011 until late 2013, Frydman and Verschleiser were
partners in several entities, including a broker-dealer, Cabot
Lodge Securities, LLC, and a public non-traded REIT, United
Realty Trust, Inc. ("United Realty").  Compl. ¶¶ 66-67.  After a
series of disagreements, their partnership came to an end in
December 2013, whereupon Frydman alleges that he terminated
Verschleiser's employment with United Realty for cause and
served a termination notice on Verschleiser.  Compl. ¶ 69.

The Complaint alleges that, subsequently, Verschleiser
headed a criminal enterprise with the Wagnerian title "the
Ring," which was comprised of the defendants.  The Complaint
alleges that the Ring committed various acts of mail and wire
fraud in a common effort "to harm Frydman and his companies . .
. by depriving them of customers and other business
relationships, and to deceive the public both as part of that
mission and independently . . . ."  Compl. ¶ 2.

The Complaint alleges six predicate acts of wire and mail
fraud.  The first predicate act allegedly began after Frydman

4

and Verschleiser dissolved their partnership. Verschleiser then recruited defendant Delforno, the former head of information technology at United Realty, to give Frydman's computer password credentials to Verschleiser. Compl. ¶¶ 70-73. Verschleiser allegedly used those credentials on December 2, 2013 "to hack into and intercept the emails of United Realty employees, to create backups of its email data and trade secrets, and to download, copy and then delete all of that data from its email exchange servers." Compl. ¶ 74. According to the Complaint, on December 3, Frydman notified his company's Internet service provider that Verschleiser was fired and not authorized to access the United Realty email system and Verschleiser was later locked out of the system. Compl. ¶¶ 75-76. Nevertheless, the Complaint alleges that Verschleiser gained unauthorized access to the email server on December 4, 2013, accessed Frydman's and others' emails, and denied Frydman access. Compl. ¶¶ 77-78.

Verschleiser allegedly feared having his termination publicly disclosed by a required Securities and Exchange Commission ("SEC") filing. Therefore, he negotiated his departure from United Realty with a Membership Interests Sale and Purchase Agreement (the "Agreement") signed shortly after midnight on December 4, 2013. Compl. ¶ 81. Pursuant to the Agreement, Verschleiser transferred his ownership interests in

their jointly owned entities in exchange for certain payments.
Compl. ¶ 81.  Pursuant to Section 10 of the Agreement,
Verschleiser agreed that for eighteen months, he would not
employ or solicit the employment of individuals at United Realty
and related entities and would not disparage or induce others to
disparage Frydman or his business.  Compl. ¶ 83.  In Section 25
of the Agreement, Verschleiser also agreed "to restore all
exchange servers, web hosting and [United Realty's and its
related enterprises'] computer servers to their status on or
before November 15, 2013 and to provide Frydman with all owner
and administrative passwords by the close of business on
December 5, 2013."  Compl. ¶ 84.

The Complaint alleges that Verschleiser, helped by other
defendants, disregarded the Agreement and through December 10,
2013---a period the Complaint terms the "Initial Infiltration
Period"---"illegally hacked into and intercepted the emails of
United Realty employees, created back-ups of its email data and
trade secrets, and downloaded, copied and then deleted all of
that data from its email exchange servers . . . ."  Compl. ¶¶
86-87; see also Compl. ¶¶ 88-101.

The Complaint alleges that the defendants committed a
second predicate act of wire fraud during what it calls the
"Ongoing Interception Period" that ran from December 2013

6

through at least March 2014.  During this period, Verschleiser,
assisted by other defendants, allegedly repeatedly accessed
Frydman's email account using various technical methods.  Compl.
¶ 102.  Through these actions the defendants learned about
several of Frydman's impending business transactions and
allegedly sent or directed to be sent emails to potential
business partners that defamed Frydman.  Compl. ¶¶ 107-09.  As a
result of these emails, Frydman allegedly lost a $10 million
loan and a $1.4 million sublease.  Compl. ¶ 110.

The Complaint alleges that Verschleiser and several
defendants committed a third predicate act of wire fraud
beginning as early as March 21, 2014 when they disseminated fake
reports, blogs, and social media posts that allegedly defamed
Frydman by calling him a "fraud" and leveling similarly
disparaging charges against him and his companies.  See, e.g.,
Compl. ¶¶ 144-54.

The Complaint alleges that the defendants committed a
fourth predicate act of wire fraud in September 2014 when
Verschleiser and others "crashed" a broker-dealer conference in
Nevada, distributed flyers and set-up posters around the
convention that disparaged Frydman, and sent those posters
through the mails or wires.  Compl. ¶¶ 177-95.

7

The Complaint alleges a fifth predicate act of wire fraud occurred following this conference.  The defendants allegedly created "numerous additional websites and posts containing false and fraudulent information with respect to Frydman, United Reality, and his other businesses."  Compl. ¶¶ 197; see also Compl. ¶¶ 205-06.

The Complaint alleges a sixth predicate act occurred in December 2014 when Verschleiser and Wright recruited Albert Akerman, an employee of United Realty and Cabot Lodge Securities, to steal "a highly confidential agreement for a transaction" among Prime United, Cabot Lodge Securities, and CL Wealth Management, LLC, and a third party (the "Transaction Agreement").  Compl. ¶¶ 220-23.  Verschleiser and Akerman are allegedly subject to various agreements that expressly prohibit the theft or use of proprietary information.  Compl. ¶ 244.

In addition to these predicate acts, the Complaint alleges a number of other wrongs committed by the defendants.  The Complaint alleges that Verschleiser had Akerman send a False Claims Letter to the SEC Office of the Whistleblower to defame Frydman and United Reality in order to hurt their ability to attract new business partners.  Compl. ¶¶ 256-57.  In May 2015, Verschleiser also allegedly defamed Frydman through a "mass-email blast to certain of plaintiffs' employees" and others

accusing Frydman of fraud.  See Compl. ¶¶ 265-69.  And Frydman claims that he had to hire technology firms to help him investigate the hacking, costing him over $500,000.  Compl. ¶¶ 113-18.

The Complaint also alleges that the defendants filed three defamatory lawsuits, which contained various allegedly defamatory statements about Frydman and his companies.  See, e.g., Compl. ¶¶ 119-24, 236-37, 250-51.  These lawsuits allegedly led to false and defamatory newspaper accounts that cost Frydman business.  See Compl. ¶ 255.

As for Wright, in addition to allegedly conspiring with Akerman to steal the Transaction Agreement, the Complaint alleges that Verschleiser recruited Wright "to join the Ring to further [Verschleiser's] scheme to bring harm to Frydman and his companies," Compl. ¶ 29, and Wright filed in 2014 one of the three allegedly defamatory lawsuits in state court, Fishoff Family Foundation v. Frydman, 653838/2014 ("the Second Defamatory Lawsuit").  Compl. ¶ 34.  The state court eventually dismissed this lawsuit.  Compl. ¶ 39.

The plaintiffs filed an action in this Court in July 2014 and another in October 2014.  The Court consolidated those cases.  In December 2014, Frydman brought an order to show cause for a temporary restraining order against Verschleiser and

others, alleging that Verschleiser solicited Akerman to give Verschleiser confidential information concerning Frydman and various companies in which Verschleiser had an interest.  See United Realty Advisors, LP v. Verschleiser, No. 14cv5903, 2015 WL 3498652, at *1 (S.D.N.Y. June 3, 2015).  This Court granted in part Frydman's request for a temporary restraining order. The Order prohibited the defendants from using or disclosing propriety or confidential documents obtained from Akerman.  The Court also specified that "nothing in this Order shall bar any of the Opposing Parties from using any of the propriety information in connection with [a] pending state court litigation . . . . Any papers filed under seal in this action may be disclosed under seal in [the] state court action."  See id. at *1.  The parties eventually stipulated to a preliminary injunction.  Id. at *2. The defendants brought a motion to impose sanctions on Frydman pursuant to 28 U.S.C. § 1927, which the Court denied.  See id. at *3.

These motions to dismiss followed.

**B.**

Two lawsuits related to the underlying conduct at issue in this action were filed in state court.  The parties represent that those cases have now been consolidated.  Frydman filed the first on March 12, 2014, JFURTI LLC et al. v. Verschleiser et

al., 650803/2014 (Sup. Ct. N.Y. Cnty.), seeking a declaratory judgment that Verschleiser breached the terms of their Agreement by "actively conducting a disparagement campaign against" Frydman and his companies. JFURTI Amended State Compl. ¶ 1, Cooper Aff. Ex. 1 ("JFURTI Compl."). In this suit, the plaintiffs allege that Verschleiser disparaged the plaintiffs in breach of Section 10 of the Agreement and recruited or attempted to recruit United Realty employees to file false claims against Frydman. JFURTI Compl. ¶¶ 72, 75. The plaintiffs also seek a declaration that Verschleiser failed to restore certain information technology systems to their previous condition and to provide the plaintiffs with the owner and administrative passwords by the close of business on December 5, 2013, as required by the Agreement. JFURTI Compl. ¶ 78. Finally, the suit seeks to enjoin the defendants from continuing with the alleged disparagement of Frydman. JFURTI Compl. ¶ 83. In its factual recitation, the state court complaint discusses allegations of hacking and improper computer access that are the subject of the Complaint in this action, but they do not amount to elements of the alleged offenses. See, e.g., JFURTI Compl. ¶¶ 27, 37, 56, 63.

    In a second action, on March 14, 2014, Verschleiser and two related entities sued Frydman in New York State Supreme Court,

New York County in EVUNP, et al. v. Frydman, et al., No.
650841/2014 (Sup. Ct. N.Y. Cnty.).  See Cooper Aff. Ex. 4
("EVUNP Compl.").  In that action, the plaintiffs seek, among
other relief, to nullify the Agreement on the grounds that
Frydman conspired with Verschleiser's attorney to defraud
Verschleiser into entering the Agreement.  It alleges, in the
alternative, that Frydman breached the Agreement by failing to
make the required distributions to Verschleiser and by
disparaging him.  See EVUNP Compl. at 22-23, 26.[1]  It also
alleges defamation, conversion and civil theft, breach of
contract, and breach of the duty to act in good faith and fair
dealing.  See EVUNP Compl. at 24-27.

**III.**

We begin with the motion to dismiss brought by
Verschleiser, Multi Group, Delforno, Pinhasi, and Onica.

**A.**

As an initial matter, the defendants argue that the Court
should abstain from exercising jurisdiction in favor of the two
pending state court actions.  The defendants argue the state and
federal actions are parallel and that, without abstention, the

---

[1] This complaint repeats paragraph numbers, and therefore the
citations refer to page numbers.

12

Court will encounter needless inefficiencies and inconsistent outcomes, not resolvable by collateral estoppel or res judicata.

The defendants argue that the Court should abstain from exercising its jurisdiction pursuant to the prudential doctrine established in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976).  In that case, the Supreme Court held that abstention can be proper in certain situations involving the contemporaneous exercise of concurrent jurisdiction for reasons of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."  Colorado River, 424 U.S. at 817 (internal citation, quotation marks, and alteration omitted); see also Burrell v. State Farm Fire & Cas. Co., No. 00cv5733 (JGK), 2001 WL 797461, at *4 (S.D.N.Y. July 12, 2001).

However, there is a strong presumption that the district court should retain jurisdiction.  A court may only abstain under Colorado River in "exceptional circumstances," Colorado River, 424 U.S. at 813, and "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction."  Id. at 817 (internal quotation and citation omitted); see also All. of Am. Insurers v. Cuomo, 854 F.2d 591, 603 (2d Cir. 1988) ("Under the Colorado River doctrine, the nature of the inquiry is not whether there

13

are reasons to exercise federal jurisdiction, but rather whether
exceptional circumstances exist which justify dismissal in
deference to a pending state court proceeding."); Burrell, 2001
WL 797461, at *4.

Under Colorado River, in determining whether to abstain
from deciding a federal action because there is a related action
in state court, a district court should consider: "(1) whether
the controversy involved a res over which one of the courts has
assumed jurisdiction, (2) whether one forum is more inconvenient
than the other for the parties, (3) whether staying the federal
action will avoid piecemeal litigation, (4) whether one action
is significantly more advanced than the other, (5) whether
federal or state law provides the rule of decision, and (6)
whether the federal plaintiff's rights will be protected in the
state proceeding."  United States v. Pikna, 880 F.2d 1578, 1582
(2d Cir. 1989) (citations omitted).  The presumption in favor of
exercising jurisdiction dictates that "the facial neutrality of
a factor is a basis for retaining jurisdiction, not for yielding
it."  Woodford v. Cmty. Action Agency of Greene Cnty., Inc., 239
F.3d 517, 522 (2d Cir. 2001); see also Burrell, 2001 WL 797461,
at *4.

"Before a court evaluates the appropriateness of abstention
under Colorado River, it must make a threshold determination

14

that the federal and state court cases are 'parallel.'" <u>Shields</u>
<u>v. Murdoch</u>, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012) (quoting
<u>Dittmer v. Cnty. of Suffolk</u>, 146 F.3d 113, 118 (2d Cir. 1998)).
Proceedings in state and federal court are "'parallel' for
purposes of abstention when the two proceedings are essentially
the same; that is, there is an identity of parties, and the
issues and relief sought are the same.'" <u>Id.</u> (quoting
<u>Abercrombie v. College</u>, 438 F. Supp. 2d 243, 258 (S.D.N.Y.
2006)). "Perfect symmetry of parties and issues is not
required. Rather, parallelism is achieved where there is a
substantial likelihood that the state litigation will dispose of
*all* claims presented in the federal case." <u>Id.</u> (quoting <u>In re</u>
<u>Comverse Tech., Inc.</u>, No. 06cv1849 (NGG)(RER), 2006 WL 3193709,
at *2 (E.D.N.Y. Nov. 2, 2006) (emphasis in original)).

"[E]ven if different relief is sought in the two actions,
or the claims are not exactly the same, they are parallel as
long as the causes of action are comprised of the same essential
issues." But "[m]erely raising an alternative theory of
recovery, which may still be raised in state court, is not
enough to differentiate the federal suit from the state suit."
<u>Garcia v. Tamir</u>, No. 99cv0298 (LAP), 1999 WL 587902, at *3
(S.D.N.Y. Aug. 4, 1999) (internal quotation marks and citations
omitted).

As a threshold matter, the defendants argue that the action is parallel to the JFURTI state court action, because, although Frydman asserts twenty causes of action in the Complaint, both the federal and state cases are about Verschleiser's purported hacking into United Realty's servers and Verschleiser's disparagement of Frydman.

In this case, while the state court action shares some of the factual allegations with the federal action, there is not such an identity of claims and parties to determine that the actions are parallel. See Dalzell Mgmt. Co. v. Bardonia Plaza, LLC, 923 F. Supp. 2d 590, 598 (S.D.N.Y. 2013). None of the thirteen parties in this action other than Frydman and Verschleiser is a party to the JFURTI state court action, which involves six additional parties. "Though abstention does not require that the parties in the relevant suits be identical, when dismissal of the federal proceeding would leave a defendant free from any proceeding on issues in question, abstention is unwarranted." DDR Const. Servs., Inc. v. Siemens Indus., Inc., 770 F. Supp. 2d 627, 645 (S.D.N.Y. 2011) (abstention unwarranted where abstention would dismiss several defendants who were not parties other action); see also Dalzell Mgmt., 923 F. Supp. 2d at 598 (abstention inappropriate where, among other factors,

16

"dismissal of federal action would presumably leave six defendants free from any proceeding on the issues in question").

Furthermore, the claims are not parallel.  The state court action alleges that Verschleiser breached the Agreement by disparaging or inducing others to disparage Frydman or his businesses.  See, e.g., JFURTI Compl. ¶¶ 72, 75.  The elements of those claims are disparagement and breach of contract; they do not include whether the defendant hacked the plaintiff's computers.  The defendants argue that the state court will necessarily address the issue of whether Verschleiser engaged in hacking when it considers whether Verschleiser disparaged Frydman.  But that is not necessarily true.  Other evidence may be adduced to show that Verschleiser disparaged Frydman without any proof of the alleged hacking.  The federal action contains numerous claims that are not included in the state court action, including federal law violations based on wire fraud through Internet scams, causing the breaches of fiduciary duties, and the loss of confidential information.  Moreover, the detailed hacking violations are alleged to have violated federal statutes.  Where, as here, "the nature of the claims in question differs, cases are not parallel despite the fact that both actions arise out of a similar set of circumstances."  DDR Constr. Servs., 770 F. Supp. 2d at 645 (internal quotation marks

17

and citation omitted); see also All. of Am. Insurers, 854 F.2d at 603 (abstention inappropriate where "the issues engendered in the state actions [we]re dissimilar to those presented" in the federal action); Dalzell Mgmt., 923 F. Supp. 2d at 598 (abstention inappropriate where the federal action was for theft of computer data and wrongful eviction while the state action was for breach of contract and breach of fiduciary duty).

While the defendants point to some cases where courts have found parallel actions in state and federal courts, those cases were substantially more parallel than the state and federal actions at issue on this motion.  See, e.g., Nakash v. Marciano, 882 F.2d 1411, 1416-17 (9th Cir. 1989) (cases substantially similar where, among other factors, all parties were named in state and federal actions, except for corporate entities owned and operated by the parties, and where the federal action was a "spin-off" of more comprehensive state litigation).

In any event, whatever the similarities between the allegations in the state and federal actions, the Colorado River factors weigh decidedly against abstention.

The defendants concede that the first two factors---the existence of a res (or not) and the convenience of the respective forums---do not favor abstention.  See Burrell, 2001 WL 797461, at *5.

18

The defendants argue that the remaining four Colorado River factors favor abstention.  With respect to the third factor--- avoidance of piecemeal litigation---the defendants argue that because there is a concurrent action in state court, there is a risk of piecemeal or duplicative litigation or inconsistent rulings.

As the Dalzell Management court observed, where "the federal and state actions are based on the same underlying facts, there is some risk of an inconsistent result."  923 F. Supp. 2d at 600.  "However, [because] 'any case involving parallel proceedings presents a risk of duplicative litigation or a rush to judgment, the existence of those risks can weigh only modestly in favor of dismissal; otherwise dismissals pursuant to Colorado River would be the rule, not the exception, in cases involving parallel proceedings in state and federal court.'"  Id. (quoting In re Asbestos Litig., 963 F. Supp. 247, 253 (S.D.N.Y. 1997)) (emphasis removed).

Here, there is a limited risk of inconsistent or duplicative outcomes.  First, neither state court action seeks a determination of any of the federal claims.  See Shields, 891 F. Supp. 2d at 582; see also Vladimir v. Cowperthwait, No. 06cv5863 (JGK), 2007 WL 1964157, at *2 (S.D.N.Y. July 3, 2007).  Second, there are defendants in the federal action who are not named in

19

the state action; accordingly, the claims against them are unlikely to be resolved in the state court action and abstention may not reduce the likelihood of piecemeal litigation.  See Shields, 891 F. Supp. 2d at 583 (quoting SST Glob. Tech., LLC v. Chapman, 270 F. Supp. 2d 444, 446 (S.D.N.Y. 2003)) (alterations in original).

To the extent that there is a final judgment in the state court action, this Court would give it the appropriate preclusive effect.  But such a judgment is unlikely to be rendered for some time.  See Andersen v. Young & Rubicam Advert., No. 11cv4466 (LAP), 2011 WL 10644197, at *2 (S.D.N.Y. Oct. 14, 2011) ("Federal courts must give a prior state court decision the same preclusive effect that the courts of that state would give to it"), aff'd, 487 F. App'x 675 (2d Cir. 2012) (citing Colon v. Coughlin, 58 F.3d 865, 869 n. 2 (2d Cir. 1995)).[2]

The defendants argue that potentially inconsistent interim rulings in the state court counsel abstention but "the mere potential for conflicting outcome[s] between the two actions does not justify abstention under the piecemeal litigation

---

[2] In their Reply Brief, the defendants argue that Verschleiser's state action could moot Frydman's hacking claims because the state court could void the Agreement.  Any such result is speculative and would not moot many of the claims in this case.

factor." Dalzell, 923 F. Supp. 2d at 599 (citation omitted) (alteration in original).  Accordingly, this factor---the avoidance of piecemeal litigation---does not favor abstention.

The fourth Colorado River factor asks whether one action is significantly more advanced than the other.  The defendants argue that the state actions were filed moths before the federal action and have progressed significantly.

"This factor does not turn exclusively on the sequence in which the cases were filed, 'but rather in terms of how much progress has been made in the two actions.'" Vill. of Westfield v. Welch's, 170 F.3d 116, 122 (2d Cir. 1999) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 21 (1983)).  "In addition, where there has been limited progress in a state court suit, 'the fact that the state action was commenced before the federal suit carries little weight.'" Id. (quoting Andrea Theatres, Inc. v. Theatre Confections, Inc., 787 F.2d 59, 64 (2d Cir. 1986)); see also Dalzell Mgmt., 923 F. Supp. 2d at 600-01.

The state court actions may have begun first, but substantive discovery has not yet begun, and, therefore, the state court actions are not substantially ahead of the federal action.  The parties represented at the motion hearing that they are scheduled to appear before a mediator to discuss settlement

21

and that discovery in the state court will not conclude until the end of December.  To the extent that discovery has occurred, and it "would be relevant to this litigation as well, [it] could easily be incorporated into this action."  CVR Energy, Inc. v. Wachtell, Lipton, Rosen & Katz, No. 14cv6566 (RJS), 2014 WL 7399040, at *4 (S.D.N.Y. Dec. 29, 2014).  Accordingly, this factor is neutral, which supports retention of jurisdiction. See id. at *4-5; see also Burrell, 2001 WL 797461, at *6.

"The fifth Colorado River factor requires a review of what law---state, federal, or foreign---provides the rule of decision in the case."  Dalzell Mgmt., 923 F. Supp. 2d at 601 (citing Moses H. Cone, 460 U.S. at 23).

"'When the applicable substantive law is federal, abstention is disfavored,' and, indeed, even 'the absence of federal issues does not strongly advise dismissal, unless the state law issues are novel or particularly complex.'"  Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 102 (2d Cir. 2012) (quoting Vill. of Westfield, 170 F.3d at 123-24 (internal quotation marks omitted)) (emphasis removed).

"[T]he Supreme Court has directed that '[a]lthough in some rare circumstances the presence of state-law issues may weigh in favor of' a federal court's surrender of its jurisdiction, 'the

presence of federal-law issues must always be a major consideration weighing against surrender.'" Id. at 103 (quoting Moses H. Cone, 460 U.S. at 26).

Here, the plaintiffs' claims arise under federal law (the RICO, CFAA, ECPA, and SCA statutes) and state law. The state law claims---for a variety of torts and breach of contract, among others---are not particularly novel or complex. Accordingly, this factor weighs against abstention. See id. at 102-03; Dalzell Mgmt., 923 F. Supp. 2d at 601; CVR Energy, 2014 WL 7399040, at *5.

The sixth Colorado River factor asks whether the state court forum will protect the plaintiff's rights. "If there is any substantial doubt" as to the adequacy of the state court forum "for the complete and prompt resolution of the issues between the parties," it would be "a serious abuse of discretion" for the federal court to abstain. Moses H. Cone, 460 U.S. at 28.

The defendants do not genuinely contest this factor and instead focus on what they call the harassing nature of the plaintiffs' litigation.[3] On the merits of the Colorado River analysis, the state court actions cannot adequately protect the

---

[3] The defendants contend that Frydman has brought 100 lawsuits over the course of the last ten years. See Defs.' Mot. to Dismiss at 18.

23

plaintiffs' rights because the federal action provides possible remedies of treble damages and attorneys' fees that are not available in the state court action.  <u>See</u> <u>Woodford</u>, 239 F.3d at 525.  Accordingly, this factor argues strongly against abstention.

In light of the heavy presumption favoring the exercise of federal jurisdiction, the "exceptional circumstances" required for <u>Colorado River</u> abstention are not present.  <u>See</u> <u>Vill. of Westfield</u>, 170 F.3d at 124. None of the six Colorado River factors weighs in favor of abstention.  The defendants' request for the Court to abstain is **denied**.[4]

**B.**

The defendants argue that the plaintiffs' RICO claims must be dismissed under Rule 12(b)(6) because they fail to state a claim.

The RICO statute provides in relevant part: "It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

---

[4] In the alternative, the defendants argue that the Court should exercise its inherent power to stay this action pending the resolution of the state proceedings.  For the reasons discussed above, and in light of "the duty of a District Court to adjudicate a controversy properly before it," <u>Colorado River</u>, 424 U.S. at 813, the Court declines to do so.

24

a pattern of racketeering activity . . . ."  18 U.S.C.
§ 1962(c).

To state a claim under § 1962(c), a plaintiff must allege
"(1) that the defendant (2) through the commission of two or
more acts (3) constituting a 'pattern' (4) of 'racketeering
activity' (5) directly or indirectly . . . participates in (6)
an 'enterprise' (7) the activities of which affect interstate or
foreign commerce."  Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17
(2d Cir. 1983); see R.C.M. Executive Gallery Corp. v. Rols
Capital Co., 901 F. Supp. 630, 639 (S.D.N.Y. 1995); see also
Fisher v. Offerman & Co., No. 95cv2566 (JGK), 1996 WL 563141, at
*2 (S.D.N.Y. Oct. 2, 1996).  To establish a pattern of
racketeering activity, a "plaintiff must plead at least two
predicate acts, and must show that the predicate acts are
related and that they amount to, or pose a threat of, continuing
criminal activity."  GICC Capital Corp. v. Tech. Fin. Grp.,
Inc., 67 F.3d 463, 465 (2d Cir. 1995) (internal citation
omitted).[5]

Where, as here, "a plaintiff in a RICO claim alleges
racketeering activity based on the predicate acts of violating
the mail or wire fraud statutes, he or she must prove three

---

[5] The plaintiffs have also alleged a claim for conspiracy to
violate the RICO statute in violation of 18 U.S.C. § 1962(d).

elements: (1) [a] scheme to defraud, including proof of intent;
(2) money or property as object of scheme; (3) use of mails or
wires to further the scheme." 4 K&D Corp. v. Concierge
Auctions, LLC, 2 F. Supp. 3d 525, 539 (S.D.N.Y. 2014) (internal
citation and quotation marks omitted).

In relevant part, the mail fraud statute states that it is
unlawful to devise or intend to devise "any scheme or artifice
to defraud, or for obtaining money or property by means of false
or fraudulent pretenses, representations, or promises . . .
[and] for the purpose of executing such scheme or artifice or
attempting so to do [to use the mails]." 18 U.S.C. § 1341; see
also 18 USC § 1343 (barring similar conduct transmitted by means
of wire).

The defendants raise three arguments for dismissal. First,
the defendants argue that the plaintiffs have failed to allege
sufficient predicate acts because, while each predicate act
purports to be a series of wire frauds, wire fraud requires that
there be a "scheme or artifice to defraud" or "obtain[] money or
property." 18 U.S.C. § 1341. The Complaint describes the
defendants' "dual mission" to "harm Frydman and his companies"
and to "deceive the public." See Compl. ¶¶ 2, 18. The
defendants argue that alleging that they intended to harm
Frydman without any allegation that they intended to profit from

26

their alleged scheme is insufficient to plead mail or wire fraud.

The plaintiffs respond that the Complaint alleges that the defendants intended to deprive the plaintiffs of money or property and is, thus, sufficient to allege mail and wire fraud. They point to the portions of the Complaint that allege the defendants' fraudulent schemes "depriv[ed] them of customers and other business relationships," Compl. ¶¶ 2, 283, "den[ied] Frydman and his businesses capital, investors, lenders, transaction opportunities," Compl. ¶ 278, and cost them loans and leases totaling millions of dollars.  Compl. ¶ 303; see also Compl. ¶¶ 106-10.  For example, Paragraph 374 states: "[T]he statements played a material and substantial part in inducing others not to deal with plaintiffs, with the result that special damages, in the form of lost dealings, were incurred," and it lists many investors by name who redeemed REIT shares.

The weight of authority indicates that a plaintiff is not required to allege that a defendant intended to obtain money or property to allege a wire fraud claim so long as the plaintiff alleges that there was a scheme or artifice to defraud the victim of money or property.  In this case, the plaintiff alleges that he was the victim of a scheme to defraud that

deceived his business associates or potential customers into failing to do business with him.

The Court of Appeals for the Second Circuit addressed the meaning of "scheme or artifice for obtaining money or property" in the context of the mail fraud statute in Porcelli v. United States, 404 F.3d 157 (2d Cir. 2005). In Porcelli, the Court of Appeals held that a "defendant does not need to literally 'obtain' money or property to violate the statute." Id. at 162. The defendant had been convicted of failing to collect state sales tax on gasoline sales and of filing fraudulent state sales tax returns, thereby depriving New York State of $5 million in tax revenue. Id. at 158. He sought to have his conviction overturned because he had not actually obtained any money or property from the State of New York during the course of his offense. Id. at 161. The Court of Appeals rejected this argument. It agreed with the Court of Appeals for the Third Circuit that "'a mail fraud violation may be sufficiently found where the defendant has merely deprived another of a property right.'" Id. at 162 n. 5 (quoting United States v. Hedaithy, 392 F.3d 580, 602 n.21 (3d Cir. 2004)). While its language is very broad and supportive of the plaintiffs' position, Porcelli is not directly on point with the present case because the

28

criminal defendant profited from the scheme by not paying taxes
that were owed.

In Hedaithy, the Court of Appeals for the Third Circuit
rejected an argument by the defendant that a superseding
indictment failed to allege mail fraud sufficiently because "in
order to sufficiently state a violation, a mail fraud charge
must include an allegation that [the] scheme was designed to
actually 'obtain' the victim's property." Hedaithy, 392 F.3d at
601.  The superseding indictment in question contained no such
allegation.  The Court of Appeals rejected this argument.  The
Court held that it was sufficient to allege that the victim was
deprived of something that constituted "property" in the hands
of the victim.  Id. at 601-02.

The Court of Appeals for the Second Circuit again endorsed
this interpretation of the wire fraud statute in United States
v. Males, 459 F.3d 154 (2d Cir. 2006).  In that case, Males
conducted a fraudulent scheme where he tried to induce investors
to execute a "non-depletion letter" that would allow Males to
freeze or reserve investors' accounts.  Males attempted to
induce an undercover FBI agent to sign such a letter but was
arrested before it was executed.  Id. at 156.  Males' argument
on appeal was that the jury should have been instructed that it
could only convict him if it found that he intended to "obtain"

29

his victim's money; if the jury found that Males only intended "to freeze" the victim's account "temporarily, and not to transfer the money to himself or an accomplice or to remove any money . . . then he could not be convicted of wire fraud." Id. at 158.  The Court of Appeals called Males's proposition "a distinction that makes no difference."  Id.  "Under either scenario, whether temporarily, as here, or permanently, as in Porcelli, a victim is deprived of the ability to use his personal property."  Relying on Porcelli, the Court held: "For purposes of establishing this element under § 1343, therefore, it is sufficient that a defendant's scheme was intended to deprive another of property rights, even if the defendant did not physically 'obtain' any money or property by taking it from the victim."  Id.[6]

---

[6] Like Porcelli, Males is somewhat distinguishable from the present case because the defendant in that case argued that he did in fact intend to obtain the victim's property temporarily while it was frozen.  Males, 458 F.3d at 158.  However, the Court of Appeals rejected the separate argument that the jury instruction was fatally defective because it did not require that the jury find that the defendant intended to "obtain" the victim's money.  Id. at 159.  Cf. United States v. Shellef, 507 F.3d 82, 109-10 (2d Cir. 2007) (holding wire fraud statute satisfied where defendant intended to deprive manufacturer of money that would have, nevertheless, been passed to the government as an excise tax).

30

To support their argument that the Complaint here fails to allege wire fraud sufficiently, the defendants cite several district court cases.  The most helpful to the plaintiffs is Kimm v. Lee, No. 04cv5724 (HB), 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005).  In that case, the plaintiff, an attorney, alleged that the defendants had used the mails and wires to manufacture and spread false news articles attacking the plaintiff's name and reputation.  Id. at *2.  Judge Baer found these allegations insufficient to constitute a properly pleaded wire and mail fraud violation because Kimm did not allege a scheme to defraud, only that the defendants transmitted false information to harm his business and reputation, and the "intent to injure is not the equivalent of intent to defraud."  Id. at *4 (internal quotation marks, citation, and alteration omitted).  "Though Kimm may well have suffered reputational injury as a result of the defendants' alleged acts, no one was induced to part with anything of value as a result.  Moreover, there is no indication in the pleadings that Kimm, Kimm's former clients, or anyone else relied upon the allegedly false statements."  Id. (internal quotation marks and citation omitted).  Judge Baer concluded that mere defamation does "not provide the requisite predicate for RICO violations."  Id. at *5 (collecting cases).

31

Despite its broad language, Kimm is distinguishable because there was no allegation of reliance, whereas, in this case, the plaintiffs allege that Frydman's business associates did rely on the allegedly false representations and that, as a result, Frydman was deprived of money and property.

In another recent case involving defamatory statements, Judge Oetken reviewed Males and Porcelli. Originally, Judge Oetken held that the predicate acts in that case---two phone calls the defendants made in which they intentionally transmitted false information to induce clients to cease all business with the plaintiffs---did *not* constitute an intent to obtain property from the plaintiffs and did not qualify as a scheme to defraud within the wire fraud statute. Reich v. Lopez, 38 F. Supp. 3d 436, 450-51 (S.D.N.Y. 2014), reconsideration denied, No. 13cv5307 (JPO), 2015 WL 1632332 (S.D.N.Y. Apr. 13, 2015). However, on reconsideration, Judge Oetken acknowledged that the issue of what constitutes a scheme to defraud "is not as clear as the Opinion may suggest." Reich, 2015 WL 1632332, at *2. Judge Oetken concluded that he did not need to decide the issue because the plaintiffs' civil RICO claims failed on a separate ground. But he observed in dicta that, "[a]though the Second Circuit has not directly addressed the question, it has suggested, in a case distinguishable from

32

this one, that it is inclined to follow the Third Circuit's holding that a plaintiff need not allege that a defendant intended to obtain money or property to make out a wire fraud claim." Id.[7]

The plaintiffs' allegations here suffice to plead violations of the wire and mail fraud statutes.  Unlike Kimm, the plaintiffs allege a scheme to defraud and point to specific losses incurred by the plaintiff as a result of the allegedly fraudulent actions of the defendants.  See, e.g., Compl. ¶¶ 303, 374.  Such lost contracts, loans, and leases would be "something that constitutes 'property' in the hands of the victim." Hedaithy, 392 F.3d at 602.  It was unnecessary to allege that the defendants personally intended to obtain the property of which the plaintiff was deprived.  Accordingly, the motion to dismiss the RICO claims on this ground is denied.

Second, the defendants argue that the plaintiffs do not have standing to bring RICO claims because they do not allege a direct causal link between the defendants' predicate acts (the

---

[7] Judge Oetken noted that the Court of Appeals for the Seventh Circuit commented that "only a scheme to obtain money or other property from the victim by fraud violates § 1341.  A deprivation is a necessary but not a sufficient condition of mail fraud. Losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement." United States v. Walters, 997 F.2d 1219, 1227 (7th Cir. 1993).

defamation transmitted through the mails and wires) and damage to the plaintiff's business or property (the lost contracts and business opportunities).

Under RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." 18 U.S.C. § 1964(c).  Therefore, "[t]o satisfy RICO's standing requirements, a plaintiff must demonstrate, '(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation.'"  Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003) (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990)); see also Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP, 806 F.3d 71, 86 (2d Cir. 2015).

The causation prong requires that a plaintiff bringing a civil RICO claim demonstrate that the plaintiff suffered an injury proximately caused by the defendant's violation of § 1962. See 18 U.S.C. § 1964(c).  In particular, "[w]here a RICO violation is predicated on acts sounding in fraud, a plaintiff must allege that the defendant's acts were not only the 'but-for' cause of plaintiff's injury, but the proximate cause as well, necessitating 'some direct relation between the injury

34

asserted and the injurious conduct alleged'; '[a] link that is
too remote, purely contingent, or indirect is insufficient.'"
Petrosurance, Inc. v. Nat'l Ass'n of Ins. Comm'rs, 888 F. Supp.
2d 491, 503-04 (S.D.N.Y. 2012) (quoting and citing Hemi Grp.,
LLC v. City of N.Y., 559 U.S. 1, 9 (2010)), aff'd, 514 F. App'x
51 (2d Cir. 2013); see also Kerik, 64 F. Supp. 3d at 556.

     The Complaint satisfies these requirements for standing.
It contains sufficient allegations that the defendants' alleged
acts caused personal harm to the plaintiffs.  For example, the
Complaint includes several instances where broker dealers
stopped using United Realty as a result of the defendants'
allegedly defamatory electronic communications in May and June
2015.  See, e.g., Compl. ¶¶ 265-68; see also Compl. ¶¶ 107-10
(alleged loss of $10 million mortgage loan and $1.4 million
lease after Verschleiser sent disparaging emails about Frydman),
¶ 374 ("[T]he statements played a material and substantial part
in inducing others not to deal with plaintiffs . . .").

     Accordingly, the plaintiffs have satisfied their burden to
establish that the defendants' alleged violations were the
proximate cause of their injuries.

     Finally, the defendants allege that the Complaint fails to
allege a RICO conspiracy.  They argue that the Complaint does

35

not allege how, when, or why the members of the so-called Ring agreed to engage in the predicate wire fraud.

To establish a RICO conspiracy claim pursuant to § 1962(d) a plaintiff must establish "as to each alleged co-conspirator: (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly participated in the same." Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001) (internal citation and quotation marks omitted).  The Court of Appeals for the Second Circuit has explained that, in a civil RICO conspiracy case, the plaintiff must establish that each defendant "knew about and agreed to facilitate the scheme." Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir. 2003) (internal quotation marks and citation omitted); see also Valenti v. Penn Mut. Life Ins. Co., 850 F. Supp. 2d 445, 450-51 (S.D.N.Y. 2012), aff'd, 511 F. App'x 57 (2d Cir. 2013).

"[T]o be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme." United States v. Yannotti, 541 F.3d 112, 122 (2d Cir. 2008) (citations omitted) "It is well-settled that a conspirator need not be fully informed about his co-conspirators' specific criminal acts provided that he agreed to

36

participate in the broader criminal conspiracy and the acts evincing participation were not outside of the scope of the illegal agreement." Id.

The Complaint satisfies this pleading burden. The Complaint describes in some detail the defendants' participation in the broader alleged criminal conspiracy and their respective roles in the RICO enterprise. See, e.g., Compl. ¶¶ 2, 18-19, 22, 28, 70, 78, 309.[8] Under RICO, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." Yannotti, 541 F.3d at 122 (internal citation and quotation marks omitted).

Accordingly, the defendants' motion to dismiss the RICO claims is **denied**.

## C.

The defendants also argue that several common law claims should be dismissed.

---

[8] This analysis does not reach defendant Wright, whose alleged culpability is addressed in Part V.

37

First, they argue that Frydman was not damaged by the purported defamatory statements because Frydman's reputation was already so low, he was libel proof.

The Second Circuit Court of Appeals has held that "a plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject." Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 303 (2d Cir. 1986). "Under the libel-proof plaintiff doctrine, if there is little or no harm to a plaintiff's already low reputation, then the statements are not actionable." Cerasani v. Sony Corp., 991 F. Supp. 343, 352 (S.D.N.Y. 1998) But the Court of Appeals for the Second Circuit has cautioned that "[t]he libel-proof plaintiff doctrine is to be applied with caution, since few plaintiffs will have so bad a reputation that they are not entitled to obtain redress for defamatory statements." Guccione, 800 F.2d at 303.

"This Circuit has applied the libel-proof defense to noncriminal cases on a limited basis.  The libel-proof defense has been held suitable in cases where 'the truth' or 'undisputed evidence' of a plaintiff's past had already severely damaged the plaintiff's reputation." Broome v. Biondi, No. 96cv0805 (RLC), 1997 WL 83295, at *4 (S.D.N.Y. Feb. 10, 1997) (citation

38

omitted).  That is not the case here.  Frydman is not a convicted criminal, as the plaintiff in Cerasani was, and a determination of whether Frydman is libel-proof would turn on factual evidence not now before the Court and unsuitable on a motion to dismiss.  Therefore, the defendants' motion to dismiss the defamation claim is **denied**.

Second, the defendants argue that the allegedly defamatory statements in the defendants' lawsuits and in the whistleblower letter the defendants sent to the SEC are absolutely privileged because they were made in a judicial proceeding and to a regulator.  See N.Y. Civil Rights Law § 74 (privilege for fair and true report of a judicial proceeding or other official proceeding); see also Able Energy, Inc. v. Marcum & Kliegman LLP, 893 N.Y.S.2d 36, 37 (App. Div. 2010) (statements made in letter to the SEC were protected by absolute privilege); Mosesson v. Jacob D. Fuchsberg Law Firm, 683 N.Y.S.2d 88, 89 (App. Div. 1999) ("[A] statement made in the course of legal proceedings is absolutely privileged if it is at all pertinent to the litigation.").

However, there is an exception to the general privilege for statements in judicial proceedings and communications to regulators where the statements are made maliciously and solely for the purpose of defaming the defendant.  See Williams v.

39

Williams, 246 N.E. 2d 333, 337 (N.Y. 1969) (interpreting N.Y. Civil Rights Law. § 74); see Halcyon Jets, Inc. v. Jet One Group, Inc., 894 N.Y.S.2d 392, 393-94 (App. Div. 2010) (per curiam); see also D'Annunzio v. Ayken, Inc., 876 F. Supp. 2d 211, 218 (E.D.N.Y. 2012) (describing the scope of the Williams exception and its relationship to common law libel).  But New York courts have consistently held that this exception is a "narrow one" and "does not apply 'in the absence of any allegation that the . . . action was brought maliciously and solely for the purpose of later defaming the plaintiff.'"  Riel v. Morgan Stanley, No. 06cv524 (TPG), 2007 WL 541955, at *12 (S.D.N.Y. Feb. 16, 2007) (quoting Branca v. Mayesh, 476 N.Y.S.2d 187, 189 (App. Div. 1984), aff'd, 63 N.Y.2d 994 (1984)) (omission in original), aff'd sub nom. Riel v. Stanley, 299 F. App'x 91 (2d Cir. 2008).

The plaintiffs allege that the statements in the letter to the SEC and the allegations in the lawsuits were made maliciously and solely for the purpose of harming the plaintiffs.  See Compl. ¶¶ 355-68.  Whether the first and third lawsuits and the SEC letter meet this standard is an open question of fact that cannot be resolved on a motion to dismiss.

However, the state court has already ruled on the second state court lawsuit, Fishoff Family Foundation v. Frydman,

40

653838/2014.  Justice Saliann Scarpulla dismissed that lawsuit
but ruled against the imposition of sanctions.  See Wright Reply
Decl. Ex. at 29.  This is a sufficient basis on which to
conclude that the lawsuit was not an objective sham filed for
the sole purpose of disseminating false allegations to the
public.  See, e.g., Mover's & Warehousemen's Ass'n of Greater
New York, Inc. v. Long Island Moving & Storage Ass'n, Inc., No.
98cv5373 (SJ), 1999 WL 1243054, at *7 (E.D.N.Y. Dec. 16, 1999)
("[A]bsent an allegation that defendants' litigation involves
conduct that at least approaches some abuse or corruption of the
judicial process, it does not come within the sham exception.").
For this reason, the motion to dismiss the defamation claim as
it relates to the filing of the second state court lawsuit is
**granted**.

Third and finally, the defendants argue that the materials
the defendants allegedly misappropriated were not trade secrets
but merely information on potential future transactions.

The plaintiffs argue that the information comprised far
more than information concerning transactions but also
proprietary shareholder lists, a proprietary list of soliciting
broker dealers, and other non-public financial information taken
from United Realty and Cabot Lodge Securities, all of which
would qualify as a trade secret.  See, e.g., In re Dana Corp.,

574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law.").

Whether the allegedly stolen information constitutes a trade secret is a question of fact that cannot be determined on a motion to dismiss.  See, e.g., Robert Half Int'l, Inc. v. Dunn, No. 5:13-CV-974, 2013 WL 10829925, at *7-8, 12 (N.D.N.Y. Oct. 29, 2013) (determining whether customer lists and similar information constituted trade secrets after evidentiary hearing).

For the forgoing reasons, except for the defamation claim relating to the filing of the second state court lawsuit, the motion to dismiss brought by Verschleiser, Multi Group, Delforno, Pinhasi, and Onica is **denied**.

## IV.

Wright moves to dismiss the Complaint as it pertains to him pursuant to Federal Rule of Civil Procedure 12(b)(6).  Of the twenty causes of action in the Complaint, only five are asserted against Wright: Counts I and II, RICO and RICO conspiracy; Count VIII, the claim of libel per se based on the three allegedly defamatory lawsuits; Count XI, misappropriation of trade secrets relating to Akerman's alleged theft; Count XII, tortious interference with contractual business relations allegedly for

42

stealing the 2014 Transaction Agreement and filing the "Second Defamatory Lawsuit."

Wright raises a number of arguments why the Court should dismiss both the RICO claims and the state law claims against him.  The Complaint contains insufficient factual allegations to support the RICO claims and the state law claims as they pertain to Wright to overcome a motion to dismiss.  It is, therefore, unnecessary to reach the additional arguments raised by Wright in support of the motion to dismiss.

Of all of the RICO allegations in the Complaint, the allegations against Wright are that he committed predicate acts of wire fraud by inducing Akerman to steal confidential information, including the Transaction Agreement.[9]

With respect to the claims of inducing Akerman to steal confidential information, particularly the Transaction Agreement, the Complaint does not include "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.  There are insufficient factual allegations to support the conclusory charges of Wright's culpability,

---

[9] Initially, Wright believed the Complaint alleged that Wright's filing of the "Second Defamatory Lawsuit" in Fishoff Family Foundation v. Frydman, 653838/2014, constituted a predicate act of wire fraud.  In his Reply Brief and at the motion hearing, Frydman clarified that the Complaint does not allege that the filing of this lawsuit constituted a RICO predicate act.

43

particularly where all of the specific allegations for the alleged thefts are against Akerman.  There are no plausible allegations that Akerman needed any inducement by Wright to act against Frydman.  According to the Complaint, Akerman "held an extremely sensitive position" that he could exploit to steal the Transaction Agreement, Compl. ¶ 221, was under financial pressure, motivating his actions, Compl. ¶ 225, sent emails to Verschleiser with trade secrets, and stole and delivered the Transaction Agreement and other materials.  Compl. ¶221.  The Complaint summarily states without any supporting factual detail that Wright "solicited Akerman to secretly work for" him and Verschleiser.  Compl. ¶ 227.  Such a conclusory allegation is not "facial[ly] plausib[le]," Iqbal, 556 U.S. at 678, and is insufficient to plead a claim.

These insufficient allegations doom the plaintiffs' substantive RICO claim against Wright.  Accordingly, the plaintiffs' RICO conspiracy claim against Wright under 18 U.S.C. § 1962(d) also fails.  See Allen v. New World Coffee, Inc., No. 00cv2610, 2002 WL 432685, at *6 (S.D.N.Y. March 19, 2002) ("Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 must fail if the substantive claims are themselves deficient.").

The Complaint's state law allegations against Wright fare no better.  Both Count VIII (libel per se) and Count XII (tortious interference with contractual business relations) are based on the filing of the Second Defamatory Lawsuit; as discussed above, there is an insufficient showing that the lawsuit was a sham in light of Justice Scarpulla's decision not to impose sanctions.  Accordingly, those claims are not plausible on their face.  See Twombly, 550 U.S. at 570.

Finally, the allegations in Count XI (misappropriation of trade secrets) as they relate to Wright are conclusory and lack "factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  For example, the Complaint alleges Wright "conspired to steal the Stolen Trade Secrets" and "effected the scheme through Akerman."  Compl. ¶¶ 394-95.  While detailed factual allegations are not required, the pleading must include more than an "unadorned, the-defendant-unlawfully-harmed-me accusation," "'labels and conclusions,'" "'a formulaic recitation of the elements of a cause of action,'" or "'naked assertion[s].'"  Iqbal, 556 U.S. at 678 (alteration in original) (quoting Twombly, 550 U.S. at 555, 557).  The allegations against Wright in Count XI do not meet that standard.  They consist of conclusory allegations that are not entitled to

45

credit and are devoid of plausible factual allegations. Accordingly, Count XI is dismissed for failure to state a claim upon which relief can be granted.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, the arguments are either moot or without merit.  For the foregoing reasons, the motion to abstain is **denied**.  The motion to dismiss the Complaint brought by Verschleiser, Multi Group, Delforno, Pinhasi, and Onica is **denied in part and granted in part**; and the motion to dismiss brought by Wright is **granted**.  The Clerk is directed to close Docket No. 100 in Case No. 14cv08084 and Docket Nos. 86 and 105 in Case No. 14cv05903.

**SO ORDERED.**

Dated:      New York, New York
            March 22, 2016            _____/s/_____
                                           John G. Koeltl
                                    United States District Judge