Hc1WuniC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    JACOB FRYDMAN, *et al.*,
3
                   Plaintiffs,
4
              v.                          14 Civ. 5903 (JGK)
5                                         14 Civ. 8084 (JGK)

6   ELI VERSCHLEISER, *et al.*,
                                          Decision
7
                   Defendants.
8   ------------------------------x
                                          New York, N.Y.
9                                         December 1, 2017
                                          1:30 p.m.
10
    Before:
11
                       HON. JOHN G. KOELTL,
12
                                          District Judge
13

14                       APPEARANCES

15  HERRICK, FEINSTEIN LLP
         Attorneys for Corporate Plaintiffs
16  BY:  ARTHUR G. JAKOBY

17  LEWIS GREENWALD CLIFTON & NIKOLAIDIS, P.C.
         Attorneys for Plaintiffs United Realty,
18       Frydman and Prime Holdings
    BY:  LEWIS S. FISCHBEIN
19
    VISHNICK MCGOVERN MILIZIO LLP
20       Attorneys for Defendant Akerman
    BY:  AVROHOM Y. GEFEN
21       ANDREW A. KIMLER

22  JOSHUA B. SUMMERS (via speakerphone)
         Attorney for Defendant Verschleiser
23
    ASHER C. GULKO (via speakerphone)
24       Attorney for Defendants Verschleiser,
         Delforno, Pinhasi and Onica
25

Hc1WuniC

1              (Case called)

2              THE COURT:  Good afternoon, all.  Please be seated.

3              MR. JAKOBY:  Arthur Jakoby of Herrick, Feinstein, for

4      plaintiffs.

5              MR. FISCHBEIN:  Good afternoon, your Honor.  Lewis

6      Fischbein for plaintiff Jacob Frydman, and cocounsel for

7      plaintiffs Prime United and -- I'm sorry, Prime United Holdings

8      and United Realty.

9              MR. JAKOBY:  Your Honor, for the record, I am here

10     only for the corporate entities, not for Mr. Frydman.

11             THE COURT:  OK.

12             MR. GEFEN:  Avrohom Gefen, for Albert Akerman.

13             I just wanted to let the Court know that if the time

14     extends past 2:15, I would have to excuse myself to get home

15     for the Sabbath, but my partner, Andrew Kimler, is here as

16     well.

17             MR. KIMLER:  Andrew Kimler.  Both of us are here for

18     defendant Akerman, your Honor.

19             THE COURT:  OK.

20             MR. SUMMERS:  Joshua Summers for defendant

21     Verschleiser.

22             MR. GULKO:  Asher Gulko, cocounsel to Verschleiser

23     companies, Ophir Pinhasi, Raul Delforno and Alex Onica.

24             THE COURT:  OK.  There are three motions for summary

25     judgment that are pending.  I indicated at an earlier

3

Hc1WuniC

conference that I would explain my decisions on those motions
today.

Let me begin with the motions between the Frydman
parties and the Verschleiser parties and then I'll reach the
Akerman motion.

This case involves two consolidated actions, United
Realty v. Verschleiser, No. 14 Civ. 5903 (S.D.N.Y.), and
Frydman v. Verschleiser, No. 14 Civ. 8084 (S.D.N.Y.).  As the
Court explained in an opinion and order dated March 22, 2016,
"these actions are the latest chapter in a long-running and
acrimonious dispute between Jacob Frydman and Eli Verschleiser
where each party has used judicial and extrajudicial scorched
earth practices to torment the other party."  Frydman v.
Verschleiser, 172 F.Supp.3d 653, 658 (S.D.N.Y. 2016).
Familiarity with the facts, underlying claims, and procedural
history of this case is presumed.

Before the Court are three motions for summary
judgment in these consolidated actions.  The first motion is
brought by the plaintiffs, Frydman and two entities affiliated
with Frydman, United Realty Advisors, LP, known as United
Realty, and Prime United Holdings, LLC, known as Prime
United Holdings.  The second motion is brought by Verschleiser,
the Multi Capital Group of Companies, Raul Delforno, Ophir
Pinhasi and Alex Onica, who, along with Albert Akerman, are the
defendants.  The defendants contend that they are unaware of

Hc1WuniC

any entity known as Multi Capital Group of Companies but have

responded on its behalf because they believe the plaintiffs

have confused it with another entity affiliated with

Verschleiser.  Delforno, Pinhasi and Onica are former employees

of United Realty.  A separate motion for summary judgment

brought by Akerman is considered separately.  For purposes of

these cross-motions, references to the defendants do not

include Akerman.

       Briefly, the record and undisputed representations of

the parties indicated following.

       From 2011 until December 2013, Frydman and

Verschleiser were partners in several business entities,

including a broker-dealer Cabot Lodge Securities, LLC ("CLS");

a public nontraded real estate investment trust ("a REIT"),

United Realty Trust, Incorporated; adviser to the REIT, United

Realty; and a sponsor of the REIT, United Realty Advisor

Holdings LLC ("United Realty Holdings").  On December 2, 2013,

Frydman sent Verschleiser a letter purporting to terminate

Verschleiser's employment with United Realty.  Verschleiser

claims to have served Frydman with a similar termination letter

prior to Frydman's letter.  Early on December 4, 2013, Frydman

and Verschleiser executed a membership interests sale and

purchase agreement (the "agreement") dated December 3, 2013.

The agreement rescinded all termination letters by both parties

and obligated Verschleiser to return the plaintiffs' computer

Hc1WuniC

1    servers to their status as of November 15, 2013, and to provide

2    Frydman all owner and administrative passwords to the computer

3    networks by December 5, 2013.  The agreement also contained

4    mutual nondisparagement and confidentiality provisions and a

5    nonsolicitation provision directed toward Verschleiser.

6          The record indicates that Verschleiser did not restore

7    United Realty's computer systems or provide Frydman the

8    passwords by December 5, 2013, as required under the agreement.

9    The plaintiffs have produced evidence purportedly demonstrating

10   that after the execution of the agreement, someone using email

11   and IP addresses associated with Verschleiser hacked into

12   United Realty's computer systems, obtaining and deleting

13   information.  The plaintiffs have also produced evidence

14   purportedly showing that someone using an IP address associated

15   with Verschleiser contacted Opera Real Estate ("Opera"), a

16   potential sublessor of office space to the plaintiffs, and

17   disparaged Frydman.

18         The plaintiffs' claims center around the alleged

19   hacking of their computer servers, the purported damage caused

20   to Frydman's business dealings as a result of disparagement by

21   Verschleiser, the purported theft of trade secrets as a result

22   of the hacking, and breach of the agreement by Verschleiser.

23   Indicative of the acrimonious nature of this litigation, the

24   plaintiffs have spread these claims across 20 counts in their

25   complaint, which includes claims under the Racketeer Influenced

Hc1WuniC

Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"),

as well as contract and tort claims under state law.  See

consolidated second amended complaint (the "complaint").

            The plaintiffs move for summary judgment on the

defendants' liability for the federal hacking-related claims,

breach of contract claims, and state law tort claims for

tortious interference with prospective contractual relations,

conversion, and misappropriation of trade secrets.  The

plaintiffs cross-move for summary judgment dismissing all

claims in the complaint.

            The standard for granting summary judgment is well

established.  "The Court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp.

v. Catrett, 477 U.S. 317, 322-23 (1986); Darnell v. Pineiro,

849 F.3d 17, 22 (2d Cir. 2017).  "The trial court's task at the

summary judgment motion stage of the litigation is carefully

limited to discerning whether there are genuine issues of

material fact to be tried, not to deciding them.  Its duty, in

short, is confined at this point to issue-finding; it does not

extend to issue resolution."  Gallo v. Prudential Residential

Servs., LP., 22 F.3d 1219, 1224, (2d Cir. 1994).

            In determining whether summary judgment is

appropriate, a court must resolve all ambiguities and draw all

Hc1WuniC

reasonable inferences against the moving party.  See Matsushita
Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574,
587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S.
654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary
judgment is improper if there is any evidence in the record
from any source from which a reasonable inference could be
drawn in favor of the nonmoving party.  See Chambers v. TRM
Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  The standards to
be applied in deciding a motion for summary judgment are well
established and need not be repeated here.  See, generally, Law
Debenture Trust Co. of New York v. Maverick Tube Corp., 595
F.3d 458, 468 (2d Cir. 2010); Scotto v. Almenas, 143 F.3d 105,
14-15 (2d Cir. 1998); Abrams v. RSUI Indemnity Co., No. 16 Civ.
4886 (JGK), 2017 WL 3433108, at *3 (S.D.N.Y. Aug. 10, 2017).

          The plaintiff's hacking claims fall under three
federal computer crimes statutes -- the Computer Fraud and
Abuse Act, 18 U.S.C. §§ 1030 et seq. (the "CFAA"); the
Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et
seq. (the "ECPA"); and the Stored Communications Act, 18 U.S.C.
§§ 2701 et seq. (the "SCA") -- each of which provides for civil
liability for persons harmed by violations of the statutes.
The CFAA prohibits, in pertinent part, "intentionally accessing
a computer without authorization or exceeding authorized
access, and thereby obtaining information from any protected
computer."  18 U.S.C. § 1030(a)(2)(C); "knowingly and with

Hc1WuniC

intent to defraud, accessing a protected computer without

authorization, or exceeding authorized access, furthering the

intended fraud and obtaining anything of value." id. §

1030(a)(4); and "intentionally accessing a protected computer

without authorization, and as a result of such conduct, causing

damage and loss." id. § 1030(a)(5)(C); see also Sewell v.

Bernardin, 795 F.3d 337, 339-40 (2d Cir. 2015).  Section (g) of

the CFAA provides for civil liability if certain requirements

are satisfied.  18 U.S.C. § 1030(g).

        The SCA prohibits "intentionally accessing without

authorization a facility through which an electronic

communications service is provided," or "intentionally

exceeding an authorization to access that facility" and thereby

obtaining, altering, or providing authorized access to

information in such facility.  18 U.S.C. §§ 2701(a), 2707(a).

And the ECPA prohibits, in pertinent part, "intentionally

intercepting" any electronic communication, 18 U.S.C. §

2511(1)(a).

        The plaintiffs argue that there is no material dispute

of fact that Verschleiser hacked into United Realty's email

servers in December 2013 and January and February 2014, and

that Verschleiser thereby obtained, deleted, and intercepted

electronic information and locked Frydman out of Frydman's

email account, in violation of the CFAA, SCA, and ECPA.  The

basis for the plaintiffs' claims are data logs from the

Hc1WuniC

plaintiff's Internet service provider, Intermedia.net Inc.

("Intermedia"), which they claim show access by email and IP

addresses associated with Verschleiser.  More specifically, the

plaintiffs claim that the email addresses eli.v@urpa.com and

2good2b4@att.net accessed the server between December 2, and

December 6 and 10, 2013, from IP addresses 100.2.2.26 and

108.29.11.176.  The plaintiffs claim that Verschleiser, through

his previous attorney, admitted to using both these email

addresses and that the 102.2.2.26 IP address was used to edit

Wikipedia articles associated with Verschleiser.  Records

subpoenaed from Verizon show that IP address 108.29.11.176 was

associated with a residential address in Brooklyn that

Verschleiser admitted he owned as of July 2014.  The plaintiffs

also claim that the Intermedia logs show further access of the

plaintiffs' email server by "workstation 'ELI-X1CARBON'" and by

someone using the email address 2good2b4@att.net from IP

address 74.108.218.147 in January and February 2014.

         With respect to Delforno, the plaintiffs contend that

certain other logs, which have not been identified or

authenticated, indicate that workstation RDELFORNO-X1 logged

into Frydman's email account in February 2014.  With respect to

Onica, the plaintiffs point to a December 5, 2013, email

exchange where Onica discussed contacting 1&1 Mail & Media,

Inc., an email service provider, regarding technical issues.

This email service provider was also used by an email address

Hc1WuniC

1    that the plaintiffs claim sent disparaging messages about

2    Frydman.  The plaintiffs claim that Delforno and Onica met at

3    United Realty's office in the early hours of February 12, 2014,

4    to do "tech stuff," but Delforno testified that he did not

5    think that he and Onica did that.  With respect to Pinhasi, the

6    record reflects that Frydman found Pinhasi working on the

7    United Realty computer early in the morning of December 4,

8    2014, migrating employee profiles from United Realty's

9    computers to Multi Group's because "we weren't allowed to

10   remove the machines."

11        The defendants argue that the Intermedia records are

12   improper because they circumvent this Court's March 24, 2017,

13   order upholding the magistrate judge's conclusion of the

14   plaintiffs' hacking expert, and further, that the records are

15   unauthenticated.  Both arguments are misguided.  The Court

16   explicitly stated in the March 27, 2017, order that "the

17   plaintiffs could still, through fact evidence, attempt to prove

18   their claims and establish damages." Frydman v. Verschleiser,

19   2017 WL 1155919, at *3 (S.D.N.Y. 2017).  Further, a

20   representative of Intermedia authenticated the records during

21   his deposition.  The plaintiffs can therefore offer the records

22   on these motions.

23        However, the records are proffered through the

24   declaration of the plaintiffs' attorney rather than through an

25   expert.  While this does not call into question the records'

Hc1WuniC

authenticity, it does raise questions as to the correct

interpretation of the records.  Where the factual meaning of

the records is disputed, the Court cannot resolve that factual

dispute on a motion for summary judgment, and the meaning of

the records is disputed.  Verschleiser claims that he cannot

recall whether he hacked into, or otherwise accessed, the

United Realty's email servers at the times he is accused of

doing so.  The plaintiffs contend that this is "a nondenial"

that does not raise a genuine issue of fact.  However,

Verschleiser appears to have accessed the servers with

authorization prior to the dispute.  Drawing all reasonable

inferences in favor of Verschleiser, it is reasonable for

Verschleiser to have difficulty recalling the precise dates of

his access during the deposition three years after the access

in question.  In any event, the plaintiffs have the burden of

showing that, as a matter of undisputed fact, Verschleiser

hacked into the United Realty email system, as the plaintiffs

allege, and the Court cannot decide that disputed factual issue

on this motion for summary judgment.

          Moreover, because the plaintiffs' evidence relates to

email and IP addresses, it does not show that Verschleiser

hacked into the United Realty email system as the plaintiffs

allege, either because the Intermedia logs are not as

conclusive as the plaintiffs' attorney believes, or because

another person or persons could have used those email and IP

Hc1WuniC

addresses.  The plaintiffs themselves articulated the

difficulty of connecting the Intermedia logs directly to

Verschleiser.  In the plaintiffs' brief arguing that the Court

should reject the magistrate judge's preclusion of their

hacking expert, the plaintiffs claimed that the expert was

"essential" to their case, and further explained:

          "The Intermedia logs are the digital trail of the

hacking; however, in and of themselves are difficult to

interpret.  The logs, in total, consist of over 58,167 lines of

small-font data, which, if printed, would comprise

approximately 8,684 pages.  (Decl., ¶ 105).  As the hacking

lies at the heart of this case and the Intermedia logs are the

digital evidence of the hacking, the expert's report and

testimony are essential to assisting the finder of fact with

interpreting the data."

          Plaintiffs' objection to magistrate's order precluding

plaintiffs' expert (Dkt. No. 272 in 14 Civ. 5903) at 23.

Without the "essential" expert, the Court cannot determine on a

motion for summary judgment whether Verschleiser hacked into

the plaintiffs' computer systems based on the declaration of

the plaintiffs' attorney and the "difficult to interpret" log.

While the plaintiffs have pointed to abundant smoke, whether

Verschleiser was the arsonist remains a disputed issue of

material fact for trial.

          Further, the evidence in the record proffered to

Hc1WuniC

implicate Delforno, Onica, and Pinhasi of hacking is, at best,

attenuated.  The plaintiffs point to circumstantial evidence

that Delforno, Onica, and Pinhasi accessed the plaintiffs'

systems from the plaintiffs' physical business location, but

the plaintiffs point to no direct evidence that any of

Delforno, Onica, and Pinhasi hacked the plaintiffs' computer

systems.

        The plaintiffs' motion for summary judgment on the

defendant's liability under the CFAA, SCA, and ECPA is

therefore denied.

        The plaintiffs submit that the same evidence that

establishes the defendants' violation of the CFAA also

establishes their liability for conversion "via forwarding and

deleting information from employee email accounts."

Plaintiffs' memo of law in support of motion for summary

judgment at 21.  For the same reasons that this evidence does

not entitle the plaintiffs to summary judgment on the

plaintiffs' CFAA claim, it does not entitle the plaintiffs to

summary judgment on their conversion claim.  The plaintiffs'

motion for summary judgment on the defendants' liability for

conversion is therefore denied.

        The plaintiffs also argue that they are entitled to

summary judgment on Verschleiser's liability for tortious

interference with prospective contractual or business

relations.  Under New York law, to prevail on this claim, a

1    plaintiff must show that "(1) it had a business relationship

2    with a third party; (2) the defendant knew of that relationship

3    and intentionally interfered with it; (3) the defendant acted

4    solely out of malice, or used dishonest, unfair, or improper

5    means; and (4) the defendant's interference caused injury to

6    the relationship."  Kirch v. Liberty Media Corp., 449 F.3d 388,

7    400 (2d Cir. 2006) (internal quotation marks and citation

8    omitted).  The plaintiffs claim that the evidence in the record

9    establishes that Verschleiser anonymously emailed Opera, a

10   prospective sublessor of office space to the plaintiffs, using

11   the email address informedconsumer@mail.com and made "false and

12   defamatory accusations" against Frydman, thereby causing Opera

13   to decline to execute the contemplated sublease with the

14   plaintiffs.  Plaintiffs' motion for summary judgment at 22.

15   The plaintiffs attempt to link Onica to the

16   informedconsumer@mail.com because Onica sent an email

17   contemplating contacting the email service provider of that

18   email address about a different matter.

19        The plaintiffs claim that the metadata from the email

20   to Opera shows that it was sent from IP address 173.254.227.108

21   and that the Intermedia logs show that this IP address also

22   logged into United Realty's servers and accessed accounts

23   associated with Verschleiser.  The plaintiffs further allege

24   that Verschleiser could only have learned of the Opera lease

25   through hacking and could only have been motivated by malice.

Hc1WuniC

The plaintiffs also contend that email messages between Opera

employees establish that the lease would have been executed but

for the email from informedconsumer@mail.com.  According to the

plaintiffs, this establishes that Verschleiser knew of and

interfered with the plaintiffs' potential sublease by unfair

means, which caused the sublessor to pull out of the deal.

           The defendants argue that the plaintiffs' attempt to

link Verschleiser to the 173.254.227.108 IP address is

circumstantial, that Verschleiser could have learned of the

deal from sources other than hacking and had motivations other

than malice, that the plaintiffs have not demonstrated that the

accusations about Frydman in the email are not true, and that

the plaintiffs have not established that the lease would have

been executed but for the email from informedconsumer@mail.com.

           Just as the plaintiffs' attorney's declaration fails

to show as a matter of undisputed material fact that

Verschleiser hacked into United Realty's servers, it also does

not show that Verschleiser sent the email from

informedconsumer@mail.com.  Verschleiser claims that he cannot

recall whether he ever used that email address.  Further, the

plaintiffs' contention that whoever sent the email could only

have learned of the lease through hacking is conclusory and

unsupported because the records indicate that several employees

of Opera were involved and could have related the information

to others unbeknownst to the plaintiffs.  Moreover, the

Hc1WuniC

1    sender's motivations, the truth of the accusations, if any, and

2    their effect on Opera are all questions of fact that cannot be

3    decided on a motion for summary judgment.

4            The plaintiffs' motion for summary judgment on their

5    claim for tortious interference is therefore denied.

6            The plaintiffs also argue that they are entitled to

7    summary judgment on their claim for breach of contract with

8    respect to the server restoration, nondisparagement,

9    nonsolicitation, and confidential provisions of the December 3,

10   2013, agreement, including that the alleged breaches were

11   material.

12           The agreement obligates Verschleiser to return various

13   computer servers to their status as of November 15, 2013, and

14   to turn over all owner and administrator passwords for the

15   plaintiffs' computer systems to Frydman by December 5, 2013.

16   The defendants concede that Verschleiser did not perform these

17   obligations within the required time period but argue that such

18   nonperformance was not a material breach of the agreement.

19           "Whether a failure to perform constitutes a material

20   breach turns on several factors, such as the absolute and

21   relative magnitude of default, its effect on the contract's

22   purpose, willfulness, and the degree to which the injured party

23   has benefitted under the contract." Process Am., Inc. v.

24   Cynergy Holdings, LLC, 839 F.3d 125, 136 (2d Cir. 2016)

25   (quoting Hadden v. Consol. Edison Co. of New York, 312 N.E.2d

445 (N.Y. 1974)).  The plaintiffs' contention that because the

agreement "was in its infancy, Verschleiser's nonperformance

was of great magnitude" is not supported by any factual

evidence in the record.  Moreover, the record indicates that

Verschleiser was dealing with a family emergency surgery at the

time, and this was the reason he did not meet his obligations.

Whether Verschleiser's failure to meet his obligations within

the agreement's time frame was excused by exigency -- and

whether it was material -- are factual questions that cannot be

determined on a motion for summary judgment.  See Cont'l Ins.

Co. v. RLI Ins. Co., 555 65 N.Y.S.2d 325, 327 (App. Div. 1990)

("Ordinarily, the question of the materiality of a breach of

warranty in an insurance contract is a question of fact for the

jury.").

          The plaintiffs also claim that they are entitled to

summary judgment on Verschleiser's breach of the agreement's

nondisparagement provision.  The plaintiffs point to emails

Verschleiser sent beginning on April 14, 2014, that are

allegedly derogatory.  The agreement stipulates that any breach

of the nondisparagement provision will be considered material.

          However, prevailing on a breach of contract claim

requires proving not only that Verschleiser breached his

obligation but also that Frydman substantially performed and

did not materially breach his.  Process Am., Inc., 839 F.3d at

136.  The defendants do not dispute that Verschleiser sent the

Hc1WuniC

1    emails in the record, but they contend that Verschleiser was

2    excused from performance because Frydman had failed to make the

3    distributions required by the agreement and because Frydman

4    disparaged Verschleiser on a website called

5    thetruthaboutEliVerschleiser.com.  There are disputed issues of

6    fact as to when Frydman began to disparage Verschleiser.  Who

7    disparaged whom first -- breaching the agreement and excusing

8    the other party's performance -- is a disputed factual question

9    that cannot be decided on a motion for summary judgment.

10           The plaintiffs also contend that they are entitled to

11   summary judgment that Verschleiser breached the agreement's

12   nonsolicitation provision by employing or soliciting two

13   employees of the plaintiffs after the execution of the

14   agreement.  The defendants dispute whether any such employment

15   took place after the signing of the agreement and whether the

16   persons in question were employees or independent contractors.

17   Contrary to the plaintiffs' belief, the portion of deposition

18   testimony the plaintiffs cite to prove the employment or

19   nonsolicitation question are far from conclusive.  Further, if

20   Frydman breached the agreement by disparaging Verschleiser

21   through thetruthaboutEliVerschleiser.com prior to any

22   employment or solicitation, such employment or solicitation

23   could be excused.  _Process Am., Inc._, 839 F.3d at 136.  Whether

24   the defendants breached the nonsolicitation provision of the

25   agreement is therefore a factual question for trial.

Hc1WuniC

1          The plaintiffs also claim that they are entitled to

2     summary judgment on Verschleiser's breach of the agreement's

3     confidentiality provision based on Verschleiser's disclosure of

4     the Opera sublease transaction.  The plaintiffs cite "the same

5     evidence that supports summary judgment in favor of United

6     Realty on so much of its tortious interference claims as

7     concerns the Opera Realty failed deal" to support this

8     contention.  Plaintiffs' motion for summary judgment, at 28.

9     As discussed above, the plaintiffs have failed to demonstrate

10    that they are entitled to summary judgment concerning the

11    alleged interference with the Opera transaction.  The

12    plaintiffs have likewise failed to establish a breach of the

13    agreement's confidentiality provision based on the same

14    evidence.

15          Therefore, the plaintiffs' motion for summary judgment

16    on Verschleiser's alleged breaches of the agreement is denied.

17          The plaintiffs also argue that they are entitled to

18    summary judgment on their claim of misappropriation of trade

19    secrets.  The basis for this claim is that Akerman, at

20    Verschleiser's behest, obtained from CLS's and the plaintiffs'

21    computer servers certain information that he provided to

22    Verschleiser, including a confidential sale and purchase

23    agreement, known as the transaction agreement, for the sale of

24    CLS's retail customer accounts, a list of the REIT's

25    shareholders who were clients of CLS, a list of broker-dealers

1   and representatives who formed part of the United Realty

2   selling group in conjunction with the public offering of the

3   REIT's common stock, and financial reports related to CLS's

4   performance.

5       The defendants contend that the record does not prove

6   that all of this information was actually sent to Verschleiser

7   and that the plaintiffs lack standing to bring claims with

8   respect to CLS's alleged trade secrets because they are no

9   longer owners of CLS and have not shown that they are assignees

10  of CLS's claims, if any.  The plaintiffs respond that much of

11  the information, including the transaction agreement, relates

12  to United Realty and to Prime United Holdings, who was a party

13  to the transaction agreement, and that they therefore have

14  standing to pursue all of their claims.

15      Whether the plaintiffs have standing to bring claims

16  for misappropriation of trade secrets related to the

17  transaction agreement depends in part on whether the

18  transaction agreement to which Prime United Holding was a

19  party, constitutes a trade secret.  Likewise, whether all, or

20  any, of the other alleged proprietary information actually

21  constitutes trade secrets is a factual question necessitating a

22  close analysis of the specific information and the context in

23  which it was obtained and used.  See N. Atl. Instruments, Inc.

24  v. Haber, 188 F.3d, 38, 44 (2d Cir. 1999) (listing six factors

25  New York courts consider when determining whether information

Hc1WuniC

1    constitutes a trade secret); <u>A.F.A. Tours, Inc. v. Whitchurch</u>,

2    937 F.2d 82, 89 (2d Cir. 1991) ("The question of whether or not

3    a customer list is a trade secret is generally a question of

4    fact.").  Thus, whether the defendants misappropriated trade

5    secrets of the plaintiffs is a factual question to be

6    determined at trial.

7         The plaintiffs' motion for summary judgment on their

8    claim for misappropriation of trade secrets is therefore

9    denied.

10        In sum, the plaintiffs' motion for summary judgment is

11   denied in its entirety.

12        The defendants also move for summary judgment

13   dismissing all of the plaintiffs' claims.  Although the

14   defendants purport to move for summary judgment as to all of

15   plaintiffs' claims, the defendants make no argument in favor of

16   dismissing the plaintiffs' claim for misappropriation of trade

17   secrets or breach of contract.  The defendants' motion as to

18   those claims, if any, is therefore denied.  For the following

19   reasons, the defendants' motion with respect to the plaintiffs'

20   other claims is also denied.

21        The defendants' motion for summary judgment is little

22   more than a reprise of their motion to dismiss, which the Court

23   denied.  <u>See</u> <u>Frydman v. Verschleiser</u>, 172 F.Supp. 653.  In

24   their reply papers, the defendants also raise a new argument --

25   that the Court should dismiss the plaintiffs' claims based on

Hc1WuniC

1    judicial estoppel.  "The Court will not consider new arguments

2    in reply papers."  PrecisionIR Inc. v. Clepper, 693 F.Supp.2d

3    286, 297 (S.D.N.Y. 2010).

4         The defendants' main argument is that the plaintiffs

5    have not adequately pleaded their RICO claims.  Plainly, this

6    is not an argument conducive to motion for summary judgment.

7    As the plaintiffs correctly observe, the defendants "cut and

8    paste entire sections from their August 28, 2015, memorandum of

9    law in support of their failed motion to dismiss" these claims

10   for lack of standing.  Plaintiffs' opposition at 2.  See also

11   defendants' memo of law in support of motion for summary

12   judgment at 10 (arguing that the plaintiffs have "failed to

13   meet their burden under the Rule 8(a) pleading standard");

14   defendants' motion for summary judgment at 12 (arguing that the

15   plaintiffs "do not allege" detrimental reliance on allegedly

16   fraudulent activity); defendants' memo of law in support of

17   motion for summary judgment at 13 (arguing that the plaintiffs'

18   RICO claims fail under the pleading standards of Fed. R. Civ.

19   P. 9(b)); defendants' memo of law in support of motion for

20   summary judgment at 16 (arguing that the plaintiffs have failed

21   to allege an enterprise for RICO purposes); defendants' memo in

22   support of motion for summary judgment at 17–18 (arguing that

23   the plaintiffs have failed to allege a pattern of racketeering

24   activity).  These are pleading arguments that have already been

25   rejected.  Even when purporting to argue that the plaintiffs

Hc1WuniC

1   have failed to prove racketeering activity, an argument which

2   is more suited to a motion for summary judgment, the defendants

3   shift to an argument based on the plaintiffs' alleged failure

4   to meet the pleading standard.  See defendants' motion in

5   support of summary judgment at 19-22.  To the extent the

6   defendants argue that the plaintiffs "failed to provide

7   evidence" of the injuries required to prove standing for the

8   RICO claims, the record demonstrates an issue of fact as to

9   whether investors pulled out of Frydman's businesses and

10  whether Opera pulled out of the prospective sublease agreement

11  due to alleged disparagement by Verschleiser.

12         For the reasons stated in the Court's order denying

13  defendants' motion to dismiss, the defendants' motion for

14  summary judgment dismissing the plaintiffs' RICO claims is

15  denied.

16         The defendants also move for summary judgment

17  dismissing the plaintiffs' hacking claims under the CFAA, SCA,

18  and ECPA.  The defendants argue that the plaintiffs have not

19  proffered any "admissible" evidence that Verschleiser or the

20  other defendants hacked into, or otherwise accessed, without

21  authorization the plaintiffs' computer servers.

22         The Court has not ruled that the Intermedia logs are

23  inadmissible and the plaintiffs have proffered some evidence of

24  authentication.  The logs cannot be rejected as inadmissible at

25  this point.  Further, the record plainly raises a question of

Hc1WuniC

1    fact as to whether Verschleiser hacked into the plaintiffs'

2    servers.  For example, the logs purport to show access to the

3    plaintiffs' servers by someone using the email address

4    2good2b4@att.net and IP address 108.29.11.176.  The record

5    offers some support to the plaintiffs' contention that this IP

6    address was associated with a residence owned by Verschleiser.

7    Verschleiser's previous attorney advised the plaintiffs that

8    Verschleiser used the email address 2good2b4@att.net.  Drawing

9    all inferences in the plaintiffs' favor, as the Court is

10   required to do on the defendants' motion, the record

11   demonstrates a material issue of fact as to whether

12   Verschleiser hacked into the plaintiffs' computer systems.

13          Further, the defendants' contentions that the

14   plaintiffs cannot prove that the defendants lack authority to

15   access the servers or that the defendants, believing they had

16   such authority, acted with the requisite knowledge or intent to

17   access the servers, are conclusory allegations.  Whether the

18   defendants had such authorization or acted with the requisite

19   mental state are quintessential questions of fact to be

20   answered at trial.  See United States v. Rajaratnam, 719 F.3d

21   139, 153 (2d Cir. 2013) ("Whether an individual had a

22   particular mental state 'is a question of fact subject to

23   demonstration in the usual ways, including inference from

24   circumstantial evidence'")  (quoting Farmer v. Brennan, 511

25   U.S. 825, 842 (1994)).  (There is thus sufficient evidence in

Hc1WuniC

1    the record to suggest hacking by Verschleiser to withstand the

2    defendant's motion for summary judgment dismissing the

3    plaintiffs' claims under the CFAA, SCA, and ECPA.

4            The defendants' motion for summary judgment dismissing

5    the plaintiffs' federal hacking claims is therefore denied.

6            Finally, the defendants move for summary judgment

7    dismissing the plaintiffs' state law tort claims for libel

8    tortious interference with prospective contractual or business

9    relations, and intentional infliction of emotional distress.

10   Essentially, the defendants argue that Frydman cannot prove

11   harm from any disparaging information expressed or disclosed

12   about him because his public reputation is so bad that Frydman

13   is "libel proof."  Although the Second Circuit Court of Appeals

14   has "recognized that a plaintiff's reputation with respect to a

15   specific subject may be so badly tarnished that he cannot be

16   further injured by allegedly false statements on that subject,"

17   the Court of Appeals has explained that "the libel-proof

18   plaintiff doctrine is to be applied with caution since few

19   plaintiffs will have so bad a reputation that they are not

20   entitled to obtain redress for defamatory statements."

21   Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 303 (2d Cir.

22   1986) (citations omitted); see also Buckley v. Littell, 539

23   F.2d 882, 889 (2d Cir. 1976) (cautioning against extending the

24   libel-proof doctrine, first enunciated in Cardillo v. Doubleday

25   & Company, 518 F.2d 638 (2d Cir. 1975), beyond Cardillo's

Hc1WuniC

1    "basic factual context.").  While the record does suggest that

2    Frydman is litigious and has been the subject of negative

3    statements apart from this lawsuit, whether Frydman was harmed

4    by the defendants' alleged statements and disclosures --

5    including allegedly private emails sent to current or

6    prospective business partners -- is a question of fact to be

7    answered at trial.  The defendants' motion for summary judgment

8    dismissing the plaintiffs' state law tort claims is therefore

9    denied.

10              In sum, the defendants' motion for summary judgment is

11    denied.

12              The Court has considered all of the arguments raised

13    by the parties.  To the extent not specifically addressed, the

14    arguments are either moot or without merit.  For the foregoing

15    reasons, both the plaintiffs' and the defendants' motions for

16    summary judgment, with the exception of the motion by defendant

17    Akerman, are denied.  Based on this decision, the clerk of

18    court is directed to close all pending motions except Dkt. No.

19    212 in 14 Civ. 8084.

20              So ordered.

21              Akerman's motion is different, and I will briefly go

22    over the Akerman motion.  I'll actually do a written decision

23    with respect to Akerman shortly, perhaps today, certainly very

24    shortly.  This will be a much shortened description of the

25    resolution of the Akerman motion, which will be expanded on in

Hc1WuniC

1    the written decision.

2            The third motion for summary judgment is brought by

3    Akerman.  The plaintiffs' consolidated second amended complaint

4    ("CSAC") alleges 20 federal and state law counts, nine of which

5    name Akerman as a defendant: violation of the Racketeer

6    Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.

7    ("RICO") (Count One); conspiracy to violate § 1962(c) of RICO;

8    18 U.S.C. § 1962(d) (Count Two); libel per se, (Count Eight);

9    trade libel (Count Nine); misappropriation of trade secrets

10   (Count Eleven); tortious interference with existing contractual

11   or business relations (Count Twelve); breach of contract (Count

12   Sixteen); indemnification (Count Seventeen); and breach of the

13   duty of loyalty (Count Eighteen).  Akerman's motion for summary

14   judgment seeks dismissal of all counts against Akerman based on

15   contractual release and the collateral estoppel effect of a

16   prior arbitration.  For the reasons explained below, Akerman's

17   motion for summary judgment is granted.

18           As relevant to Akerman's motion for summary judgment,

19   the record and undisputed representations of the parties show

20   the following facts as to which there is no genuine dispute.

21           Part of the plaintiffs' allegations in this case are

22   that Akerman provided confidential and trade secret information

23   to Verschleiser, another defendant, after Verschleiser and

24   Frydman's business partnership ended in December 2013.  Until

25   mid-December 2014, Akerman was the chief compliance officer

Hc1WuniC

```
1    ("CCO") of Cabot Lodge Securities LLC ("CLS"), a broker-dealer

2    registered with the United States Securities and Exchange

3    Commission ("SEC") and a member of the Financial Industry

4    Regulatory Authority ("FINRA").  Akerman was also CCO for CL

5    Wealth Management LLC ("CLW"), an investment adviser registered

6    with the SEC and an affiliate of CLS.  At the time, Prime

7    United Holdings, one of the plaintiffs in this lawsuit, owned

8    CLS.  Frydman, also a plaintiff in this lawsuit, is the chief

9    executive officer ("CEO") and chairman of Prime United Holdings

10   and the chairman of CLS and CLW.  CSAC ¶ 48.  On or around

11   December 15, 2014, Frydman fired Akerman from CLS and CLW.

12          After Akerman's termination from CLS and CLW, Akerman

13   and Frydman asserted various claims against each other in New

14   York State court.  Akerman also sent a letter to the SEC, among

15   other parties, alleging wrongdoing related to the management of

16   CLS.  On or about January 14, 2015, CLS and CLW filed a Form

17   U-5 with FInRA containing allegations of misbehavior against

18   Akerman.  The Form U-5 is a uniform termination notice for

19   securities industry registration.

20          On February 20, 2015, Akerman executed a settlement

21   agreement (the "agreement") with CLS, Frydman, and United

22   Realty, whereby each party released the others from all claims

23   relating to events prior to and including February 20, 2015

24   (the "release").  Specifically, the release provided, in

25   relevant part, that subject to Akerman's faithful performance
```

Hc1WuniC

1   of his obligations in paragraphs 1, 2, and 3, and subject to

2   certain exceptions not here relevant:

3           United Realty; CLS, United Realty Trust Incorporated,

4   Frydman and each of their respective agents, representatives

5   and affiliates (the "United releasing persons") hereby release

6   any and all claims, suits, controversies, actions, causes of

7   action, cross-claims, counterclaims, demands, debts,

8   compensatory damages, liquidated damages, punitive or exemplary

9   damages, other damages, claims for costs and attorneys' fees,

10  or liabilities of any nature whatsoever in law and in equity,

11  both past and present, whether known or unknown, suspected, or

12  claimed against Akerman and each and every one of his

13  affiliates, and each of their respective successors or assigns,

14  which the United releasing persons ever had, now have, or

15  hereafter may have, by reason of any matter, cause, or thing

16  whatsoever, from the beginning of the world to the time of

17  execution of this agreement.  This relief will survive the

18  transactions contemplated herein.  In the event that Akerman

19  breaches the provisions of paragraphs 1, 2, or 3, the release

20  provided in this paragraph 4 shall be null and void ab initio.

21          Paragraphs 1 and 3 of the agreement obligated Akerman

22  to send a retraction letter to the SEC and discontinue the

23  state court lawsuit against Frydman by February 20, 2015.

24  Paragraph 2 of the agreement obligated Akerman to refrain from

25  soliciting any employees of the United releasing persons,

Hc1WuniC

1   divulging confidential information of the United releasing

2   persons, communicating with any agency about the United

3   releasing persons, or disparaging the United releasing persons.

4   However, the agreement provided that the United releasing

5   persons would not oppose Akerman's initiation of arbitration

6   with FInRA to expunge the Form U-5 letter as long as Akerman

7   did not seek "affirmative relief."

8          On or about February 25, 2015, Akerman initiated

9   arbitration with FInRA, seeking to expunge the Form U-5.  On

10  March 18, 2015, CLS and CLW filed an answer, affirmative

11  defenses, and counterclaims with FInRA -- which was signed by

12  Frydman -- seeking damages against Akerman in excess of $8

13  million.  Akerman moved the FInRA arbitrators to strike the

14  answer and to dismiss the counterclaims because the

15  counterclaims were barred by the release in the agreement.  CLS

16  and CLW responded by arguing that the release was void because

17  Akerman had breached the agreement by disparaging CLS and CLW

18  and seeking affirmative relief with respect to the Form U-5.

19  On November 17, 2015, the FInRA arbitration panel issued an

20  order striking the answer by CLS and CLW and dismissing the

21  counterclaims.  The arbitrators found that Akerman had not

22  sought affirmative relief by seeking to expunge the Form U-5.

23  The arbitrators also determined that CLS, and CLW as an

24  affiliate of CLS, had "released any and all claims in dispute

25  by a signed settlement agreement and a written release."

Hc1WuniC

1          On February 16, 2016, Akerman moved this Court for

2     summary judgment dismissing the plaintiffs' claims against

3     Akerman.  Akerman argued that there was no genuine dispute,

4     that he had not breached the agreement, and the release

5     therefore barred the plaintiffs' claims against him in this

6     case.  The plaintiffs responded that there were numerous

7     disputed issues of material fact with respect to Akerman's

8     performance (or lack thereof) under the agreement that

9     precluded summary judgment.  On June 30, 2016, the Court denied

10    Akerman's motion for summary judgment on the ground that there

11    remained disputed facts as to whether Akerman had breached the

12    agreement and thus whether plaintiffs' claims were barred by

13    the release.

14          Thereafter, on July 11, 2016, Akerman amended his

15    answer to include a new affirmative defense, collateral

16    estoppel.  See Dkt. No. 155 in 14 Civ. 5903.  On April 28,

17    2017, Akerman again moved this Court for summary judgment

18    dismissing all of the plaintiffs' claims.  This time, Akerman

19    argues that the FInRA arbitration order precludes plaintiffs

20    from arguing that Akerman breached the agreement or from

21    contesting the enforceability of the release.  If the

22    plaintiffs were so precluded, there would be no factual dispute

23    that Akerman complied with the agreement and can rely on the

24    release.

25          It is not necessary to repeat the standards to be

Hc1WuniC

1   applied on a motion for summary judgment.  See, generally,

2   Scotto v. Almenas, 143 F.3d 105, 14-15 (2d Cir. 1998); Ying

3   Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993);

4   Abrams v. RSUI Indemnity Co., No. 16 Civ. 4886 (JGK), 2017 WL

5   3433108, at *3 (S.D.N.Y. Aug. 10, 2017).

6        Akerman moves for summary judgment.  Akerman contends

7   that by the February 20, 2015, agreement, the plaintiffs

8   released all of the claims asserted against Akerman in this

9   case, which pertain to events preceding February 20, 2015.

10  Akerman argues that the FInRA arbitration panel ruled that the

11  agreement is binding and therefore the doctrine of collateral

12  estoppel precludes the plaintiffs from now arguing otherwise.

13       The doctrine of collateral estoppel may preclude a

14  party, or its privy, from relitigating an issue that the party

15  previously litigated and lost.  Parklane Hosiery Co. v. Shore,

16  439 U.S. 322, 329 (1979); Blonder-Tongue Labs, Inc. v. Univ. of

17  Illinois Found., 402 U.S. 313, 320-21 (1971).  District courts

18  have broad discretion to determine when collateral estoppel

19  should be applied.  Parklane Hosiery, 439 U.S. 331.  The Second

20  Circuit Court of Appeals has explained that a prior arbitration

21  may have preclusive effect where:

22       "(1) the identical issue was raised in a previous

23  proceeding; (2) the issue was actually litigated and decided in

24  the previous proceeding; (3) the party had full and fair

25  opportunity to litigate the issue; and (4) the resolution of

Hc1WuniC

1  the issue was necessary to support a final and valid judgment

2  on the merits."  Bear, Stearns & Co., Bear, Stearns Sec. Corp.

3  v. 1109580 Ontario, Inc., 409 F.3d 87, 91 (2d Cir. 2005)

4  (internal quotation marks and citations omitted).

5  Additionally, "a court must satisfy itself that application of

6  the doctrine is fair."  Id.

7          The plaintiffs contend that the FInRA arbitration does

8  not have a preclusive effect in this litigation and that the

9  Court's previous determination that the Court is not bound by

10  the FInRA arbitration is "law of the case."  The plaintiffs

11  also suggest that the FInRA arbitration should not be given

12  preclusive effect because the arbitrators did not explicitly

13  find that Akerman did not breach the agreement.  Further, the

14  plaintiffs argue that, even if the FInRA arbitration could have

15  a preclusive effect, it does not have the effect in this case

16  because the respondents in the arbitration are not identical

17  to, nor in privity with, the plaintiffs in this litigation.

18          The plaintiffs contend that the Court's prior

19  determination that Akerman was not entitled to summary judgment

20  because a fact dispute existed regarding whether Akerman had

21  violated the agreement is law of the case.  This argument is

22  misguided.  "The law of the case doctrine commands that when a

23  court has ruled on an issue, that decision should generally be

24  adhered to by that court in subsequent stages in the same case

25  unless cogent and compelling reasons militate otherwise."

Hc1WuniC

1    <u>Johnson v. Holder</u>, 564 F.3d 95, 99 (2d Cir. 2009) (internal

2    quotation marks omitted).  However,

3         "unlike the doctrines of *res judicata* and collateral

4    estoppel, which a court cannot ignore where they apply, the law

5    of the case, as Justice Holmes remarked, 'merely expresses the

6    practice of the courts generally to refuse to reopen what has

7    been decided'... [and] is, at best, a discretionary doctrine

8    which does not constitute a limitation on the court's power but

9    merely expresses this practice."  <u>Devilla v. Schriver</u>, 245 F.3d

10   192, 197 (2d Cir. 2001) (internal quotation marks, citations,

11   and brackets omitted).

12        Further, the issue of collateral estoppel has not

13   previously been raised with respect to the FInRA arbitration.

14   Rather, Akerman previously argued that there was no genuine

15   fact dispute that Akerman had not breached the agreement and

16   that he was therefore entitled to summary judgment dismissing

17   all of the plaintiffs' claims.  In the plaintiffs' opposition

18   to Akerman's earlier motion for summary judgment, the

19   plaintiffs asserted that numerous fact disputes existed over

20   whether Akerman breached the agreement, precluding summary

21   judgment.  The Court denied Akerman's motion for summary

22   judgment on that ground.  Akerman had not raised a defense of

23   collateral estoppel, although the Court may have inquired about

24   that issue at argument.  That defense was not resolved on the

25   prior motion.  Akerman did not amend his answer to include

Hc1WuniC

collateral estoppel as an affirmative defense until after the

Court had ruled on its first motion for summary judgment.

Akerman's current motion for summary judgment seeks to preclude

the plaintiffs from making the argument on which the plaintiffs

prevailed in their earlier opposition to Akerman's motion for

summary judgment.  Akerman does not seek to relitigate the same

issues of fact.

      Law of the case is a discretionary doctrine, and this

Court could reconsider a prior ruling.  In any event, because

Akerman now raises a new issue, the doctrine of the law of the

case does not foreclose Akerman's argument of collateral

estoppel.

      The plaintiffs also contend that, even if collateral

estoppel applies in this case, the FInRA arbitration should not

be given preclusive effect because the arbitrators did not

expressly find that Akerman had not breached the agreement.

However, there is no requirement that the issue over which

preclusion is sought have been the subject of an express

finding of fact.  Rather, as the Second Circuit Court of

Appeals explained, the question is whether "the resolution of

the issue is necessary to support a valid and final judgment on

the merits."  Bear, Stearns & Co., 409 F.3d at 91.

      Here, it is clear that the resolution of the contested

issue -- whether Akerman breached the agreement, thereby

voiding the release -- was necessary to support the

Hc1WuniC

arbitrators' ruling dismissing counterclaims by CLS and CLW and

enforcing the release.  The counterclaims by CLS and CLW echo

the claims in this case alleging a history of abuses by Akerman

from mid-2014 into 2015 against CLS and CLW, including

conspiring with Verschleiser to steal secrets, and to commit

defamation, libel, tortious interference with existing and

prospective business relations, and other torts and violations

of federal laws.  Akerman responded by relying on the release

contained in the agreement.  Akerman argued:  "The

counterclaims against Akerman should be dismissed because the

claims against him are barred by the release and therefore fail

to state a cause of action against him."  In opposing Akerman's

motion to dismiss the counterclaims, CLS and CLW specifically

argued, in detail, that "Akerman breached the agreement

rendering the release null and void *ab initio*."  To find the

agreement's release controlling, the arbitrators necessarily

had to reject the argument by CLS and CLW that Akerman had

breached the agreement.  The arbitrators also specifically

rejected CLS and CLW's contention that Akerman had sought

"affirmative relief," in violation of the agreement, by seeking

to expunge the Form U-5.

     The plaintiffs cite In re S.W. Bach & Co., 425 B.R. 78

(Bankr. S.D.N.Y. 2010) to support their argument that courts

sometimes decline to give collateral estoppel effect to

arbitration rulings that lack findings of fact.  That case is

Hc1WuniC

distinguishable.  In S.W. Bach & Co., the bankruptcy court

stayed a pending arbitration precisely because "it is possible

that collateral estoppel would apply such that this Court would

be deprived of its necessary jurisdiction over the 11 U.S.C. §

548 fraudulent conveyance claim." Id. at 102, the S.W. Bach &

Co. court pointed to another bankruptcy case, In re Klein, Maus

& Shire, Inc., 301 B.R. 408 (Bankr. S.D.N.Y. 2003), to explain

that some courts decline to grant preclusive effect to

arbitration rulings that have not made or adopted findings of

fact.  In Klein, Maus & Shire, Inc., however, the court

determined that it could not give preclusive effect to an

arbitration ruling because the complaint before the arbitrator

contained multiple causes of action seeking identical relief,

and the court could therefore not determine the basis (or

bases) of the arbitration award.  In re Klein, Maus & Shire,

Inc., 301 B.R. at 416-17.  In this case, by contrast, the

resolution of the disputed issue was necessarily reached.  The

arbitrators' ruling that the agreement's release required

dismissal of the counterclaims by CLS and CLW necessarily

required the arbitrators to find, over the vigorous objection

of CLS and CLW, that Akerman had not breached the agreement.

          Generally, the doctrine of collateral estoppel only

has preclusive effect on the parties against whom the issue was

decided or their privies.  See Blonder-Tongue Labs, Inc., 402

U.S. 320-21.

Hc1WuniC

1          The three plaintiffs in this claim who have sued

2    Akerman are Frydman, United Realty, and Prime United Holdings.

3    The entities in the arbitration against Akerman were CLS and

4    CLW.  Akerman contends that the requirement of privity is met

5    because Prime United Holdings owned CLS and is a plaintiff in

6    this case.  Moreover, Akerman argues that Frydman, the CEO and

7    chairman of Prime United Holdings, was the true driving force

8    behind the arbitration.  Frydman is also the assignee of the

9    claims of United Realty and Prime United Holdings.  The

10   plaintiffs argue that the privity requirement is not met

11   between the parties to the arbitration and the plaintiffs in

12   this case because "certain affiliates of Frydman" sold their

13   interest in United Realty midway through the arbitration and

14   because different attorneys represented the parties in the

15   arbitration and the plaintiffs in this case.

16          The plaintiffs' arguments have no merit.  Generously

17   construed, the plaintiffs argue that precluding United Realty

18   from relitigating the agreement's release would be unfair

19   because United Realty was not a party to the arbitration, and

20   the plaintiffs allege that, as of September 15, 2015 -- three

21   weeks before CLS and CLW submitted the counterclaims to the

22   arbitration -- Frydman no longer owned United Realty.  However,

23   "complete privity" is not required for a party to have been

24   adequately represented in a previous proceeding.  See

25   M.O.C.H.A. Soc'y, Inc. v. City of Buffalo, 689 F.3d 263, 285

Hc1WuniC

1    (2d Cir. 2012) ("Despite the absence of complete privity

2    between the named plaintiffs in the two actions, sufficient

3    identity exists between the plaintiffs for the district court

4    to apply collateral estoppel and to bar litigation" of the

5    previously decided issue.)  (internal quotation marks omitted).

6    The interests of all the plaintiffs in the current action --

7    Frydman, United Realty, and Prime United Holding -- were all

8    adequately represented in the arbitration and all had the same

9    interest in invalidating the agreement and the release.

10           Moreover, Frydman owns the litigation claims of United

11   Realty and Prime United Holdings.  Those entities will

12   therefore lose nothing by not litigating Akerman's release

13   because Frydman is the only person who stands to benefit from

14   invalidating the release.  And not only did Frydman control the

15   respondents to the arbitration by virtue of being the CEO and

16   chairman of Prime United Holdings, which owned CLS, but Frydman

17   personally litigated much of the arbitration, including signing

18   the counterclaims at issue on behalf of the respondents in the

19   arbitration.  There is no doubt that the plaintiffs in this

20   case are in privity with, and were adequately represented by,

21   the respondents in the arbitration.

22           Therefore, the doctrine of collateral estoppel

23   precludes the plaintiffs from contesting the enforceability of

24   the agreement or the release.

25           "New York law favors enforcement of valid releases."

Hc1WuniC

1    Spanski Enterprises Inc. v. Telewizja Polska, S.A., No. 10 Civ.

2    4933 (ALC) (GWG), 2013 WL 81263 at *4 (S.D.N.Y. Jan. 8, 2013)

3    (collecting cases).  "An unambiguous release 'should be

4    enforced according to its terms.'"  Krumme v. WestPoint Stevens

5    Inc., 238 F.3d 133, 144 (2d Cir. 2000) (quoting Booth v. 3669

6    Delaware, 703 N.E.2d 757, 758 (N.Y. 1998)).  The February 20,

7    2015, agreement between Akerman and Frydman contained a broad

8    release of all claims the plaintiffs "ever had, now have, or

9    hereafter may have, by reason of any matter, cause, or thing

10   whatsoever, from the beginning of the world through the time of

11   execution of this agreement."  All of the claims against

12   Akerman in this case relate to events prior to February 20,

13   2015, the date of the agreement and the release.  Because the

14   release is unambiguous and because plaintiffs are precluded by

15   the doctrine of collateral estoppel from arguing that Akerman

16   breached the agreement Akerman is entitled to summary judgment

17   dismissing all of the plaintiffs' claims against him.  Indeed,

18   the arbitration panel correctly dismissed the counterclaims in

19   the arbitration, which asserted similar claims to those now

20   played by plaintiffs in this case against Akerman.

21        Akerman's motion for summary judgment dismissing all

22   of the plaintiffs' claims against him is therefore granted.

23        The Court has considered all of the arguments raised

24   by the parties.  To the extent not specifically addressed, the

25   arguments are either moot or without merit.  For the foregoing

Hc1WuniC

1   reasons, the motion for summary judgment by defendant Akerman

2   is granted.  All claims against defendant Akerman are

3   dismissed.

4           With this decision, the final outstanding motion is

5   denied, so the clerk of court will be directed to close all

6   pending motions in both 14 Civ. 8084 and 14 Civ. 5903.  And as

7   I said, I'll issue a written decision incorporating what I said

8   with respect to Akerman.

9           I realize now that there is an outstanding motion to

10  withdraw as counsel by Eric Feinstein for some of the

11  plaintiffs.  I have referred that motion to withdraw and the

12  charging lien to the magistrate judge.  I hope that that will

13  be resolved promptly.  Some time is necessary to prepare the

14  joint pretrial order, motions *in limine*, requests to charge,

15  voir dire.  And if the motion is granted, there would then be

16  the need for new counsel, so I would think that a reasonable

17  time to submit the joint pretrial order, motions *in limine*,

18  requests to charge, voir dire, is about two months.

19          Joint pretrial order and the other filings are due

20  February 2, 2018.  Responses and objections are due February 9.

21  The case is on the ready trial calendar, 48 hours' notice,

22  February 23, 2018.

23          I'll incorporate the scheduling order into a separate

24  order.  All right?

25          Thank you, all.  Is there anything else for me?

Hc1WuniC

1          MR. KIMLER:  Thank you, your Honor.

2          MR. FISCHBEIN:  Thank you, your Honor.

3          THE COURT:  Does anyone want to talk to the magistrate

4    judge about the possibility of settlement?  If you do, I'll put

5    in the order that if anyone wishes a reference to the

6    magistrate judge for purposes of settlement, they should advise

7    the Court, but I'm not going to automatically send you to the

8    magistrate judge unless there is an indication that it would

9    not be a waste of the magistrate judge's time.

10          OK.

11          MR. GULKO:  The last thing that you had mentioned was

12    February 23.

13          THE COURT:  Yes.

14          MR. GULKO:  Two points.  One is I'm actually scheduled

15    to be on a family vacation that weekend and so I know that

16    we're not sure yet, but is there any way that we could add a

17    week, it would be very helpful.

18          THE COURT:  I'm not inclined to change the ready trial

19    date.  The ready trial date is a date that is a definite date

20    in the sense that you are subject to call at that point on 48

21    hours' notice, so you have to keep my chambers advised.  If you

22    have a firm trial commitment in another case or a vacation that

23    is otherwise definitely planned, tickets bought, whatever, if

24    that's true, you let me know and I won't call you for that

25    period, but if you get called at any time after the ready trial

Hc1WuniC

```
 1    date and you tell me that for the first time you have another

 2    commitment or you have a vacation, then I won't recognize it

 3    unless you'd told me before.  It's perfectly fine to put in a

 4    letter what your commitments are, and I'll honor those if

 5    they're told to me in advance, before you're actually called to

 6    trial.

 7              MR. GULKO:  OK.  That's fine, your Honor.  I'll tell

 8    you now so it's on the record, but as we get closer I'll remind

 9    the Court by letter as well.

10              THE COURT:  Fine.

11              MR. GULKO:  I do have tickets already booked for the

12    22nd through the 27th.

13              THE COURT:  I'll tell you what -- you've told me you

14    have tickets, fine -- 48 hours' notice as of March 2, 2018.

15              MR. GULKO:  Thank you, your Honor.

16              THE COURT:  And if there's any desire to talk to the

17    magistrate judge about settlement, simply put that in a letter

18    to me and I will make sure that that gets to the magistrate

19    judge.  I think I have already referred it for general pretrial

20    to the magistrate judge, so I will just alert the magistrate

21    judge that you want to talk about settlement.  OK?

22              MR. GULKO:  Thank you, your Honor.

23              THE COURT:  All right.  Thank you, all.  Bye now.

24              (Adjourned)

25
```