UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNITED REALTY ADVISORS, LP and JACOB
FRYDMAN,

                 Plaintiffs,                 14 Civ. 5903 (JGK) (JLC)

          -against-

ELI VERSCHLEISER, RAUL DELFORNO, OPHIR     **PLAINTIFFS' PROPOSED**
PARNASI, and ALEX ONICA,                  **REQUESTS TO CHARGE**

                 Defendants.
-------------------------------------------------------------------X
JACOB FRYDMAN, UNITED REALTY ADVISORS,
LP, and PRIME UNITED HOLDINGS, LLC,

                 Plaintiffs,

          -against-                 14 Civ. 8084 (JGK) (JLC)

ELI VERSCHLEISER, ALBERT AKERMAN, MULTI
CAPITAL GROUP OF COMPANIES, LLC, RAUL
DELFORNO, OPHIR PINHASI, ALEX ONICA, ALEX
VEEN, SOFIA SVISCH, ALEXANDER MERCHANSKY
and DOES 1 through 15 inclusive,

                 Defendants.
-------------------------------------------------------------------X

      Pursuant to Rule 51 of the Federal Rules of Civil Procedure and Section 4.C(ii) of the

Court's Individual Practices in Civil Cases, plaintiffs Jacob Frydman, United Realty Advisors,

LP, through Jacob Frydman as the assignee of its claims herein, and Prime United Holdings,

LLC, by their attorneys, The Law Offices of Neal Brickman, P.C. and Lewis S. Fischbein, P.C.,

respectfully submit this proposed set of jury charges to be given in the instant case, and

respectfully reserve the right to add, subtract, or modify the same prior to the jury's

commencement of its deliberations.

Dated: New York, New York
        May 1, 2018

                                    THE LAW OFFICES OF NEAL
                                    BRICKMAN, P.C.


                                    By: _____
                                    Neal Brickman
                                    *Counsel for Plaintiffs Jacob Frydman,*
                                    *United Realty Advisors, LP, and Prime*
                                    *United Holdings, LLC*
                                    420 Lexington Avenue, Suite 2440
                                    New York, New York 10170
                                    T: (212) 986-6840; F: (212) 986-7691
                                    Neal@brickmanlaw.com


                                    LEWIS S. FISCHBEIN, P.C.


                                    By: Lewis S. Fischbein /WB
                                    Lewis S. Fischbein
                                    *Counsel for Plaintiffs Jacob Frydman,*
                                    *United Realty Advisors, LP, and Prime*
                                    *United Holdings, LLC*
                                    420 Lexington Avenue, Suite 2440
                                    New York, New York 10170
                                    T: (212) 752-3374; F: (212) 986-7691
                                    lfischbein@wsmblaw.com

# TABLE OF CONTENTS

**Page**

I.  Pre-Trial Jury Instructions............................................................... 1

Plaintiffs' Proposed Request to Charge No. 1....................................... 1
  Opening Instructions and Parties............................................... 1

Plaintiffs' Proposed Request to Charge No. 2....................................... 5
  Order of Trial........................................................................ 5

Plaintiffs' Proposed Request to Charge No. 3....................................... 6
  Claims and Defenses................................................................ 6

Plaintiffs' Proposed Request to Charge No. 4....................................... 31
  Province of Judge and Jury........................................................ 31

Plaintiffs' Proposed Request to Charge No. 5....................................... 32
  Jury Conduct – Contact with Others............................................. 32

Plaintiffs' Proposed Request to Charge No. 6....................................... 34
  Juror Use of Electronic Technology............................................. 34

Plaintiffs' Proposed Request to Charge No. 7....................................... 35
  Notetaking – Permitted............................................................ 35

Plaintiff's Proposed Request to Charge No. 8....................................... 36
  Questions by Jurors – Prohibited............................................... 36

Plaintiffs' Proposed Request to Charge No. 9....................................... 37
  No Transcript Available to Jury................................................. 37

Plaintiffs' Proposed Request to Charge No. 10...................................... 38
  Judge's Questions to Witness.................................................... 38

Plaintiffs' Proposed Request to Charge No. 11...................................... 39
  Bench Conferences.................................................................. 39

Plaintiffs' Proposed Request to Charge No. 12...................................... 40
  What is and Is Not Evidence and Evidence for Limited Purposes........ 40

Plaintiffs' Proposed Request to Charge No. 13...................................... 43
  Rulings on Objections.............................................................. 43

Plaintiffs' Proposed Request to Charge No. 14……………………………….. 44
    Burden of Proof – General Instruction………………………………… 44

Plaintiffs' Proposed Request to Charge No. 15……………………………….. 46
    Preponderance of the Evidence…………………………………………….. 46

Plaintiffs' Proposed Request to Charge No. 16……………………………….. 47
    Direct and Circumstantial Evidence……………………………………… 47

Plaintiffs' Proposed Request to Charge No. 17……………………………….. 49
    Stipulations of Fact…………………………………………………………. 49

Plaintiffs' Proposed Request to Charge No. 18……………………………….. 54
    Inferences…………………………………………………………………… 54

Plaintiffs' Proposed Request to Charge No. 19……………………………….. 55
    Finding as to Thing Once Proved to Exist……………………………… 55

Plaintiffs' Proposed Request to Charge No. 20……………………………….. 56
    Credibility of Evidence and Weighing Testimony…………………….. 56

Plaintiffs' Proposed Request to Charge No. 21……………………………….. 58
    Discrepancies in Testimony……………………………………………….. 58

Plaintiffs' Proposed Request to Charge No. 22……………………………….. 60
    Testimony of Perjurer……………………………………………………… 60

Plaintiffs' Proposed Request to Charge No. 23……………………………….. 61
    Impeachment – Inconsistent Statement or Conduct………………….. 61

Plaintiffs' Proposed Request to Charge No. 24……………………………….. 62
    Effect of Prior Inconsistent Statements or Conduct………………….. 62

Plaintiffs' Proposed Request to Charge No. 25……………………………….. 63
    Impeachment – Bad Reputation for truth and Veracity……………… 63

Plaintiffs' Proposed Request to Charge No. 26……………………………….. 64
    Impeachment by Conviction of Crime…………………………………… 64

Plaintiffs' Proposed Request to Charge No. 27……………………………….. 65
    Failure to Recall…………………………………………………………….. 65

Plaintiffs' Proposed Request to Charge No. 28……………………………….. 66
    Effect of Refusal of Witness to Answer………………………………… 66

Plaintiffs' Proposed Request to Charge No. 29……………………………….. 67
    Cautionary Instruction Before Court Recess…………………………….... 67

II.   Post-Trial Jury Instructions…………………………………………………… 68

Plaintiffs' Proposed Request to Charge No. 30……………………………….. 68
    Role of the Court and Juror Attentiveness…………………………….. 68

Plaintiffs' Proposed Request to Charge No. 31……………………………….. 69
    Role of the Jury………………………………………………………….. 69

III.  Post-Trial Jury Instructions Continued -- Substantive Law……………………. 71

Plaintiffs' Proposed Request to Charge No. 32……………………………….. 71

    A.     Introduction Regarding the Applicable Law…………………….. 71

    B.     RICO Claims……………………………………………………... 71
            i.      Section 1962(c)………………………………………….. 72
            ii.     Section 1962(d)…………………………………………. 84
            iii.    Causation……………………………………………….. 88
            iv.    Damages…………………………………………………. 89

    C.     CFAA Claims…………………………………………………….. 92
            i.      Section 1030(a)(2)(C)………………………………….. 92
            ii.     Section 1030(a)(4)………………………………………. 96
            iii.    Section 1030(a)(5)(C)…………………………………… 97
            iv.    Section 1030(a)(6)……………………………………….. 98
            v.     Damages…………………………………………………. 99

    D.     Conspiracy to Violate the CFAA……………………………….. 100
            i.      Damages…………………………………………………... 102

    E.     ECPA Claims…………………………………………………….. 102
            i.      Section 2511(1)(a)………………………………………. 103
            ii.     Section 2511(1)(c)………………………………………. 105
            iii.    Damages………………………………………………….. 106
            iv.    Punitive Damages………………………………………... 108

    F.     SCA Claims……………………………………………………... 109
            i.      Section 2702(a)…………………………………………. 109
            ii.     Damages………………………………………………….. 113
             iii.    Punitive Damages………………………………………... 114

    G.     Libel Claims…………………………………………………….... 115
            i.      Libel Per Se……………………………………………....... 115

|  |  | ii. | Damages…………………………………………….. | 147 |
|  |  | iii. | Trade Libel………………………………………….. | 148 |

|  | H. | | Misappropriation of Trade Secrets…………………………. | 155 |
|  |  | i. | Elements of a Claim of Misappropriation of | |
|  |  | | Trade Secrets………………………………………. | 156 |
|  |  | ii. | First Element: Possession of a Trade Secret………….. | 156 |
|  |  | iii. | Second Element: Use of a Trade Secret in Breach | |
|  |  | | of an Agreement or a Duty…………………….. | 158 |
|  |  | iv. | Damages…………………………………………….. | 161 |

|  | I. | | Tortious Interference with Existing Contractual Relations……. | 162 |
|  |  | i. | Damages…………………………………………….. | 165 |

|  | J. | | Tortious Interference with Prospective Contractual Relations… | 166 |
|  |  | i. | Damages…………………………………………….. | 171 |

|  | K. | | Intentional Infliction of Emotional Distress……………………. | 172 |
|  |  | i. | Damages…………………………………………….. | 174 |

|  | L. | | Breach of Contract………………………………………….. | 175 |
|  |  | i. | Damages…………………………………………….. | 182 |
|  |  | ii. | General, Consequential and Nominal Damages……….. | 183 |

|  | M. | | Breach of Duty of Loyalty………………………………………. | 186 |
|  |  | i. | Damages…………………………………………….. | 187 |

|  | N. | | Conversion……………………………………………………. | 188 |
|  |  | i. | Damages…………………………………………….. | 191 |

| IV. | | | Post-Trial Jury Instructions Continued………………………………….. | 192 |

|  | | | Plaintiffs' Proposed Request to Charge No. 33………………………….. | 192 |
|  | | | Jury to Disregard Court's View………………………………….. | 192 |

|  | | | Plaintiffs' Proposed Request to Charge No. 34………………………….. | 194 |
|  | | | Review Principles Stated……………………………………….. | 194 |
|  | | | Additional Review Principles Stated – Witness Credibility………….. | 195 |
|  | | | Additional Review Principles Stated – Preponderance of | |
|  | | | the Evidence…………………………………………… | 196 |
|  | | | Additional Review Principles Stated – Impeachment of | |
|  | | | Witnesses, Discrepancies in Testimony……………………….. | 197 |

|  | | | Plaintiffs' Proposed Request to Charge No. 35………………………….. | 199 |
|  | | | Falsus in Uno………………………………………………….. | 199 |

Plaintiffs' Proposed Request to Charge No. 36........................................ 200
    Admission by a Party – By Statement.......................................... 200

Plaintiffs' Proposed Request to Charge No. 37........................................ 201
    Interested Witness – Generally................................................. 201

Plaintiffs' Proposed Request to Charge No. 38........................................ 202
    All Available Evidence Need not Be Produced............................. 202

Plaintiffs' Proposed Request to Charge No. 39........................................ 203
    Summaries and Charts Admitted as Evidence.............................. 203

Plaintiffs' Proposed Request to Charge No. 40........................................ 204
    Use of Depositions as Evidence............................................... 204

Plaintiffs' Proposed Request to Charge No. 41........................................ 205
    Consider Only Testimony and Exhibits...................................... 205

Plaintiffs' Proposed Request to Charge No. 42........................................ 206
    Answers to Interrogatories..................................................... 206

Plaintiffs' Proposed Request to Charge No. 43........................................ 207
    Agents of Corporation.......................................................... 207

Plaintiffs' Proposed Request to Charge No. 44........................................ 208
    Juror's Use of Professional Expertise........................................ 208

V.    Closing Instructions................................................................ 209

Plaintiffs' Proposed Request to Charge No. 45........................................ 209
    Duty to Deliberate............................................................... 209

Plaintiffs' Proposed Request to Charge No. 46........................................ 211
    Communications Between Court and Jury
        During Jury's Deliberations........................................... 211

Plaintiffs' Proposed Request to Charge No. 47........................................ 212
    Right to See Exhibits and Hear Testimony.................................. 212

Plaintiffs' Proposed Request to Charge No. 48........................................ 213
    Evidence in Electronic Format................................................ 213

Plaintiffs' Proposed Request to Charge No. 49........................................ 215
    Selection of Foreperson, Special Verdict and Return of Verdict.......... 215

Plaintiffs' Proposed Request to Charge No. 50……………………………….. 216
    Verdict Forms – Jury's Responsibility…………………………………… 216

Plaintiffs' Proposed Request to Charge No. 51……………………………….. 217
    Juror Oath……………………………………………………………… 217

## I. PRE-TRIAL JURY INSTRUCTIONS

### PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 1

**Opening Instructions and Parties**

We are about to begin the trial of the case you heard about during the jury selection.
Before the trial begins, I am going to give you instructions that will help you to understand what
will be presented to you and how you should conduct yourself during the trial.

During the trial you will hear me use a few terms that you may not have heard before.
Let me briefly explain some of the most common to you. The parties who sue are called the
plaintiffs. In this action, the plaintiffs are Jacob Frydman, United Realty Advisors, LP, and
Prime United Holdings, LLC. I will refer to Mr. Frydman as Frydman, United Realty Advisors,
LP as United Realty and Prime United Holdings, LLC as Prime United. I will refer to plaintiffs'
claims as particular Counts.

Frydman is an individual and a resident of the State of New York. United Realty is said
by plaintiffs to be a Delaware limited partnership, with an office in New York. Prime United is
said by plaintiffs to be a Delaware limited liability company, also with an office in New York.

The parties being sued are called the defendants. In this action, the named defendants are
Eli Verschleiser, Albert Akerman, Multi Capital Group of Companies, LLC, Raul Del Forno,
Ophir Pinhasi, and Alex Onica,Alex Veen, Sofia Svisch, Alexander Merchansky, and a number
of parties whose names and capacities are said to be unknown to plaintiffs and are sued as John
Does 1 through 15. I will refer to the individuals by their last names, and I will refer to Multi
Capital Group of Companies, LLC as Multi Group. Akerman was previously dismissed from
this action. Plaintiffs have indicated that they intend to bring him up during the trial. Plaintiffs
voluntarily dismissed this action as against Veen, and have elected not to pursue their claims

1

against Svisch and Merchansky. Plaintiffs have indicated that they intend to bring up Veen, Svisch and Merchansky during the trial as well.

Verschleiser, Del Forno and Pinhasi are residents of the State of New York. Onica is a resident of New Jersey. Akerman is said by plaintiffs to be a resident of the State of New York. Veen, Svisch and Merchansky are said by plaintiffs to be residents of Ukraine. Multi Group is said by plaintiffs to be a limited liability company, with an office in New York.

You will sometimes hear me refer to "counsel." "Counsel" is another way of saying "lawyer" or "attorney." I will sometimes refer to myself as the "Court."

When I "sustain" an objection, I am excluding that evidence from this trial for a good reason. When you hear that I have "overruled" an objection, I am permitting that evidence to be admitted.

When I say "admitted into evidence" or "received in to evidence," I mean that this particular statement or the particular exhibit may be considered by you in making the decisions you must make at the end of the case.

By your verdict, you will decide disputed issues of fact. I will decide all questions of law that arise during the trial. Before you begin your deliberation at the close of the case, I will instruct you in more detail on the law that you must follow and apply. It is your duty to accept my instructions of law and apply them to the facts as you determine them. Regardless of any opinion that you may have as to what the law may be or ought to be, it is your sworn duty to follow the law as I give it to you.

Because you will be asked to decide the facts of this case, you should give careful attention to the testimony and evidence presented. Keep in mind that I will instruct you about determining the credibility or "believability" of the witnesses. During the trial you should keep

an open mind and should not form or express any opinion about the case until you have heard all of the testimony and evidence, the lawyers' closing arguments, and my instructions to you on the law.

While the trial is in progress, you must not discuss the case in any manner among yourselves or with anyone else. In addition, you should not permit anyone to discuss the case in your presence.

From time-to-time during the trial, I may make rulings on objections or motions made by the lawyers. It is a lawyer's duty to object when the other side offers testimony or other evidence the lawyer believes is not admissible. Counsel also have the right and duty to ask the court to make rulings of law and to request conferences at the side bar out of the hearing of the jury. All those questions of law must be decided by me, the court. You should not show any prejudice against an attorney or client because the attorney objected to the admissibility of evidence, or asked for a conference out of the hearing of the jury or asked the court for a ruling on the law. If I sustain or uphold an objection to a question that goes unanswered by the witness, you should not draw any inferences or conclusions from the question. You should not infer or conclude from any ruling or other comment I may make that I have any opinions on the merits of the case favoring one side or the other. I do not favor one side or the other.

The lawyers are not allowed to speak with you during this case. When you see the lawyers at a recess or pass them in the halls and they do not speak to you, they are not being rude or unfriendly; they are simply following the law.

During the trial, it may be necessary for me to talk with the lawyers out of your hearing about questions of law or procedure. Sometimes, you may be excused from the courtroom during these discussions. I will try to limit these interruptions as much as possible, but you

3

should remember the importance of the matter you are here to determine and should be patient even though the case may seem to go slowly.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:01 (modified)

## PLANTIFFS' PROPOSED REQUEST TO CHARGE NO. 2

**Order of Trial**

The case will proceed as follows:

First, the lawyers for each side may make opening statements. What is said in the opening statements is not evidence, but is simply an outline or summary to help you understand what each party expects the evidence to show. A party is not required to make an opening statement.

After the opening statements, plaintiffs will present evidence in support of their claims and the lawyers for defendants Verschleiser, Multi Group, Del Forno, Pinhasi and Onica may cross-examine plaintiffs' witnesses. At the conclusion of plaintiffs' case, those defendants may introduce evidence and plaintiffs' lawyers may cross-examine those defendants' witnesses. Those defendants are not required to introduce any evidence or to call any witnesses. If those defendants introduce evidence, plaintiffs may then present rebuttal evidence.

Upon completion of the introduction of evidence, the lawyers will again speak to you in a closing statement or summation. In summing up, the lawyers will point out what they believe the evidence has shown, what inferences or conclusions they believe you should draw from the evidence and what conclusions they believe you should reach as your verdict. What is said by the lawyers in summation, like what is said by them in their opening statements, or in the making of objections or motions during the trial, is not evidence. Summations are intended to present the arguments of the parties based on the evidence.

Finally, I will instruct you on the law that you are to apply in reaching your verdict.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:02 (modified to include parties); as to summation, N.Y. Pattern Jury Instr.--Civil 1:5 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 3

**Claims and Defenses**

The positions of the parties can be summarized as follows:

1.       Plaintiffs claim that defendants Verschleiser, Multi Group, Del Forno, Pinhasi and

Onica violated a federal statute, the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. §§ 1961 et seq., commonly known as "RICO," which comprises Counts I-II.  I will

charge you the applicable elements of RICO at the close of evidence.  Plaintiffs make the

following allegations and those related thereto in support of their RICO claims.

Frydman is a principal in numerous businesses that invest in, develop or manage real

estate.  Until September 15, 2015, Frydman was the CEO and Chairman of United Realty Trust

Incorporated, a public non-traded REIT, which I will call the REIT, and CEO and Chairman of

United Realty, a private real estate investment and advisory firm which acted as an external

advisor to the REIT.  The REIT was in the process of a public offering of over $1 billion of its

common stock.  Frydman is also the CEO and Chairman of the board of Prime United, a

financial services holding company which owned Cabot Lodge Securities, LLC, which I will call

CLS, a broker dealer which acted as the dealer manager for the offering of securities by the REIT

to the public.  Non- party Craig Gould was the CEO of CLS.  I will refer to him by his last

name.

From 2011 until late 2013, Frydman and Verschleiser were partners in several real estate

and related entities, including United Realty, the REIT, Prime United and CLS.  After a series of

disagreements, their partnership came to an end in early December 2013, whereupon Frydman

claims that he terminated Verschleiser's employment with United Realty as president for cause

and served a termination notice on Verschleiser on December 2, 2013.

When I charge you at the close of evidence as to the elements of the RICO claims made

in this case, I will charge you as to what constitutes an enterprise and what constitutes wire fraud or mail fraud, which the plaintiff must prove in this case as part of his or its RICO claims. Plaintiffs claim that virtually from the moment Frydman and Verschleiser split up as real estate partners, Verschleiser, whom they claim is a convicted criminal, headed a criminal enterprise that was comprised of defendants Verschleiser, Multi Group, Del Forno, Pinhasi and Onica, later joined by Veen, Svisch, Merchansky, Akerman, and one or more Doe defendants, as a group of individuals and entities associated together for a common purpose of engaging in a course of conduct that has functioned as a continuing unit. Plaintiffs claim such enterprise committed various acts of wire or mail fraud in a common effort to harm Frydman and his companies, including United Realty, Prime United and the REIT, by depriving them of customers and other business relationships, and to deceive the public – particularly by making false and fraudulent claims against Frydman and United Realty on fake websites, blogs and other Internet postings – both as part of that mission and independently, including by enterprise members victimizing and fleecing others over more than a 10-year period. Plaintiffs claim that the enterprise's goal has been to cause investors and others not to invest or otherwise do business with Frydman and his companies, that all the members of the enterprise have worked together to commit various acts of wire or mail fraud for the foregoing common purpose, and that each member of the enterprise has had some part in directing its affairs.

Plaintiffs also claim as follows. Verschleiser owns or controls Multi Group, a real estate investment and development company and rival to Frydman's companies since the split-up that operates as an umbrella organization for other entities owned or controlled by Verschleiser. Verschleiser both acted individually and through Multi Group. Del Forno, Pinhasi and Onica are IT professionals and former employees or consultants of United Realty and acted as agents of

7

Verschleiser or Multi Group; in particular, Del Forno was United Realty's head of information technology until February 14, 2014. Veen, Svisch and Merchansky are all Ukrainian residents. Veen is a long-time associate of Verschleiser who holds himself out as a vice president of Multi Group and who is a Ukrainian computer programmer and a website designer. Veen is married to Svisch, who went to high school with Merchansky, who is another Ukrainian computer programmer and a website developer, and the person who was contracted by Veen and/or Svisch on behalf of Verschleiser to create and/or host a number of the fake websites, blogs and other Internet postings. Merchansky is also known as "Sasha." Veen and Svisch acted as intermediaries between Verschleiser and Merchansky. Akerman is a former dual employee of United Realty and Cabot Lodge Securities.

When I charge you at the close of evidence as to the elements of the RICO claims made in this case, I will also charge you as to what constitutes a predicate act and a pattern of racketeering activity. Plaintiffs claim that the enterprise involved here committed six predicate acts of wire or mail fraud, that those acts were related and amount to, or pose a threat of, continuing criminal activity, so as to comprise a pattern of racketeering activity, and that the members of the enterprise have conducted or participated, directly or indirectly, in the conduct of its affairs through a pattern of racketeering activity. Plaintiffs claim that the enterprise's business is inherently or at least primarily unlawful, and that regardless, the alleged pattern of racketeering activity has continued on a consistent basis since December 2, 2013, has seen no cessation, and in fact has been escalating with greater frequency over time.

The first predicate act concerns wire or mail fraud concerns computer hacking and plaintiffs claim that it began on December 2, 2013 immediately after Verschleiser was served with the termination notice. Plaintiffs claim that without authorization, Verschleiser accessed

8

and hijacked United Realty's hosted email exchange server, which was also utilized by Prime

United, Frydman and his other affiliates, and, in turn, hacked into and intercepted the emails of

United Realty employees, including Frydman, locked them out of their email accounts and

changed their passwords on those accounts, thereby denying them rightful access to the

company's email server, created multiple backups of United Realty's email data and trade

secrets, downloaded, copied and then deleted all of that data from its email exchange server, and

created distribution lists to automatically forward those employees' emails to himself. Plaintiffs

claim that Verschleiser did so and continued to do so for an essentially uninterrupted eight-day

period through December 10, 2013 with the assistance of Del Forno, Pinhasi and Onica,

accessing Frydman's and other United Realty employees' emails while denying them access.

Plaintiffs also claim as follows. Verschleiser feared having his termination publicly

disclosed by a required SEC filing. Therefore, he negotiated his departure from United Realty

with a Membership Interests Sale and Purchase Agreement, which I will refer to as the

Separation Agreement as it is in the nature of such an agreement, which was signed shortly after

midnight on December 4, 2013 and made as of December 3, 2013. Pursuant to the Separation

Agreement, Verschleiser transferred his ownership interests in his and Frydman's jointly owned

entities (other than in two instances not relevant here) in exchange for certain consideration and

resigned from each position or office he held with those entities. The Separation Agreement also

contained the following provisions, among others: (i) a provision prohibiting Verschleiser from

disparaging or encouraging or inducing others to disparage Frydman, United Realty or any of

Frydman's other businesses, (ii) a provision prohibiting the solicitation or employment of

employees of United Realty, Prime United or any of Frydman's other businesses; and (iii) a

provision requiring Verschleiser to restore United Realty's email exchange server to its pre-

November 15, 2013 status or condition and to surrender all owner and administrative passwords by December 5, 2013. Plaintiffs claim, however, that Verschleiser disregarded the Separation Agreement and continued his hacking activities.

Plaintiffs claim that the enterprise committed a second predicate act of wire or mail fraud that also concerns computer hacking and that ran from December 11, 2013 through at least March 2014. Plaintiffs claim as follows in that regard. During this period, Verschleiser, still assisted by Del Forno, Pinhasi and Onica, repeatedly accessed Frydman's email account using various technical methods. Through these actions Verschleiser learned about several of Frydman's impending confidential business transactions and sent "anonymous" emails to potential business partners that disparaged Frydman and his businesses and encouraged them not to go forward. As a result of these emails, United Realty lost inter alia a $1.4 million sublease about to close with a company called Opera Solutions, among other things.

Plaintiffs claim that the enterprise committed a third predicate act of wire or mail fraud beginning as early as March 21, 2014, when Verschleiser, directly or through Veen, Svisch and Merchansky, created a number of fake websites and disseminated multiple fake reports, blogs, and social media and other posts on the Internet that defamed Frydman by calling him a "fraud" and leveling similarly disparaging charges against him and his companies, particularly United Realty.

Plaintiffs claim that the enterprise committed a fourth predicate act of wire or mail fraud in September 2014 when Verschleiser, through one or more Doe defendants, "crashed" a premier broker-dealer conference in Nevada, distributed flyers and set-up posters around the convention that disparaged Frydman and were sent through the wires or mails.

Plaintiffs claim that the enterprise committed a fifth predicate act of wire or mail fraud

that occurred and continued to occur following this conference. Plaintiffs claim in that regard
that Verschleiser, through Veen, Svisch and Merchansky, created numerous additional websites
and disseminated numerous additional fake reports, blogs, and social media and other posts on
the Internet containing false and fraudulent information with respect to Frydman, United Realty
and his other businesses. Plaintiffs claim that Verschleiser continues to do so to date.

      Plaintiffs claim that the enterprise committed a sixth predicate act of wire or mail fraud
that occurred in and before the first half of December 2014 when Verschleiser recruited
Akerman to steal proprietary information of United Realty, Prime United, CLS or the REIT,
including a draft of a confidential transaction agreement, a shareholder list, a list of broker dealer
selling group members, and other non-public financial information. Plaintiffs claim that
Verschleiser and Akerman are subject to various agreements that expressly prohibit the theft or
use of proprietary information. Plaintiffs claim that Prime United and its affiliates entered into a
certain $4 million transaction agreement with a third party, Royal Alliance Associates, Inc.,
which I will refer to as Royal Alliance, for the sale of CLS' retail customer accounts, among
other things, that was confidential and among the proprietary information allegedly stolen by
Verschleiser and Akerman, and that Verschleiser provided it to the plaintiffs in the state court
action *Fishoff Family Foundation v. Frydman*, Index No. 653838/2014, who referenced and
included the agreement in that lawsuit, which allegedly caused Royal Alliance to terminate or
breach the agreement, resulting in substantial damages.

      Plaintiffs claim that the enterprise, through Verschleiser either directly or with the
assistance of Veen, Svisch, Merchansky, or one or more of the Doe defendants, committed
additional, related acts of wire or mail fraud in May and June 2015 when Verschleiser sent mass
"anonymous" defamatory email blasts to REIT investors, United Realty broker-dealer selling

group members and prospective members, and others, disparaging Frydman, United Realty and his other businesses.

Plaintiffs claim that as a result of a pattern of racketeering activity, plaintiffs have been injured in their business and property in that they have been denied valuable business opportunities and have suffered other damage to their business and property. Specifically, plaintiffs claim that they and/or their affiliates have had members of the REIT's broker dealer selling group terminate or suspend selling agreements, have had REIT investors redeem their shares of common stock, lost sales of REIT common stock, lost numerous prospective selling agreements, sustained lost earnings relating to the REIT, lost real estate opportunities, suffered loss of reputation, lost a certain $4 million transaction agreement with a third party, lost a $1.4 million sublease about to close with Opera Solutions, and suffered other losses.

2.     Plaintiffs claim that defendants Verschleiser, Del Forno, Pinhasi and Onica also violated a second federal statute, the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq., known as the CFAA, which comprises Counts III-IV. Plaintiffs claim that defendants Verschleiser and Del Forno also violated a third federal statute, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq., known as the ECPA, which comprises Counts V-VI. Plaintiffs claim that defendants Verschleiser, Del Forno, Pinhasi and Onica also violated a fourth federal statute, the Stored Communications Act, 18 U.S.C. §§ 2701 et seq., known as the SCA, which comprises Count VII. I will charge you the applicable elements of the CFAA, the ECPA and the SCA at the close of evidence. In general, those statutes prohibit computer hacking. Plaintiffs make the following allegations and those related thereto in support of their CFAA, ECPA and SCA claims.

Plaintiffs claim that the allegations of computer hacking comprising the first and second

12

claimed RICO predicate acts of wire or mail fraud that I previously discussed, if proven, also

violate the CFAA, ECPA and SCA. As far as the CFAA is concerned, plaintiffs claim that

defendants Verschleiser, Del Forno, Pinhasi and Onica (i) intentionally and knowingly accessed

plaintiffs' computers connected to the Internet without authorization or in excess of authorization

and obtained information from those computers or intentionally trafficked in plaintiffs'

passwords, resulting in or causing losses during any one-year period aggregating at least $5,000

in value and damage; and (ii) conspired to commit or attempted to commit one or more of such

acts. In that regard, plaintiffs claim that those defendants acted without authorization after their

employment with United Realty ended and their permission to access such computers had been

terminated, using Frydman's password credentials or their former password credentials to gain

access; that Del Forno also acted without authorization during such employment starting with

when he first became disloyal to the company; that Del Forno also exceeded his authorization

during such employment in accessing Frydman's or other employees' emails, because he was

expressly not authorized to access their email accounts, and thereby became disloyal to the

company; that Del Forno further exceeded his authorization during such employment in that he

was never authorized to use his authority, when he had same, to alter, copy, distribute, disclose

to persons outside of United Realty, or delete any electronic communications, attachments, data,

information, trade secrets or the like, and thereby also became disloyal to the company; that Del

Forno impermissibly disclosed Frydman's password credentials to Verschleiser, who in turn

impermissibly disclosed them to Pinhasi and Onica, who in turn impermissibly disclosed them to

one or more Doe defendants, each such act thereby constituting trafficking in passwords; and

that the foregoing conduct resulted in, among other things, those defendants' blocking plaintiffs'

email and server access, and accessing and deleting information from employee email accounts.

Also in that regard, plaintiffs claim that defendants obtained information or something of value

when (i) Verschleiser, with the assistance of Del Forno, Pinhasi and Onica, allegedly created

multiple backups of United Realty's email data and trade secrets, downloaded, copied and then

deleted all of that data from its email exchange server; and (ii) Verschleiser, with the assistance

of Del Forno, Pinhasi and Onica, allegedly learned of a $1.4 million sublease transaction on

which United Realty and Opera Solutions were about to close and torpedoed the deal with his

otherwise anonymous email to Opera Solutions that disparaged Frydman and his businesses and

encouraged Opera Solutions not to go forward. In that regard as well, plaintiffs claim that as a

result of such defendants' conduct, they suffered loss by (a) incurring costs to investigate and

otherwise respond to defendants' offenses, conduct a damage assessment and restore conditions

prior to the offenses, including hiring several computer investigation or IT consulting firms and

spending many hours of valuable time away from day-to-day responsibilities assisting in

investigating the offenses; and (b) incurring lost revenue, cost or other consequential damages

because of the interruption of service due to blocking plaintiffs' email and server access. Further

in that regard, plaintiffs claim that as a result of defendants' conduct, they suffered damage from

the deletion of files, data and other information, including the value of such information and the

development costs of recreating it.

As far as the ECPA is concerned, plaintiffs claim that defendants Verschleiser and Del

Forno intentionally intercepted email communications to plaintiffs, such as by engaging in email

auto-forwarding, and that defendant Verschleiser intentionally disclosed the contents of such

communications, causing damages. In that regard, plaintiffs claim that Verschleiser, and in at

least one instance Del Forno, set up distribution groups and established email forwarding rules

causing emails intended for Frydman and other United Realty employees to be forwarded to

them instead, and that Verschleiser disclosed the contents of one or more intercepted communications between United Realty or Frydman and Opera Solutions with his otherwise anonymous email to Opera Solutions referencing the $1.4 million sublease transaction between the parties about to close, causing the loss of that transaction.

As far as the SCA is concerned, plaintiffs claim that defendants Verschleiser, Del Forno, Pinhasi and Onica intentionally accessed without authorization or in excess of authorization plaintiffs' email exchange server hosted by an electronic communication service provider, Intermedia.net Inc., which I will refer to as Intermedia, and thereby obtained, altered or prevented authorized access to one or more stored wire or electronic communications, causing damages. In that regard, plaintiffs make the same claims regarding lack of authorization or acting in excess of authorization, blocking email and server access, and accessing and deleting information from employee email accounts, as they do with respect to their CFAA claims.

Plaintiffs claim that they suffered at a minimum the following damages: the same alleged loss and damage suffered on their CFAA claims; the loss of the $1.4 million sublease transaction between United Realty and Opera Solutions; and damages stemming from defendants Veschleiser, Del Forno, Pinhasi and Onica's alleged use of the contents of illegally accessed electronic communications so that Verschleiser could create, or cause to be created, the fake websites, blogs and other Internet postings that are the subject of the third and fifth RICO predicate acts of wire or mail fraud, including without limitation through use of photos of Frydman and information about United Realty that was not available on its website.

3.     Plaintiffs claim that defendant Verschleiser committed libel per se, a tort which is a form of defamation and comprises Count VIII. I will charge you the elements of libel per se at the close of evidence. Plaintiffs make the following allegations in support of their libel per se

claims.

Plaintiffs claim that in early February 2015, Verschleiser had Akerman commence a baseless, sham state court action against Frydman, *Akerman v. Frydman*, Index No. 650351/2015, fabricating a claim that he acted as a whistleblower rather than a thief and falsely asserting that Frydman committed various acts of misconduct. Plaintiffs claim that Verschleiser did so in order to disseminate the lawsuit's alleged defamatory statements against Frydman and his companies to the public and the press.

Plaintiffs also claim that in mid-February 2015, Akerman, acting at Verschleiser's direction and using information supplied by him, manufactured claims against Frydman concerning a nominal transaction that occurred almost two years earlier. Plaintiffs claim that Akerman did so in a scathing whistleblower complaint against Frydman and the REIT in a letter to the SEC Office of the Whistleblower, on which he copied 17 third parties. Plaintiffs claim that just a week later, however, Akerman discontinued his lawsuit with prejudice and retracted his whistleblower letter based on misrepresentations made to him by Verschleiser. Plaintiffs claim that Verschleiser had Akerman send his whistleblower letter in order to disseminate the letter's alleged defamatory statements against Frydman and his companies to the public and the press.

Plaintiffs claim that the foregoing alleged defamations caused injury to Frydman's personal and business reputation and to the other plaintiffs' business reputations and humiliation and mental anguish in Frydman's public and private life.

4.      Plaintiffs claim that defendant Verschleiser committed trade libel, a tort which is another form of defamation and comprises Count IX. I will charge you the elements of trade libel at the close of evidence. Plaintiffs make the following allegations in support of their trade

libel claims.

Underlying those claims are the allegations of (i) defamatory emails, websites, reports, blogs, social media and other posts, flyers and posters sent, created, put up, made or disseminated by Verschleiser in the course of the second through fifth claimed RICO predicate acts of wire or mail fraud that I previously discussed; (ii) the sham lawsuit and whistleblower letter that are the subject of plaintiffs' libel per se claims that I previously discussed; (iii) defamatory emails sent under Verschleiser's own name on various occasions after December 2013; and (iv) mass anonymous defamatory email blasts sent by Verschleiser to REIT investors, selling group members and prospective members, and others in May and June 2015 that I previously mentioned.

Plaintiffs claim that the foregoing alleged defamations caused injury to plaintiffs' business reputations and caused Frydman mental suffering, and anguish and anxiety, and that they played a material and substantial part in inducing others not to deal with plaintiffs. Specifically in the latter regard, plaintiffs claim that they and/or their affiliates have had members of the REIT's broker dealer selling group terminate or suspend selling agreements, have had REIT investors redeem their shares of common stock, lost sales of REIT common stock, lost numerous prospective selling agreements, sustained lost earnings relating to the REIT, lost real estate opportunities, lost a $1.4 million sublease about to close with Opera Solutions, and suffered other losses.

5.      Plaintiffs claim that defendant Verschleiser committed additional libel per se, which comprises Count X.  Plaintiffs make the following allegations in support of their additional libel per se claims.

Underlying those claims are the allegations of (i) defamatory emails, websites, reports,

blogs, social media and other posts, flyers and posters sent, created, put up, made or disseminated by Verschleiser in the course of the second through fifth claimed RICO predicate acts of wire or mail fraud that I previously discussed; (ii) defamatory emails sent under Verschleiser's own name on various occasions after December 2013 that I previously mentioned; and (iii) mass anonymous defamatory email blasts sent by Verschleiser to REIT investors, selling group members and prospective members, and others in May and June 2015 that I previously mentioned.

Plaintiffs claim that the foregoing defamations caused injury to Frydman's personal and business reputation and to the other plaintiffs' business reputations, and humiliation and mental anguish in Frydman's public and private life.

6.     Plaintiffs claim that defendants Verschleiser, Del Forno, Pinhasi and Onica misappropriated trade secrets. Misappropriation of trade secrets is another tort and comprises Count XI. I will charge you the elements of misappropriation of trade secrets at the close of evidence. Plaintiffs make the following allegations in support of their misappropriation of trade secrets claims.

Underlying those claims against Verschleiser are the allegations of (i) theft of proprietary information of United Realty, Prime United, CLS or the REIT, including a draft of a confidential transaction agreement with Royal Alliance, a shareholder list, a list of broker dealer selling group members, and other non-public financial information, that I previously discussed comprising the sixth claimed RICO predicate act of wire or mail fraud that occurred in and before the first half of December 2014 when Verschleiser allegedly recruited Akerman to steal such proprietary information and thereafter caused the use of portions of the information in two state court lawsuits and used another portion of the information to send mass anonymous

defamatory email blasts to REIT investors and selling group members in May 2015 and June 2015; and (ii) theft of proprietary information through computer hacking that I previously discussed comprising the second claimed RICO predicate act of wire or mail fraud, causing substantial damages. The latter allegations also underlie the misappropriation of trade secrets claim against Del Forno, Pinhasi and Onica.

In regard to their misappropriation claims, plaintiffs claim that Verschleiser, Del Forno, Pinhasi, Onica, and/or Akerman are subject to various agreements or other binding documents that expressly prohibit the theft or use of proprietary information and/or had a confidential relationship with United Realty or otherwise had a duty of confidentiality as current or former United Realty employees. Plaintiffs claim that the REIT shareholder list and the selling group list and other financial information allegedly stolen were stored in servers only accessible to authorized United Realty or CLS employees, that those lists and other financial information were quite valuable to United Realty, Prime United, CLS and their competitors or potential competitors and required considerable effort and expense to develop, and that the identities of the shareholders and selling group members and other financial information were not publicly available. Plaintiffs claim that Prime United and its affiliates entered into a certain $4 million transaction agreement with Royal Alliance that was confidential and among the proprietary information allegedly stolen by Verschleiser and Akerman; that Verschleiser provided it to the plaintiffs in the state court action *Fishoff Family Foundation v. Frydman*, Index No. 653838/2014, who referenced and included the agreement in that lawsuit, which allegedly caused the third party to the agreement to terminate or breach it, resulting in substantial damages; and that Verschleiser caused Akerman to reference the agreement in *Akerman v. Frydman*, resulting in damages as well. Plaintiffs also claim that through his hacking with the assistance of Del

Forno, Pinhasi and Onica, Verschleiser learned of a confidential $1.4 million sublease transaction on which United Realty and Opera Solutions were about to close and torpedoed the deal with his otherwise anonymous email to Opera Solutions that disparaged Frydman and his businesses and encouraged Opera Solutions not to go forward.

7.      Plaintiffs claim that defendant Verschleiser tortiously interfered with their existing contractual relations, which comprises Count XII. I will charge you the elements of tortious interference with existing contractual relations at the close of evidence. Plaintiffs make the following allegations and those related thereto in support of their tortious interference with existing contractual relations claims.

Plaintiffs claim that one or more of them had existing agreements with certain REIT shareholders and broker-dealer selling group members, and that Verschleiser knew of such agreements and intentionally interfered with them. Plaintiffs claim that he did so, directly or through Veen, Svisch, Merchansky, or one or more Doe defendants, by (i) creating fake websites, disseminating fake reports, blogs, and social media and other posts on the Internet, distributing flyers at a premier broker-dealer conference, and putting up posters at the conference, which disparaged Frydman, United Realty and Frydman's other businesses and were directed at the public, including without limitation REIT investors, potential REIT investors, selling group members, and prospective selling group members; and/or (ii) sending mass anonymous defamatory email blasts to REIT investors, selling group members and prospective selling group members, among others, in May and June 2015, which also disparaged Frydman, United Realty and Frydman's other businesses. That allegedly occurred in the course of the third through fifth claimed RICO predicate acts of wire or mail fraud and additional, related acts of wire or mail fraud that I previously discussed. Plaintiffs claim that such activities caused those

20

certain REIT shareholders and selling group members to terminate, suspend or breach their agreements with plaintiffs, resulting in substantial damages.

In addition, plaintiffs claim that Prime United and its affiliates entered into a certain $4 million transaction agreement with Royal Alliance that was confidential and among the proprietary information allegedly stolen by Verschleiser and Akerman comprising the sixth claimed RICO predicate act of wire or mail fraud that I previously discussed. Plaintiffs claim that Verschleiser knew of that agreement and intentionally interfered with it by providing it to the plaintiffs in *Fishoff Family Foundation v. Frydman*, who referenced and included the agreement in that lawsuit, which allegedly caused the Royal Alliance to terminate or breach the agreement, resulting in substantial damages.

8.      Plaintiffs claim that defendants Verschleiser, Del Forno, Pinhasi and Onica tortiously interfered with their prospective contractual relations, which comprises Count XIII. I will charge you the elements of tortious interference with prospective contractual relations at the close of evidence. Plaintiffs make the following allegations and those related thereto in support of their tortious interference with prospective contractual relations claims.

Plaintiffs claim that one or more of them had prospective contractual relationships with (i) certain intended REIT buyers through certain existing broker-dealer selling group members; (ii) certain intended broker-dealer selling group members; and/or (iii) an intended sub-landlord, Opera Solutions. Plaintiffs claim that Verschleiser knew of such relationships and intentionally interfered with them and continues to do so, and that such was also the case with Del Forno, Pinhasi and/or Onica as to the relationship with Opera Solutions. Other than the latter relationship, plaintiffs claim that Verschleiser did so, directly or through Veen, Svisch, Merchansky, or one or more Doe defendants, by (i) creating fake websites, disseminating fake

21

reports, blogs, and social media and other posts on the Internet, distributing flyers at a premier

broker-dealer conference, and putting up posters at the conference, which disparaged Frydman,

United Realty and Frydman's other businesses and were directed at the public, including without

limitation REIT investors, potential REIT investors, selling group members, and prospective

selling group members; and/or (ii) sending mass anonymous defamatory email blasts to REIT

investors, selling group members and prospective selling group members, among others, in May

and June 2015, which also disparaged Frydman, United Realty and Frydman's other businesses.

As to the relationship with Opera Solutions, plaintiffs claim that Verschleiser, either directly or

with Del Forno, Pinhasi and/or Onica knowingly providing substantial assistance, did so by first

learning the identity of Opera Solutions through hacking and then sending Opera Solutions an

"anonymous" email that disparaged Frydman and his businesses and encouraged it not to go

forward with them. All that allegedly occurred in the course of the second through fifth claimed

RICO predicate acts of wire or mail fraud that I previously discussed. Plaintiffs claim such

activities caused the foregoing intended REIT buyers, broker-dealer selling group members and

sublandlord to terminate their prospective contractual relationships with plaintiffs, which

plaintiffs claim would have otherwise ripened into actual contractual relationships, resulting in

substantial damages.

In that regard, plaintiffs claim that with respect to plaintiffs' prospective contractual

relations, Verschleiser, Del Forno, Pinhasi and Onica acted intentionally and with the sole

purpose of harming plaintiffs or used dishonest, unfair or improper means.

9.      In the alternative to Counts IX and X for trade libel and additional libel per se,

respectively, to the extent that those claims are asserted by plaintiff Frydman, Frydman claims

that defendant Verschleiser intentionally inflicted emotional distress upon him, which comprises

Count XIV. I will charge you the elements of intentional infliction of emotional distress at the close of evidence. Frydman makes the following allegations in support of his intentional infliction of emotional distress claim.

Underlying that claim are the allegations of disparaging emails, fake or otherwise disparaging websites, reports, blogs, and social media and other posts, disparaging flyers and posters, and mass defamatory email blasts sent, created, published, made, put up, or otherwise disseminated in the course of the second through fifth claimed RICO predicate acts of wire or mail fraud and claimed additional, related acts of wire or mail fraud that I previously discussed. Frydman claims that the mass creation and dissemination of that information constitute conduct (i) that is so extreme and outrageous that it transcends the bounds of decency so as to be regarded as atrocious and intolerable in a civilized society; (ii) that was undertaken by Verschleiser, directly or through Veen, Svisch, Merchansky, or one or more Doe defendants, with the intent to cause severe emotional distress to Frydman, or recklessly; and (iii) that caused such distress and resulted in substantial damages.

10.     Plaintiffs United Realty and Frydman claim that defendant Verschleiser breached agreements with them, which comprises Count XV. I will charge you the elements of breach of contract at the close of evidence. Those plaintiffs make the following allegations in support of their breach of contract claims. Frydman claims that Verschleiser entered into the Separation Agreement with Frydman, which I previously mentioned, containing the following provisions, among others. In Paragraph 10 of the Separation Agreement, Verschleiser agreed that for 18 months, (i) he would not disparage, encourage or induce others to disparage Frydman, United Realty or any of Frydman's other businesses, with the term disparage defined as including the making of false, defamatory or derogatory comments that could reasonably be expected to

damage the reputation of Frydman, United Realty or any of Frydman's other businesses, and any

breach of the non-disparagement provision being deemed a material breach pursuant to

Paragraph 11 of the Separation Agreement; and (ii) he would not employ or solicit the

employment of individuals at United Realty, Prime United or any of Frydman's other businesses.

I will charge you the meaning of the term derogatory at the close of evidence. In Paragraph 25

of the Separation Agreement, Verschleiser agreed to restore all exchange servers, web hosting,

and United Realty and its affiliates' computer servers to their status on or before November 15,

2013 and to provide Frydman with all owner and administrative passwords by the close of

business on December 5, 2013. United Realty claims that Verschleiser entered into an

employment agreement with it on January 4, 2011, which also contained non-disparagement and

non-solicitation provisions as well as a confidentiality provision. Specifically, in section (b) of

his employment agreement, Verschleiser agreed that, directly or indirectly, for 12 months after

the date of termination of his employment, among other things, (i) he would not hire any

employee, consultant or advisor of United Realty or a United Realty affiliate, among others

(section (b)(ii)(B)); (ii) he would not disparage United Realty, a United Realty affiliate or

Frydman, among others, in a manner that could reasonably be expected to injure its or his

business or reputation (section (b)(iv)), and (iii) he would not divulge to anyone or use any

confidential or trade secret information of United Realty or any of its affiliates, among others

(section (b)(v)).

Frydman claims that (i) he performed all the terms and conditions of the Separation

Agreement on his part to be performed prior to Verschleiser's alleged breaches of that

Agreement; and (ii) the breach of the non-disparagement provision or email exchange server

restoration provision of the Agreement was material, such that his own performance of the

Agreement was excused thereafter. I will charge you what constitutes a material breach of contract at the close of evidence. United Realty claims that it performed all the terms and conditions of Verschleiser's employment agreement on its part to be performed.

Frydman and United Realty claim that Verschleiser breached the non-disparagement provision of (a) the Separation Agreement during the 18-month period following its effective date of December 3, 2013 and/or (b) his employment agreement during the 12-month period following his termination, by (i) allegedly sending negative emails about Frydman and/or United Realty under Verschleiser's own name to or with a copy to one or more third parties on various occasions after December 2013; (ii) allegedly creating fake websites, disseminating fake reports, blogs, and social media and other posts on the Internet, sending anonymous emails, distributing flyers at a premier broker-dealer conference, and putting up posters at the conference, in the course of the second through fifth RICO predicate acts of wire or mail fraud that I previously summarized; (iii) allegedly sending Opera Solutions an anonymous email encouraging it not to go forward with the $1.6 million sublease transaction; (iv) allegedly sending mass anonymous email blasts to REIT investors, selling group members and prospective selling group members, among others, in May and June 2015; and (v) allegedly having Akerman in February 2015 commence a baseless, sham state court action against Frydman, *Akerman v. Frydman*, Index No. 650351/2015, and disseminate a baseless sham whistleblower letter, each of which items (i) through (v) disparaged Frydman, United Realty and/or Frydman's other businesses, including through making false, defamatory or derogatory comments that could reasonably be expected to damage one or more of their reputations.

Frydman claims that Verschleiser breached the email exchange server restoration provision of the Separation Agreement by allegedly failing by the close of business on December

5, 2013 to restore United Realty and its affiliates' computer servers to their pre-November 16, 2013 status and to provide Frydman with all owner and administrative passwords. Frydman and United Realty claim that Verschleiser breached the non-solicitation provision of (a) the Separation Agreement during the 18-month period following its effective date and/or (b) his employment agreement during the 12-month period following termination, by allegedly soliciting the employment of, or employing, one or more United Realty employees following his departure from United Realty, in particular Del Forno, Pinhasi and Nick Constantinescu. United Realty claims that Verschleiser breached the confidentiality provision of his employment agreement during the 12-month period following termination by disclosing his alleged knowledge of (i) the $1.4 million sublease transaction on which United Realty and Opera Solutions were about to close that was allegedly confidential; and (ii) the $4 million transaction agreement between Royal Alliance and Prime United that was allegedly confidential.

As far as concerns a material breach of the non-disparagement provision of the Separation Agreement, Frydman claims that Verschleiser himself agreed in that Agreement that any breach of the non-disparagement provision would be considered a material breach; that its alleged breach was a massive and intentional one; that it began while the Separation Agreement was in its relative infancy and therefore was of great magnitude; and that non-disparagement was critical to Frydman, United Realty and Frydman's other companies' business activities, especially attracting investors and broker-dealer selling group members for United Realty and the REIT, who would typically search Frydman's name and the names of his businesses on Internet search engines as part of their due diligence. As far as concerns a material breach of the email exchange server restoration provision of the Separation Agreement, Frydman claims that the breach of that provision was a complete and intentional one; that it occurred while the

Separation Agreement was in its infancy and therefore was of great magnitude; and that server restoration to pre-November 16 status by December 5 was also critical to Frydman, United Realty and Frydman's other companies' business activities, particularly in terms of communications with respect to the REIT, and in treating the damage caused by Verschleiser's allegedly hacking the United Realty server beginning December 2.

Frydman and United Realty claim that they performed all the terms and conditions of Separation Agreement and Verschleiser's employment agreement on their respective parts to be performed prior to the breaches. Frydman and United Realty claim that they suffered substantial damages as a result of those breaches.

11.    Plaintiff United Realty claims that defendant Del Forno breached his duty of loyalty to it as an employee, which comprises Count XIX. I will charge you the elements of breach of duty of loyalty at the close of evidence. Plaintiff United Realty makes the following allegations in support of its breach of duty of loyalty claim.

United Realty claims that Del Forno breached his duty of loyalty to it while he was still employed by United Realty through February 14, 2014 as head of its information technology, by providing necessary computer-related assistance to Verschleiser in furtherance of alleged hacking beginning December 2, 2013. Specifically, United Realty claims that (i) Del Forno accessed, including by using a computer workstation called "RDELFORNO-X1," or assisted Verschleiser in allegedly accessing, Frydman's and/or other employees' emails, as a result of which, among other things, Del Forno and/or Verschleiser allegedly learned of a $1.4 million sublease transaction on which United Realty and Opera Solutions were about to close, although Del Forno was expressly not authorized to access other employee email accounts pursuant to the terms of United Realty's employee manual; (ii) Del Forno gave Verschleiser Frydman's United

27

Realty email account password in excess of his authority, which allegedly allowed Verschleiser to access and commandeer United Realty's hosted email exchange server; (iii) with Del Forno's assistance, Verschleiser allegedly was able to hack into and intercept the emails of United Realty employees, create backups of United Realty email data and trade secrets, and to download, copy and then delete all of that data from United Realty's email exchange server, depriving United Realty of its important confidential and proprietary information, data and trade secrets; and/or (iv) Del Forno used the contents of illegally accessed electronic communications so that Verschleiser allegedly could create, or cause to be created, the fake websites, blogs and other Internet postings that are the subject of the third and fifth RICO predicate acts of wire or mail fraud I previously discussed, including without limitation allegedly through use of photos of Frydman and information about United Realty that was not available on its website, causing United Realty to suffer substantial damages.

12.    Plaintiff United Realty claims that defendants Verschleiser, Del Forno, Pinhasi and Onica converted certain of its personal property, which comprises Count XX. I will charge you the elements of conversion at the close of evidence. Plaintiff United Realty makes the following allegations in support of its conversion claim.

United Realty claims that after Verschleiser was no longer employed by it, Verschleiser and Del Forno, Pinhasi and/or Onica, either directly or by knowingly providing substantial assistance to Verschleiser, in the course of the first RICO predicate act of wire fraud or mail fraud I previously discussed, took control of United Realty's email exchange server beginning December 2, 2013, then copied for themselves certain computer files, including .pst files, from that server, and then deleted those files, depriving United Realty of their data, by reason of which Verschleiser and Del Forno, Pinhasi and/or Onica assumed and continued to assume the rights of

ownership over such personal property of United Realty to the exclusion of its rights in such property, as a result of which United Realty suffered substantial damages. A .pst file contains the backup data for its associated email account. United Realty claims that Verschleiser and Del Forno, Pinhasi and/or Onica, either directly or by knowingly providing substantial assistance to Verschleiser, deleted, and thereby deprived United Realty of the following .pst files:

1. Jacob_Frydman_12-06-2013.pst

2. Eli_Verschleiser_12-06-2013.pst

3. URPA_Backup_Joseph_Santacruz_12-01-2013.pst

4. Asher_Gulko_12-06-2013.pst

5. Monica_Frydman_12-06-2013.pst

6. Cathy_Larson_12-08-2013.pst

7. Jacob_Frydman_12-09-2013.pst

\* \* \* \*

Defendants Verschleiser, Multi Group, Del Forno, Pinhasi, and Onica deny each of plaintiffs' claims, and assert the following affirmative defenses to be decided by you,[1] as to which they have the burden of proof.

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

Plaintiffs' claims, or parts thereof, are barred by the doctrine of accord and satisfaction.

Plaintiffs' claims are barred by the doctrine of unclean hands.

Plaintiffs have failed to mitigate their damages.

Damages, if any, alleged to have been suffered by plaintiffs were caused, in whole or in part, by the intentional conduct, negligent conduct, fault, or other culpable conduct of plaintiffs

---

[1] The only affirmative defenses that should be listed are those remaining after the determination of plaintiffs' motion in limine regarding certain affirmative defenses.

or others over whom plaintiffs exercised authority and/or control.

Plaintiffs' claims are barred, in whole or in part, by the principle of laches and unclean hands, as, inter alia, plaintiffs fraudulently induced Verschleiser to sign the Membership Interests Sale and Purchase Agreement.

Plaintiffs have not suffered any loss, damage, or injury as a result of the conduct alleged.

Defendants are not liable because the allegedly derogatory statements did not harm Frydman because Frydman's reputation is already severely impaired.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:03 (modified)

## PLANTIFFS' PROPOSED REQUEST TO CHARGE NO. 4

**Province of Judge and Jury**

After all the evidence has been heard and arguments and instructions are finished, you will meet to make your decision. You will determine the facts from all the testimony and other evidence that is presented. You are the sole and exclusive judge of the facts. I must stress that you must accept the rules of law that I give you, whether or not you agree with them.

The law permits me to comment on the evidence in the case during the trial or while instructing the jury. Such comments are only expressions of my opinion as to the facts. You may disregard these comments entirely, because you are to determine for yourself the weight of the evidence and the credibility of each of the witnesses.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:10

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 5

**Jury Conduct – Contact with Others**

Before we start the trial, let me give you a few "rules of the road."

First, please do not discuss the case or about anyone involved with this case with anyone, including members of your family and your friends, until the trial has ended and you have been discharged as jurors. This includes discussing the case in person, in writing, by phone or electronic means, via text messaging, e-mail, Facebook, Twitter, blogging or any Internet chat room, website or other feature. If you have to tell someone such as your spouse or your employer that you are serving on a jury and that the trial may last as late as _____, that's okay. But when they inevitably ask you what the case is about, please tell them that you are under strict instructions from the judge not to discuss the case. The reason for this, obviously, is that we want you to decide this case solely on the evidence presented in this courtroom, and not on the basis of anything anyone who hasn't heard the evidence may think about the case. Outside the courtroom, if you are asked or approached in any way about your jury service or anything about the case, you should respond that you have been ordered by the judge not to discuss the matter. Likewise, do not let anyone tell you anything about the case, or about anyone involved with it until the trial has ended. If someone asks or approaches you in any way about your jury service or anything about the case or tries to talk to you about the case during the trial, please report it to me immediately.

Second, during the trial you should not talk with or speak to any of the parties, lawyers or witnesses involved in this case – you should not even pass the time of day with any of them. It is important not only that you do justice in this case, but that you also give the appearance of doing justice.

32

Third, along the same lines, you should not try to access any information about the case, the matters in the case, and the individuals or entities involved in the case or do research on any issue that arises in the case from any outside source, including dictionaries, reference books, or anything on the Internet, or make any investigation about the case on your own. And in the event you see or hear anything in the media about this case or anyone involved in it, such as news articles or reports or radio or television reports, please turn away and pay it no heed. Your sworn duty is to decide this case solely and wholly on the evidence presented in this courtroom.

Fourth, do not make up your mind during the trial about what the verdict should be. Keep an open mind until after you have gone to the jury room to decide the case and you and the other jurors have discussed all the evidence.

Fifth, if you need to tell me something, simply give a signed note to the court deputy to give to me.

Finally, please do not discuss the case or anyone involved with it among yourselves until all the evidence has been presented and the case has been given to you for your deliberations. The reason for this is that the evidence will be presented one witness and one exhibit at a time, and it is important that you keep an open mind until you have heard all the evidence.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 71.02, at 71-15 (modified); 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:11 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 6

**Juror Use of Electronic Technology**

I know that many of you use cell phones, Blackberries, the Internet and other tools of technology. You also must not use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website, including Facebook, Google+, My Space, LinkedIn, or YouTube. You may not use any similar technology of social media, even if I have not specifically mentioned it here. I expect you will inform me as soon as you become aware of another juror's violation of these instructions.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:13

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 7

**Notetaking – Permitted**

If you want to take notes during the course of the trial, you may do so. If you do take notes, be sure that your note-taking does not interfere with your listening to and considering all of the evidence. Also, if you take notes, do not discuss them with anyone before or during your deliberations. Your notes are to be used solely to assist you and are not to substitute for your recollection of the evidence in the case. The fact that a particular juror has taken notes entitles that juror's view to no greater weight than those of any other juror and your notes are not to be shown to any other juror during your deliberations. If, during your deliberations, you have any doubt as to any of the testimony, you will be permitted to request that the official trial transcript which is being made of these proceedings be read to you.

Frequently, there is a tendency to attach too much importance to what a person writes down. Some testimony that is considered unimportant at the time presented, and thus not written down, may take on greater importance later in the trial in light of all the evidence presented, the final arguments, and my instructions on the law.

Accordingly, you are instructed that your notes are only a tool to aid your own individual memory and you should not compare your notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Your memory should be your greatest asset when it comes time to deciding this case.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 71.02, at 71-16 (modified); 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:15 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 8

**Questions by jurors – Prohibited**

I do not permit jurors to ask questions of witnesses or of the lawyers.  Please do not interrupt the lawyers during their examination of witnesses.

If you are unable to hear a witness or a lawyer, please raise your hand immediately and I will see that this is corrected.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:18

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 9

**No Transcript Available to Jury**

At the end of the trial, you will have to make your decision based on what you remember about the evidence. You will not have a written transcript to read, and it is difficult and time-consuming for the reporter to read back testimony. I urge you to pay close attention to the testimony as it is presented at the trial.

*Authority*:  3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:20

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 10

**Judge's Questions to Witnesses**

During the trial, I may sometimes ask a witness questions.  Please do not assume that I

have any opinion about the subject matter of my questions.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:30

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 11

**Bench Conferences**

From time to time it may be necessary for me to talk to the lawyers out of your hearing. The purpose of these conferences is to decide how certain matters are to be treated under the rules of evidence. The lawyers and I will do what we can to limit the number and length of these conferences.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:31

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 12

**What Is and Is Not Evidence and Evidence for Limited Purposes**

The evidence in the case will consist of the following:

1.  The sworn testimony of the witnesses, no matter who called a witness.

2.  All exhibits received in evidence, regardless of who may have produced the exhibits.

3.  All facts that may have been judicially noticed and that you must take as true for purposes of this case.

Depositions may also be received in evidence. A deposition is simply a procedure where the attorneys for one side may question a witness or an adverse party under oath before a stenographer prior to trial. This is part of the pretrial discovery, and each side is entitled to take depositions. You may consider the testimony of a witness given at a deposition and received in evidence during the trial according to the same standards as you would use to evaluate the testimony of a witness given at trial.

By contrast, the questions and objections of the lawyers are not to be considered by you as evidence. It is the witness' answers that are evidence, not the questions. At times, a lawyer may have incorporated into a question a statement which assumed certain facts to be true, and asked the witness if the statement was true. If the witness denied the truth of a statement, and if there is no direct evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

The famous example of this is the lawyer's question of a married witness: "When did you stop beating your wife?" You would not be permitted to consider as true the assumed fact that he ever beat his wife, unless the witness himself indicated he had, or unless there was some other

40

evidence in the record that he had beaten his wife.

Statements and arguments of the lawyers are not evidence in the case, unless made as an admission or stipulation of fact. A "stipulation" is an agreement between both sides that certain facts are true. When the lawyers on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence, and regard that fact as proved.

To constitute evidence which may be considered by you, exhibits must be received in evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials brought forth only to refresh a witness' recollection.

I may take judicial notice of certain facts or events. When I declare that I will take judicial notice of some fact or event, you must accept that fact as true.

If I sustain an objection to any evidence or if I order evidence stricken, that evidence must be entirely ignored.

Some evidence is admitted for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other purpose.

Statements which I may make concerning the quality of the evidence do not constitute evidence.

You are to consider only the evidence in the case. But in your consideration of the evidence you are not limited to the statements of the witness. In other words, you are not limited solely to what you see and hear as the witnesses testified. You may draw from the facts that you find have been proved, such reasonable inferences or conclusions as you feel are justified in light of your experience.

41

At the end of the trial you will have to make your decision based on what you recall of

the evidence. You will not have a written transcript to consult, and it is difficult and time

consuming for the reporter to read back lengthy testimony. I urge you to pay close attention to

the testimony as it is given.

In deciding the facts of this case, you are also not to consider anything you may see or

hear when the court is not in session even if what you see or hear is done or said by one of the

parties or by one of the witnesses.

It is for you alone to decide the weight, if any, to be given to the testimony you have

heard and the exhibits you have seen.

*Authority*: 3 Kevin F. O'Malley et al., 3 Fed. Jury Prac. & Instr. (6th ed.) §§ 101:40 (modified); 101:44 (modified); 101:45 (modified); 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 74.01, at 74-1 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 13

**Rulings on Objections**

When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side believes the question or exhibit is not admissible under the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received into evidence. If I sustain the objection, the question cannot be answered and the exhibit cannot be received into evidence.

If I sustain an objection to a question or the admission of an exhibit, you must ignore the question and must not guess what the answer to the question might have been. In addition, you must not consider evidence that I have ordered stricken from the record.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:49

43

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 14

**Burden of Proof – General Instruction**

This is a civil case and as such the plaintiff has the burden of proving the material allegations of his or its claims by a preponderance of the evidence. I will explain shortly what is meant by a preponderance of the evidence.

If after considering all of the testimony you are satisfied that the plaintiff has carried his or its burden on each essential point as to which he or it has the burden of proof, then you must find for the plaintiff on the particular claim involved, subject to my instructions concerning one or more affirmative defenses of the defendant, if any, relevant to the claim. If after such consideration you find the testimony of both parties to be in balance or equally probable, then the plaintiff has failed to sustain his or her burden and you must find for the defendant on the particular claim involved.

If upon a consideration of all the facts concerning a particular claim, you find that the plaintiff has failed to sustain the burden cast upon him or it, then you should proceed no further and your verdict must be for the defendant on that claim. If, however, you find that the plaintiff has sustained his or her burden, then you should proceed to consider one or more affirmative defenses of the defendant, if any, that I instruct you is relevant to the particular claim. In this regard, the burden is upon the defendant to establish such affirmative defense or defenses by a preponderance of the evidence.

If you determine that the defendant has sustained his or its burden of establishing a particular affirmative defense, then you should proceed no further and your verdict must be for the defendant. If, however, you find that the plaintiff has established the material elements of his

or its particular claim and that the defendant has not sustained his or its burden to establish the affirmative defense, then you should proceed to consider the issue of damages.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 73.01, at 73-1 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 15

**Preponderance of the Evidence**

The plaintiff must prove the elements of each of his or its claims against the defendant by a preponderance of the evidence but need not prove more than a preponderance.

To establish by the preponderance of the evidence means to prove that something is more likely so than it is not so.  In other words, a preponderance of the evidence in this case means such evidence as, when considered and compared to that opposed to it, has more convincing force, and produces in your mind a belief that what is sought to be proved is more likely true than not true. more likely true than not true.  If the evidence on a particular issue is equally balanced, that issue has not been proven by a preponderance of the evidence and you must find in favor of the defendant on that issue.  If, however, the evidence tips at least 51% in favor of the plaintiff on a particular issue, then that issue has been proven by a preponderance of the evidence, and you must find in favor of the plaintiff on that issue.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

Some of you may have heard of proof beyond a reasonable doubt, which is the standard of proof in a criminal trial. That standard does not apply to a civil case such as this and you should put it out of your mind.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 104:01 (modified); 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 73.01, at 73-2 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 16

**Direct and Circumstantial Evidence**

There are two types of evidence which you may properly use in reaching your verdict. One type of evidence is direct evidence. Direct evidence is when a witness testifies about something he knows by virtue of his own senses – something he has seen, felt, touched, or heard. Direct evidence may also be in the form of an exhibit when the fact to be proved is its present existence or condition.

The other type of evidence is circumstantial evidence. This is evidence which tends to prove a disputed fact by proof of other facts. There is a simple example of circumstantial evidence which is often used in this courthouse.

Assume that when you came into the courthouse this morning the sun was shining and it was a nice day. Assume that the courtroom blinds were drawn and you could not look outside. As you were sitting here, someone walked in with an umbrella which was dripping wet. Then a few minutes later another person also entered with a wet umbrella. Now, you cannot look outside of the courtroom and you cannot see whether or not it is raining. So you have no direct evidence of that fact. But on the combination of facts which I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence. You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of some other fact.

Circumstantial evidence is of no less weight or value than direct evidence, and a greater degree of certainty is not required of circumstantial evidence; for it is a general rule that the law makes no distinction between direct evidence and circumstantial evidence but simply requires

47

that your verdict must be based on a preponderance of all the evidence presented, both direct and

circumstantial.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 74.01, at 74-2 (modified);
3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 104:05 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 17

**Stipulations of Fact**

A stipulation of facts is an agreement among the parties that a certain fact is true. You

must regard such agreed facts as true. The parties have stipulated to the following facts as true:

1.     Frydman is a resident of the State of New York.

2.     Verschleiser is a citizen and resident of the State of New York.

3.     In 2011, Verschleiser and Frydman joined together to sponsor a public non-traded

Real Estate Investment Trust, the REIT.

4.     In connection therewith, Frydman and Verschleiser formed numerous entities,

and, as of December 2, 2013, Verschleiser and Frydman, directly and indirectly through a variety

of affiliates, jointly owned, operated and/or controlled the following public and private entities,

which I will collectively refer to as the Entities:

    United Realty Advisor Holdings, LLC, which I will refer to as URA Holdings
    United Realty
    United Realty Trust Incorporated
    United Realty Partners, LLC
    URA Property Management, LLC
    United Realty Capital Markets, LLC
    URP Investments, LLC
    URTI GP, LLC
    URTIGP Investments, LLC
    URA Property Management, LLC
    URTI LP, LLC
    Riverside United Title Agency, LLC
    Prime United
    CLS
    CL Wealth Management, LLC
    CL General Agency, LLC
    Cabot Lodge Lending, LLC
    American United Securities, LLC
    AUS Holdings, LLC
    United 866 Management, LLC
    United Realty 866 UN Plaza, LLC
    United Realty Capital Operating Partnership, L.P.

5.      Prior to December of 2013, Frydman was CEO and Chairman and Verschleiser was President and a member of the board of both the REIT and its advisor United Realty. Frydman and Verschleiser both held management or board positions with each of the other Entities.

6.      Prior to December 3, 2013, the Operating Agreement of URA Holdings, which was the primary sponsor of the REIT, made as of August 1, 2011, which I will refer to as the URA Holdings Operating Agreement, constituted the overarching agreement between Verschleiser and Frydman.

7.      Section 3.1.3(a) of the URA Holdings Operating Agreement provides for removal of a manager for cause.

8.      Verschleiser's employment with United Realty was governed by an employment agreement accepted and agreed to by him on January 1, 2012, which I will refer to as the Employment Agreement.

9.      The Employment Agreement contained, among other provisions, a non-solicitation provision, i.e., section (b)(i-iii); a non-disparagement provision, i.e., section (b)(iv); and a confidentiality provision, i.e., section (b)(v), all with a one-year duration following termination.

10.     Verschleiser has admitted to using the following email addresses:

eli.v@multigroups.com
eli.v@urpa.com
eli.v@magenu.org
eli.v@multi-capital.com
hr@multigroups.com
press@multigroups.com
eliv@att.net
2good2b4@att.net
elivmulti@gmail.com

> eli.v@ourplaceny.org
> eli.v@eliv.com

11.     As a public company, with reporting obligations to the United States Securities and Exchange Commission (the "SEC"), the removal of Verschleiser and/or Frydman as an officer of the REIT triggered a four-day period for the REIT to file a Form 8-K with the SEC announcing these events.

12.     Just after midnight on December 4, 2013, Frydman and Verschleiser and several of their respective affiliates entered into the Separation Agreement, which was made as of December 3, 2013.

13.     The Separation Agreement contained, among other provisions, a non-solicitation provision (with an 18-month duration), i.e., paragraph 10(a)(i); a non-disparagement provision (with an 18-month duration), i.e., paragraph 10(a)(ii), (b); a provision that any breach of the non-solicitation or non-disparagement provisions would be considered a material breach, i.e., paragraph 11; and an e-mail exchange server restoration provision, i.e., paragraph 25.

14.     On or about December 10, 2013, Intermedia, which hosted the United Realty email exchange server, locked Verschleiser out of the United Realty email account, and returned control to Frydman.

15.     Emails between Frydman and Verschleiser reflect admissions by Verschleiser that he failed to restore the United Realty email exchange server, web hosting server and computer network, among other servers and networks, to their status on or before November 15, 2013 and provide Frydman with all owner and administrative passwords by the close of business on December 5, 2013, as required by Paragraph 25 of the Separation Agreement.

16.     By December 10, 2013, Verschleiser had not relinquished control of the United Realty email exchange server to Frydman.

17.     In or about February 2014, Frydman, on behalf of United Realty, was negotiating a new corporate headquarters sublease for space in the building at 180 Maiden Lane from the sub-landlord, Opera Solutions, involving a favorable $1.4 million sublease at below market rent.

18.     On April 17, 2014, The *Real Deal*, a real estate news website primarily concerned with the New York City market, published an article entitled "Feud between United Realty CEO and ex-president turning ugly."

19.     On September 28, 2011, Akerman executed an employment agreement with United Realty, which I will refer to as the Akerman Employment Agreement.

20.     The Akerman Employment Agreement contained, among other provisions, a confidentiality provision (with a one-year duration following termination), i.e., section (b)(v).

21.     Akerman executed a subscription agreement with United Realty as of January 8, 2013, which I will refer to as the Akerman Subscription Agreement.

22.     The Akerman Subscription Agreement contained, among other provisions, a confidentiality provision, i.e., paragraph 15.

23.     Akerman executed a limited partnership agreement with United Realty, which I will refer to as the Akerman Limited Partnership Agreement.

24.     The Akerman Limited Partnership Agreement contained, among other provisions, a confidentiality provision, i.e., section 10.1(b).

25.     The employee manual of CLS, dated January 2013, contained, among other provisions, confidentiality provisions, i.e., p. 5, item (iii)(E); p. 8; pp. 9-10.

26.     In a submission dated January 3, 2014, Akerman, on behalf of CLS and in his capacity as its Chief Compliance Officer, submitted a Form B-D to the Financial Industry Regulatory Authority, which is known as FINRA, which I will refer to as the January Form B-D.

27.    The January Form B-D provided as follows:

**WARNING**:  Failure to keep this form current and to file accurate supplementary information on a timely basis, or the failure to keep accurate books and records or otherwise to comply with the provisions of law applying to the conduct of business as a broker-dealer would violate the Federal securities law and the laws of the jurisdictions and may result in disciplinary, administrative, injunctive or criminal action.
**INTENTIONAL MISSTATEMENTS OR OMISSIONS OF FACTS MAY CONSTITUTE CRIMINAL VIOLATIONS.**

28.    Akerman executed the January Form B-D under the following statement:

The undersigned, being first duly sworn, deposes and says that he/she has executed this form on behalf of, and with the authority of, said applicant.  The undersigned and applicant represent that the information and statements contained herein, including exhibits attached hereto, and other information filed herewith, all of which are made a part hereof, are current, true and complete.   The undersigned and applicant further represent that to the extent any information previously submitted is not amended such information is currently accurate and complete.

29.    In the January Form B-D, Akerman amended the Schedule B of indirect owners to

reflect that Verschleiser no longer had any ownership interest in CLS.

30.    On October 8, 2014, Prime United, CLS, an affiliate of CLS, and the CEO and

President of CLS, Gould, entered into a highly confidential agreement for a transaction with a

third party, Royal Alliance.


*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 74.02, at 74-4 (modified)

53

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 18

**Inferences**

During the trial you may hear the attorneys use the term "inference," and in their arguments they may ask you to infer, on the basis of your reason, experience, and common sense, from one or more established facts, the existence of some other fact.

An inference is not a suspicion or a guess. It is a reasoned, logical conclusion that a disputed fact exists on the basis of another fact which has been shown to exist.

There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence. Plaintiffs ask you to draw one set of inferences, while defendants ask you to draw another. It is for you, and you alone, to decide what inferences you will draw.

The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion which you, the jury, are permitted to draw – but not required to draw – from the facts which have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense.

So, while you are considering the evidence presented to you, you are permitted to draw, from the facts which you find to be proven, such reasonable inferences as would be justified in light of your experience.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 75.01, at 75-1

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 19

**Finding as to Thing Once Proved to Exist**

You may find that a state of affairs, once proved to exist, continues as long as is usual with things of that nature, in the absence of evidence in the case leading you to a different conclusion.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 104:23

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 20

**Credibility of Evidence and Weighing Testimony**

In deciding the facts, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of it, or none of it.

The law does not require you to accept all of the evidence I shall admit. In deciding what evidence you will accept you must make your own evaluation of the testimony given by each of the witnesses, and decide how much weight you choose to give to that testimony. The testimony of a witness may not conform to the facts as they occurred because he or she is intentionally lying, because the witness did not accurately see or hear what he or she is testifying about, because the witness' recollection is faulty, or because the witness has not expressed himself or herself clearly in testifying. There is no magical formula by which you evaluate testimony. You bring with you to this courtroom all of the experience and background of your lives. In your everyday affairs you decide for yourselves the reliability or unreliability of things people tell you. The same tests that you use in your everyday dealings are the tests which you apply in your deliberations. The interest or lack of interest of any witness in the outcome of this case, the bias or prejudice of a witness, if there be any, the age, the appearance, the manner of the witness as the witness testifies, the opportunity and ability that the witness had to observe the facts about which he or she testifies, the quality of the witness' memory, the witness' candor or lack of candor, the witness' intelligence, the reasonableness and probability of the witness' testimony and its consistency or lack of consistency and its corroboration or lack of corroboration with other credible evidence, other evidence that may have contradicted the witness' testimony, are all items to be considered by you in deciding how much weight, if any, you will give to that witness' testimony. If it appears that there is a conflict in the evidence, you will have to consider whether

the apparent conflict can be reconciled by fitting the different versions together.  If, however,

that is not possible, you will have to decide which of the conflicting versions you will accept.

The weight of the evidence does not necessarily depend upon the number of witnesses

who testify.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 101:43 (modified);
N.Y. Pattern Jury Instr.--Civil 1:8 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 21

**Discrepancies in Testimony**

As I previously instructed, you are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You may be guided by the appearance and conduct of a witness, or by the manner in which a witness testifies, or by the character of the testimony given, or by evidence contrary to the testimony.

You should carefully examine all the testimony given, the circumstances under which each witness has testified, and every matter in evidence tending to show whether a witness is worthy of belief. Consider each witness's intelligence, motive and state of mind, and demeanor or manner while testifying.

Consider the witness' ability to observe the matters as to which the witness has testified, and whether the witness impresses you as having an accurate recollection of these matters. Also, consider any relation each witness may have with either side of the case, the manner in which each witness might be affected by the verdict, and the extent to which the testimony of each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses may or may not cause you to discredit such testimony. Two or more persons seeing an event may see or hear it differently. People sometimes forget things and even a truthful witness may be nervous and contradict himself.

Whether a discrepancy pertains to a fact of importance or only to an unimportant detail should be considered in weighing its significance; but an intentional falsehood always is a matter of importance and should be considered seriously.

Discrepancies in a witness' testimony or between his testimony and that of others do not necessarily mean that the witness' entire testimony should be discredited.

After making your own judgment, you will give the testimony of each witness such weight, if any, that you may think it deserves. In short, you may accept or reject the testimony of any witness, in whole or in part. It is for you to decide, based on your total impression of the witness, how to weigh the discrepancies in his or her testimony. You should, as always, use common sense and your own good judgment.

In addition, as I previously instructed you, the weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact. You may find that the testimony of a small number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 105:01 (modified); 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 76.01, at 76-4 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 22

**Testimony of Perjurer**

All testimony of an admitted perjurer should always be considered with caution and weighed with great care.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 105:03

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 23

**Impeachment – Inconsistent Statement or Conduct**

A witness may be discredited or impeached by contradictory evidence or by evidence that at some other time the witness has said or done something or has failed to say or do something that is inconsistent with the witness's present testimony.

If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness such credibility, if any, you think it deserves.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency; and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent, and if so how much, if any, weight to give to the inconsistent statement in determining whether to believe all or part of the witness' testimony.

If a witness is shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness' other testimony and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

An act or omission is "knowingly" done, if the act is done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 105:04 (modified); 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 76.01, at 76-5 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 24

**Effect of Prior Inconsistent Statements or Conduct**

Evidence that, at some other time while not under oath a witness who is not a party to this action has said or done something inconsistent with the witness' testimony at the trial, may be considered for the sole purpose of judging the credibility of the witness. However, such evidence may never be considered as evidence of proof of the truth of any such statement.

Where the witness is a party to the case, and by such statement or other conduct admits some fact or facts against the witness' interest, then such statement or other conduct, if knowingly made or done, may be considered as evidence of the truth of the fact or facts so admitted by such party, as well as for the purpose of judging the credibility of the party as a witness.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 105:09 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 25

**Impeachment – Bad Reputation for Truth and Veracity**

A witness may be discredited or impeached by evidence that the character of the witness for truthfulness is bad. If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness such credibility, if any, you think it deserves.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 105:06

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 26

**Impeachment by Conviction of Crime**

You may hear evidence that one or more of the defendants have been convicted of a crime. You may consider evidence of a witness' prior conviction of a crime only as it may affect the credibility of the witness. You may use that evidence only to help you decide whether to believe that witness and how much weight to give that witness' testimony.

*Authority:* 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 102:44 (modified)

**PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 27**

**Failure to Recall**

The failure of a witness to recall a matter such as whether an event occurred or a particular circumstance existed does not in and of itself create a factual issue whether the event occurred or the circumstance existed. For example, if the plaintiff has established on his or its direct case, that is, before the defendant offers any witnesses in defense, that an event occurred or that a particular circumstance existed, the failure of a witness for the defendant to recall whether the event occurred or the circumstance existed is not in and of itself a denial that the event occurred or the circumstance existed.

*Authority*: *See Vega v. Restani Const. Corp.*, 18 N.Y.3d 499, 504, 942 N.Y.S. 13, 16 (2012)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 28

**Effect of Refusal of Witness to Answer**

The law requires every witness to answer all proper questions put to the witness at trial, unless I rule the witness is privileged to refuse to answer on constitutional or other grounds.

The fact a witness refuses to answer a question after being instructed by me to answer it may be considered by the jury as one of the factors in determining the credibility of the witness and the weight his or her testimony deserves.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 105:10

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 29

**Cautionary Instruction Before Court Recess**

We are about to take our first recess. I want to remind you of the instructions I gave you earlier. Until the trial is over, you are not to discuss this case with anyone, including other jurors, members of your family, people involved in the trial, or anyone else. You may not permit others to discuss the case with you. If anyone approaches you and tries to talk to you about the case, please let me know about it immediately.

Do not read or listen to any news reports of the trial. If a newspaper headline or news broadcast catches your attention, do not examine the article or watch or listen to the broadcast any further. The person who wrote or is reporting the story may not have listened to all the testimony, may be getting information from persons whom you will not see here in court under oath and subject to cross examination. The report may emphasize an unimportant point or may simply be wrong. You must base your verdict solely and exclusively on the evidence received in court during the trial.

The same holds true for information you may learn through the internet. What is said on the internet may or may not be true, and information you learn outside of the courtroom cannot be allowed to influence your decision in this case in any way. It is vital to our system of justice decisions in a case be made based upon the facts that are presented in the courtroom. I instruct you not to do any internet searches on this case, the parties, or anything related to this case.

Finally, you are reminded to keep an open mind until all the evidence has been received and you have heard the arguments of counsel, the instructions of the court, and the views of your fellow jurors.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 102:01 (modified)

67

## II.    POST-TRIAL JURY INSTRUCTIONS

### PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 30

**Role of the Court and Juror Attentiveness**

You have now heard all of the evidence in the case as well as the final arguments of the lawyers for the parties.

Before you begin your deliberations, I now am going to instruct you on the law. You must pay close attention and I will be as clear as possible. As I told you at the start of this case, and as you agreed, it is your duty to accept my instructions of law and apply them to the facts as you determine them, just as it has been my duty to preside over the trial and decide what testimony and evidence is relevant under the law for your consideration. If any attorney or other person has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

You should not single out any instruction as alone stating the law, but you should consider my instructions as a whole when you retire to deliberate in the jury room.

You should not, any of you, be concerned about the wisdom of any rule that I state. Regardless of any opinion that you may have as to what the law may be or ought to be, it is your sworn duty to follow the law as I give it to you.

It has been obvious to me and counsel that until now you have faithfully discharged your duty to listen carefully and observe each witness who testified. Your interest never flagged, and you have followed the testimony with close attention.

I ask you to give me that same careful attention as I instruct you on the law.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 71.01, at 71-1, 71-3 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 31

**Role of the Jury**

As members of the jury, you are the sole and exclusive judges of the facts. You pass upon the evidence. You determine the credibility of the witnesses. You resolve such conflicts as there may be in the testimony. You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

In determining these issues, no one may invade your province or functions as jurors. In order for you to determine the facts, you must rely upon your own recollection of the evidence. What the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions is not evidence. Nor is what I may have said – or what I may say in these instructions – about a fact issue evidence. In this connection, you should bear in mind that a question put to a witness is never evidence, it is only the answer which is evidence. But you may not consider any answer that I directed you to disregard or that I directed struck from the record. Do not consider such answers.

Since you are the sole and exclusive judges of the facts, I do not mean to indicate any opinion as to the facts or what your verdict should be.

I also ask you to draw no inference from the fact that upon occasion I asked questions of certain witnesses. These questions were only intended for clarification or to expedite matters and certainly were not intended to suggest any opinions on my part as to the verdict you should render, or whether any of the witnesses may have been more credible than any other witnesses. You are expressly to understand that the court has no opinion as to the verdict you should render in this case.

As to the facts, ladies and gentlemen, you are the exclusive judges. You are to perform

the duty of finding the facts without bias or prejudice to any party.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 71.01, at 71-3 (modified)

### III.   POST-TRIAL JURY INSTRUCTIONS CONTINUED – SUBSTANTIVE LAW

### PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 32

**A.  Introduction Regarding the Applicable Law**

I will now explain the substantive law that is applicable to this case.  The specific law that governs this case has several facets. I will explain each one.  [In an effort to assist you in reaching your verdict, your verdict in this case will be in the form of a series of questions to be used by you in the jury room, principally by "Yes" or "No" answers.  I ask the court deputy to distribute this special verdict form to you now with the thought that it may help you to follow the instructions I am about to give you.]

*Authority*:  4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 71.01, at 71-2 (modified)

**B.  RICO Claims**

Plaintiffs claim in Counts I-II that defendants Verschleiser, Multi Group, Del Forno, Pinhasi, and Onica, later joined by Veen, Svisch, Merchansky, Akerman, and one or more Doe defendants, have violated section 1962(c) and (d) of the federal statute commonly known as RICO.  The plaintiff must establish by a preponderance of the evidence every element of each of his or its RICO claims.  You should consider each and every element of a RICO cause of action only in the precise way that I will define them in these instructions. You must avoid confusing any of the elements of a RICO claim with your prior conceptions of the meaning of the terms that are used to describe the elements of a RICO claim.

Although RICO uses the terms "racketeer," "racketeering," and "corrupt organizations," Congress did not mean that the plaintiff must prove that each or any of defendants Verschleiser, Multi Group, Del Forno, Pinhasi, and Onica is a "racketeer" or a member of what is commonly referred to as "organized crime" in order to recover damages.  Those concepts do not apply in

71

this case. Likewise, you should not assume that any of those defendants is a "racketeer" because they been sued under RICO.

In addition, mere violations of the law are not enough to establish a violation of RICO. The plaintiff must prove each element of a RICO violation as those elements will be explained to you.

*Authority*: 3B Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 161:01 (modified); 3B Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (5th ed.) § 161:20 (portions also applicable to section 1962(c)) (modified); § 161:20 is much more extensive in the 5th edition than in the 6th edition, where it covers section 1962(a) only.

### Section 1962(c)

Plaintiffs claim in Count I that defendants Verschleiser, Multi Group, Del Forno, Pinhasi and Onica, later joined by Veen, Svisch, Merchansky, Akerman, and one or more Doe defendants, have violated section 1962(c) of RICO. Section 1962(c) prohibits the conduct of an enterprise through a pattern of racketeering activity. Specifically, under section 1962(c),

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To establish that a defendant has violated section 1962(c), the plaintiff must prove (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.[2] In that regard, the plaintiff must prove each of the following elements by a preponderance of the evidence:

1.    That an "enterprise" existed;

2.    That the enterprise engaged in, or had some effect upon, interstate or foreign

---

[2] *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 667 (S.D.N.Y. 2016)

commerce;

      3.      That the defendant was a person employed by or associated with the enterprise;

      4.      That the defendant knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise; and

      5.      That the defendant did so knowingly and willfully through the commission of two or more predicate acts constituting a pattern of racketeering activity.

A "person" under the law includes any person or entity that is capable of holding a legal or beneficial interest in property. A corporation or limited liability company, for example, is a legal entity that, like a person, is capable of holding a legal or beneficial interest in property.

The term "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. A defendant may be a "person" and one of a number of members of the "enterprise."[3] An association-in-fact enterprise means a group of people who have associated together for a common purpose of engaging in a course of conduct over time. This group of people may include one or more legal entities. This group of people, in addition to having a common purpose, must have an ongoing organization, either formal or informal, and it must have personnel who function as a continuing unit. This group of people does not have to be a legally recognized entity, such as a partnership or corporation. This group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose. This group need not have a name.[4] An enterprise may be, in effect, no more than the sum of the predicate

---

[3] *Cullen v. Margiotta,* 811 F.2d 698, 730 (2d Cir.), *cert. denied,* 483 U.S. 1021 (1987)

[4]*United States v. Bagaric,* 706 F.2d 42, 55 (2d Cir. 1983), *abrogated on other grounds by Natl. Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994)

racketeering acts;[5] proof of those acts may be relied on to establish the existence of the enterprise.[6] An established hierarchy is not essential to the existence of an enterprise.[7]

Plaintiffs claim that an association-in-fact enterprise existed comprised of defendants Verschleiser, Multi Group, Del Forno, Pinhasi, and Onica, later joined by Veen, Svisch, Merchansky, Akerman, and one or more Doe defendants. Plaintiffs claim such enterprise committed various acts of wire or mail fraud in a common effort to harm Frydman and his companies, including United Realty, Prime United and the REIT, by depriving them of customers and other business relationships, and to deceive the public – particularly by making false and fraudulent claims against Frydman and United Realty on fake websites, blogs and other Internet postings – both as part of that mission and independently, including by enterprise members victimizing and fleecing others over more than a 10-year period. Plaintiffs claim that the enterprise's goal has been to cause investors and others not to invest or otherwise do business with Frydman and his companies.

If you find that this was a group of people characterized by (1) a common purpose, (2) an ongoing formal or informal organization, and (3) by personnel who function as a continuing unit, then you may find that an enterprise existed.

"Interstate commerce" includes the movement of goods, services, money and individuals between states or between states and foreign countries.

An enterprise "affects interstate or foreign commerce" if the enterprise either engages in or pursues activities affecting or having a potential effect on commerce between the states or

---

[5] *Bagaric,* 706 F.2d at 55

[6] *United States v. Coonan,* 938 F.2d 1553, 1559-60 (2d Cir.1991)

[7] *U.S. v. Burden,* 600 F.3d 204, 215 (2d Cir. 2010)

between the states and foreign countries. Only a minimal effect or minimal potential effect is required.[8]

"Employed by or associated with" means some minimal association with the alleged enterprise. The defendant must know something about the enterprise's activities as they relate to the racketeering activity, but it is not necessary that the defendant be aware of all racketeering activities of each of the participants in the enterprise.

It is not required that the defendant have been employed by, or associated with, the enterprise for the entire time that the enterprise existed. It *is* required, however, that the plaintiff prove, by a preponderance of the evidence, that at *some* time during the period involved, the defendant in question was employed by, or associated with, the enterprise.

A person cannot be associated with, or employed by, an enterprise, if he, she or it does not know of the enterprise's existence or the nature of its activities. Thus, in order to prove this element, the plaintiff must prove, by a preponderance of the evidence, that the defendant was connected to the enterprise in some meaningful way and that the defendant knew of the existence of the enterprise and of the general nature of its activities.

"Conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise" means that the defendant must have played some part in the operation or management of the enterprise. RICO liability is not limited to those with primary responsibility for the enterprise's affairs; one is liable under RICO if he or it has discretionary authority in carrying out the instructions of the enterprise's principal or principals, or has played some part in directing the enterprise's affairs.[9] The plaintiff is not required to prove that the defendant was a member of

---

[8] *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001)

[9] *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003)

upper management. An enterprise is operated not only by those in upper management, but also by those lower down in the enterprise who act under the direction of upper management.

In this case, plaintiffs claim that defendant Verschleiser was the central figure who controlled the enterprise, assisted by defendants Multi Group, Del Forno, Pinhasi, and Onica, later joined by Veen, Svisch, Merchansky, Akerman, and one or more Doe defendants.

In addition to proving that the defendant played some part in the operation or management of the enterprise, the plaintiff must also prove that there is some meaningful connection between the defendant's illegal acts and the affairs of the enterprise. To satisfy this part of the element, the plaintiff must establish either (1) that the defendant's position in the enterprise facilitated the commission of those illegal acts and that the racketeering acts had some impact or effect on the enterprise, (2) that the acts were in some way related to the affairs of the enterprise, or (3) that the defendant was able to commit the acts by virtue of his or its position, or involvement in, the affairs of the enterprise.

The word "knowingly," as that term has been used in these RICO instructions, means that the action was done voluntarily and intentionally and not because of mistake or accident.

The word "willfully," as that term has been used in these RICO instructions, means that the action was committed voluntarily and purposely, with the specific intent to do something the law forbids. The action must be done with a bad purpose: either to disobey or disregard the law.

A "racketeering activity" or "racketeering act" means, for purposes of this case, an act in violation of the federal wire fraud statute or the federal mail fraud statute. You will be instructed on the law pertaining to these statute(s) to guide you in determining whether the plaintiff has proved by a preponderance of the evidence that a defendant committed one or more violations of

these statutes. A "racketeering activity" or a "racketeering act" may also be referred to as a "predicate act."

A "pattern of racketeering activity" requires that the plaintiff prove that a defendant committed at least two acts of racketeering activity within ten years of each other. The proof of two or more predicate acts does not in and of itself establish a "pattern" under RICO. The two acts need not be of the same kind. For example, the acts may be one act of wire fraud and one act of mail fraud. However, you must find by a preponderance of the evidence that the two acts occurred within the time specified and that each was related to the other so as to constitute a "pattern." Predicate acts are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. A series of wholly separate, isolated or disconnected acts of racketeering activity does not constitute a pattern.

A pattern also requires continuity; besides being related, the predicate acts that are the basis of racketeering activity must amount to, or present, a threat of continued criminal activity.[10] The continuity necessary to prove a pattern can be either "closed-ended continuity," or "open-ended continuity."[11] Plaintiffs claim that they have established both closed- and open-ended continuity.

Closed-ended continuity is demonstrated by predicate acts that amount to continued criminal activity by the defendant. To satisfy closed-ended continuity, the plaintiff must prove a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months do not satisfy this requirement. To establish closed-ended

---

[10] *H.J. Inc. v. Northwestern Bell Tel Co.,* 492 U.S. 229, 237 (1989)

[11] *H.J. Inc.,* 492 U.S. at 241-42

continuity, the plaintiff must provide some basis to conclude that the defendant's activities were neither isolated or sporadic. A period approaching not less than two years suffices to constitute a substantial period of time for closed-ended continuity. For example, periods of 19 or 20 months are sufficient.[12] Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists. The duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendant commits.[13]

To establish open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. Plaintiffs claim that the alleged pattern of racketeering activity has continued on a consistent basis since December 2, 2013, has seen no cessation, and in fact has been escalating with greater frequency over time.

In assessing whether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant. A threat of continuing criminal activity, and thus open-ended continuity, may be established by showing that the predicate acts are part of the enterprise's regular way of doing business, in other words where the predicate acts

---

[12] *Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (2d Cir. 1992), *cert. denied,* 508 U.S. 952 (1993); *see also U.S. v. Veliz,* 623 Fed. Appx. 538, 543 (2d Cir. 2015) (summary order), *cert. denied,* 136 S. Ct. 848 (2016) ("That we have not held a period of less than two years to be sufficient does not mean that such a period is insufficient as a matter of law.....for closed-ended continuity.")

[13] This paragraph is otherwise drawn from *DeFalco*, 244 F.3d at 321

can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.[14]

Plaintiffs have alleged that each of the defendants has committed two or more predicate acts based on violations of the wire fraud or mail fraud statutes, specifically wire or mail fraud via initial computer hacking; via subsequent hacking, via Internet scams, via false advertisement flyers and posters; via additional Internet scams; and via Verschleiser's alleged recruitment of Akerman to steal plaintiffs' proprietary information, causing the loss of such information, as well additional, related acts of wire or mail fraud via sending mass anonymous disparaging email blasts. It is your function to decide whether the plaintiff has proved by a preponderance of the evidence as to each defendant whether that defendant violated either or both of those statutes on two or more occasions, if at all.

The plaintiff satisfies his or its burden if the plaintiff proves by a preponderance of the evidence that at least two of the alleged predicate acts sufficiently related to constitute a pattern were committed by the defendant within the prescribed time.

However, you may not find that the plaintiff has established this element unless you all agree that at least two particular predicate acts were committed by the defendant. It is not enough if some of you think that only predicate acts A and B were committed by the defendant, and the rest of you think that only acts C and D were committed by the defendant. There must be at least two specific racketeering acts that you unanimously find by a preponderance of the evidence were committed by the defendant in order to satisfy this element.

The wire fraud statute, Section 1343 of Title 18 of the United States Code, provides in pertinent part, that:

---

[14] This paragraph is drawn from *DeFalco*, 244 F.3d at 323, and *H.J. Inc.*, 492 U.S. at 242-43

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both....

The mail fraud statute, Section 1341 of Title 18 of the United States Code, provides in pertinent

part, that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, *[shall be guilty of an offense against the laws of the United States]*.

To establish that predicate acts of wire fraud or mail fraud have been committed, the

plaintiff must prove the following by a preponderance of the evidence as to each defendant so

charged:

1. some person or persons willfully and knowingly devised a scheme or artifice to

defraud, or a scheme or artifice for obtaining money or property by means of false pretenses,

representations or promises; and

2. use of the wires or mails to further the scheme or artifice.

The words "scheme" and "artifice" in the wire and mail fraud statutes include any plan or

course of action intended to deceive others, or to obtain, by false pretenses, representations, or

promises, money or property from persons so deceived. However, the plaintiff is not required to

prove that the defendant intended to actually obtain money or property so long as the plaintiff

proves that there was a scheme or artifice to deprive them of money or property.[15] Use of the

---

[15] *Frydman*, 172 F. Supp. 3d 653, 668

wires include, but are not limited to, use of telephones, mobile phones or cellphones[16] or any use of the Internet, such as sending or receiving emails, text messages or instant messages, transmitting or downloading images, or communicating with websites.[17]

To establish fraudulent intent on the part of any person for purposes of the wire and mail fraud statutes, it must be established that such person knowingly and intentionally attempted to deceive another. One who knowingly and intentionally deceives another is chargeable with fraudulent intent, notwithstanding the manner and form in which the deception was attempted. To act with an "intent to defraud" means to act knowingly and with specific intent to deceive, ordinarily for the purpose of causing some financial loss to another, or to bring about some financial gain to one's self. An intent to defraud may be inferred from a defendant's statements or conduct. A "scheme to defraud" under the wire and mail fraud statutes means the use of dishonest methods or schemes and usually signifies the deprivation of something of value by trick, deceit, chicane or overreaching.

A statement or representation is "false" or "fraudulent" within the meaning of the wire and mail fraud statutes if it relates to a material fact and is known to be untrue or is made with

---

[16] Seventh Circuit Pattern Criminal Jury Instructions (2012 ed.), *Wire Communication*, p. 408 (modified); *United States v. Radomski*, 473 F.3d 728, 729 (7th Cir 2007); *accord Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 827 (7th Cir. 2016)

[17] Seventh Circuit Pattern Criminal Jury Instructions (2012 ed.), *Wire Communication*, p. 408 (modified); *United States v. Ferriero*, 2015 WL 7737341, at *20-*21 (D.N.J. Dec. 1, 2015), *aff'd*, 866 F.3d 107 (3d Cir. 2017), citing *United States v. MacEwan*, 445 F.3d 237, 243-46 (3d Cir.), *cert. denied*, 594 U.S. 882 (2006); *Alkhatib v. New York Motor Group LLC*, 2015 WL 3507340, at *13 (E.D.N.Y. June 3, 2015), *report and recommendation adopted in relevant part*, 2016 WL 5660372 (E.D.N.Y. Sept. 30, 2016); *DNJ Logistic Group, Inc. v. DHL Express (USA), Inc.*, 2010 WL 625364, at *6 n.4 (E.D.N.Y. Feb. 19, 2010); *see U.S. v. Skvarla*, 673 Fed. Appx. 111, 113 (2d Cir. 2016) (summary order), *cert denied*, 137 S. Ct. 1119 (2017); *United States v. Harris*, 548 Fed App'x 679, 682 (2d Cir. 2013) (summary order); *SEC v. Straub*, 2016 WL 5793398, at *11 (S.D.N.Y. Sept. 30, 2016) (collecting decisions of various Circuits)

reckless indifference as to its truth or falsity, and is made or caused to be made with intent to defraud. A statement or representation may also be "false" or "fraudulent" if it constitutes a half truth, or effectively conceals a material fact, with intent to defraud. A material fact is a fact that would be important to a reasonable person in deciding whether to engage in a particular transaction. Good faith constitutes a complete defense to wire or mail fraud. Good faith means the actor had a genuine belief that the information which was sent or given was true.

It is not necessary that the plaintiff prove:

1.    All of the details concerning the precise nature and purpose of the scheme, or

2.    That the particular wire or mail communication or material wired or mailed was itself false or fraudulent, or

3.    That the alleged scheme actually succeeded in defrauding anyone, or

4.    That the use of the wires or mails was intended as the specific or exclusive means of accomplishing the alleged fraud.

The plaintiff must prove by a preponderance of the evidence that the defendant knowingly and willfully devised or intended to devise a scheme to defraud that was substantially the same as the one alleged by the plaintiff and that the use of the wires or mails was closely related to the scheme in that the defendant either wired or mailed something or caused it to be wired or mailed in an attempt to execute or carry out the scheme. One causes the wires or mails to be used if he does an act with knowledge that the use of the wires or mails will follow in the ordinary course of business, or if he can reasonably foresee such use.

You have heard throughout these instructions references to "knowingly," "willfully," "intentionally," and "recklessly" or "reckless" in relation to various elements of the offenses or predicate acts charged. These terms refer to the state of mind of each defendant. You must

82

decide whether various acts were committed by a particular defendant with a certain state of mind.

You may infer a defendant's state of mind from both the defendant's words and the defendant's actions. The commission of an act may more clearly show defendant's state of mind than defendant's words or explanation uttered long after the act's occurrence.

You may determine a defendant's state of mind based upon the facts and circumstances surrounding the act and any reasonable inferences drawn from those facts and circumstances.

I have previously instructed you as to when an act is done knowingly and when it is done willfully. An act is also done knowingly if the defendant consciously avoided knowledge or deliberately refused to act or investigate where the defendant had an affirmative duty to do so. To be found responsible under this theory, the defendant must have been aware that there was a substantial risk that a certain circumstance existed or that a certain result would occur but the defendant nevertheless disregarded the risk. A substantial risk means a risk that is of such a nature and degree that to disregard it constitutes a gross deviation from the standard of care that a reasonable person would exercise in such a situation. An act is done intentionally if the defendant has a conscious objective or desire either to engage in the conduct or to cause the result. An act is done recklessly if the defendant is aware of a substantial risk that a surrounding circumstance exists or that a result will occur, but disregards the risk.

Each separate use of the wires or mails in furtherance of a scheme to defraud constitutes a separate racketeering activity. Wire fraud or mail fraud as a racketeering activity may be established without proof that one or more of the defendants personally did every act constituting wire or mail fraud. The law recognizes that, ordinarily, anything a person can do for himself

may also be accomplished by that person through direction of another person as an agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort.

### Section 1962(d)

Plaintiffs claim in Count II that defendants Verschleiser, Multi Group, Del Forno, Pinhasi and Onica, later joined by Veen, Svisch, Merchansky, Akerman, and one or more Doe defendants, have violated section 1962(d) of RICO. Section 1962(d) provides that it shall be unlawful for any person to conspire to violate any of the provisions of, as relevant here, section 1962(c) of RICO.

In order to prove that a defendant violated section 1962(d), the plaintiff must prove by a preponderance of the evidence each of the following elements:

First, that there was an agreement among two or more persons to participate in an enterprise that would affect interstate or foreign commerce through a pattern of racketeering activity;

Second, that defendant knowingly and willfully became a member of that agreement; and

Third, that the defendant or another member of the conspiracy agreed to commit two racketeering acts, as I have defined the term racketeering act for you.

The first element that the plaintiff must prove is that there was an agreement among two or more persons to participate in an enterprise that would affect interstate or foreign commerce through a pattern of racketeering activity. I have previously instructed you as to the meaning of a "person," an "enterprise," "interstate commerce," "affecting interstate or foreign commerce," "racketeering activity," and "a pattern of racketeering activity."

A "conspiracy" is an agreement among two or more persons to achieve an unlawful object. To show a conspiratorial agreement, the plaintiff is not required to prove that two or

more persons entered into a solemn pact, but only that two or more persons explicitly or implicitly came to an understanding to achieve the specified unlawful object, whether they were successful or not.

In this case, the unlawful act is the formation of an enterprise whose activities would affect interstate or foreign commerce through a pattern of racketeering activity.

However, with respect to a conspiracy, the plaintiff is not required to prove that the enterprise actually came into existence as long as he or it proves that if the objective of the conspiracy had been achieved, the enterprise would have been established.

As with the enterprise element, it is not required that the plaintiff prove that the enterprise actually affected interstate or foreign commerce as long as he or it proves that if the objective of the conspiracy had been achieved, the enterprise would have affected interstate or foreign commerce.

In regard to the first element, the evidence in the case need not show that the alleged members of the conspiracy entered into any express or formal agreement, or that they directly stated between themselves the details of the scheme and its object or purpose or the precise means by which the object or purpose was to be accomplished. Similarly, the evidence in the case need not establish that all of the means or methods alleged were in fact agreed upon to carry out the alleged conspiracy, or that all of the means or methods which were agreed upon were actually used or put into operation. The plaintiff is not required to prove that all of the persons charged with being members of the conspiracy were such or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

The second element the plaintiff must prove is that the defendant whom you are considering knowingly and willfully became a member of the conspiracy.

If you are satisfied that the conspiracy alleged existed, you must next ask yourselves who the members of that conspiracy were. In deciding whether the defendant whom you are considering was, in fact, a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy. Did he or it participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its objective as an associate or worker?

In that regard, it has been said that in order for a defendant to be deemed a participant in a conspiracy, he or it must have had a stake in the venture or its outcome. You are instructed that, while proof of a financial interest in the outcome of a scheme is not essential, if you find that the defendant had such an interest, that is a factor you may properly consider in determining whether the defendant was a member of the conspiracy.

As I mentioned a moment ago, before the defendant can be found to have been a conspirator, you must first find that he or it knowingly joined in the unlawful agreement or plan. The key question, therefore, is whether the defendant joined the conspiracy with an awareness of the basic aims and purposes of the unlawful agreement.

It is important for you to note that the defendant's participation in the conspiracy must be established by independent evidence of his or its own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences that may be drawn from them.

The defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need he or it have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his or

its part. If the plaintiff proves by a preponderance of the evidence that the particular defendant has knowingly and willfully joined the alleged conspiracy it does not matter that the defendant may not have participated in the earlier stages of the alleged conspiracy or scheme.

I want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for the purpose of furthering the illegal undertaking. By such means he or it becomes a knowing and willing participant in the unlawful agreement – that is to say, a conspirator.

The third element that the plaintiff must prove is that the defendant or another member of the conspiracy agreed to commit two racketeering acts.

The focus of this element is on the defendant's agreement to participate in the objective of the enterprise to engage in a pattern of racketeering activity, and not on the defendant's or another conspiracy member's agreement to commit the individual criminal acts. The plaintiff must prove that the defendant participated in some manner in the overall objective of the conspiracy, and that the conspiracy involved, or would have involved, the commission of two racketeering acts. The defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme.[18]  The plaintiff is not required to prove either that the defendant

---

[18] *U.S. v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008), *cert. denied*, 556 U.S. 1130 (2009)

agreed to commit two racketeering acts or that he or it actually committed two such acts, although you may conclude that he or it agreed to participate in the conduct of the enterprise from proof that he or it agreed to commit or actually committed such acts.

For the purposes of this Count, plaintiffs claim that two or more racketeering acts of wire fraud or mail fraud were, or were intended to be, committed as part of the conspiracy, again specifically wire or mail fraud via initial computer hacking; via subsequent hacking, via Internet scams, via false advertisement flyers and posters; via additional Internet scams; and via Verschleiser's alleged recruitment of Akerman to steal plaintiffs' proprietary information, causing the loss of such information.  Again, the plaintiff must prove that two of these acts were, or were intended to be, committed as part of the conspiracy, although he or it need not prove that the defendant committed or agreed to commit any of these acts as long as the plaintiff proves that the defendant participated in some manner in the overall objective of the conspiracy.

Similarly, it is not necessary that the plaintiff prove the defendant committed an overt act in furtherance of the object of the conspiracy.[19]  An overt act is any transaction or event that may be entirely innocent when considered alone, but that is committed by a conspirator in an effort to accomplish some object of the conspiracy.

### Causation

If you find that all of the elements of the alleged violation of section 1962(c) or section 1962(d) or both those sections,[20] as I have just explained those elements to you, have been

---

[19] *Yannotti*, 541 F.3d at 129

[20] *Ruocco v Hemmerdinger Corp.*, 2017 WL 4387184 (2d Cir. Oct. 3, 2017) (summary order) (even without considering jury charge waiver by defendants, defendants can be found liable

established by a preponderance of the evidence, you must also determine the existence of an additional element, whether the plaintiff has proved by a preponderance of the evidence that the violation was the "proximate cause" of an injury to the plaintiff's business or property before you may find for the plaintiff. Either damages proximately caused by the predicate acts themselves or damages proximately caused by the pattern of acts as a whole, or both, will satisfy this requirement. In either case, however, you must find that there was some direct relationship between the injury the plaintiff has asserted and the alleged violation.

The plaintiff is not required to prove that he or it personally relied on misrepresentations by the defendant as long as the plaintiff proves by a preponderance of the evidence that reliance on those misrepresentations by one or more third parties or the public proximately caused the injury the plaintiff has alleged.

An injury or damage is proximately caused when the acts played a substantial part in bringing about or actually causing injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the acts.

A person or entity is injured in his, her or its business when he, she or it suffers loss of money or profits or a reduction in the value or worth of his or its business.

## Damages

You reach the issue of damages only if you find that a plaintiff has established the elements of a RICO violation under section 1962(c) or section 1962(d) or both those sections, under the standards I have described.

---

under RICO conspiracy irrespective of the outcome of substantive RICO claim)

The fact that I instruct you on the issue of damages does not mean that the plaintiff is entitled to prevail – that is for you to decide.  I instruct you on this subject only in the event that you decide that plaintiff has sustained the burden of proof as to the elements of a RICO violation under the standards I have described.

If you find that the plaintiff has established those elements by a preponderance of the evidence, you should then consider the evidence presented concerning damages to the plaintiff's business or property that are alleged to be proximately caused by the defendant's violation of the statute.

The damages alleged by plaintiffs include as follows.  Plaintiffs claim that they and/or their affiliates have had members of the REIT's broker dealer selling group terminate or suspend selling agreements, have had REIT investors redeem their shares of common stock, lost sales of REIT common stock, lost numerous prospective selling agreements, lost numerous prospective REIT investors, the cumulative effect of which allegedly caused the REIT to go out of business, suffered the loss of the REIT, lost real estate or other business opportunities, suffered loss of reputation, lost a certain $4 million transaction agreement with a third party, lost a $1.4 million sublease about to close with Opera Solutions, and suffered other losses.

You must evaluate each claim of damages, and the proof submitted in support of each claim, separately and you should award damages only for those claims that you find have been established by a preponderance of the evidence.

In considering the issue of damages, if any, with respect to the RICO claims, you must assess the amount you find justified by a preponderance of the evidence as full, just and

reasonable compensation for all of the damages to the plaintiffs in their business or property, no more or no less. Damages may not be based on speculation because it is only actual damages, what the law calls compensatory damages, that you are to determine.

The plaintiff may recover only for injury to his or its business or property. Injury to property may include lost profits and expenses incurred in connection with a defendant's RICO violation and decrease in the value or worth of the business or property itself.

Because RICO limits the plaintiff's recoveries to business or property injuries, you may not compensate the plaintiffs on his or its RICO claims for other losses, such as personal injuries or emotional harm. You may, however, compensate for costs the plaintiff incurred in connection with such non-property injuries.

You should consider the amount of damages, if any, as to each defendant with respect to each RICO claim separately and independently from the amount of damages, if any, with respect to the other, non-RICO claims of plaintiffs. For example, and by way of example only, if you determine that damages should be awarded to the plaintiff under his or its RICO claims, you should award full, just and reasonable compensation for damages under the RICO claims, without regard to the damages, if any, you might award under any other claim brought by the plaintiff.

*Authority*: 3B Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) §§ 161:12; 161:13; 161:14; 161:15; 161:25; 161:40; 161:41; 161:42; 161:43; 161:47; 161:51; 161:52; 161:53; 161:54; 161:55; 161:57; 161:58; 161:59; 161:61; 161:70; 161:90 (one or more modified); 3B Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (5th ed.) § 161:20 (portions also applicable to section 1962(c)); 4-84 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 84.04, at 84-24; 84-25; 84-26; 84-28; 84-29; 84-30; 84-31 (one or more modified); 4-84 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 84.05, at 84-34; 84-35, 84-36; 84-37; 84-38; 84-39 (one or more modified), together with the Seventh Circuit Pattern Criminal Jury Instructions and cases cited in the above footnotes to the RICO charges

## C.  CFAA Claims

Plaintiffs claim in Count IIII that defendants Verschleiser, Del Forno, Pinhasi, and Onica

have violated various sections of the federal statute known as the CFAA, specifically sections

1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C), and 1030(a)(6).  The CFAA was originally enacted in

an effort to criminalize and to deter computer hacking, and also provides for civil liability.  In

other words, hacking violates the CFAA.[21]  Plaintiffs claim that the allegations of computer

hacking comprising the first and second claimed RICO predicate acts of wire or mail fraud that I

previously discussed, if proven, also violate the CFAA.

*Authority*: *See* Plaintiff's Proposed Jury Instructions in *Reid-Lamb v. Time Warner*
*Entertainment Co.*, U.S.D.C, W.D.N.C., 3:10-CV-77-FDW (July 1, 2011), Plaintiff's Request for
Instruction No. 16 (with authorities), 2011 Jury Instr. LEXIS 178 at *21-*24 (modified)
(hereafter "*Reid-Lamb* Request for Instruction No. 16")

### Section 1030(a)(2)(C)

To establish his or its claims under section 1030(a)(2)(C) of the CFAA, the plaintiff must

prove by a preponderance of the evidence that one or more of defendants Verschleiser, Del

Forno, Pinhasi, and Onica "intentionally accesse[d] a computer without authorization or

exceed[ed] authorized access, and thereby obtain[ed] . . . information from any protected

computer," resulting in a "loss" during any one-year period aggregating at least $5,000 in

value.[22] "Damage" may result as well.[23]

Under the CFAA, the term "intentionally" means done with the aim of carrying out the

act.

---

[21] *Jet One Group, Inc. v. Halcyon Jet Holdings, Inc.*, 2009 WL 2524864, at *6 (E.D.N.Y. Aug. 14, 2009)

[22] *Estes Forwarding Worldwide LLC v. Cuellar*, 2017 WL 931617, at *4 (E.D. Va. Mar. 9, 2017)

[23] 18 U.S.C. § 1030(g)

Under the CFAA, the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device.

Under the CFAA, an employee accesses a computer without authorization when he or she accesses a computer without permission or makes such access after his or her permission has been rescinded. Authorization of an employee to access a computer ends when the employee is terminated or resigns.[24] The question of "authorization," however, does not turn on an employee's intended use of the information or whether the employee intends to use the information in a manner that is adverse to an employer's interests or policies.

Similarly, under the CFAA, an employee exceeds authorized access whenever that employee accesses a computer "with authorization" and uses "such access to obtain or alter information in the computer that [he] is not entitled so to obtain or alter." An employee does so when he has permission to access certain information on a computer, but accesses other information as to which he lacks permission.[25] Liability, therefore, does not depend on an employee's purpose or intended future use of that information; rather, it is dependent upon the actions of the employer in authorizing access to the information in question.

The phrase "obtain[ed] information" includes merely reading the information. There is no requirement that the information be copied or transported.

---

[24] *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 233 (S.D.N.Y. 2013); *accord Apple Mtge. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 287 (S.D.N.Y. 2016)

[25] *JBC Holdings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 523 (S.D.N.Y. 2013)

Under the CFAA, the term "protected computer" means a computer which is used in or affecting interstate or foreign commerce or communication that affects interstate commerce and/or communication of the United States. Email exchange servers qualify as "protected computers" because the servers can be used in interstate communication.[26] So do computers connected to the Internet, which is the case when email accounts are accessed.[27] So do computers used in conjunction with a business' efforts to conduct sales across state lines.[28]

Under the CFAA, the term "loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of an interruption of service." Among other things, the cost of investigating and identifying a CFAA offense, assessing any damage it may have caused, and determining whether any remedial measures were needed constitutes "loss" under the CFAA.[29] With respect to losses claimed under the CFAA, the plaintiff must show that the losses he or it claims were a natural and foreseeable result and that the costs incurred for such loss were reasonably necessary under the circumstances.

Under the CFAA, the term "damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." The very act of hacking compromises

---

[26] *United States v. Powers*, 2010 WL 1418172, at *4 (D. Neb. Mar. 4, 2010), *report and recommendation adopted*, 2010 WL 1418168 (D. Neb. Apr. 6, 2010)

[27] *United States v. Yucel*, 97 F. Supp. 3d 413, 417-19 (S.D.N.Y. 2015) (collecting cases)

[28] *Patrick Patterson Custom Homes, Inc. v. Bach*, 586 F. Supp. 2d 1026, 1032 (N.D. Ill. 2008); *accord Intl. Chauffeured Serv., Inc. v. Fast Operating Corp.*, 2012 WL 1279825, at *3 (S.D.N.Y. Apr. 16, 2012)

[29] *Univ. Sports Pub. Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 388 (S.D.N.Y. 2010)

the integrity and availability of data.[30]

Plaintiffs claim that defendants Verschleiser, Del Forno, Pinhasi and Onica (i) intentionally and knowingly accessed plaintiffs' computers connected to the Internet without authorization or in excess of authorization and obtained information from those computers, resulting in or causing losses during any one-year period aggregating at least $5,000 in value and damage. In that regard, plaintiffs claim that those defendants acted without authorization after their employment with United Realty ended and their permission to access such computers had been terminated, using Frydman's password credentials or their former password credentials to gain access; that Del Forno also acted without authorization during such employment starting with when he first became disloyal to the company; that Del Forno also exceeded his authorization during such employment in accessing Frydman's or other employees' emails, because he was expressly not authorized to access their email accounts, and thereby became disloyal to the company; that Del Forno further exceeded his authorization during such employment in that he was never authorized to use his authority, when he had same, to alter, copy, distribute, disclose to persons outside of United Realty, or delete any electronic communications, attachments, data, information, trade secrets or the like, and thereby also became disloyal to the company; and that the foregoing conduct resulted in, among other things, defendants' blocking plaintiffs' email and server access, and accessing and deleting information from employee email accounts. Also in that regard, plaintiffs claim that defendants obtained information or something of value when (i) Verschleiser, with the assistance of Del Forno, Pinhasi and Onica, allegedly created multiple backups of United Realty's email data and trade secrets, downloaded, copied and then deleted all of that data from its email exchange server; and

---

[30] *Orbit One Commc'ns, Inc.* v. *Numerex Corp.*, 692 F. Supp. 2d 373, 386 (S.D.N.Y. 2010)

(ii) Verschleiser, with the assistance of Del Forno, Pinhasi and Onica, allegedly learned of a $1.4 million sublease transaction on which United Realty and Opera Solutions were about to close and torpedoed the deal with his otherwise anonymous email to Opera Solutions that disparaged Frydman and his businesses and encouraged Opera Solutions not to go forward.

Plaintiffs claim that as a result of defendants Verschleiser, Del Forno, Pinhasi and Onica's conduct, they suffered loss by (a) incurring costs to investigate and otherwise respond to defendants' offenses, conduct a damage assessment and restore conditions prior to the offenses, including hiring several external computer investigation or IT consulting firms and spending many hours of valuable time away from day-to-day responsibilities assisting in investigating the offenses; and (b) incurring lost revenue, cost or other consequential damages because of the interruption of service due to blocking plaintiffs' email and server access. Plaintiffs further claim that as a result of those defendants' conduct, they suffered damage from the deletion of files, data and other information, including the value of such information and the development costs of recreating it.

*Authority*: *Reid-Lamb* Request for Instruction No. 16 (modified); Jury Instructions in *Denarii Sys. v. Arab*, U.S.D.C., S.D.FL., 1:12-cv-24239 (Aug. 7, 2014), Jury Instruction No. 13, 2014 Jury Instr. LEXIS 229, at \*9-\*10 (modified); Parties' Jointly Proposed Jury Instructions in *Fiber Sys. Int'l v. Roehrs,* U.S.D.C, E.D. Tex., 4:04-CV-355-MHS (March 4, 2005), Joint Requested Instruction No. 6, 2005 Jury Instr. LEXIS 152, at \*14-\*18 (modified) (hereafter "*Fiber Sys.* Joint Requested Instruction No. 6"), together with the cases and statutory authority cited in the above footnotes to section 1030(a)(2)(C)

### Section 1030(a)(4)

To establish his or its claims under section 1030(a)(4) of the CFAA, as relevant here, the plaintiff must prove by a preponderance of the evidence that the defendant "knowingly and with intent to defraud, accesses[d] a protected computer without authorization, or exceed[ed] authorized access, and by means of such conduct further[ed] the intended fraud and obtain[ed]

anything of value," causing a loss during any one-year period aggregating at least $5,000 in value.[31] "Damage" may result as well.[32]

Under the CFAA, the term "knowingly" means that the act was done voluntarily and intentionally, and not because of mistake or accident.  You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of the fact.

Under the CFAA, the phrase "intent to defraud" simply means intent to commit wrongdoing.[33]

The terms "protected computer," "without authorization," exceeds authorized access," "loss," and "damage" each has the same meaning that I previously instructed you with respect to section 1030(a)(2)(C) of the CFAA.

Here, plaintiffs claim that they suffered the same alleged loss and damage that I mentioned with respect to section 1030(a)(2)(C).

*Authority*: *Fiber Sys.* Joint Requested Instruction No. 6 (modified), together with the cases and statutory authority cited in the above footnotes to section 1030(a)(4)

### Section 1030(a)(5)(C)

To establish his or its claims under section 1030(a)(5)(C) of the CFAA, the plaintiff must prove by a preponderance of the evidence that one or more of defendants Verschleiser, Del

---

[31] *Estes Forwarding, supra*

[32] 18 U.S.C. § 1030(g)

[33] *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 892 (N.D. Cal. 2010)

Forno, Pinhasi, and Onica "intentionally accesse[d] a protected computer without authorization, and as a result of such conduct, cause[d] damage and loss" during any one-year period aggregating at least $5,000 in value.[34]

The terms "intentionally," "protected computer," "without authorization," "damage," and "loss" each has the same meaning that I previously instructed you with respect to section 1030(a)(2)(C) of the CFAA.

Also here, plaintiffs claim that they suffered the same alleged loss and damage that I mentioned with respect to section 1030(a)(2)(C).

*Authority*: 18.U.S.C. § 1030(a)(5)(C), together with the case cited in the above footnote to section 1030(a)(5)(C)

### Section 1030(a)(6)

To establish his or its claims under section 1030(a)(6) of the CFAA, as relevant here, the plaintiff must prove by a preponderance of the evidence that one or more of defendants Verschleiser, Del Forno, Pinhasi, and Onica "knowingly and with intent to defraud traffic[ed] in any password or similar information through which a computer may be accessed without authorization, if...such trafficking affects interstate or foreign commerce," resulting in a "loss" during any one-year period aggregating at least $5,000 in value.[35]  Damage" may result as well.[36]

Under the CFAA, the "term "traffic" means "transfer, or otherwise dispose of, to another, or obtain control of with intent to transfer or dispose of."[37]

The terms "knowingly," "intent to defraud," "without authorization," "loss," and

---

[34] *Estes Forwarding*, *supra*

[35] *Estes Forwarding*, *supra*

[36] 18 U.S.C. § 1030(g)

[37] 18 U.S.C. § 1029

"damage" each has the same meaning that I previously instructed you with respect to section 1030(a)(2)(C) of the CFAA.

Plaintiffs claim that De Forno impermissibly disclosed Frydman's password credentials to Verschleiser, who in turn impermissibly disclosed them to Pinhasi and Onica, who in turn impermissibly disclosed them to one or more Doe defendants.

Here as well, plaintiffs claim that they suffered the same alleged loss and damage that I mentioned with respect to section 1030(a)(2)(C).

*Authority*: 18 U.S.C. § 1030(a)(6), together with the case and statutory authority cited in the above footnotes to section 1030(a)(6)

### **Damages**

If you find that the plaintiff has proved that one or more of defendants Verschleiser, Del Forno, Pinhasi, and Onica are liable for a violation of one or more of sections 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C), and 1030(a)(6) of the CFAA, then you must determine what were the plaintiff's damages.

The fact that I instruct you on the law of damages as it relates to a CFAA claim must not be taken as a suggestion that you should find for the plaintiff. It is for you to decide on the evidence presented and the rules of law I have given you whether the plaintiff is entitled to recover from the defendant.

You should determine what were the plaintiff's damages in accordance with (1) the definition of the term "loss" and my other instructions regarding "losses" under the CFAA that I provided in my instructions with respect to section 1030(a)(2)(C) of the CFAA, and (2) the definition of the term "damage" that I provided in those instructions.

**D.     Conspiracy to Violate the CFAA**

Plaintiffs claim in Count IV that defendants Verschleiser, Del Forno, Pinhasi and Onica violated section 1030(b) of the CFAA by conspiring to commit or attempting to commit an offense under either section 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C), or 1030(a)(6) of the CFAA, the elements of which I previously instructed you.

A "conspiracy" is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of "partnership in crime" in which each member becomes the agent of every other member.

To establish his or its claims under section 1030(b) of the CFAA the plaintiff must prove by a preponderance of the evidence that the defendant conspired to commit or attempted to commit an offense under either section 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C), or 1030(a)(6) of the CFAA.

A person attempts to commit such an offense if he (1) knowingly takes a substantial step toward committing the offense, (2) with the intent to commit the offense. The substantial step must be an act that strongly corroborates that the defendant intended to carry out the offense.[38]

To prove a conspiracy as opposed to proving such an attempt, the plaintiff must prove, by a preponderance of the evidence, each of the following:

1.     That a defendant and another person, such as one or more of the other defendants, made an agreement to commit an offense under either section 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C), or 1030(a)(6) of the CFAA); and

2.     That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to advance the unlawful purpose.

---

[38] Seventh Circuit Pattern Criminal Jury Instructions (2012 Ed.), § 409 *Attempt*

One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to prove conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The plaintiff need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme. Similarly, the plaintiff need not prove that all of the details of the scheme were actually agreed upon or carried out. Nor must the plaintiff prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with knowledge that an offense is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator.

*Authority*: Seventh Circuit Pattern Criminal Jury Instructions (2012 Ed.), *18 U.S.C. § 1030(b) ATTEMPT AND CONSPIRACY – ELEMENTS*, p. 378, *Committee Comment*: "...§ 1030(b) of Title 18 proscribes attempts and conspiracies to violate any subsection of § 1030(a). Where the indictment charges an attempt or conspiracy adjust the instruction accordingly, *using relevant elements from the attempt pattern instruction or pattern instruction for conspiracies where an* overt *act is not required*, see the Pattern Instructions 4.09 and 5.08(B), as appropriate" (emphasis added); Seventh Circuit Pattern Criminal Jury Instructions (2012 Ed.), 5.08(B) *CONSPIRACY – NO OVERT ACT REQUIRED*, p. 69 (modified); Fifth Circuit Pattern Criminal Jury Instructions (2012 Ed.), § 2.20 *CONSPIRACY TO COMMIT OFFENSE 18 U.S.C. § 371* (modified to eliminate reference to overt acts), together with the Seventh Circuit Pattern Criminal Jury Instructions cited in the above footnote to the Conspiracy to Violate the CFAA charge

Here too, plaintiffs claim that they suffered the same alleged loss and damage that I mentioned with respect to section 1030(a)(2)(C).

**Damages**

If you find that the plaintiff has proved that one or more of defendants Verschleiser, Del Forno, Pinhasi, and Onica are liable for a violation of section 1030(b) of the CFAA, then you must determine what were the plaintiff's damages.

Here too, you should make that determination in accordance with (1) the definition of the term "loss" and my other instructions regarding "losses" under the CFAA that I provided in my instructions with respect to section 1030(a)(2)(C) of the CFAA, and (2) the definition of the term "damage" that I provided in those instructions.

**E. ECPA Claims**

Plaintiffs claim in Count V that defendants Verschleiser and Del Forno have violated section 2511(1)(a) of the federal statute known as the ECPA, which concerns intercepting communications, and plaintiffs claim in Count VI that Verschleiser has violated section 2511(1)(c) of the ECPA, which concerns disclosing the contents of intercepted communications. Plaintiffs claim that the allegations of computer hacking comprising the first and second claimed RICO predicate acts of wire or mail fraud that I previously discussed, as far as those allegations involve auto-forwarding of emails, if proven, also violate the ECPA. The ECPA is also known as the Wiretap Act, and I will refer to the Wiretap Act instead from time to time. Section 2520(a) of the ECPA provides in pertinent part that "any person whose...electronic communication is intercepted [or] disclosed...in violation of [the Wiretap Act]" may sue for damages.

### Section 2511(1)(a)

For their claims under section 2511(1)(a) of the Wiretap Act, plaintiffs allege that Verschleiser and Del Forno intentionally intercepted plaintiffs' electronic communications. Under section 2511(1)(a), the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

First, that the defendant intercepted a communication;

Second, that the intercepted communication was, as relevant here, an electronic communication, as I will explain that term to you; and

Third, that the defendant acted intentionally.

The first element that the plaintiff must prove by a preponderance of the evidence is that the defendant intercepted a communication.

To intercept a communication means to acquire access to the contents of that communication through the use of any electronic, mechanical, or other device. The interception must be contemporaneous with the communication to violate the Wiretap Act; the automatic forwarding of plaintiffs' emails to one or more of the defendants, if proven, would satisfy this standard.[39]

The second element that the plaintiff must prove by a preponderance of the evidence is that the intercepted communication was an "electronic communication."

An "electronic communication" means any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio,

---

[39] *U.S. v. Szymuszkiewicz*, 622 F.3d 701, 705-06 (7th Cir. 2010) (upholding defendant's conviction under "intercept" provision of ECPA for setting up automatic rule whereby defendant's supervisor's emails were automatically forwarded to defendant's email account); *accord Zaratzian v. Abadir*, 2014 WL 4467919, at *6-*7 (S.D.N.Y. Sept. 2, 2014), *aff'd*, 694 Fed. Appx. 822 (2d Cir 2017)

electromagnetic, photoelectric or photo-optical system that affects interstate or foreign

commerce. To affect interstate commerce, the communications system must have had some

effect on the movement, transportation, or flow of goods, merchandise, information, money and

individuals between or among the states. Email messages satisfy these requirements and are

"electronic communications."[40]

The third element that the plaintiff must prove by a preponderance of the evidence is that

the defendant acted intentionally.

To act intentionally means to act deliberately and purposefully. That is, the defendant's

acts must have been the product of defendant's conscious objective to intercept the

communication in question rather than the product of a mistake or accident.

That does not, however, require any intent to violate the law, or even any knowledge that

the interception would be illegal, nor is an affirmative act required; it is enough to be aware that

such interception is occurring and to fail to stop it.[41]

With respect to section 2511(1)(a) of the Wiretap Act, plaintiffs claim that Verschleiser,

and in at least one instance Del Forno, set up distribution groups and established email

forwarding rules causing emails intended for Frydman and other United Realty employees to be

forwarded to them instead.

*Authority*: 5-92 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 92.01, at 92-1; 92-2; 92-3; 92-6; 92-7 (one or more modified), together with the cases cited in the above footnotes to section 2511(1)(a)

---

[40] *Szymuszkiewicz*, 622 F.3d at 705; *Shefts v. Petrakis*, 2012 WL 4049484, at *9 (C.D. Ill. Sept. 13, 2012)

[41] *Narducci v. Village of Bellwood*, 444 F. Supp .2d 924, 935 (N.D. Ill. 2006), *aff'd*, 572 F.3d 313 (7th Cir. 2009)

### Section 2511(1)(c)

For their claims under section 2511(1)(c) of Wiretap Act, plaintiffs allege that Verschleiser intentionally disclosed the contents of plaintiffs' intercepted electronic communications.

Under section 2511(1)(c), as relevant here, the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

First, that the defendant disclosed to another person the contents of an electronic communication;

Second, that the defendant knew or had reason to know that the contents of that communication had been obtained in violation of the law; and

Third, that the defendant acted intentionally.

The first element that the plaintiff must prove by a preponderance of the evidence is that the defendant disclosed to another person the contents of an electronic communication.

The contents of a communication include any information concerning the substance or meaning of that communication.

The term "electronic communication" has the same meaning that I previously instructed you with respect to section 2511(1)(a) of the Wiretap Act.

The second element that the plaintiff must prove by a preponderance of the evidence is that the defendant knew or had reason to know that the contents of that communication had been obtained in violation of the law.

In order to satisfy this element, the plaintiff must establish that the defendant knew or had reason to know that the information disclosed came from an intercepted communication in violation of section 2511(1)(a) of the Wiretap Act, and that the defendant knew or had reason to

know sufficient facts about the circumstances of that interception to determine that the interception was prohibited by law.

To be liable under section 2511(1)(c), a defendant must know or have reason to know sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of the Wiretap Act.[42]

The third element that the plaintiff must prove by a preponderance of the evidence is that the defendant acted intentionally.

The term "intentionally" has the same meaning that I previously instructed you with respect to section 2511(1)(a) of the Wiretap Act.

With respect to section 2511(1)(c) of the Wiretap Act, plaintiffs claim that Verschleiser disclosed the contents of one or more intercepted communications between United Realty or Frydman and Opera Solutions with his otherwise anonymous email to Opera Solutions referencing the $1.4 million sublease transaction between the parties about to close.

*Authority*: 5-92 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 92.03, at 92-20; 92-21; 92-22; 92-23 (one or more modified), together with the case cited in the above footnote to section 2511(1)(c)

**Damages**

If you find that the plaintiff has proved that one or both of defendants Verschleiser and Del Forno are liable for a violation of section 2511(1)(a) of the Wiretap Act, or that defendant Verschleiser is liable for a violation of section 2511(1)(c) of the Act, then you must determine what were the plaintiff's actual damages.

---

[42] *Zaratzianr*, 2014 WL 4467919, at *10 (collecting cases)

106

The fact that I instruct you on the law of damages as it relates to a Wiretap Act claim must not be taken as a suggestion that you should find for the plaintiff. It is for you to decide on the evidence presented and the rules of law I have given you whether the plaintiff is entitled to recover from the defendant.

In determining what were the plaintiff's actual damages, you should add together first, any damages that the plaintiff suffered as a direct result of the defendant's wrongful actions, and second, any profits made by the defendant as a direct result of those wrongful actions.

The burden is on the plaintiff to prove the amount of actual damages by a preponderance of the evidence. Plaintiffs claim that they suffered at a minimum the loss of the $1.4 million sublease transaction between United Realty and Opera Solutions.

You may assess as damages whichever is the greater of—

(A) the sum of the actual damages suffered by the plaintiff, including any profits made by the defendant as a direct result of his wrongful actions; or

(B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.[43]

Statutory damages under the Wiretap Act are calculated based upon the number of days the violation has occurred. To calculate statutory damages, you are to employ a two-step process. First, you must determine whether the plaintiff has proved that Verscheiser and/or Del Forno's violation or violations of the Wiretap Act occurred on more than or less than one hundred days. If you find that the plaintiff has proved that the violation of section 2511(1)(a) or section 2511(1)(c) occurred on less than one hundred days, then the statutory damages would be $10,000 for that category of violation. If you determine that the violation of section 2511(1)(a)

---

[43] 18 U.S.C § 2520(c)(2)

or section 2511(1)(c) occurred on one hundred or more days, then the statutory damages would be $100 for each day that a violation took place for that category of violation.

*Authority*: 5-92 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 92.01, at 92-9 (modified), together with the statutory authority cited in the above footnote to this damages section

### Punitive Damages

If you find that the plaintiff has proved that one or both of defendants Verschleiser and Del Forno are liable for a violation of section 2511(1)(a) of the Wiretap Act, or that defendant Verschleiser is liable for a violation of section 2511(1)(c) of the Act, then you have the discretion to award punitive damages in addition to compensatory damages.

The damages with you so far are compensatory, because they are intended to compensate for injury suffered by the plaintiff. In addition, the plaintiff asks that you award punitive damages. Punitive damages may be awarded to punish a defendant who has acted wantonly, recklessly or maliciously. You may award punitive damages only if the plaintiff proves by a preponderance of the evidence that the defendant's conduct was wanton, reckless, or malicious. An act is wanton or reckless if it is done in such a manner and under such circumstances as to reflect utter disregard for the potential consequences of the act on the safety or rights of others. An act is malicious if it is wrongful and done intentionally without just cause or excuse and as a result of ill will or evil motive.

The awarding of punitive damages is within your discretion – you are not required to award them. Punitive damages are appropriate only for especially shocking and offensive misconduct. You may impose punitive damages against one or more of the defendants, but not necessarily all of them, or against one or more of them in different amounts.

*[If the jury decides to award punitive damages, the court should proceed to charge the jury on the factors it should consider in determining the amount of punitive damages, which appear below.]*

In arriving at your decision as to the amount of punitive damages you should consider the following factors:

1.      The nature and reprehensibility of what the defendant did. That would include the character of the wrongdoing; whether the defendant attempted to conceal or cover up his wrongdoing; whether the defendant demonstrated an indifference to, or a reckless disregard of, the rights of others; whether the acts were done with an improper motive; whether the acts constituted outrageous or oppressive intentional misconduct; how long the conduct went on; and the defendant's awareness of what harm the conduct caused or was likely to cause. In considering the amount of punitive damages to award, you should weigh this factor heavily.

2.      The actual and potential harm created by the defendant's conduct. The amount of punitive damages that you award must be both reasonable and proportionate to the actual and potential harm suffered by the plaintiff, and to the compensatory damages you awarded the plaintiff.

3.      The defendant's financial condition and the impact your punitive damages award will have on the defendant.

*Authority*: 5-92 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 92.01, at 92-10 (modified); N.Y. Pattern Jury Instr.--Civil 3:34A (modified)

## F.      SCA Claims

### Section 2701(a)

Plaintiffs claim in Count VII that defendants Verschleiser, Del Forno, Pinhasi, and Onica violated section 2701(a) of the federal statute known as the SCA, which concerns unlawfully

accessing stored communications, by illegally accessing the United Realty email exchange server hosted by Intermedia, and thereby obtained, altered or prevented access to plaintiffs' emails. Hacking violates the SCA.[44]  Plaintiffs claim that the allegations of computer hacking comprising the first and second claimed RICO predicate acts of wire or mail fraud that I previously discussed, if proven, violate the SCA as well.

Section 2701(a) of the SCA provides in pertinent part that a person may be liable for damages if he or she:

(1) accesses without authorization a facility through which an electronic communication service is provided; or

(2) exceeds an authorization to access that facility;

and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system.

Under section 2701(a), the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

First, that without authorization, the defendant accessed a system through which electronic communication service is provided to others or accessed a system through which electronic communication service is provided to others with authorization, but exceeded that authority in accessing the information in question;

Second, that the defendant obtained or altered or prevented access to a wire or electronic communication while it was in electronic storage in such system; and

Third, that the defendant acted knowingly or intentionally.

---

[44] *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008)

The first element the plaintiff must prove by a preponderance of the evidence is that without authorization, the defendant accessed a system through which electronic communication service is provided or accessed a system through which electronic communication service is provided with authorization, but exceeded that authority in accessing the information in question, in other words, that the defendant had access to the electronic communication service, and used that access to obtain or alter or destroy an electronic communication that the defendant was not entitled to obtain or alter or destroy.

An "electronic communication service" means any service that provides to users the ability to send or receive wire or electronic communications.  An Internet service provider, known as an ISP, or other network service provider is an "electronic communication service."[45]  So is a provider of email services,[46] through an email server.[47]  A system or facility through which electronic communications service is provided includes an email server.[48]

A "wire communication" is a communication containing the human voice made in whole or in part through the use of facilities for the transfer of communications by the aid of wires, cables, or similar connections at any point between and including the point of origin and the point of reception.

---

[45] *Theofel v Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir.), *cert. denied*, 543 U.S. 813 (2004)

[46] *Garcia v City of Laredo, Tex.*, 702 F.3d 788, 792 (5th Cir. 2012), *cert. denied*, 133 S.Ct. 2859 (2013)

[47] *Cornerstone Consultants, Inc. v Prod. Input Sols., L.L.C.*, 789 F. Supp. 2d 1029, 1049 (N.D. Iowa 2011)

[48] *Cornerstone*, 789 F. Supp. 2d at 1050

The term "electronic communication" has the same meaning that I previously instructed you with respect to section 2511(1)(a) of the Wiretap Act. Again, email messages are "electronic communications."[49]

The second element that the plaintiff must prove by a preponderance of the evidence is that the defendant obtained or altered or prevented access to a wire or electronic communication while it was in electronic storage in the electronic communication service system.

The term "electronic storage" means any storage of a wire or electronic communication by an electronic communication service for purposes of backup protection of that communication. It also includes any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission of that communication. That includes e-mail, text messages, or voice mail sitting in a user's mailbox after it has been transmitted to the intended user but before it has been accessed by that user.

The third element that the plaintiff must prove by a preponderance of the evidence is that the defendant acted knowingly or intentionally.

To act knowingly means to act voluntarily, and not because of ignorance, mistake, accident, or carelessness.

To act intentionally means to act deliberately and purposefully. That is, the defendant's acts must have been the product of the defendant's conscious objective to obtain or to alter or to prevent access, as the case may be, to the communication in question rather than the product of a mistake or accident.

Plaintiffs claim that defendants Verschleiser, Del Forno, Pinhasi and Onica accessed without authorization or in excess of authorization United Realty's email exchange server hosted

---

[49] *Szymuszkiewicz*, 622 F.3d at 705; *Shefts*, 2012 WL 4049484, at *9

by an email service provider, Intermedia, and thereby obtained, altered or prevented authorized access to Frydman's emails and those of other United Realty or Prime United employees. In that regard, plaintiffs make the same claims regarding lack of authorization or acting in excess of authorization, blocking email and server access, and accessing and deleting information from employee email accounts, as they do with respect to their CFAA claims.

*Authority*: 5-92 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 92.04, at 92-26; 92-27; 92-28; 92-2; 92-30 (one or more modified), together with the cases cited in the footnotes to section 2701(a)

### Damages

If you find that the plaintiff has proved that the one or more of defendants Verschleiser, Del Forno, Pinhasi and Onica are liable for a violation of section 2701(a) of the SCA, then you must determine the plaintiff's actual damages.

The fact that I instruct you on the law of damages as it relates to a section 2701(a) claim must not be taken as a suggestion that you should find for the plaintiff. It is for you to decide on the evidence presented and the rules of law I have given you whether the plaintiff is entitled to recover from the defendant.

In determining the amount of the plaintiff's actual damages, you should add together first, any damages that the plaintiff suffered as a direct result of the defendant's wrongful actions, and second, any profits made by the defendant as a direct result of those wrongful actions.

The burden is on the plaintiff to prove the amount of actual damages by a preponderance of the evidence. Plaintiffs claim that they suffered at a minimum the following: the same alleged loss and damage that I mentioned with respect to section 1030(a)(2)(C) of the CFAA; the loss of the $1.4 million sublease transaction between United Realty and Opera Solutions; and damages stemming from defendants Veschleiser, Del Forno, Pinhasi and Onica's use of the contents of

illegally accessed electronic communications so that Verschleiser could create, or cause to be created, the fake websites, blogs and other Internet postings that are the subject of the third and fifth RICO predicate acts of wire or mail fraud, including without limitation through use of photos of Frydman and information about United Realty that was not available on its website.

If the plaintiff has not shown actual damages, you may award statutory damages.[50]

The SCA provides that an award of statutory damages must not be less than one thousand dollars for each violation of the SCA.[51] The plaintiff must show by a preponderance of the evidence the number of violations of section 2701(a) that occurred, that is, one violation for each unauthorized access or access exceeding authorization.[52] If you find that one or more of defendants Verschleiser, Del Forno, Pinhasi, and Onica violated section 2701(a), you must determine the number of times each such defendant violated that section.

*Authority*: 5-92 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 92.04, at 92-31 (modified), together with the statutory authority and case cited in the above footnotes to this damages section

### Punitive Damages

If you find that the defendant is liable for unlawfully accessing stored communications, then in addition to compensatory damages, you have the discretion to award punitive damages in the manner in which I instructed you with respect to plaintiffs' ECPA claims.

*Authority*: 5 L. Sand et al., Modern Federal Jury Instructions (Civil), ¶ 92.04, at 92-32 (modified)

---

[50] *E.g., Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 759 F. Supp. 2d 417, 428-29 (S.D.N.Y. 2010)

[51] 18 U.S.C. § 2707(c)

[52] *Pure Power Boot Camp*, 759 F. Supp. 2d at 429

## G. Libel Claims

### *Libel Per Se*

In Counts VIII and X, plaintiffs claim that Verschleiser committed libel per se, which is a type of defamation. A libel is a writing or broadcast which tends to expose the plaintiff to public hatred, contempt, ridicule or disgrace. A writing or broadcast constitutes libel per se if it charges the plaintiff with committing a serious crime; or if it tends to injure the plaintiff in his, her or its trade, business or profession; or if it imputes serious sexual misconduct to the plaintiff; or if it states that the plaintiff has a loathsome disease.[53] An accusation of theft or stealing constitutes a charge of committing a serious or indictable crime.[54] A writing or broadcast imputing fraud, dishonesty, untrustworthiness, misconduct, unfitness or incompetence in connection with a person's profession or a company's business with reference to his, her or its methods of carrying on business constitutes libel per se.[55] Also, statements in lawsuits or communications with regulators (such as the SEC) made maliciously and solely for the purpose of defaming the plaintiff are actionable as defamatory,[56] and constitute libel per se if they fall into one or more of the categories of libel per se I just described. The plaintiff need not prove special damages, that is, specific financial loss, if a writing or broadcast constitutes libel per se.[57]

In Count VIII, plaintiffs claim that in early February 2015, defendant Verschleiser had

---

[53] *Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 860 (1992)

[54] *O'Diah v. Yogo Oasis*, 954 F. Supp. 2d 261, 275 (S.D.N.Y. 2013)

[55] *See Pearlman v. NYP Holdings, Inc.*, 2015 WL 2232335, at *2 (Sup. Ct. N.Y. Co. May 11, 2015) (citing inter alia *Kotowski v. Hadley*, 38 A.D.3d 499, 500, 833 N.Y.S.2d 103, 105 (2d Dept. 2007); 43A N.Y. Jur. 2d *Defamation and Privacy* §§ 51-52

[56] *Frydman*, 172 F. Supp. 3d at 672 (citing inter alia *Williams v. Williams*, 23 N.Y.2d 592, 298 N.Y.S.2d 473 (1969))

[57] *Liberman*, 80 N.Y.2d at 435, 590 N.Y.S.2d at 860-61

Akerman commence a baseless, sham state court action against Frydman, *Akerman v. Frydman*,
fabricating a claim that he acted as a whistleblower rather than a thief and falsely asserting that
Frydman committed various acts of misconduct. Plaintiffs claim that Verschleiser did so in
order to disseminate the lawsuit's alleged defamatory statements against Frydman and his
companies to the public and the press. Plaintiffs claim that similarly, in mid-February 2015,
Akerman, acting at Verschleiser's direction and using information supplied by him,
manufactured claims against Frydman concerning a nominal transaction that occurred almost
two years earlier. Plaintiffs claim that Akerman did so in a scathing whistleblower complaint
against Frydman and the REIT in a letter to the SEC Office of the Whistleblower, on which he
copied 17 third parties, including the IRS, FINRA, the REIT's accounting firm Ernst & Young,
the REIT's law firm Proskauer Rose, REIT industry due diligence firms Fact Right and
Buttonwood Investment Services, Brock Capital, and the Department of the Treasury.
Plaintiffs claim that just a week later, however, Akerman discontinued his lawsuit with prejudice
and retracted his whistleblower letter based on misrepresentations made to him by Verschleiser.
Plaintiffs claim that Verschleiser had Akerman send his whistleblower letter in order to
disseminate the letter's allegedly defamatory statements against Frydman and his companies to
the public and the press.

In Count X, which is also for libel per se, plaintiffs claim that Verschleiser (i) sent,
created, put up, made or disseminated emails, websites, reports, blogs, social media and other
posts on the Internet, flyers and posters that were defamatory in the course of the second through
fifth claimed RICO predicate acts of wire or mail fraud that I previously discussed; (ii) sent
emails sent under Verschleiser's own name on various occasions after December 2013 that were
defamatory; and (iii) sent mass anonymous email blasts to REIT investors, selling group

members and prospective selling group members, and others in May and June 2015 that were

defamatory that I previously discussed.

With respect to Count XIII, plaintiffs claim that the following statements in the complaint

filed February 6, 2015 or amended complaint filed February 9, 2015 in the *Akerman v. Frydman*

lawsuit are defamatory and that each constitutes libel per se:

a.  at para. 39(e) of the complaint: "Frydman has taken business assets for personal use";

b.  at para. 40 of the complaint: "Frydman is (a) insolvent and (b) judgement-proof";

c.  at para. 42 of the complaint: "Frydman and Gould were under investigation by FINRA";

d.  at para. 43 of the complaint: "[Akerman] sought...to prevent further fraud and misappropriation of investor and public funds [by Frydman]";

e.  at para. 57 of the complaint: "Frydman...by improperly retaining monies due to [Akerman], ...wrongfully exerted dominion and control over [Akerman]'s property"

f.  at para. 32 of the amended complaint: "Between the dates of March 31, 2014 and October 31, 2014, there were numerous transactions by or directed by...Frydman that were...in some instances, in complete violation of law";

g.  at para. 42(e) of the amended complaint: "Frydman has taken business assets for personal use";

h.  at para. 43 of the amended complaint: "Frydman is (a) insolvent and (b) judgment proof";

i.  at para. 45 of the amended complaint: "Frydman and Gould were under investigation by FINRA";

j.  at para. 46 of the amended complaint: "[Akerman] sought...to prevent further fraud and misappropriation of investor and public funds [by Frydman]"; and

k.  at para. 60 of the amended complaint: "Frydman...by improperly retaining monies due to [Akerman], ...wrongfully exerted dominion and control over [Akerman]'s property"

Plaintiffs claim that within minutes of the *Akerman v. Frydman* lawsuit being filed,

Frydman received a telephone call from a reporter from *The Real Deal* informing him that the

complaint in that lawsuit had been emailed to the *Real Deal,* which then re-published the

allegations contained in the lawsuit. Plaintiffs claim that Verschleiser emailed the complaint to

the *Real Deal.*

    With respect to Count XIII, plaintiffs also claim that the following statements in the

Akerman whistleblower letter sent on February 13, 2015 are defamatory and that each constitutes

libel per se:

    a.  at page one of the letter: "This fraud, described herein,…was perpetrated by the
       REIT's CEO Jacob Frydman";

    b.  at page 2 of the letter, "Frydman wasted his…the resources of the REIT in his effort
       to cheat [Joseph] Spiezio and [Peter and Mary] Francese out of the property [that
       Spezio bought from the Franceses]";

    c.  at page 3 of the letter: "[T]he REIT does not own the Mortgage [on the property] that
       Frydman put into the REIT in April of 2013 and the investing public is being
       deceived. The SEC must step in to protect the public."

    Plaintiffs claim that less than a week after the whistleblower letter, *Investment News*

republished the allegations contained in the letter and that Verschleiser admitted responsibility

for the letter to Gould, the CLS CEO.

    With respect to Count X, plaintiffs claim that the following statements were made by or

on behalf of Verschleiser, that the statements were defamatory and that each constitutes libel per

se:

    1.  statements in an anonymous email using the pseudonym "informedconsumer" sent on
       February 10, 2014 to Opera Solutions, as follows:

        "….You are about to enter into an agreement with an individual who alledgedly
        [sic] does anything and everything NOT to pay his vendors and or circumvent any
        written agreement he or his affiliated entities have…. Do a google search 'Jacob
        Frydman Fraud'…and think twice…. Speak to ANY ex employee, any ex
        creditor, from bank to local phone company, from office supplies company to
        landlords….Speak not to someone currently doing business with Mr Frydman,
        speak to 3 former companies that did, former employees, or partners that have.
        Be an informed consumer, dont [sic] get hurt."

    2.  the same statements in a second anonymous email using the pseudonym
       "informedconsumer" sent on February 10, 2014 to Bancorp, which was a bank
       allegedly from which plaintiffs were seeking a business loan.

3.  statements in an anonymous email using the pseudonym "Friends of Eli@gmz.com" sent on February 24, 2014 to Gould, as follows:

> "Look at Eli's letter terminating Jacob…Be careful – you might want to exit before the sexual harassment suits…all coming!"

4.  the subheadline and statements in a March 21, 2014 report posted on ripoffreport.com with the headline "Jacob Frydman" and subheadline, "Jacob Frydman, Jake Frydman, Jake the snake Frydman, Jacob A Frydman, United Realty Partners, United Realty Trust,…Master of deception, Megalomaniac, Scam, Fraud, Thief, Criminal, Ponzi," as follows:

> **"Jacob Frydman** is trying to raise money from the public through a Non Traded REIT, **United Realty Trust**. He has induced many to work for his failing company by promising them stock as an incentive which he never delivers. His partner who funded the company resigned and sued him for stealing and fraud. Jacob Frydman will wine you, dine you, then screw you. He does not pay his bills, even the smallest of them. He will not reimburse you. He will sign documents and then completely ignore and define them to his liking. Look closely at his track record. You will see the truth by doing some simple homework on Jacob Frydman or the dozens of failed businesses and companies he has created every few years and over the course of his career. He may have one or two success stories, but when digging deeper the truth of the success is ultimately uncovered as a failure. Can it be a scam? Is it like Madoff on a small scale? Is there a fraud taking place? How many banks are screwed? Is there a criminal hiding within? Protect yourself as the poor innocent people get hurt daily in this fictitious world of Wall Street wannabes. Ask your lawyer to do the homework before investing with any suspect."

5.  statements in an April 12, 2014 post on complaintsboard.com, as follows: "[Jacob Frydman and United Realty] will not return your money when you ask for it back. be aware. look up the ceo jacob frydman and it seems like he is not honest or a wall street thief."

6.  the title of and screenshot and statements in an April 12, 2014 report posted on ScamGuard.com about the REIT entitled "They take your investment in the stock they sell and then dont [sic] let you get the money back," using the name and mark of United Realty without permission, containing a screenshot of the REIT's website with a pair of hands emblazoned on it pulling plugs on either side of buildings depicted on the website, as follows:

> "This company is supposed to be public and audited by earnst [sic] and young. they promise to give you your money back and when you request it they say you can not get it back. it is a non- traded reit that i now see has many problems. i will call the sec to complain. Please help me it is all of my retirement money."

7.  a statement in an April 14, 2014 post on reitwrecks.com as follows:

> "i searched Jacob Frydman and see fraud cases with this ceo of United Realty."

8. the title of and statements in the second of two claimed letters from Verschleiser to Frydman dated November 29, 2013, the first of which is entitled "Notice of [Frydman's] Removal" and the second of which purports to terminate Frydman's employment, attached to an April 14, 2014 email sent by Verschleiser under his own name to David Newman, whom plaintiffs allege was an independent director of the REIT, stating, "I was told that I should share this with you as it is likely to become a very public story in the near future. It seems apparent that the board is unaware of any of this….," as follows:

that Frydman:

(i) "failed to adequately perform [his] duties to [United Realty]";

(ii) "ma[de] unauthorized distributions to [him]self";

(iii) was "involved in possible fraud with respect to certain written disclosures made to the Securities and Exchange Commission";

(iv) "made fraudulent representations and fraudulently induced certain investors, including Mr. Alan Stahler, to make loans to [United Realty]";

(v) had "wrongful and unlawful control of…CLS";

(vi) was involved in "potential fraudulent activity in connection with a transaction referred to as the Parker Note…wherein [Frydman] wrongfully transferred property into the REIT in order…to continue to qualify as a public REIT";

(vii) "further damaged [United Realty] and/or its affiliates by [his]… transfer…of [a bad and debilitating] asset [that] had no actual beneficial impact on [United Realty] and/or its affiliates";

(viii) "conspire[ed] to defraud investors";

(ix) "made materially dishonest representations of fact at public conventions and conferences with regard to the size and structure of [United Realty] and/or its affiliates";

(x) "offer[ed] a sham Stock Incentive Plan [to employees]";

(xi) "wrongfully entered into employment agreements with certain employees, including Mr. Sam Akabas, Ms. Catherine Larson, and Mr. Rick Vitale";

(xii) engaged in "morally reprehensible conduct…that involved …sexist condescending and vulgar sexual references";

(xiii) "demonstrated…morally unacceptable behavior in having certain employees, by example and not by limitation, Ms. Twighlight Johnson,

> dress more provocatively and solicit potential investors by offering to meet in person";
>
> (xiv) "breached [his] fiduciary duty to [United Realty]";
>
> (xv) "[committed] willful acts of misconduct or gross neglect in the conduct of [his] duties to [United Realty]"; and
>
> (xvi) "[was]...terminated...[as an] employ[ee]...[of United Realty]...effective immediately"

9.  statements in the first of the claimed two letters from Verschleiser to Frydman dated November 29, 2013 as far as being the same or substantively identical statements as in items 3(ii)-(xv) that I just mentioned, and also as follows:

> "[Frydman was] remove[d] as a Manager [of United Realty Advisor Holdings, LLC] for Cause, effective immediately."

10. a statement in an April 17, 2014 report posted on ripoffreport.com, as follows:

> "Jacob Frydman will do anything to hurt anyone."

11. statements in an April 17, 2014 *The Real Deal* article entitled "Feud between United Realty CEO and ex-president turning ugly," as follows:

> "In a written statement to *The Real Deal,* Verschleiser noted: 'He [Frydman] lost in court and the judge did not award him the injunction. I ultimately decided to resign as the President and Treasurer of United Realty Trust due to the fraud and actions of my ex-partner Mr. Jacob Frydman as outlined in my lawsuits against him.'

12. the titles of and statements in a June 27, 2014 post on a blog on wordpress.com entitled "jacobfrydmanfraud" and "FRAUD ALERT" using the likeness (a photo) and name of Frydman allegedly without permission, as far as containing the following immediately under the photo:

> "Biggest real estate FRAUD man – Jacob Frydman."

13. the title of and statements in a June 27, 2014 post on wordpress.com entitled "jacob frydman criminal," using the likeness (a photo) and name of Frydman allegedly without permission, as far as containing the word "FRAUD" emblazoned on the photo and the following below the photo:

> "#Jacob Frydman #Real estate #Fraud #Criminal #Scam # Alert."

14. the title of and statements in a June 28, 2014 post on a blog on blogspot.com entitled "JACOB FRYDMAN SCAM," using the likeness (a photo) and name of Frydman allegedly without permission, as far as containing the following above the photo:

> "Don't Become A Victim Of Real Estate & Mortgage Fraud!! REMEMBER THIS FACE!" and 'FRAUD ALERT."

15. the description of the poster, title of and statements in a June 29, 2014 post on Twitter from "Jacob Frydman @FRAUD_man, Real estate Fraud in NYC STOP Real Estate Fraud!!," entitled "DON'T TRUST THAT SCUMBAG," using the likeness (a photo) and name of Frydman allegedly without permission, as far as containing the word "FRAUD" emblazoned on the photo.

16. the title of, description of the poster and statements in a July 12, 2014 post on reitwrecks.com entitled "United Realty Trust Jacob Frydman Fraud," by "PutJacobInJail," as follows:

> "look into the CEO before giving them money. He clearly has many issues relating to FRAUD. Jacob Frydman of http://www.urpa.com has been sued many times for fraud

> "One lawsuit alleges that Mr. Frydman defaulted on his personal guaranty of a $12 million loan PAF Capital made to McDonald Ave. Acquisition LLC. The suit claims that after defaulting on his guaranty, Mr. Frydman represented to PAF Capital that he could not afford to honor his guaranty and provided PAF Capital with what they now believe are fraudulent financial statements in an effort to get PAF Capital to settle with Mr. Frydman for a significant haircut. He can end up in Jail."

17. the title of, description of the poster and statements in a July 12, 2014 post on reitwrecks.com also entitled "United Realty Trust Jacob Frydman Fraud," by "PutJacobInJail," as follows:

> It is amusing to see that the SEC and FINRA lets a complete fraud take place with a public company http://www.United Realtyrealtytrust.com Jacob Frydman steals old peoples money, has his friends and lawyers on his independent board, then buys notes with other notes and gives it to the public in exchange for cash he NEVER paid for it.

18. the title of and statements in a July 15, 2014 post on scamguard.com entitled "Jacob Frydman and United Realty - Beware: The too good to be true United Realty - Frydman new scam," using the name and mark of United Realty allegedly without permission, containing a screenshot of the REIT's website emblazoned with a pair of hands pulling plugs on either side of buildings depicted on the website, as follows:

> "The CEO has many lawsuits against him especially FRAUD….Jacob Frydman steals peoples [sic] money…."

19. a statement in a July 15, 2014 post on scamorg.com on the message board "United Realty Trust REIT," as follows:

> "The CEO has many lawsuits against him especially FRAUD."

20. a statement referring to Frydman as "a desperate loser" in an August 18, 2014 email from Verschleiser under his own name to Frydman, copied to Daniel Edelman, whom plaintiffs allege was General Counsel for United Realty and Alex Libin, whom

plaintiffs allege was its Associate General Counsel. I will refer to them as Edelman and Libin, respectively.

21. statements commenting about Frydman in an August 28, 2014 email from Verschleiser under his own name to Frydman copied to Edelman and Libin, as follows:

"Pussied out, figured.

"The nature of a pussy is to scratch, yell, and then run away. But here's another that seems to fit the bill as well.

"Noah Webster, in his original 1828 *American Dictionary of the English Language*, defined *pussy* as: 'inflated, swelled; hence, fat, short and thick; and as persons of this make labor in respiration, the word is used for short breathed'. He gave *pursy* as a 'corrupt orthography' or misspelling of *pussy*.... In 1913, however, *Webster's Revised Unabridged Dictionary* reversed the original, suggesting that *pussy* was a 'colloquial or low' variant of pursy. That word, in turn, was defined as 'fat and short-breathed'.

"I get a laugh at all the time and efforts you clearly put into your legal products. Sad for those that are forced to surround you (for the temporary time that they do)."

22. the title of, headline and statements in a September 5, 2014 post on a blog on weebly.com entitled "Jacob Frydman Real Estate Fraud," containing the headline "JAKE THE SNAKE (HTTP://WWW.URPA,COM)," using the likeness (a photo) and name of Frydman allegedly without permission, and containing the following above the photo: "FRAUD ALERT," as follows:

"The CEO Jacob Frydman (AKA Jake The Snake) has many lawsuits against him especially for FRAUD."

23. statements in a second September 5, 2014 post on the blog on weebly.com entitled "Jacob Frydman Real Estate Fraud," as follows:

"Everything in his United Realty Trust prospectus is bullshit. He claims to have a track record. Look closely at each one.

"[H]e is a thief and a con artist[ ]."

24. statements in a third September 5, 2014 post on the blog on weebly.com entitled "Jacob Frydman Real Estate Fraud," as follows:

"As a master in LITIGATION the con man Jake the Snake mobster wanna be Frydman aka Jacob Frydman has so many liens against him because he sues, loses in court and then still fights. the liens he may ultimately settle as a way to get a discount. But the records show it all. From the smallest few hundred dollars to the larger ones where he screws lawyers and lawfirms that represent him."

25. statements in a fourth September 5, 2014 post on the blog on weebly.com entitled "Jacob Frydman Real Estate Fraud," as follows:

> "Dozens of litigations many many with Fraud.  Makes you wonder whats next.

> "Madoff?

> "Jacob Frydman hires lawyers, leases copy machines, gets internet service, hires executives and employees (dozens of them) and SCREWS them ALL.

> "Frydman knows how to use LLC's and corporations to hide his fraud and deception….

> "Jake has screwed dozens of banks and lenders (yes on many properties he bought and they took back, NOT in his SEC documents).

> "There are probably hundreds more in arbitration but just read these and weep and your money is gone."

> "The world will see who Jake really is when he Is in Jail.

> "Jake the Rat Snake Frydman, the story of Greed and Wanna Bees."

26. statements in a September 6, 2014 post on scamorg.com on the message board "United Realty Trust REIT," as follows:

> "This is the Filing the REIT just filed. This means that NONE of the money raised is going to real estate. It means he [Jake Frydman] took out loans, preffered [sic] loans, and outside investors (NOT THE REIT) to buy the property, and put in a few dollars from the REIT.

> "So you ask WHERE IS THE money Jake Frydman raises???????????

> "He pays it to his other companies.

> "United Realty Capital, United Realty Advisors, and all the other United Realty Companies he can suck cash from.

> "READ AND UNDERSTAND THE FINANCIALS OF THIS COMPANY

> "PLEASE PROTECT YOURSELF FROM FRAUD"

27. statements in a September 6, 2014 post on scam.com entitled "United Realty Trust REIT," as follows:

> "The CEO Jacob Frydman (AKA Jake The Snake) has many lawsuits against him **mostly** doing **FRAUD**.

> "If you just write in google search Jacob Frydman Fraud , or Jacob Frydman Lawsuit you will see so many that you will save your money.

> "Please do not get hurt and give them your money.

"You worked for it. Don't let the liar salesman sell you his big return on real estate."

28. the title of and statements in a September 9, 2014 post on reitwrecks.com entitled "Re: United Realty Trust Jacob Frydman Fraud," by United Realty Trust," as follows:

**"Ask Yourself** why the CEO Jacob Frydman http://en.wikipedia.org/wiki/Jacob_Frydman(aka Jake the Snake) has dozens of lawsuits against him for fraud and stealing.

"Dozens of litigations many many with Fraud. Makes you wonder whats [sic] next. Madoff ???? Jake Frydman hires Architects, Contractors, Electricians, and Plumbers etc, for his house he calls Ledge Rock and then sues them all....Why? to scare them and not to pay them. Read these litigations and you will be in shock!

"As a master in LITIGATION the con man Jake the Snake mobster wanna be Frydman aka Jacob Frydman has so many liens against him because he sues, loses in court and then still fights. the liens he may ultimately settle as a way to get a discount. But the records show it all. From the smallest few hundred dollars to the larger ones where he screws lawyers and lawfirms that represent him.

"He hires lawyers, leases copy machines, gets Internet service, hires executives and employees (dozens of them) and SCREWS them ALL. READ the lawsuits.

"There are probably hundreds more in arbitration but just have your lawyer get you a copy of these lawsuits and weep for those that their money is gone already.

"THE PARTIAL LIST (when you read them highlight the word FRAUD....

"Frydman knows how to use LLC's and corporations to hide his fraud and deception....

"Jake has screwed dozens of banks and lenders (yes on many properties he bought and they took back, NOT in his SEC documents).

"The world will see who Jake really is when he is in Jail."

29. the title of and statements in another September 9, 2014 post on reitwrecks.com entitled "Re: United Realty Trust Jacob Frydman Fraud," by United Realty Trust," as follows:

"Everything in his United Realty Trust http://www.urpa.com/bio_frydman.htmlprospectus is bullshit. He claims to have a track record. Look **VERY** closely at each one.

"The DHL building is only fractionally owned by him and he has many lawsuits against him in that deal because he is a thief and a con artist[ ]. He is not "the guy" who did the deal, he just lucked out and owns a share in the deal.

"He pretends to have done the old global crossing building **BUT** once again the guy only got a small piece of the deal as he was at the right place at the right time. He was even sued by the main owners of these two deal BOTH of the DEALS the Majority partners sued him.

"ask yourself, **is my money safe here**?"

30. the title of and statements in another September 9, 2014 post on reitwrecks.com entitled "Re: United Realty Trust Jacob Frydman Fraud," by United Realty Trust," as follows:

"Ask yourself, Do you want to invest with a company [United Realty Trust Inc.] whose CEO [Frydman] has or has had DOZENs of liens against him…?"

31. the title of, headline and statements in a September 12, 2014 post on the blog on weebly.com entitled "Jacob Frydman Real Estate Fraud," containing the headline, "LENDERS SCREWED BY JACOB FRYDMAN," as follows:

"Would a lender make a loan to Jacob Frydman and his United Realty Trust ?

"Many lenders have been alledaagly [sic] screwed by United Realty Trust s CEO Jacob Frydman. MANY."

32. the title of and statements in a September 12, 2014 post on reitwrecks.com entitled "Re: United Realty Trust Jacob Frydman Fraud" by [sic] United Realty Trust," as follows:

"Would a lender make a loan to Jacob Frydman and his United Realty Trust http://www.unitedrealtytrust.com ? Many lenders have been alledaagly [sic] screwed by United Realty Trust s CEO Jacob Frydman. MANY."

**"Ask Yourself** why the CEO Jacob Frydman http://en.wikipedia.org/wiki/Jacob_Frydman(aka Jake the Snake) has dozens of lawsuits against him for fraud and stealing.

"Dozens of litigations many many with Fraud. Makes you wonder whats [sic] next. Madoff ???? Jake Frydman hires Architects, Contractors, Electricians, and Plumbers etc, for his house he calls Ledge Rock and then sues them all....Why? to scare them and not to pay them. Read these litigations and you will be in shock!

"As a master in LITIGATION the con man Jake the Snake mobster wanna be Frydman aka Jacob Frydman has so many liens against him because he sues, loses in court and then still fights. the liens he may ultimately settle as a way to get a discount. But the records show it all. From the smallest few hundred dollars to the larger ones where he screws lawyers and lawfirms that represent him.

"He hires lawyers, leases copy machines, gets Internet service, hires executives and employees (dozens of them) and SCREWS them ALL. READ the lawsuits.

"There are probably hundreds more in arbitration but just have your lawyer get you a copy of these lawsuits and weep for those that their money is gone already.

"THE PARTIAL LIST (when you read them highlight the word FRAUD....

"Frydman knows how to use LLC's and corporations to hide his fraud and deception....

"Jake has screwed dozens of banks and lenders (yes on many properties he bought and they took back, NOT in his SEC documents).

"The world will see who Jake really is when he is in Jail."

33. the title of and statements in a claimed fake LinkedIn account under Frydman's name created on September 24, 2014, entitled "Jacob Frydman SCAM at REAL ESTATE." using the likeness (a photo) and name of Frydman allegedly without permission, with the word "FRAUD" emblazoned on the photo, also as follows:

"Background

"*

"JACOB FRYDMAN - REAL ESTATE FRAUD, SCAM, NYC.

"*
**"CEO**
"Self-employed
"January 2014 * Present (9 months)

**"SCAM**
"REAL ESTATE
"April 2011 * Present (3 years 6 months)

**"SCAMBAG**
"SCAM
"March 2010 * Present (4 years 7 months) | nyc

"Don't Become A Victim Of Real Estate & Mortgage Fraud"

34. the title of and statements in a claimed fake "United Realty Trust Employee Review" on ebosswatch.com posted on September 8, 2014, entitled "United Realty Trust - 'Bad Boss,'" as follows:

"United Realty Partners is run by a fellow named Jacob Frydman who is guaranteed to fire you or push you out within 9 months. Jacob Frydman will never let you do the job you know how to do as he always knows better. There maybe some fraud going on there as well.

"When I was employed at United Realty Partners and CLS Securities (a Broker Dealer owned by Jacob Frydman and his partners) it was nice when Jacob did not

show up or was traveling. those days everyone at our offices was relaxed and also was able to get work done. As soon as Jacob Frydman came in the entire situation went bad. He tried to control everything. Thinking he was the best thing since sliced bread. Also he gets drunk and talks crap to the girls, which is possible sexual harassment."

35. the title of and statements in a second claimed fake "United Realty Trust Employee Review" on ebosswatch.com posted on September 17, 2014, entitled "United Realty Trust – 'Under investigation for Fraud by FINRA and SEC,'" as follows:

"The company is run by a man who has been sued for fraud over 20 times by 20 different parties all in the past 10 years. Jacob Frydman seems to only know how to get by by stealing from others."

36. the title of and statements in a third claimed fake "United Realty Trust Employee Review" on ebosswatch.com posted on October 14, 2014, entitled "United Realty Trust – 'Feel under pressure waiting for FBI to raid the company,'" as follows:

"Everything is a secret amongst the CEO Jacob Frydman and his couple of just graduated law school son in law and other kid. All they are busy with (by seeing what they mistakenly leave on the printer and copy machine) are defending lawsuits for fraud. It's kind of interesting that the Fraud on Wall Street still goes on and nothing is done about it. United Realty Trust has E&Y and a large law firm that represents them. Did anyone do their homework on Jacob Frydman."

37. the title of and statements in a fourth claimed fake "United Realty Trust Employee Review" on ebosswatch.com posted on October 28, 2014, entitled "United Realty Trust – 'A public company with a bad CEO that is likely a target of investigations with the government and the SEC,'" as follows: "If the CEO Jacob frydman would leave it would be wonderful place to work."

38. statements in flyers that plaintiffs claim were distributed on September 15, 2014 to approximately 1,000 convention attendees under their hotel room doors during a nontraded REIT industry conference held at Caesars Palace & Convention Center in Las Vegas at which Frydman would be a speaker, as follows:

"Would you invest with a fraudster?

"Google:

"Jacob Frydman Fraud

"And save yourself from this lowlife.

"Btw, He is the CEO of United Realty Trust"

39. the same statements as the flyers in posters claimed to have been plastered on September 16, 2014 on top of the 35 or more real convention posters hanging throughout the Caesars Palace & Convention Center's public spaces on September

16, 2014 commencing approximately one hour before Frydman's main conference presentation.

I will now describe to you certain contents of several websites, among others, that plaintiffs claim were created by Verschleiser, with the help of Veen, Svisch, Merchansky and one or more of the Doe defendants, and were defamatory. Specifically, the websites are fully developed multi-paged websites containing various sections such as "Home," "Overview," "History," "Team," "Gallery," or "Aliases." The pages for each section contain images of Frydman, stock photography, graphics, and allegedly defamatory statements. Although the websites' layouts vary, they are substantially similar and recycle the same elements throughout — that is, they reuse the same or nearly the same images of Frydman, stock photography, graphics and allegedly defamatory statements.

40. on the website jacobfrydmancriminal.com, which was registered on June 23, 2014 and whose name is allegedly defamatory, in the section entitled "Overview," one or more portions of which are reproduced or substantially reproduced in the "Overview" sections of the following websites, among others: jacobfrydman-thief.com, which was registered on February 17, 2015 and whose name is allegedly defamatory; jacobfrydmanfraud.com, which was registered on February 17, 2015 and whose name is allegedly defamatory; and jacob-frydman.com, which was registered on August 10, 2017, the following appears:

   a. the words "JACOB Frydman *" and the United Realty Trust logo above an image of a woman crying, and the words "*working to hurt you and your family" superimposed over the image. This is reused on jacobfrydman-thief.com in the "JACOB Frydman *" section.

   b. there is a graphic highlighted with the words "Securities Fraud," and a caption stating: "As one of the world's greatest Con-men, Jacob Frydman is the example of *American greed gone mad* in his quest to destroy the hard work and savings of innocent individuals. Jacob Frydman uses his ill got Mansions, NY offices, cars, yachts, planes and lavish lifestyle to perpetuate the continued fraud and abuse of his innocent victims."

   c. below the "Securities Fraud" graphic and caption, the statements:

      "The site will continuously be updated with many details of the individual scams that Jacob Frydman has pulled off. Included will be the ways Jacob Frydman defrauds the common individual, companies, banks, and his own attorneys. Leading accounting firms, investment banks, global law firms

and consultants have all been duped by Jacob Frydman. This page will elaborate on how Jacob Frydman uses a vast network of corporations to defraud the individual unsuspecting person from their hard earned money while leading a wild life on the account of it all.

"Strategy & Operations

"Typically every two – five years Jacob Frydman begins a 'new' chapter. Jacob Frydman historically forms a 'new corporate name' and uses it as his shield from the unsuspecting public. Generally Jacob Frydman pays some money to an unsuspecting party and then has work done for him until that party demands payment. At such time Jacob Frydman sues or threatens to sue the party and tries to negotiate a settlement so as to defraud the unsuspecting party." These statements are substantially reproduced in the "jacob-frydman" section of united-realty-frydman.com, which was registered on December 31, 2017.

"Financing his practices

"Historically Frydman has a third party become his partner and uses their capital connections and sources to inject money into his 'new corporate scheme.' Such projects and practices provides Frydman the cover and resources to meet his ultimate objectives of fraud, deception, manipulation and abuse.

"Closing in on Jacob Frydman

"As the world is becoming smaller with legal research, a private investigator, the IRS, FINRA, the SEC and interviews of many of Jacob Frydman victims, we have uncovered the truth and will continue to reveal the true nature of the Con man, Jacob Frydman the Fraudman. As a former attorney Jacob Frydman left Ohio in a hurry. After defrauding numerous banks and clients Cleveland Ohio was too small to continue the practice of deception…. "

"Complex Structures

"It's a simple way to describe a complex situation, and criminals like Jacob Frydman approach it from multiple angles. Buying real estate in the U.S. has been the preferred method for Frydman to con millions of dollars from investors….Each of the hundreds of lawsuits Jacob Frydman is a participant in has a web of companies and complex structure MOSTLY used for the Fraudman to hide behind." These statements are substantially reproduced in the "jacob-frydman" section of united-realty-frydman.com.

"Lawsuit after lawsuit, Frydman has used the American courts in his daily practice of intimidation, to further his fraud against investors, lenders, employees, partners, family members, and anyone he things he does not want to pay his debts to." This statement is reused in the "Lawsuits"

130

sections of jacobfrydman-thief.com, jacobfrydmanfraud.com and jacob-frydman.com. It is substantially reproduced in the "Lawsuits" section of united-realty-frydman.com.

41. in the section of jacobfrydmancriminal.com entitled "Aliases," one or more portions of which are reproduced or substantially reproduced in the "JACOB Frydman *" section of jacobfrydman-thief.com and the "Home" section of jacob-frydman.com, the following appears:

> a. the words "Jacob Frydman *" and the United Realty Trust logo above an abstract image and the words "*working to hurt you and your family" superimposed over the image.

> b. below the abstract image is the caption that states:

>> "As a prominent Con Artist, Jacob Frydman uses a sophisticated method to Defraud the small business owner, Scam attorneys, Beat the government, Hurt his own employees, Abuse woman [sic], and simply Destroy the common individual, by stealing from everyone in his path."

> c. below the caption are two columns of text, one labeled "Known Aliases used by Frydman to perpetuate his fraud" and the other labeled "Known Addresses used by Frydman to perpetuate his fraud."

42. in the section of jacobfrydmancriminal.com entitled "Home," one or more portions of which are reproduced or substantially reproduced in the same sections of jacob-frydman.com and jacobfrydmanfraud.com and the "jacob-frydman" section of united-realty-frydman.com, the following appears:

> a. the words "Jacob Frydman *" and the United Realty Trust logo above a stock photographic image and the words "*working to hurt you and your family" superimposed over the image.

> b. below the abstract image is the caption that states:

>> "As a prominent **Con Artist, Jacob Frydman** uses a sophisticated method to **Defraud** organizations, **Steal from companies, Scam** attorneys, **Beat** the government, **Hurt** his employees, **Abuse** woman [sic], and simply **destroy** the most *common individual*, and everyone in his path.

>> "The story of a ***Jacob Fraudman.***

>> "Jacob Frydman Fraudman incorporates his sophisticated method of fraud by using the legal system and a corporate shell game. In doing so Frydman has built a huge Twenty Million Dollar home, collected dozens of expensive cars, lead a lavish lifestyle, all with

the stolen money of others. We help individuals protect themselves by uncovering Fraud, Bad acts, Scams, and Abuse by JACOB FRYDMAN a New York based individual that creates new characters of himself through different entities and circles. Currently under the guise of a US Public company called United Realty Trust Jacob Frydman is at it again."

c. there is also an image of a yellow traffic sign with the words "FRAUD ALERT" superimposed on it.

43. in the section of jacobfrydmancriminal.com entitled "History," one or more portions of which are reproduced or substantially reproduced in the same sections of jacobfrydman-thief.com, jacobfrydmanfraud.com and Jacob-frydman.com, the following appears:

a. the words "Jacob Frydman *" and the United Realty Trust logo above a graphic intended to look like a dictionary entry for the word "Fraud" and the words "*working to hurt you and your family" superimposed over the image.

b. below the "Fraud" graphic is the caption that states:

"The Value of history is that it teaches us what Jacob Frydman has done and thus what Frydman is. Jacob A Frydman is a New York based individual that creates new characters of himself through different entities and corporations. Currently under the guise of a US Public company called United Realty Trust, Jacob Frydman is at it again."

c. the section also contains various other graphics that state: "Keep Calm and Boldly Flee"; "Search for the Truth Through Evidence"; "Know Fraud"; "Keep Calm and Run Away"; "Tired of Getting Hurt"; "You Are Being Lied To"; "One Big Lie."

d. the section also contains "A partial list of companies that Jacob Frydman has used to shield his fraud and deceit."

44. in the section of jacobfrydmancriminal.com entitled "Team," one or more portions of which are reproduced or substantially reproduced in the same sections of jacobfrydman-thief.com, jacobfrydmanfraud.com and jacob-frydman.com, the following appears:

a. the words "Jacob Frydman *" and the United Realty Trust logo above an image of birds in flight and the words "*working to hurt you and your family" superimposed over the image.

b. below the image is the caption that states:

"As the countries [sic] longest standing Con-man, Jacob Frydman continues to defraud innocent victims with his superb skills and web of shell companies. Jacob Frydman uses his *ill got* mansion, New York

132

offices, cars, and lavish lifestyle to perpetuate the continued fraud and abuse of his innocent victims."

c. below the caption is a photograph of Frydman with the words "FRAUD ALERT" superimposed over the image.  Below that photograph is another photograph of Frydman with the word "FRAUD" superimposed over the image.  Next to both images are the statements:

"Jacob Frydman, the 'CEO'

"Jacob's professional experience includes over 34 years of unbiased continued fraud resistant to economies, industries and most of all elusive to all government agencies....Frydman acts as the chairman of United Realty Advisors and Cabot Lodge Securities part of a web of companies designed to defraud the public.

"Prior to the United Realty Group of Companies Jacob Frydman successfully conned six million dollars out of William Blair & Co....

"Frydman embarrassed Case Western University as a supposed graduate from its Academy.  Frydman then defrauded many in Cleveland Ohio and ran off to NYC where he currently is based out of.

Jacob Frydman, the 'Attorney'

"Within a few short years he was rejected by [a law] firm for conning his partners into a real estate transaction...

"Jacob Frydman, the 'Restaurateur [sic]'

"If Jacob Frydman, the real estate developer cum restaurateur [sic], and man behind Poughkeepsie's recently opened Bull and Buddha were not a thief, he may have been successful....

"Frydman once again conned innocent people to invest in his failed venture he named Bull and Buddha but was again a quick failure.  Frydman also screwed a Chef Sushi Master....

"Jacob Frydman, the 'Producer'

"Frydman the moron boasted 'I do go to the Emmys, and when we do win, I'm up on the stage.'...No one in Hollywood ever heard the name Jacob Frydman, perhaps he can still go there to defraud some celebrities.

45. in the section of jacobfrydmancriminal.com entitled "Gallery," the following appears:

a. the words "Jacob Frydman *" and the United Realty Trust logo above an image of Frydman and the words "*working to hurt you and your family" superimposed over the image.

b. below the image is the caption which states:

"We have uncovered Fraud, Bad Acts, Scams, and Abuse by a shady person named Jacob Frydman. Jacob A. Frydman is a New York based individual that creates new characters of himself through different entities and circles. Currently under the guise of a US Public company called United Realty Trust Inc. Jacob Frydman is at it again. Look closely at these images." This statement is reused in the "Press" sections of jacobfrydman-thief.com and jacob-frydman.com.

c. below the caption are a series of photographs of Frydman, some with either the words "FRAUD ALERT" or "FRAUD" superimposed over the photograph. Also included in the photo gallery are: a photograph of Bernard Madoff; a graphic depicting a microscope and Scrabble-type tiles spelling the word "FRAUD"; a graphic depicting a highway sign that states "Welcome to BANKRUPTCY Drive Carefully"; a graphic depicting a man stealing a woman's purse which states "DANGER THIEVES"; a traffic sign that states "FRAUD ALERT"; a graphic depicting Scrabble-type tiles spelling the word "RISK"; and a graphic depicting a traffic sign that states "DO NOT STEAL". The photographs of Frydman, including those with the superimposed words "FRAUD ALERT" and "FRAUD," are reused in the "Gallery" section of jacobfrydman-thief.com.

46. in the section of jacob-frydman.com entitled "Home," the following also appears:

   a. there are three columns of text, one labeled "Known Aliases used by the Jacob Fraudman" and another labeled "Known Addresses used by the Jacob Fraudman"

   b. the following statement, "NY Magazine on Jacob Frydman Fraud"

47. in the section of jacob-frydman.com entitled "Team," the following statements also appear:

   **"Jacob Frydman, the Failed 'Infrastructure Specialist'**

   "In 2008, Frydman looking for a new game and not realizing that the world had just come to a standstill had a brilliant idea and conned William Blair and Co into giving him SIX MILLION dollars to launch a 1 Billion dollar Infrastructure Fund. Lambdastar Infrastrucutre Fund was born.

   "In its short lived life Frydman screwed a few law firms, 6-15 individuals and is still in litigation over the funds he stole from the company to support his wild lifestyle.

   "This litigation is still shielded in Arbitration, (as most of the Fraudman's con jobs are) but will shortly be revealed here."

48. at the top of the sections of united-realty-frydman.com entitled "Home," "jacob-frydman," "Lawsuits," "History," "Press," and "Referrals," the United Realty Trust

134

logo appears, but with the words "DO NOT" inserted before the word "Trust" and the word "Fraud" substituted for the word "REIT"

49. in the section of united-realty-frydman.com entitled "Home," the following statements appear:

"OUR FINDINGS

"**United Realty Trust** is being run by a board that is unaware of the ongoing fraud by its CEO **Jacob Frydman**.

"**Frydman** a serial con artist and master manipulator has committed fraud for many years and been able to hurt hundreds of innocent people by stealing their money.

"The fraud, abuse, self dealing and misappropriation of the money belonging to the **public** goes on daily at **United Realty Trust**.

"In analyzing the prospectus of United Realty Trust, we uncovered lies, deception and generally mostly FAILURES of **Jacob Frydman the CEO**....

"QUICK FACTS

"The CEO **accused of Fraud** 621 times in **144 lawsuits**...

"OUR MISSION

"WE ARE HERE TO HELP REMOVE THE CHAIRMAN & CEO OF UNITED REALTY TRUST AND HELP CONVICT JACOB FRYDMAN OF FRAUD."

50. The same statements appear in the section of united-realty-frydman.com entitled "Home," which was registered on February 3, 2015.

51. in the section of united-realty-frydman.com entitled "jacob-frydman," the following additional statements appear:

"OVERVIEW

"**Jacob Frydman** the CEO of United Realty Trust, and Chairman of Cabot Lodge Securities incorporates a highly sophisticated method of fraud by using a corporate shell game and legal loopholes.

"UPDATES

"This site will be updated with details of the scams that **Jacob Frydman** the CEO of **United Realty Trust** has pulled off. Included will be the ways **Jacob Frydman** defrauds the common individual, corporation, banks and his own attorneys.

"Leading accounting firms, investment banks, global law firms and consultants have all been deceived by Frydman.

"Finally, the true nature of the Con man, **Jacob Frydman** – 'the Fraudman' is revealed.

"LEAVING A TRAIL

"As a former attorney Jacob Frydman was run out of Cleveland Ohio and had to leave in a hurry. After defrauding many banks, his partners and clients in the small town it was too difficult to continue the practice of deception.

"HISTORY

"**Historically** Frydman found a third party to become his partner and uses their resources, connections, and capital to inject money into his 'new corporate scheme.'

"Such partners and practices have provided Frydman the cover and resources to meet his ultimate objectives of fraud, deception, manipulation and abuse."

52. in the section of united-realty-frydman.com entitled "History," the following statements appear:

**"JACOB FRYDMAN**

"A TALE OF **GREED** AND FRAUD

"15 Years, 50+ failures ! !

"See the detail in each web of Lies, Deceipt [sic], Fraud and Failure.

"Jacob Frydman the current CEO of United Realty Trust Incorporated has a long history of corporate, and real estate failures.

"Digging deeper one will find that each company was simply a vehicle for him to defraud the unsuspecting investor.

"CLICK TO SEE RELATED INFO TO THE SPECIFC FRYDMAN FRAUD AND FAILURE."

53. in the section of united-realty-frydman.com entitled "Referrals," the following statements appear:

"HUNDREDS OF INDIVIDUALS HAVE BEEN SCREWED AND HURT BY JACOB FRYDMAN. CONTACT ANY OF THESE INDIVIDUALS. SIMPLY

ASK THEM FOR A REFERRAL. SEE WHAT THEY SAY AND THEN
DECIDE IF YOU SHOULD DO BUSINESS WITH "JAKE THE SNAKE" AKA
JACOB FRYDMAN. THE FRAUDMAN."

54. statements plaintiffs claim that Verschleiser made in a February 13, 2015 telephone
call to Gould, the CLS CEO, as follows:

"You know all the fraud that goes on….and you'll see in a letter today that's
going to FINRA, the SEC, everybody….

"he's [Frydman] a thief and a criminal.  So, he'll go to jail.  The DA is
investigating, the FBI is investigating, they are all investigating-he's going to go
to jail….His Wife did mortgage fraud."

55. statements that plaintiffs claim Verschleiser made on one or more occasions during
the period of December 4, 2013 to May 31, 2014 to Ellis Mirsky, whom they allege
was the personal attorney for one of the principals of the limited partners of United
Realty, consisting of using the words "fraud," "liar," "cheat," or "thief" to describe
what Frydman was.

56. statements in a March 10, 2015 email that Verschleiser sent under his own name to
Frydman, copying Benjamin Fishoff, whom plaintiffs allege is a principal of one of
the limited partners in United Realty, as follows:

"Seemingly you are too scared to meet me in front of the board of directors and
the money partners in our companies. This has been telling to all of your immoral,
unethical and criminal tactics which as you have seen will not deter my attorneys
from pursuing you, until you are brought to justice. It is unfortunate for the
investors that I brought into this mess….

"…I got you removed from my office a year ago…..

When I originally removed you for cause, and fired you I should have left it that
way…..remember the QuickBooks don't lie which shows the 14+ million WE put
in versus the few hundred thousand you stole from the company and then "put
back into it" as your so called investment.

"I am always ready to meet you in front of the board and any of our investment
partners (whom you are now screwing too)."

57. statements in a March 11, 2015 email that Verschleiser sent under his own name to
Frydman, copying ten others, including Pinny Rand, Mark Appel, Benny Fishoff,
Elan Jaffa, and Steven Vegh, whom plaintiffs allege were United Realty limited
partners or the principals of limited partners, as well as Daniel Aronzon, David
Newman and Robert S. Levine, whom plaintiffs allege were the independent directors
of the REIT, as follows:

"As it turns out we are not the only ones you stole from over the past 20 years. Seemingly we are just a small minority of individuals in an endless ocean of victims."

58. statements in a March 27, 2015 email that that Verschleiser sent under his own name to Frydman, copying Frydman's wife, Monica, with the subject line: "Today was a wonderful day," as follows:

"Today after meeting with the IRS numerous times the lawsuit against you for cheating them on your personal taxes is moving forward. Start thinking hard....(or drink your worries away) Your soon to be house on the Hudson will be vacant and for sale by the US government. Your view will be from a simple jail cell where you can try and con your inmates."

59. a photograph and statements in a May 6, 2015 email using the pseudonym fucanax@flurred.com that plaintiffs allege was a mass email blast to certain of their employees, various REIT investors, United Realty selling group members or prospective selling group members, and/or REIT industry persons, with the subject line: "a message regarding Jacob A. Frydman," and with a photograph of Frydman with the word "FRAUD" superimposed over the image, stating as follows:

"Fraud Alert

"Know the Thief amongst You!

"Master of disguise, Creative Evil. Hurts anyone.

"You may have heard about some of the odd stories about Jacob Frydman, BUT you do NOT know the truth until you take a few minutes to really look at the evidence.

"You will be saving money and aggravation if you take a few moments to see some judgements, court findings, judges and DA's comments on the Fraudman - Jacob Frydman.

"Learn More at: United Realty Fraud

"or simply google 'Jacob Frydman Fraud'

"His own house has dozens of liens against it as he simply cant do anything without screwing someone.

"Be Forewarned.

"You are receiving this email as an associate of Jacob Frydman"

60. statements in a May 7, 2015 email using the pseudonym fucanax@flurred.com that plaintiffs allege was a mass email blast to at least various REIT investors, United Realty selling group members or prospective selling group members, and/or REIT

industry persons with the subject line: "Jacob Frydman – A Personal Note," stating as follows:

> "JACOB FRYDMAN FRAUD ALERT
>
> **"Know the Thief amongst You!**
>
> "Master of disguise, Creative Evil. Hurts anyone. Deceives everyone.
>
> "You may have heard some of the odd stories about Jacob Frydman, BUT you do NOT know the truth, until you take a few minutes to really look at the evidence.
>
> "http://united-realtytrusts.com/
>
> "You will be saving money and aggravation if you take a few moments to see court findings, judges and DA's comments, dozens of existing judgments, on the Fraudman - Jacob Frydman.
>
> "Learn More at: United Realty Fraud
>
> "or simply google 'Jacob Frydman Fraud'
>
> "His own house has dozens of liens against it where he put 17 different contractors out of business....
>
> "Be Forewarned.
>
> "And dont be fooled by his claims of a Billion Dollar REIT.
>
> "The REIT has 3 small properties in it and has raised from unsuspecting individuals a mere 12 million Dollars most of which the Fraudman used on overhead and personal expenses.
>
> "You are receiving this as a courtesy, for having met Jacob Frydman"

61. statements in a May 8, 2015 email using the pseudonym fucanax@flurred.com that plaintiffs allege was a mass email blast to at least certain of their employees, with the subject line" Personal Note - Jacob Frydman," as follows:

> "How can it be that so many people are out to get Frydman? or are you too scared to actually read some of the hundreds of lawsuits against the man for fraud. You may be a co-conspirator by simply knowing and sitting around. Is your life worth that little. Be Smart. Be responsible. Be thoughtful. Make an informed and educated decision. READ THE LAWSUITS www.United-RealtyTrusts.com---"

62. the logo of and graphic, photograph and statements in a June 10, 2015 email using the pseudonym "inezrodriguez2@gmail.com" that plaintiffs allege was a mass email blast to various REIT independent directors, REIT investors, United Realty selling group members or prospective selling group members, and/or REIT industry persons, with the subject line: "Copy of Is your investment in United Realty truly safe & secure ? check again....", with the United Realty Trust logo, but with the words "DO

NOT" inserted before the word "Trust" and the word "Fraud" substituted for the word "REIT"; with a graphic highlighted with the words "Securities Fraud"; and with a photograph of Frydman with the word "FRAUD" superimposed over the image, stating as follows:

> **"Are you aware of the Fraud in United Realty, the REIT you OWN shares of?**
>
> **"You deserve to READ the public lawsuits filed against the CEO Jacob Frydman.**
>
> "Obviously, he will tell you a story "and evidence" his side as truth and innocent, however when you read the public lawsuits he has lost in for years of fraudulent activity, you will ask the Broker WHY he sold you this stock when there are so many more stable investments out there.
>
> **"PLEASE look into this and protect your investment.**
>
> **"Click here for ALL the info: www.unitedrealty-trust.com.**
>
> **"Did you know that the CEO's company has borrowed over FIVE million dollars from YOUR REIT to pay his bills?**
>
> **"Jacob Frydman the CEO has smoke surrounding him for 20+ years. 'Where there's Smoke, there's Fire'.**
>
> **"Did you know**: There is an asset on books that **does not** belong to REIT, yes you read that correctly!
>
> **"Did you know**: Jacob Frydman the CEO **accused of Fraud** 621 times in 144 lawsuits.
>
> **"Did you know**: A New York Judge recently found Frydman to have stolen over 700k in a case from 2002.
>
> **"Did you know**: The ex-CFO in 2011 sued Frydman for his thievery of company assets and WON!
>
> **"Did you know**: If you ask any attorney to "Lexis Nexus search" Jacob Frydman, they will yell at you for investing into a company run by this con-man. ALL THIS INFO PUBLICLY AVAILABLE AND RETRIEVABLE ON THIS WEBSITE: http://www.unitedrealty-trust.com/history.htmlhttp://www.unitedrealty-trust.com/history.html"

63. statements in a June 10, 2015 email using the pseudonym "1fhmia+3wi0sve8jc17c@gmail.com" that plaintiffs allege was a mass email blast to various REIT independent directors, REIT investors, United Realty selling group members or prospective selling group members, and/or REIT industry persons, with the subject line: "Is your investment in United Realty safe?", as follows:

"If you did some homework on United Realty Trust and its CEO, you would likely ask your broker WHY you were sold the stock.

"Just read some of his history:

"http://www. unitedlrealtv-trust.com/history.html

"or like an interesting book soon to be published on this man of greed, you can read it all."

64. the title of, description of the poster and statements in a September 6, 2015 post on reitwrecks.com entitled "Another David Lerner," by "frydmanfrauds," as follows:

### "**BEWARE of a new David Lerner wannabe**

"Jacob Frydman is a HUGE lowlife, and fraudster.

"Spend **10 minutes** doing your research on Frydman and **save a lifetime** of headaches, **plus 100% loss** guaranteed.

"frydmanfrauds"

65. the title of, description of the poster, photograph and statements in a second September 6, 2015 post on reitwrecks.com entitled "Another David Lerner," by "frydmanfrauds," with a photograph of Frydman with the words "Fraud Alert" and "BEWARE" superimposed over the image, stating as follows:

### "**BEWARE**

"Jacob Frydman_united realty trust fraud

"frydmanfrauds"

66. the title of, description of the poster, photograph and statements in a third September 6, 2015 post on reitwrecks.com entitled "Another David Lerner," by "frydmanfrauds," with a photograph of Frydman and Bernard Madoff with the words "Fraud Alert," which are repeated four times, superimposed between the images of Frydman and Madoff, stating as follows:

### "**United Realty Frydman Fraud**

"Jacob Frydman_united realty trust fraud – Madoff

"frydmanfrauds"

67. the title of, description of the poster, photographs and statements in another September 6, 2015 post on reitwrecks.com entitled "Another David Lerner / Cabot Lodge Securities," by "frydmanfrauds," with a photograph of Frydman and the words "Perjury," "Jacob Frydman LIED under oath" and "FRAUD ALERT!" next to Frydman's image, stating as follows:

**"The fraudster Frydman**

"Jacob Frydman_united realty trust fraud

"frydmanfrauds"

68. the title of, description of the poster, photographs and statements in a fourth
September 6, 2015 post on reitwrecks.com entitled "Another David Lerner," by
"frydmanfrauds," with three identical photographs of Frydman and the words
"FRAUD ALERT" and "run away, save the day" superimposed over the images,
stating as follows:

**"American greed, fraud, and abuse**

"BY JACOB FRYDMAN

"Jacob-Frydman-fraud- united realty

"frydmanfrauds"

69. the title of, description of the poster and statements in a September 6, 2015 post on
reitwrecks.com, entitled "DST Fraud By United Realty & Jacob Frydman," by
"frydmanfrauds," stating as follows:

"Aside from destroying shareholders in his United Realty Trust Inc., Jacob
Frydman has now been blatantly stealing from his DST investors through his
United Realty Funds Management LLC

"READ the United Realty Trust 10Q...[in] which Frydman shows how he
STOLE ONE MILLION FOUR HUNDRED and EIGHTY NINE THOUSAND
DOLLARS.

"DON'T FORGET YOU HAVE BEEN FOREWARNED ABOUT JACOB
FRYDMAN - DO YOUR HOMEWORK, LOOK AT THE HUNDREDS OF
LAWSUITS AGAINST HIM RELATED TO FRAUD"

"frydmanfrauds"

70. the title of, description of the poster, photograph and statements in a second
September 6, 2015 post on reitwrecks.com, entitled "DST Fraud By United Realty &
Jacob Frydman," by "frydmanfrauds," with a photograph of Frydman and the words
"FRAUD ALERT" superimposed over the image, stating as follows:

"THIS IS THE FRAUDMAN – JACOB FRYDMAN

**"BEWARE**

_   "Jacob Frydman united realty trust_fraud

"frydmanfrauds"

71. Verschleiser admitted during his deposition on December 7, 2016 in this action that he made and continued to make disparaging statements about Frydman to others, as follows:

> "I definitely disparaged you and I definitely continue to disparage you and tell people the truth about you . . . that you are a sick man, you have some sort of mental illness, and...it is beyond sad."

To recover damages for libel, here libel per se, the plaintiff has the burden of proving six elements. If the plaintiff has proved all six of these elements, you will decide in the plaintiff's favor and proceed to determine the amount of damages. However, if the plaintiff has failed to prove any one of these six elements, the plaintiff may not recover.

First, the plaintiff must prove that the statement was defamatory, meaning that the statement had a tendency to expose the plaintiff to public hatred, contempt, ridicule or disgrace.

Second, the plaintiff must prove that the statement referred to the plaintiff, meaning that the statement would be reasonably understood to be about the plaintiff.

Third, the plaintiff must prove that the defendant published or broadcast the statement, meaning that the defendant communicated the statement to someone other than the plaintiff.

Fourth, the plaintiff must prove that the statement was false, meaning substantially untrue.

Fifth, the plaintiff must prove that the defendant published the statement in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties.

Sixth, the plaintiff must prove that the statement proximately caused, as I previously defined that term to you, actual harm to the plaintiff, meaning that the plaintiff suffered damages such as personal humiliation, mental anguish and suffering or damage to the plaintiff's reputation or standing in the community.

The plaintiff has the burden of proving these six elements of his or its libel claim by a preponderance of the evidence.

The first question for you to decide is whether the defendant's statement was defamatory. A statement is defamatory if it tends to expose the plaintiff to public hatred, contempt, ridicule or disgrace—that is, if it would tend to lead the average person in the community to form an evil or bad opinion of the plaintiff. A statement is also defamatory if it tends to discredit the plaintiff in the conduct of his, her or its business, trade, occupation, profession or office; or if it charges the plaintiff with committing a serious crime; or if it imputes serious sexual misconduct to the plaintiff; or if it states that the plaintiff has a loathsome disease. As far as the plaintiff complains about statements in lawsuits or communications with regulators (such as the SEC), as I previously instructed you, such statements must be made maliciously and solely for the purpose of defaming the plaintiff to be defamatory.

Not every unpleasant or uncomplimentary statement is defamatory. A statement that is merely unpleasant, offensive or embarrassing, or that hurts the plaintiff's feelings, is not necessarily defamatory. Because language often has different meanings, the law imposes upon the plaintiff the burden of proving that the statement about which the plaintiff complains would in fact be understood by the average person as defamatory.

I have already instructed you on the statements that the plaintiff claims are defamatory.

If you find that the statement did not tend to expose the plaintiff to public hatred, contempt, ridicule or disgrace; or did not tend to discredit the plaintiff in the conduct of his or its business, trade, occupation, profession or office; or did not charge the plaintiff with committing a serious crime; or did not impute serious sexual misconduct to the plaintiff; or did not state that the plaintiff has a loathsome disease, then you need proceed no further and report to the Court. If

you find from the evidence that the plaintiff has proved that the statement tended to expose the plaintiff to public hatred, contempt, ridicule or disgrace; or tended to discredit the plaintiff in the conduct of his or its business, trade, occupation, profession or office; or charged the plaintiff with committing a serious crime; or imputed serious sexual misconduct to the plaintiff; or stated that the plaintiff has a loathsome disease, then you must find the statement defamatory and proceed to consider the remaining elements.

The second element that the plaintiff must prove is that the statement referred to him or it; that is, the plaintiff must prove that the statement was communicated to one or more third persons who reasonably would have understood the statement to refer to the plaintiff.

The third element that the plaintiff must prove is that the defendant published the statement, that is, that the defendant's statement was read or heard by some person or persons other than the plaintiff.

If you find that the defendant's statement was not read or heard by someone other than the plaintiff, then you need proceed no further and report to the Court. If you find that the defendant's statement was read or heard by someone other than the plaintiff, then you must proceed to consider the other elements of the plaintiff's case.

The fourth element that the plaintiff must prove is that the statement was false. A statement is false if it is not substantially true. Minor inaccuracies in the statement may be disregarded in determining whether the statement is false.

You will determine from the evidence presented what the truth was and then compare that with the statement which you find was made by the defendant, taking that statement according to the ordinary meaning of its words. If you find that the statement was true, then you

need proceed further and report to the Court. If you find that the statement was false, then you must proceed to consider the other elements of the plaintiff's case.

The fifth element that the plaintiff must prove is that the defendant published the statements in a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. To establish that the defendant acted in a grossly irresponsible manner, the plaintiff must prove that the defendant disregarded a risk that the statement was false and that the defendant's disregard was a substantial departure from accepted standards and practices of information gathering and verification followed by responsible parties.

If you find that the plaintiff has failed to prove that the defendant was grossly irresponsible, then you need proceed no further and report to the Court. If you find that the plaintiff has proved that the defendant was grossly irresponsible, then you must proceed to consider the other elements of the plaintiff's case.

The sixth element that the plaintiff must prove is actual harm. This means that you may not presume that the plaintiff has been damaged, although as I previously instructed, the plaintiff need not prove special damages, that is, out of pocket or pecuniary loss. Rather, to prove actual harm the plaintiff must prove (1) damage to his or its reputation or standing in the community, or damages such as personal humiliation, mental anguish and suffering; in order to do this, the plaintiff need not offer evidence which assigns an actual dollar amount to the injury, or (2) special damages.[58] If you find that the plaintiff has failed to prove actual harm, then you need

---

[58] *Nolan v. State*, 158 A.D.3d 186, 192-94, 69 N.Y.S.3d 277, 281-82 (1st Dept. 2018) (actual injury includes, but is not limited to, out-of-pocket loss)

proceed no further and you should report to the Court. If you find that the plaintiff did suffer such actual harm, then you will proceed to consider damages.

**Damages**

The fact that I instruct you on the law of damages as it relates to a libel per se claim must not be taken as an indication that you should decide for the plaintiff. You will decide on the evidence presented and the rules of law that I have given you whether the plaintiff is entitled to recover from the defendant.

If you find that the plaintiff did suffer actual harm, as I have defined that term for you, you will award the plaintiff a sum of money that in the exercise of your good judgment and common sense, you find is fair and just compensation for that injury which you find was directly and actually caused by the defendant's statement.

If you find that the plaintiff did suffer actual harm, you may also award the plaintiff such amount as, in the exercise of your good judgment and common sense, you find is fair and just compensation for the injury to the plaintiff's reputation and the humiliation and mental anguish in his or its public and private life which you find was directly and actually caused by the defendant's statement.

If you find that the plaintiff's reputation will be injured in the future as a result of the defendant's statement, or that the plaintiff will suffer humiliation or mental anguish in the future as a result of the defendant's statement, you will award such additional amount as will compensate the plaintiff for such injuries.[59]

In fixing those amounts you should consider the plaintiff's standing in the community, the nature of the defendant's charge against the plaintiff, the extent to which the charge was

---

[59] N.Y. Pattern Jury Instr.--Civil 3:29.2

circulated, the tendency of the charge to injure such a person as the plaintiff, and all of the other facts and circumstances surrounding the parties. Such damages cannot be proved with mathematical certainty. Fair compensation may vary, ranging from one dollar as nominal damages if you decide that there was no injury,[60] to a substantial sum if you decide that the injury was substantial.

In addition to compensatory damages, you have the discretion to award punitive damages in the manner in which I instructed you with respect to plaintiffs' ECPA claims.

*Authority*: N.Y. Pattern Jury Instr.--Civil 3:34A (modified), together with the jury instruction and cases cited in the above footnotes to the libel per se charges

### *Trade Libel*

In Count IX, Plaintiffs claim that Verschleiser committed trade libel. Specifically, they claim that the statements from both of the libel per se counts (Counts VIII and Counts X)) that I have read to you also constitute trade libel. Trade libel is similar to libel per se, and I will now explain to you the differences between the two claims.

Trade libel consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment. The communication must play a material and substantial part in inducing others not to deal with the plaintiff, with the result that special damages, in the form of lost dealings, are incurred,[61] with one exception I will instruct you in a moment.

---

[60] *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000)

[61] This paragraph is drawn from *Waste Distillation Technology, Inc. v. Blasland & Bouck Engineers, P.C.*, 136 A.D.2d 633, 634, 523 N.Y.S.2d 875, 877 (2d Dept. 1988)

Like defamation, trade libel is based on an injurious falsehood published to a third party. However, whereas defamation in the commercial context entails a statement that impugns the basic integrity or creditworthiness of a business, trade libel is based on statements confined to denigrating the quality of a business' services or products.[62]

To recover damages for trade libel, the plaintiff has the burden of proving five elements. If the plaintiff has proved all five of these elements by a preponderance of the evidence, you will decide in the plaintiff's favor and proceed to determine the amount of damages. However, if the plaintiff has failed to prove any one of these five elements, with one exception that I will explain, the plaintiff may not recover.

The plaintiff must prove that the defendant (1) made a statement denigrating the quality of the services or products of the plaintiff's business, (2) that was false (3) to a third party, (4) with malice, and (5) that it suffered special damages.[63] However, to the extent the plaintiff proves an injury to the business's reputation and not the product, it is the libel *per se* form of defamation and the fifth element, that the plaintiff suffered special damages, that is, specific pecuniary loss, need not be proven.[64] To reiterate, reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties.[65]

---

[62] *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670-71, 439 N.Y.S.2d 858, 862 (1981)

[63] 44 N.Y. Jur. 2d, *Defamation and Privacy* § 281

[64] *Aequitron Med. v. Dyro*, 999 F. Supp. 294, 297 (E.D.N.Y.1998)

[65] *Van-Go Transp. Co., Inc. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997)

I have already recited to you what the plaintiff contends that the defendant said of the plaintiff's business. To the extent, if any, that the defendant denies that he made a particular statement, you must first determine whether the defendant made such statement. If you find that no such statement was made, you will find for the defendant as to that particular statement.

If you find that the defendant made the particular statement claimed and that it denigrated the quality of the services or products of the plaintiff's business, you must then determine whether the statement was false. If you find that it was not, you will find for the defendant. If you find that it was false, you will then consider whether the statement was maliciously made.

The burden of proving malice is upon the plaintiff. A false statement is maliciously made if the person making it knows that his or her statement is false. A false statement is maliciously made even though the person making it did not know that it was false if (1) it is made with intent to interfere with another person's interests or a deliberate desire to do another person harm, or (2) it is made recklessly, without regard to the consequences, and under circumstances which the defendant as a reasonably prudent person should have anticipated that injury to another would follow. From the making of a false statement the law presumes malice, and, therefore, if you find that the statement was false, you must find malice unless on all the evidence you find the presumption overcome. In determining whether the statement was maliciously made you may consider the language in which the statement was cast, whether at the time he made the statement the defendant knew that it was untrue or believed that it was true, and all of the other facts and circumstances surrounding the making of the statement. If you find that the statement was not made maliciously, you will find for the defendant.

If you find that the statement was maliciously made, you will next consider whether the statement was a substantial factor in causing the plaintiff pecuniary loss, that is, special damages. Plaintiffs claim to have suffered pecuniary loss in each of the following respects:

    a.  the alleged loss of the $1.4 million Opera Solutions sublease that I previously mentioned

    b.  Scott Haag, an investor, allegedly redeemed $241,052.63 in REIT shares

    c.  Christina Opinski, an investor, allegedly redeemed $51,215.58 in REIT shares

    d.  Anthony and Maryellen Strollo, investors, allegedly redeemed $170,526.32 in REIT shares

    e.  Frank Rizzo, an investor, allegedly redeemed $26,950.99 in REIT shares

    f.  Isabelle Kirschenbaum, an investor, allegedly redeemed $27,500 in REIT shares

    g.  Jeffrey Burns, an investor, allegedly redeemed $136,835.08 in REIT shares

I will collectively refer to the foregoing alleged redeeming shareholders starting with Scott Haag as the alleged "Redeeming REIT Shareholders."

    h.  Karl Birkenfeld, an employee of United Realty and CLS, allegedly lost a $1.5 million sale of REIT stock to Scott Kirtland of Stirling Insurance Services

    i.  Bernard Lherrisson and Confrence Gbaje, both registered representative with Aegis Capital, a broker dealer with whom United Realty allegedly had a selling agreement, allegedly lost a $700,000 sale of REIT stock to John Kindle

    j.  Martin Barth, a registered representative with Meyers Associates, a broker dealer with whom United Realty allegedly had a selling agreement, allegedly lost a $50,000 sale of REIT stock to his client

    k.  Francis P. Carson, a registered representative with Trustmont Financial Group, a broker dealer with whom United Realty allegedly had a selling agreement, allegedly lost a $30,000 sale of REIT stock to his client

    l.  David Levinson, a registered representative with Newport Coast Securities, a broker dealer with whom United Realty allegedly had a selling agreement, allegedly lost a $250,000 sale of REIT stock to his client

    m.  Ed Suzuki, a registered representative associated with Newport Coast Securities, allegedly lost approximately five client sales allegedly as a result of the mass email blasts in May 2015 or June 2015 that I previously discussed, which allegedly represented lost REIT sales of $1,000,000

n.  Each of the following registered representatives of broker dealers with whom United Realty allegedly had a selling agreement, or in one instance another employee of United Realty and CLS, allegedly lost sales of REIT stock to their clients, in an amount exceeding $10 million: (i) Stacy Skytte with Newport Coast Securities; (ii) Jason Vanclef with Vanclef Financial Group; (iii) Todd Rustman with Niagara International Capital; (iv) Jeff Noard, an employee of United Realty and CLS; and (v) Greg McClosky with Newport Coast Securities

I will collectively refer to the foregoing alleged prospective REIT buyers starting with Karl

Birkenfeld's client as the alleged "Intended REIT Buyers."

o.  Concorde Investment Services, a broker dealer with allegedly 106 registered representatives with whom United Realty allegedly had a selling agreement, dropped United Realty allegedly as a result of Akerman's whistleblower letter that I previously discussed and/or the mass email blasts in May 2015 or June 2015, which allegedly represented a loss of approximately $10 million in REIT stock, and more than $10 million in what are called 1031 syndications

p.  Sandlapper Securities, a broker dealer with allegedly 45 registered representatives with whom United Realty allegedly had a selling agreement, dropped United Realty allegedly as a result of Akerman's whistleblower letter and/or the mass email blasts in May 2015 or June 2015, which allegedly represented a loss of approximately $4 million in REIT stock, and more than $6 million in 1031 syndications

q.  Trustmount Financial Group, a broker dealer with allegedly 150 registered representatives with whom United Realty allegedly had a selling agreement, dropped United Realty allegedly as a result of Akerman's whistleblower letter and/or the mass email blasts in May 2015 or June 2015, which allegedly represented a loss of approximately $10 million in REIT stock, and more than $10 million in 1031 and other syndications

r.  Dynasty Capital Partners, a broker dealer with whom United Realty allegedly had a selling agreement, dropped United Realty allegedly as a result of Akerman's whistleblower letter and/or the mass email blasts in May 2015 or June 2015, which represented a loss of approximately $5 million in REIT stock, and what are called Reg. D syndications

I will collectively refer to the foregoing alleged United Realty selling group members

starting with Concorde Investment Services as the alleged "Selling Group Members."

s.  Each of the following broker dealers with whom United Realty allegedly was in discussions to enter into a selling agreement, elected not to enter into a selling agreement with United Realty, which represented an alleged loss of prospective REIT stock in an amount believed to exceed $100 million: (i) Madison Avenue Securities; (ii) International Financial Group; (iii) Crown Capital Securities; (iv)

Centaurus Financial; (v) Summit  Brokerage Services; (vi) J.P. Turner & Company; (vii) Capital Financial Services; (viii) SCF Securities; (ix) Voya Financial; (x) D.H. Hill Securities; (xi) Triad Advisors; (xii) JRL Capital; (xiii) Independent Financial Group; (xiv) Newbridge Securities; (xv) ProEquities; (xvi) Kovack Securities; (xvii) Kalos Capital; (xviii) American Portfolios Financial Services; (xix) David A. Noyse & Company; (xx) LMA (Lara, May & Associates); (xxi) Dempsey Lord Smith; (xxii) LaSalle St. Securities; (xxiii) Investment Planners, Inc.; (xxiv) Lifemark Securities; (xxv) Harbor Light Securities, LLC; (xxvi) McDermott Investment Services Advisors; (xxvii) Harbour Investments; (xxviii) CV Brokerage; (xxix) Berthel Fisher & Company Financial Services

I will collectively refer to the foregoing alleged prospective United Realty selling group members as the alleged "Intended Selling Group Members."

t. $263,725,227.23 in lost earnings relating to the REIT allegedly sustained by plaintiffs, which includes lost earnings attributable to the Intended REIT Buyers, the Selling Group Members and the Intended Selling Group Members

u. $507,600,631 in risk adjusted net cash flows from plaintiffs' alleged lost real estate opportunities

v. alleged other losses

If you find that the plaintiff did not suffer a particular pecuniary loss, or that though plaintiff did, a particular statement was not a substantial factor in causing that loss, you will find for the defendant on that particular statement, other than in the instance of the exception that I previously explained. If you find that the statement was a substantial factor in causing plaintiff a particular pecuniary loss where that exception does not apply, you will find for the plaintiff in the amount of such pecuniary loss as you find resulted directly and naturally from the making of the statement.

Again, the exception is that to the extent the plaintiff proves an injury to the business's reputation and not the product, it is the libel *per se* form of defamation and the fifth element, that the plaintiff suffered special damages, that is, specific pecuniary loss, need not be proven.  To the extent that the plaintiff does prove an injury to the business's reputation and not the product, the

plaintiff may recover (1) damages for the injury to the plaintiff's reputation and the humiliation and mental anguish in his or its public and private life in such amount as, in the exercise of your good judgment and common sense, you find is fair and just compensation for such injury to reputation, or for such humiliation and mental anguish, which you find was directly and actually caused by the defendant's statement, as I previously instructed you with respect to libel per se, and (2) any special damages that are proven. If you find that the plaintiff's reputation will be injured in the future as a result of the defendant's statement, or that plaintiff will suffer humiliation or mental anguish in the future as a result of the defendant's statement, you will award such additional amount as will compensate the plaintiff for such injuries, as I also previously instructed you with respect to libel per se.

As I previously instructed you as well with respect to libel per se, in fixing those amounts you should consider the plaintiff's standing in the community, the nature of the defendant's charge against the plaintiff, the extent to which the charge was circulated, the tendency of the charge to injure such a person as the plaintiff, and all of the other facts and circumstances surrounding the parties. Such damages cannot be proved with mathematical certainty. Fair compensation may vary, ranging from one dollar as nominal damages if you decide that there was no injury,[66] to a substantial sum if you decide that the injury was substantial.

In addition to compensatory damages, you have the discretion to award punitive damages in the manner in which I instructed you with respect to plaintiffs' ECPA claims.

The fact that I have instructed you on the law of damages as it relates to a trade libel claim must not be taken as an indication that you should decide for the plaintiff. You will decide

---

[66] *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000)

on the evidence presented and the rules of law that I have given you whether the plaintiff is
entitled to recover from the defendant.

*Authority*: N.Y. Pattern Jury Instr.--Civil 3:55 (modified), together with the cases cited in the
above footnotes to the trade libel charge

## H.    MISAPPROPRIATION OF TRADE SECRETS

In Count XI, Plaintiffs claim that defendant Verschleiser and in certain instances Del
Forno, Pinhasi and Onica misappropriated various of plaintiffs' alleged trade secrets. Plaintiffs'
claims for such misappropriation are premised on two separate allegations.

First, as I previously discussed, plaintiffs claim that these four defendants did so when
Verschleiser, with the assistance of Del Forno, Pinhasi and Onica, allegedly hacked into the
United Realty email exchange server and stole highly confidential information relating to the
impending $1.4 million Opera Solutions sublease transaction and used that information allegedly
to send an anonymous email to Opera Solutions under the pseudonym "informedconsumer" on
February 10, 2014 revealing the information and disparaging United Realty, resulting in damages
of $1.4 million allegedly representing the loss of that sublease transaction.

Second, as I also previously discussed, plaintiffs claim that prior to and during the first
half of December 2014, Verschleiser, working together with Akerman, stole confidential and
proprietary information of United Realty, Prime United, CLS and the REIT, including a draft of
a $4 million confidential transaction agreement with Royal Alliance, a shareholder list, a list of
broker dealer selling group members, and other non-public financial information; and thereafter
caused the use of portions of the information, including the confidential transaction agreement
with Royal Alliance, in two state court lawsuits allegedly resulting in the loss of the transaction,
and used another portion of the information to send mass anonymous defamatory email blasts to
REIT investors and selling group members in May and June 2015, resulting in substantial

damages, including $4 million allegedly representing the loss of the transaction and damages caused by the mass email blasts.

**Elements of a Claim of Misappropriation of Trade Secrets**

In order to prevail on this claim, the plaintiff must prove by a preponderance of the evidence, first, that he or it possessed a trade secret, and second, that the defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.

*Authority*: *Faiveley Transp. Malmo AB v Wabtec Corp.,* 559 F.3d 110, 117 (2d Cir. 2009) (internal citation and quotation marks omitted)

### First Element: Possession of a Trade Secret

With respect to the first element, a trade secret may be any form of information that is valuable to a business and maintained in secrecy. The owner of a trade secret does not have to patent the information in order to receive trade secret protection.

Information is "valuable to a business" if it gives the business an opportunity to obtain an advantage over competitors who do not know or use it. The trade secret comprises not simply information as to single or passing events in the conduct of one's business; rather, it is also a process, device or compilation of information for continuous use in the operation of the business, such as for the production of items or sale of goods or services.

Information is "maintained in secret" if, of course, the subject matter of the trade secret is kept a secret and is not public knowledge in the trade or business. Absolute secrecy, however, is not required, although a substantial element of secrecy must exist. Substantial secrecy exists as long as there would be difficulty in acquiring the trade secret information except by the use of improper means, including without limitation through the breach of an agreement or duty.

The fact that others may know of the information does not negate secrecy if the owner

156

takes reasonable measures under the circumstances to maintain secrecy.  For example, an

employer may communicate confidential information to its employees involved in its use without

losing trade secret protection.  Even disclosure of a trade secret to a third party does not result in

the loss of trade secret protection if the owner of the trade secret took some reasonable steps to

maintain its secrecy.  If, for example, the third party to whom the information was disclosed was

under an obligation or acting under an implicit agreement to protect the confidentiality of the

information, the information may still be considered secret.

In this case, plaintiffs claim that the following documents and the information contained

in them constitute trade secrets:

(i) emails and one or more draft agreements between United Realty and Opera Solutions
for the sublease of corporate office facilities at 180 Maiden Lane;

(ii) a draft of a transaction agreement with Royal Alliance for the sale of CLS' retail
customer accounts, among other things, and to which Prime United was a party;

(iii) a shareholder list of REIT investors who were clients of CLS, including their names,
addresses, social security numbers and other private information;

(iv) a list of broker-dealers and registered representatives who were part of the United
Realty selling group involved in the REIT's public offering of common stock, including
their contact information; and

(v) non-public financial reports regarding the performance or projected performance of
CLS or its sales representatives

You should consider the following factors in deciding whether information constitutes a

trade secret:

(1) the extent to which the information is known outside of the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and its competitors;

(5) the amount of effort or money expended by the business in developing the

information;

(6) the ease or difficulty with which the information could be properly acquired or

duplicated by others.[67]

*Authority*:  *See* Proposed Jury Instructions in *E.J. Brooks Co. v. Cambridge Security Seals*,
U.S.D.C, S.D.N.Y., 12 Civ. 2937 (LAP) (Apr. 8, 2015), Doc. No. 299 (hereafter "*E.J. Brooks -*
Plaintiff's (Defendants') Proposed Instruction No. __"), Plaintiff's Proposed Instruction No. 27,
at pp. 35-38 (modified), and authorities cited therein, together with the case cited in the above
footnote to this section

### Second Element: Use of a Trade Secret in Breach of an Agreement or a Duty

If you do not find that a particular document, information in it or compilation of

information in it I just described was a trade secret, you will find for the defendant or defendants

you are considering on that particular document, information or compilation of information.  If

you find that a particular document, information or compilation of information was a trade

secret, you must then determine whether the defendant or defendants you are considering used

the trade secret in breach of an agreement, a confidential relationship or a duty, or as a result of

discovery by improper means.

Plaintiffs contend that Verschleiser's alleged use or disclosure of the information in the

United Realty-Opera Solutions emails and sublease agreement drafts breached the confidentiality

provision of his employment agreement with United Realty and/or was as a result of discovery

by improper means.  Plaintiffs contend that Del Forno's assisting Verschleiser breached a

confidential relationship or duty of confidence as a United Realty employee, and/or used

improper means.  Plaintiffs contend that Pinhasi and Onica's assisting Verschleiser breached a

duty of confidence as former employees or consultants of United Realty and/or used improper

---

[67] *Faiveley Transp.*, *supra* (internal citation omitted).

means.

Plaintiffs further contend that Verschleiser's alleged use or disclosure of the documents and information contained in them that he, working together with Akerman, allegedly stole also breached the confidentiality provision of his employment agreement with United Realty and/or was as a result of discovery by improper means. Plaintiffs also contend that Akerman's alleged use or disclosure of such documents and information in providing them to Verschleiser breached the confidentiality provisions of his employment, limited partnership and subscription agreements with United Realty; breached a confidential relationship or duty of confidence as a United Realty employee; and/or was as a result of discovery by improper means. In addition, plaintiffs contend that Verschleiser knew or should have known of the duty owed by Akerman to keep such documents and information confidential, but nonetheless used the documents and information that was allegedly wrongfully provided to him by Akerman.

An individual may acquire knowledge of a trade secret by means which appear proper, yet still be under a duty not to use or disclose it. In New York, a confidential relationship exists between an employer and an employee, such that an employee may not compete with his or her employer by using or relying on trade secret information that was acquired in the course of the employment. The employer need not expressly inform the employee that the information is a trade secret; if the employee generally understood the information to be confidential in nature, then liability may attach to his or her use or disclosure of that information. This duty survives the termination of employment and does not depend upon the existence of any contract. Where an employee has also expressly or impliedly agreed not to disclose an employer's trade secret or confidential information, that agreement similarly prohibits the employee from disclosing the secret information.

If a person with an obligation to keep a trade secret confidential discloses the trade secret to a third party, the third party receiving the secret information is liable for misappropriation if the third party knows or has reason to know that the person from whom it received the information was under a duty to keep the information confidential. In other words, the third party is liable for misappropriation if it is on notice that it received the information as a result of a breach of duty. Actual notice is not required; constructive notice of the breach is sufficient to impose liability. A defendant is on constructive notice of a breach if he could have inferred a breach from the information available or if, under the circumstances, it would have been reasonable to make an inquiry and diligence would have disclosed the breach.

If you find that the defendant or defendants you are considering were in a confidential relationship with the plaintiff or otherwise owed him or it a duty of confidence, or were under a contractual obligation not to disclose the plaintiff's trade secrets, or derived their knowledge of the plaintiff's trade secrets from one they knew or should have known was in such a relationship or under such a duty, then the defendant or defendants were and are obligated not to use or disclose any of the plaintiff's trade secrets.

Only the wrongful use of secret information may give rise to liability. It is not enough that a defendant simply has access to the trade secret information. Further, there is no requirement that the defendant or defendants you are considering use the plaintiff's trade secrets in exactly the same form in which the defendant or defendants received it. You may find the defendant or defendants liable for misappropriation even if they used the plaintiff's confidential information with modifications effected by their own efforts. Differences in detail do not preclude liability if the information used by the defendant or defendants was substantially derived from the plaintiff's trade secret.

*Authority*: *E.J. Brooks* - Plaintiff's Proposed Instruction No. 27, at pp. 39-41 (modified), and authorities cited therein

In sum, if you find by a preponderance of the evidence that the plaintiff possessed a trade secret and that the defendant or defendants you are considering used the plaintiff's trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means, you must enter a verdict in favor of the plaintiff as to the particular trade secret or secrets and decide the issue of damages.

*Authority*: *E.J. Brooks* - Plaintiff's Proposed Instruction No. 27, at p. 43 (modified)

## Damages

The fact that I instruct you on the law of damages as it relates to a misappropriation of trade secrets claim must not be taken as an indication that you should decide for the plaintiff. You will decide on the evidence presented and the rules of law that I have given you whether the plaintiff is entitled to recover from the defendant.

The plaintiff has the burden of establishing the amount of actual damages, if any, that he or it is entitled to. However, the plaintiff need not establish the amount he or it is owed with mathematical precision; a reasonable estimate is permitted. Once you determine that the plaintiff has suffered damages, uncertainty as to the amount provided should not prevent you from assessing damages so long as you can determine the amount with reasonable certainty from the evidence presented. If you do not award actual damages to the plaintiff in the instance of a particular trade secret misappropriation, you must nonetheless award that plaintiff nominal damages.[68]

---

[68] *Juniper Entertainment, Inc. v Calderhead*, 2013 WL 120636, at *5 (E.D.N.Y. Jan. 9, 2013)

In addition to actual damages, or if none, nominal damages, you have the discretion to award punitive damages in the manner in which I instructed you with respect to plaintiffs' ECPA claims.

*Authority*: *E.J. Brooks* - Plaintiff's Proposed Instruction No. 31, at p. 64 (modified), and authorities cited therein

## I.    TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS

In Count XII, plaintiffs claim, as relevant here, that Verschleiser, directly or through Veen, Svisch, Merchansky, or one or more Doe defendants, tortiously interfered with plaintiffs' existing contractual relations.

Specifically, plaintiffs claim (1) that one or more of them had valid agreements with the Redeeming REIT Shareholders and the Selling Group Members, each of whom I previously listed, as well as a valid $4 million confidential agreement with Royal Alliance for the sale of CLS' retail customer accounts, among other things, (2) that defendant Verschleiser knew about the agreements, (3) that Verschleiser (a) intentionally induced the Redeeming REIT Shareholders and the Selling Group Members to terminate, suspend or breach those agreements by (i) creating fake websites, disseminating fake reports, blogs, and social media and other posts on the Internet, distributing flyers at a premier broker-dealer conference, and putting up posters at the conference, which disparaged Frydman, United Realty and Frydman's other businesses and were directed at the public, including without limitation REIT investors, potential REIT investors, selling group members, and prospective selling group members; and/or (ii) sending mass anonymous defamatory email blasts to REIT investors, selling group members and prospective selling group members, among others, in May and June 2015, which also disparaged Frydman, United Realty and Frydman's other businesses, and (b) intentionally induced Royal Alliance to terminate or breach the agreement for the sale of CLS' retail customer accounts, among other

things, by providing it to the plaintiffs in *Fishoff Family Foundation v. Frydman*, who referenced and included the agreement in that lawsuit, (4) that the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance did, in fact, terminate, suspend or breach those agreements, (5) that the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance would not have done so if it had not been for Verschleiser's conduct, and (6) that plaintiffs sustained damages as a result of the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance's termination, suspension or breach.

For the plaintiff to recover, the plaintiff must prove that he or it had agreements with the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance and that Verschleiser knew about one or more of those agreements. To prove that Verschleiser knew about an agreement between the plaintiff and one or more of the Redeeming REIT Shareholders or Selling Group Members and/or Royal Alliance, it is not necessary that Verschleiser had knowledge of the agreement's specific terms. The plaintiff must also prove that Verschleiser intentionally induced the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance to terminate,[69] suspend or breach the agreements. An act is intentional if it is done deliberately and for the purpose of inducing a party to an agreement to terminate, suspend or breach it. The plaintiff must also prove that the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance, in fact, terminated, suspended or breached the agreements and that they would not have would not have done so if it had not been for Verschleiser's conduct; however, the defendant's conduct need not be the sole "proximate cause" of the termination, suspension or breach.[70] In this context, a party's conduct qualifies as a

---

[69] *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189, 428 N.Y.S.2d 628, 631 (1980) (treating termination)

[70] *Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 35 A.D.3d 317, 318, 829 N.Y.S.2d 7, 9

proximate cause where it is a substantial cause of the events which produced the injury.[71] An agreement is terminated, suspended or breached when one of the parties fails to do what he, she or it promised to do under the agreement. An act induces termination, suspension or breach if it causes a party who otherwise would have complied with the agreement not to do so. Additionally, the plaintiff must prove that he or it sustained damages as a result of the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance's termination, suspension or breach.

If you decide (1) that the plaintiff had agreements with the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance, (2) that Verschleiser knew about the agreements between the plaintiff and the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance, (3) that Verschleiser intentionally induced the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance to terminate, suspend or breach those agreements, (4) that the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance, in fact, terminated, suspended or breached the agreements, (5) that they would not have done so if it had not been for Verschleiser's conduct, and( 6) that the plaintiff sustained damages as a result of the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance's termination, suspension or breach, you will find Verschleiser liable to the plaintiff and will proceed to consider the amount of the plaintiff's damages. On the other hand, if you decide (1) that the plaintiff did not have agreements with the Redeeming REIT Shareholders, the Selling Group Members or Royal Alliance, or (2) that Verschleiser did not know about any of the agreements between the plaintiff and the Redeeming

---

(1st Dept. 2006)

[71] *Mazella v. Beals*, 27 N.Y.3d 694, 706, 37 N.Y.S.3d 46, 53 (2016)

REIT Shareholders, the Selling Group Members or Royal Alliance, or (3) that Verschleiser did not intentionally induce the Redeeming REIT Shareholders, the Selling Group Members or Royal Alliance to terminate, suspend or breach those agreements, or (4) that the Redeeming REIT Shareholders, the Selling Group Members or Royal Alliance did not in fact, in fact, terminate, suspend or breach the agreements, or (5) that the Redeeming REIT Shareholders, the Selling Group Members or Royal Alliance would have terminated, suspended or breached the agreements with the plaintiff even if it had not been for Verschleiser's conduct, or (6) that the plaintiff did not sustain damages as a result of the Redeeming REIT Shareholders, the Selling Group Members or Royal Alliance's termination, suspension or breach, you will find that Verschleiser is not liable to the plaintiff and you will proceed no further on this claim in respect of that plaintiff.

*Authority*: N.Y. Pattern Jury Instr.--Civil 3:56 (modified), together with the cases cited in the above footnotes to this section

### **Damages**

The fact that I instruct you on the law of damages as it relates to a tortious interference with existing contractual relations claim must not be taken as an indication that you should decide for the plaintiff. You will decide on the evidence presented and the rules of law that I have given you whether the plaintiff is entitled to recover from the defendant.

If you find that the defendant is liable to the plaintiff for tortious interference with his or its agreements with the Redeeming REIT Shareholders, the Selling Group Members and/or Royal Alliance, you will consider the amount of the plaintiff's damages. The plaintiff is entitled to damages in the amount of the full pecuniary loss of the benefits of the agreement; for any consequential losses; and for emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

In addition to compensatory damages, you have the discretion to award punitive damages in the manner in which I instructed you with respect to plaintiffs' ECPA claims.

*Authority*: *Guard-Life Corp.*, 50 N.Y.2d at 197 & n.6, 428 N.Y.S.2d at 637 & n.6; Restatement (Second) of Torts § 774A (1977)

## J.   TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

In Count XIII, plaintiffs claim, as relevant here, that Verschleiser, directly or through Veen, Svisch, Merchansky, or one or more Doe defendants, Del Forno, Pinhasi, and/or Onica tortiously interfered with plaintiffs' prospective contractual relations.

Specifically, plaintiffs claim (1) that one or more of them had the opportunity to enter into contractual relationships with (i) the Intended REIT Buyers through certain existing broker-dealer selling group members whom I previously listed; (ii) the Intended Selling Group Members, whom I also previously listed; and/or (iii) Opera Solutions, (2) that Verschleiser knew about those prospective contractual relationships and that Del Forno, Pinhasi and/or Onica also knew about the prospective contractual relationship with Opera Solutions, (3) that (i) Verschleiser intentionally interfered with the prospective contractual relationships with the Intended REIT Buyers and/or the Intended Selling Group Members (a) by using dishonest, unfair or improper means in that Verschleiser (i) created fake websites, disseminated fake reports, blogs, and social media and other posts on the Internet, distributed flyers at a premier broker-dealer conference, and set up posters at the conference, which disparaged Frydman, United Realty and/or Frydman's other businesses and were directed at the public, including without limitation REIT investors, potential REIT investors, selling group members, and prospective selling group members; and/or (ii) sent mass anonymous defamatory email blasts to REIT investors, selling group members and prospective selling group members, among others, in May

and June 2015, which also disparaged Frydman, United Realty and/or Frydman's other businesses, and/or (b) for the sole purpose of harming plaintiffs, and/or (ii) Verschleiser, either directly or with Del Forno, Pinhasi and/or Onica knowingly providing substantial assistance, intentionally interfered with the prospective contractual relationship with Opera Solutions (a) by using dishonest, unfair or improper means in that through hacking, Verschleiser identified Opera Solutions and then sent an "anonymous" email to it that disparaged Frydman and his businesses and encouraged Opera Solutions not to go forward with them, and/or (b) for the sole purpose of harming plaintiffs, (4) that had it not been for Verschleiser, Del Forno, Pinhasi and/or Onica's interference, the Intended REIT Buyers, the Intended Selling Group Members and/or Opera Solutions would have entered into contractual relationships with plaintiffs, and (5) that as a result of the loss of the contractual relationships, plaintiffs sustained damages.

For the plaintiff to recover, the plaintiff must prove (1) that he or it had the opportunity to enter into contractual relationships with (i) the Intended REIT Buyers through certain existing broker-dealer selling group members; (ii) the Intended Selling Group Members; and/or (iii) Opera Solutions, (2) that Verschleiser knew about those prospective contractual relationships and/or that Del Forno, Pinhasi and/or Onica also knew about the prospective contractual relationship with Opera Solutions, (3) that (i) Verschleiser intentionally interfered with the prospective contractual relationships with the Intended REIT Buyers and/or the Intended Selling Group Members, and/or (ii) Verschleiser, either directly or with Del Forno, Pinhasi and/or Onica knowingly providing substantial assistance, intentionally interfered with the prospective contractual relationship with Opera Solutions, (4) that had it not been for Verschleiser, Del Forno, Pinhasi and/or Onica's interference, the plaintiff and the Intended REIT Buyers, the Intended Selling Group Members and/or Opera Solutions would have entered into contractual

relationships, (5) that (i) with respect to the Intended REIT Buyers and/or the Intended Selling Group Members, Verschleiser (a) used dishonest, unfair or improper means[72] in that Verschleiser (i) created fake websites, disseminated fake reports, blogs, and social media and other posts on the Internet, distributed flyers at a premier broker-dealer conference, or set up posters at the conference, which disparaged Frydman, United Realty and/or Frydman's other businesses and were directed at the public, including without limitation REIT investors, potential REIT investors, selling group members, or prospective selling group members; and/or (ii) sent mass anonymous defamatory email blasts to REIT investors, selling group members or prospective selling group members, among others, in May and/or June 2015, which also disparaged Frydman, United Realty and/or Frydman's other businesses, and/or (b) acted for the sole purpose of harming the plaintiff, and/or (ii) with respect to Opera Solutions, Verschleiser, either directly or with Del Forno, Pinhasi and/or Onica knowingly providing substantial assistance, (a) used dishonest, unfair or improper means in that through hacking, Verschleiser identified Opera Solutions and then sent an "anonymous" email to it that disparaged Frydman and his businesses and encouraged Opera Solutions not to go forward with them, and/or (b) acted for the sole purpose of harming the plaintiff, and (6) that as a result of the loss of the contractual relationships, the plaintiff sustained damages.

In considering whether Verschleiser knew about the prospective contractual relationships with the Intended REIT Buyers, the Intended Selling Group Members and/or Opera Solutions, and/or whether Del Forno, Pinhasi and/or Onica also knew about the prospective contractual relationship with Opera Solutions, you will decide whether Verschleiser, Del Forno, Pinhasi and/or Onica were actually aware of the respective prospective contractual relationship, although

---

[72] *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003), *certified question answered*, 3 N.Y.3d 182, 785 N.Y.S.2d 359 (2004)

knowledge of the specific terms of the respective prospective contractual relationship is not
required. In considering whether Verschleiser intentionally interfered with the prospective
contractual relationships with the Intended REIT Buyers and/or the Intended Selling Group
Members, and/or whether Verschleiser, either directly or with Del Forno, Pinhasi and/or Onica
knowingly providing substantial assistance, intentionally interfered with the prospective
contractual relationship with Opera Solutions, you will decide whether Verschleiser acted with
the purpose of interfering with the respective prospective contractual relationship.

   If you decide (1) that the plaintiff would have entered into contractual relationships with
(i) the Intended REIT Buyers through certain existing broker-dealer selling group members; (ii)
the Intended Selling Group Members; and/or (iii) Opera Solutions, (2) that Verschleiser knew
about those prospective contractual relationships and/or that Del Forno, Pinhasi and/or Onica
also knew about the prospective contractual relationship with Opera Solutions, (3) that (i)
Verschleiser intentionally interfered with the prospective contractual relationships with the
Intended REIT Buyers and/or the Intended Selling Group Members, and/or (ii) Verschleiser,
either directly or with Del Forno, Pinhasi and/or Onica knowingly providing substantial
assistance, intentionally interfered with the prospective contractual relationship with Opera
Solutions, (4) that (i) with respect to the Intended REIT Buyers and/or the Intended Selling
Group Members, Verschleiser (a) used dishonest, unfair or improper means in that Verschleiser
(i) created fake websites, disseminated fake reports, blogs, or social media or other posts on the
Internet, distributed flyers at a premier broker-dealer conference, or set up posters at the
conference, which disparaged Frydman, United Realty and/or Frydman's other businesses and
were directed at the public, including without limitation REIT investors, potential REIT
investors, selling group members, or prospective selling group members; and/or (ii) sent mass

anonymous defamatory email blasts to REIT investors, selling group members or prospective

selling group members, among others, in May and/or June 2015, which also disparaged

Frydman, United Realty and/or Frydman's other businesses, and/or (b) acted for the sole purpose

of harming the plaintiff, and/or (ii) with respect to Opera Solutions, Verschleiser, either directly

or with Del Forno, Pinhasi and/or Onica knowingly providing substantial assistance, (a) used

dishonest, unfair or improper means in that through hacking, Verschleiser identified Opera

Solutions and then sent an "anonymous" email to it that disparaged Frydman and his businesses

and encouraged Opera Solutions not to go forward with them, and/or (b) acted for the sole

purpose of harming the plaintiff, and (6) that the plaintiff sustained damages as a result of the

interference, you will find for the plaintiff and proceed to consider the amount of the plaintiff's

damages.  On the other hand, if you decide (1) that the plaintiff would not have entered into

contractual relationships with (i) the Intended REIT Buyers through certain existing broker-

dealer selling group members; (ii) the Intended Selling Group Members; or (iii) Opera Solutions,

or (2) that Verschleiser did not know about any of those prospective contractual relationships and

that Del Forno, Pinhasi and Onica also did not know about the prospective contractual

relationship with Opera Solutions, or (3) that (i) Verschleiser did not intentionally interfere with

the prospective contractual relationships with the Intended REIT Buyers or the Intended Selling

Group Members, or (ii) Verschleiser, either directly or with Del Forno, Pinhasi and/or Onica

providing substantial assistance, did not intentionally interfere with the prospective contractual

relationship with Opera Solutions, or (4) that (i) with respect to the Intended REIT Buyers and/or

the Intended Selling Group Members, Verschleiser (a) did not use dishonest, unfair or improper

means in that Verschleiser did not (i) create fake websites, disseminate fake reports, blogs, or

social media or other posts on the Internet, distribute flyers at a premier broker-dealer

conference, or set up posters at the conference, which disparaged Frydman, United Realty and/or

Frydman's other businesses and were directed at the public, including without limitation REIT

investors, potential REIT investors, selling group members, or prospective selling group

members; or (ii) send mass anonymous defamatory email blasts to REIT investors, selling group

members or prospective selling group members in May and June 2015, which also disparaged

Frydman, United Realty and/or Frydman's other businesses, or (b) did not act for the sole

purpose of harming the plaintiff, or (iii) with respect to Opera Solutions, Verschleiser, either

directly or with Del Forno, Pinhasi and/or Onica providing substantial assistance, (a) did not use

dishonest, unfair or improper means in that Verschleiser did not, through hacking or otherwise,

identify Opera Solutions and sent an "anonymous" email to it that disparaged Frydman and his

businesses and encouraged Opera Solutions not to go forward with them, or (b) did not act for

the sole purpose of harming the plaintiff, or (5) that the Intended REIT Buyers, the Intended

Selling Group Members and Opera Solutions would not have entered contractual relationships

with the plaintiff even if Verschleiser, Del Forno, Pinhasi and/or Onica had not interfered, you

will find for those defendants as to that plaintiff and proceed no further.

*Authority*: N.Y. Pattern Jury Instr.--Civil 3:57, together with the case cited in the above footnote
to this section

### Damages

The fact that I instruct you on the law of damages as it relates to a tortious interference

with prospective contractual relations claim must not be taken as an indication that you should

decide for the plaintiff. You will decide on the evidence presented and the rules of law that I

have given you whether the plaintiff is entitled to recover from the defendant.

If you find that the defendant is liable to the plaintiff for tortious interference with his or

its prospective contractual relationships with the Intended REIT Buyers or the Intended Selling

Group Members or Opera Solutions, you will consider the amount of the plaintiff's damages.  As with tortious interference with existing contractual relations, the plaintiff is entitled to damages in the amount of the full pecuniary loss of the benefits of the agreement; for any consequential losses; and for emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

In addition to compensatory damages, you have the discretion to award punitive damages in the manner in which I instructed you with respect to plaintiffs' ECPA claims.

*Authority*: *Guard-Life Corp.*, *supra*; Restatement (Second) of Torts, *supra*

## K.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In Count XIV, which plaintiff Frydman asserts in the alternative to Counts IX and X for trade libel and additional libel per se, respectively, to the extent that those counts are asserted by him, plaintiff Frydman claims that defendant Verschleiser intentionally inflicted emotional distress upon him.  You will reach Count XIV if and only if you do not find for Frydman on either Count IX for trade libel or Count X for additional libel per se.

Specifically, Frydman claims that Verschleiser's alleged actions, directly or through Veen, Svisch, Merchansky, or one or more Doe defendants in sending, creating, publishing, making, putting up, or otherwise disseminating disparaging emails, fake or otherwise disparaging websites, reports, blogs, and social media and other posts, disparaging flyers and posters, and mass defamatory email blasts intentionally inflicted emotional distress upon him.  In that regard, Frydman claims that the mass creation and dissemination of such information constitute conduct (i) that is so extreme and outrageous that it transcends the bounds of decency so as to be regarded as atrocious and intolerable in a civilized society; (ii) that was undertaken by Verschleiser, directly or through Veen, Svisch, Merchansky, or one or more Doe defendants, with the intent to

cause severe emotional distress to Frydman, or recklessly; and (iii) that caused such distress and resulted in substantial damages.

One who intentionally and for the purpose of causing severe emotional distress, or recklessly and with utter disregard for the consequences that might follow, conducts himself toward another person in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency is liable to such person for any resulting severe emotional distress.

Intent involves the state of mind with which an act is done. If a person acts voluntarily with a desire to bring about a result, he is said to have intended that result. Further, although he has no desire to bring about the result, if he does the act knowing, with substantial certainty, that the result will follow, he is also said to have intended that result. An act is reckless when it is done in such a manner and under such circumstances as to show utter disregard of the consequences that may follow. A deliberate and malicious campaign of harassment or intimidation that inflicts severe mental pain or anguish may constitute intentional infliction of emotional distress.[73]

Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it. Medical evidence is not required to corroborate severe emotional distress where the conduct involved is of the type that guarantees an especial likelihood of genuine and serious mental distress on the part of plaintiff or where one must draw only a common sense causal connection between plaintiff's injury and one precipitating cause.[74]

If you find, first, that defendant's conduct toward plaintiff was so outrageous and shocking that it exceeded all reasonable bounds of decency as measured by what the average

---

[73] *Nader v. General Motors Corp.,* 25 N.Y.2d 560, 569, 307 N.Y.S.2d 647, 654 (1970)

[74] *Sylvester v. City of New York,* 385 F. Supp. 2d 431, 444 (S.D.N.Y. 2005) (collecting cases); *Doe v. Doe,* 2017 WL 3025885, at *7 (S.D.N.Y. July 14, 2017) (same)

member of the community would tolerate and, second, that defendant's conduct caused severe emotional distress to plaintiff and, third, that defendant acted with the desire to cause such distress to plaintiff or under circumstances known to defendant which made it substantially certain that that result would follow or recklessly, your finding on this issue will be for plaintiff.

If, on the other hand, you find, first, that defendant's conduct was not so outrageous and shocking as to exceed all reasonable bounds of decency as measured by what the average member of the community would tolerate or, second, that although it was, defendant's conduct did not cause severe emotional distress to plaintiff or, third, that although defendant's conduct was outrageous and shocking and did cause severe emotional distress to plaintiff, defendant did not act with the desire to cause such distress to plaintiff; nor under circumstances known to defendant which made it substantially certain that that result would follow; nor recklessly, your finding on this issue will be for defendant.

*Authority*: N.Y. Pattern Jury Instr.--Civil 3:6 (modified), together with the cases cited in the footnotes to this section

### **Damages**

The fact that I instruct you on the law of damages as it relates to an intentional infliction of emotional distress claim must not be taken as an indication that you should decide for the plaintiff. You will decide on the evidence presented and the rules of law that I have given you whether the plaintiff is entitled to recover from the defendant.

If you find that Verschleiser is liable to Frydman for intentionally inflicting emotional distress, you will consider the amount of Frydman's damages. The plaintiff may recover damages for injury to his reputation and the humiliation and mental anguish in his public and private life, as I previously instructed you with respect to libel per se, and any special damages that are proven, as I previously instructed you with respect to trade libel. If you find that the

174

plaintiff's reputation will be injured in the future as a result of the defendant's conduct, or that

plaintiff will suffer humiliation or mental anguish in the future as a result of such conduct, you

will award such additional amount as will compensate the plaintiff for such injuries, as I also

previously instructed you with respect to libel per se.

     If you do not award actual damages to the plaintiff for intentional infliction of emotional

distress you must nonetheless award the plaintiff nominal damages.[75]

     In addition to compensatory damages, you have the discretion to award punitive damages

in the manner in which I instructed you with respect to plaintiffs' ECPA claims.

*Authority*: N.Y. Pattern Jury Instr.--Civil 3:6, Damages Comment

## L.    BREACH OF CONTRACT

     In Count XV, plaintiffs United Realty and Frydman claim that defendant Verschleiser

breached contracts with them.

     Frydman claims that he had a contract with Verschleiser, i.e., the Separation Agreement,

requiring Verschleiser to comply with various provisions, including the following non-

disparagement, email exchange server restoration and non-solicitation provisions. To reiterate,

in Paragraph 10 of the Separation Agreement, Verschleiser agreed that for 18 months, (i) he

would not disparage, encourage or induce others to disparage Frydman, United Realty or any of

Frydman's other businesses, with the term disparage defined as including the making of false,

defamatory or derogatory comments that could reasonably be expected to damage the reputation

of Frydman, United Realty or any of Frydman's other businesses, and any breach of the non-

disparagement provision being deemed a material breach pursuant to Paragraph 11 of the

---

[75] *Doe v Roe*, 157 Misc. 2d 690, 694-95, 598 N.Y.S.2d 678, 681-82 (Just. Ct. Haverstraw 1993)

Separation Agreement; and (ii) he would not employ or solicit the employment of individuals at

United Realty, Prime United or any of Frydman's other businesses. In Paragraph 25 of the

Separation Agreement, Verschleiser agreed to restore all exchange servers, web hosting, and

United Realty and its affiliates' computer servers to their status on or before November 15, 2013

and to provide Frydman with all owner and administrative passwords by the close of business on

December 5, 2013.

Frydman claims that (i) he performed all the terms and conditions of the Separation

Agreement on his part to be performed prior to Verschleiser's alleged breaches of the foregoing

provisions of that Agreement; and (ii) the alleged breach of either of the non-disparagement and

email exchange server restoration provisions of the Agreement was material, such that his own

performance of the Agreement was excused thereafter. I will instruct you as what constitutes a

material breach of contract later.

Frydman claims that Verschleiser breached the non-disparagement provision of the

Separation Agreement during the 18-month period following its effective date of December 3,

2013, by (i) allegedly sending negative emails about Frydman and/or United Realty under

Verschleiser's own name to or with a copy to one or more third parties on various occasions after

December 2013; (ii) allegedly creating fake websites, disseminating fake reports, blogs, and

social media and other posts on the Internet, sending anonymous emails, distributing flyers at a

premier broker-dealer conference, and putting up posters at the conference, in the course of the

second through fifth RICO predicate acts of wire or mail fraud that I previously summarized;

(iii) allegedly sending Opera Solutions an anonymous email encouraging it not to go forward

with the $1.6 million sublease transaction; (iv) allegedly sending mass anonymous email blasts

to REIT investors, selling group members and prospective selling group members, among others,

in May and June 2015; and/or (v) allegedly having Akerman in February 2015 commence a baseless, sham state court action against Frydman, *Akerman v. Frydman*, Index No. 650351/2015, and disseminate a baseless sham whistleblower letter, each of which items (i) through (v) allegedly disparaged Frydman, United Realty and/or Frydman's other businesses, including through making false, defamatory or derogatory comments that could reasonably be expected to damage one or more of their reputations.

Frydman claims that Verschleiser breached the email exchange server restoration provision of the Separation Agreement by allegedly failing by the close of business on December 5, 2013 to restore United Realty and its affiliates' computer servers to their pre-November 16, 2013 status and to provide Frydman with all owner and administrative passwords. Frydman claims that Verschleiser breached the non-solicitation provision of the Separation Agreement during the 18-month period following its effective date by allegedly soliciting the employment of, or employing, one or more United Realty employees following his departure from United Realty, in particular Del Forno, Pinhasi and Nick Constantinescu, whom I will refer to as Constantinescu.

United Realty claims that it had a contract with Verschleiser, an employment agreement entered into on January 4, 2011, requiring him to comply with various provisions, including the following non-disparagement, non-solicitation and confidentiality provisions. To reiterate, in Section (b) of the employment agreement, Verschleiser agreed that, directly or indirectly, for 12 months after the date of termination of his employment, among other things, (i) he would not hire any employee, consultant or advisor of United Realty or a United Realty affiliate, among others (Section (b)(ii)(B)); (ii) he would not disparage United Realty, a United Realty affiliate or Frydman, among others, in a manner that could reasonably be expected to injure its or his

business or reputation (Section (b)(iv)), and (iii) he would not divulge to anyone or use any confidential or trade secret information of United Realty or any of its affiliates, among others (Section (b)(v)).

United Realty claims that it performed all the terms and conditions of the employment agreement on its part to be performed.

United Realty claims that Verschleiser breached the non-disparagement provision of his employment agreement during the 12-month period following his termination by disparaging Frydman, United Realty and/or Frydman's other businesses in one or more of the manners in which Verschleiser breached the non-disparagement provision of the Separation Agreement. United Realty claims that Verschleiser breached the non-solicitation provision of the employment agreement in the same manner in which Verschleiser breached the non-disparagement provision of the Separation Agreement. United Realty claims that Verschleiser breached the confidentiality provision of his employment agreement by disclosing his alleged knowledge of (i) the $1.4 million sublease transaction on which United Realty and Opera Solutions were about to close that was allegedly confidential; and (ii) the $4 million transaction agreement between Royal Alliance and Prime United that was allegedly confidential.

Frydman has the burden of proving, by a preponderance of the evidence, that:

(1) he had a contract with Verschleiser, the Separation Agreement, requiring Verschleiser to comply with its non-disparagement, email exchange server restoration and non-solicitation provisions;

(2) he performed all the terms and conditions of the Separation Agreement on his part to be performed prior to Verschleiser's alleged breach of any of those provisions;

(3) Verschleiser breached one or more of those provisions in the manner or manners I have described;

(4) the alleged breach of either of the non-disparagement and email exchange server restoration provisions of the Separation Agreement was material, such that his own performance of the Agreement was excused thereafter; and

(5) he sustained damages because of Verschleiser's breach or breaches.

Again, the non-disparagement provision of the Separation Agreement defines the term disparage as including the making of false, defamatory or derogatory comments that could reasonably be expected to damage the reputation of Frydman, United Realty or any of Frydman's other businesses.  A derogatory comment is a comment that expresses a low opinion about someone or something or that detracts from the character or standing of someone or something – in other words a belittling, contemptuous, degrading, demeaning, deprecatory, derisory, disdainful, pejorative, slighting or uncomplimentary remark.[76] As the term appears in that non-disparagement provision, a derogatory comment need not be false or defamatory.[77]

---

[76] The Merriam-Webster dictionary definition of and synonyms for "derogatory." https://www.merriam-webster.com/dictionary/derogatory

[77] *Cf. Propis v Fireman's Fund Ins. Co.,* 112 A.D.2d 734, 737-38, 492 N.Y.S.2d 228, 231-32 (4th Dept.), *aff'd,* 66 N.Y.2d 828, 498 N.Y.S.2d 363 (1985), which reasoned as follows:

> We note that *the material published or uttered need not,* to be the basis of a covered claim under 2(B)…*constitute a libel or slander or be legally defamatory or even allegedly false.* (Section 2[B] of the definition of "Personal Injury" lists the covered publications or utterances *in the disjunctive,* i.e., "of a libel and slander *or* of other disparaging *or* defaming material"….*It is enough if the insured has published or uttered "[other] disparaging material"—material which is derogatory or belittling….*

(initial emphasis in original; subsequent emphasis added.)

A party's performance under a contract is excused where the other party has substantially failed to perform under the contract, or, synonymously, where that committed a material breach.[78] Whether a failure to perform constitutes a material breach turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefited under the contract.[79]

As far as concerns a material breach of the non-disparagement provision of the Separation Agreement, Frydman claims that Verschleiser himself agreed in the Separation Agreement that any breach of the non-disparagement provision would be considered a material breach; that its breach was a massive and intentional one; that it began while the Separation Agreement was in its relative infancy and therefore was of great magnitude; and that non-disparagement was critical to Frydman, United Realty and Frydman's other companies' business activities, especially attracting investors and broker-dealer selling group members for United Realty and the REIT, who would typically search Frydman's name and the names of his businesses on Internet search engines as part of their due diligence. As far as concerns a material breach of the email exchange server restoration provision of the Separation Agreement, Frydman claims that the breach of that provision was a complete and intentional one; that it occurred while the Separation Agreement was in its infancy and therefore was of great magnitude; and that server restoration to pre-November 16 status by December 5, 2013 was also critical to Frydman, United Realty and Frydman's other companies' business activities, particularly in terms of communications with respect to the REIT, and in treating the damage caused by Verschleiser's allegedly hacking the United Realty server beginning December 2, 2013.

---

[78] *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016)

[79] *Id.* (citing *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96, 356 N.Y.S.2d 249, 255 (1974))

It is stipulated that Frydman had a contract with Verschleiser, the Separation Agreement, requiring Verschleiser to comply with its non-disparagement, email exchange server restoration and non-solicitation provisions, and if you decide that Frydman performed all the terms and conditions of the Separation Agreement on his part to be performed prior to Verschleiser's alleged breaches of any of those provisions, and that Verschleiser breached one or more of those provisions in the manner or manners I have described, and that the breach of the non-disparagement provision or the email exchange server restoration provision was material, you will find for Frydman on his breach of contract claim and you will go on to consider his damages. If you decide that Frydman did not perform the terms and conditions of the Separation Agreement on his part to be performed prior to Verschleiser's alleged breach of any of the non-disparagement, email exchange server restoration and non-solicitation provisions of the Separation Agreement, or that Verschleiser did not breach any of those provisions, or that his breach of the non-disparagement provision or the email exchange server restoration provision was not material, you will find for Verschleiser on Frydman's breach of contract claim and report to the Court.

United Realty has the burden of proving, by a preponderance of the evidence, that:

(1) it had a contract with Verschleiser, his employment agreement, requiring Verschleiser to comply with its non-disparagement, non-solicitation and confidentiality provisions;

(2) it performed all the terms and conditions of the employment agreement on its part to be performed prior to Verschleiser's alleged breach of any of those provisions;

(3) Verschleiser breached one or more of those provisions in the manner or manners I have described; and

(4) it sustained damages because of Verschleiser's breach or breaches.

It is stipulated that United Realty had a contract with Verschleiser, his employment

agreement, requiring Verschleiser to comply with its non-disparagement, non-solicitation and

confidentiality provisions, and if you decide that United Realty performed all the terms and

conditions of the employment agreement on its part to be performed prior to Verschleiser's

alleged breach of any of those provisions, and that Verschleiser breached one or more of those

provisions in the manner or manners I have described, you will find for United Realty on its

breach of contract claim and you will go on to consider its damages.  If you decide that United

Realty did not perform the terms and conditions of the employment agreement on its part to be

performed prior to Verschleiser's alleged breach of any of the non-disparagement, non-

solicitation and confidentiality provisions of that agreement, or that Verschleiser did not breach

any of those provisions, you will find for Verschleiser on United Realty's breach of contract

claim and report to the Court.

*Authority*: N.Y. Pattern Jury Instr.--Civil 4:1 (modified), together with the cases and authority
cited in the footnotes to this section

### **Damages**

The fact that I instruct you on the law of damages as it relates to a breach of contract

claim must not be taken as a suggestion that you should find for the plaintiff on his or its breach

of contract claims.  It is for you to decide on the evidence presented and the rules of law I have

given you whether the plaintiff is entitled to recover from the defendant.  The basic principle of

contract damages is to leave the injured party in as good a position as he, she or it would have

been if the contract had been performed; damages for breach of contract are ascertained as of the

date or dates of the breach or breaches.[80]

---

[80] *Brushton-Moira Cent. School Dist. v. Fred H. Thomas Associates, P.C.,* 91 N.Y.2d 256, 261,
669 N.Y.S.2d 520, 522 (1998)

*Authority*: N.Y. Pattern Jury Instr.--Civil 4:20 (modified), together with the case cited in the footnote to this damages section

### General, Consequential and Nominal Damages

In an action for breach of contract, a plaintiff may seek two distinct categories of damages: (1) "general" damages; and (2) "consequential" damages.[81] A plaintiff is seeking general damages when he tries to recover the value of the very performance promised.[82] Frydman seeks general damages on his claim against Verschleiser for breach of the email exchange server restoration provision of the Separation Agreement, namely, the damages sustained by the alleged failure by the close of business on December 5, 2013 to restore United Realty and its affiliates' computer servers to their pre-November 16, 2013 status and to provide Frydman with all owner and administrative passwords. Also, Frydman and United Realty seek general damages on their respective claims against Verschleiser for breach of the non-solicitation provision of the Separation Agreement and the non-solicitation provision of his employment agreement, namely, the damages sustained by the loss of the services of Del Forno, Pinhasi and/or Nick Constantinescu during the time that Verschleiser allegedly employed them.

The burden of uncertainty as to the amount of general damages is upon the wrongdoer; the plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach.[83]

"Consequential" damages, on the other hand, seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the

---

[81] *See* 3 Dan B. Dobbs, *Dobbs Law of Remedies* § 12.2(3) (1993)

[82] *Id.*

[83] *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)

defendant's breach.[84] Frydman and United Realty seek consequential damages on their respective claims against Verschleiser for breach of the non-disparagement provision of the Separation Agreement and the non-disparagement provision of his employment agreement, namely, the lost profits allegedly sustained by them as a result of Verschleiser's (i) allegedly sending negative emails about Frydman and/or United Realty under Verschleiser's own name to or with a copy to one or more third parties on various occasions after December 2013; (ii) allegedly creating fake websites, disseminating fake reports, blogs, and social media and other posts on the Internet, sending anonymous emails, distributing flyers at a premier broker-dealer conference, and putting up posters at the conference, in the course of the second through fifth RICO predicate acts of wire or mail fraud; (iii) allegedly sending Opera Solutions an anonymous email encouraging it not to go forward with the $1.6 million sublease transaction; (iv) allegedly sending mass anonymous email blasts to REIT investors, selling group members and prospective selling group members, among others, in May and June 2015; and/or (v) allegedly having Akerman in February 2015 commence a baseless, sham state court action against Frydman, *Akerman v. Frydman*, and disseminate a baseless sham whistleblower letter, each of which items (i) through (v) allegedly disparaged Frydman, United Realty and/or Frydman's other businesses, including through making false, defamatory or derogatory comments that could reasonably be expected to damage one or more of their reputations.  United Realty also seeks consequential damages on its claim against Verschleiser for breach of the confidentiality provision of the employment agreement, namely, the lost profits allegedly sustained by it as a result of the loss of (i) the $1.4 million sublease transaction on which United Realty and Opera Solutions were about to close; and (ii) the $4 million transaction agreement between Royal Alliance and Prime United.

---

[84] *Dobbs Law of Remedies, supra*

To be recoverable, lost profits must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting; the party breaching the contract is liable for those risks foreseen or which should have been foreseen.[85] It is not necessary for the breaching party to have foreseen the breach itself or the particular way the loss occurred, rather, it is only necessary that loss from a breach is foreseeable and probable.[86] To determine whether consequential damages were reasonably contemplated by the parties, you must look to the nature, purpose and particular circumstances of the contract known by the parties as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.[87] Proof of lost profits cannot be speculative or conjectural; rather, the plaintiff must establish both the existence and the amount of such damages with reasonable certainty.[88] In addition, consequential damages must be proximately caused by the breach.[89]

If you do not award general or consequential damages to the plaintiff in the instance of a particular breach, you must nonetheless award the plaintiff nominal damages.[90]

*Authority*: the cases and authority cited in the footnotes to this section

---

[85] *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192-93, 856 N.Y.S.2d 505, 508 (2008) (internal citations and quotation marks omitted)

[86] *Id.* at 193, 856 N.Y.S.2d at 508 (internal citations and quotation marks omitted)

[87] *Id.* (internal citations and quotation marks omitted)

[88] *Id.* (internal citations omitted)

[89] *Id.* at 193, 856 N.Y.S.2d at 508 (internal citation and quotation marks omitted)

[90] *Oklahoma Police Pension and Retirement Sys. v. U.S. Bank Nat. Ass'n*, 291 F.R.D. 47, 71 (S.D.N.Y. 2013) (collecting cases), *abrogated on other grounds by Retirement Bd. of the Policemen's Annuity and Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154 (2d Cir. 2014)

## M.    BREACH OF DUTY OF LOYALTY

In Count XIX, plaintiff United Realty claims that defendant Del Forno breached a duty of

loyalty to United Realty as its employee.  Employees owe duties of good faith and loyalty to

their employers while carrying out their duties.[91]  The employer-employee relationship is one of

contract, express or implied, and is in the nature of master-servant and principal-agent

relationships; an employee is to be loyal to his or her employer and is prohibited from acting in

any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost

good faith and loyalty in the performance of his or her duties.[92]

As I previously explained, United Realty claims that Del Forno breached his duty of

loyalty while he was still employed by it through February 14, 2014 as head of its information

technology, by providing necessary computer-related assistance to Verschleiser in furtherance of

alleged hacking beginning December 2, 2013.  Specifically, United Realty claims that (i) Del

Forno accessed, including by using a computer workstation called "RDELFORNO-X1," or

assisted Verschleiser in allegedly accessing, Frydman's and/or other employees' emails, as a

result of which, among other things, Del Forno and/or Verschleiser allegedly learned of a $1.4

million sublease transaction on which United Realty and Opera Solutions were about to close,

although Del Forno was expressly not authorized to access other employee email accounts

pursuant to the terms of United Realty's employee manual; (ii) Del Forno gave Verschleiser

Frydman's United Realty email account password in excess of his authority, which allegedly

allowed Verschleiser to access and commandeer United Realty's hosted email exchange server;

(iii) with Del Forno's assistance, Verschleiser allegedly was able to hack into and intercept the

---

[91] *Poller*, 974 F. Supp. 2d at 227

[92] *W. Elec. Co. v Brenner*, 41 N.Y.2d 291, 295, 392 N.Y.S.2d 409, 411 (1977)

emails of United Realty employees, create backups of United Realty email data and trade secrets, and to download, copy and then delete all of that data from United Realty's email exchange server, depriving United Realty of its important confidential and proprietary information, data and trade secrets; and/or (iv) Del Forno used the contents of illegally accessed electronic communications so that Verschleiser allegedly could create, or cause to be created, the fake websites, blogs and other Internet postings that are the subject of the third and fifth RICO predicate acts of wire or mail fraud I previously discussed, including without limitation allegedly through use of photos of Frydman and information about United Realty that was not available on its website, causing United Realty to suffer substantial damages.

United Realty has the burden of proving, by a preponderance of the evidence, that Del Forno breached his duty of loyalty to it in one or more of those manners.

If you find that Del Forno did not breach his duty of loyalty to United Realty in any of those manners, you need proceed no further.

If you find that Del Forno did breach his duty of loyalty to United Realty in one or more those manners, you must then decide, you must then decide the amount of damages United Realty sustained on account of the breach.

*Authority*: the cases cited in the footnotes to this section

### **Damages**

The fact that I instruct you on the law of damages as it relates to a breach of duty of loyalty claim must not be taken as a suggestion that you should find for the plaintiff on its breach of duty of loyalty claim. It is for you to decide on the evidence presented and the rules of law I have given you whether the plaintiff is entitled to recover from the defendant.

Where an employee has breached a duty of loyalty, the employer may choose between

recovering the profits the defendant made or recovering the profits the employer would have made had the employee not breached his or her duty of loyalty to the employer.[93]

United Realty seeks lost profits on its breach of duty of loyalty claim allegedly sustained by it as a result of (i) the loss of the $1.4 million sublease transaction on which United Realty and Opera Solutions were about to close; and (i) Del Forno's alleged use of the contents of illegally accessed electronic communications so that Verschleiser allegedly could create, or cause to be created, the fake websites, blogs and other Internet postings that are the subject of the third and fifth RICO predicate acts of wire or mail fraud, including without limitation through use of photos of Frydman and information about United Realty that was not available on its website, all of which disparaged United Realty and/or Frydman.

You should assess United Realty's lost profits damage claims in the manner in which I instructed you with respect to consequential damages on Frydman and United Realty's breach of contract claims.

*Authority*: the case cited in the footnote to this damages section

## N. CONVERSION

In Count XX, plaintiff United Realty claims that defendants Verschleiser, Del Forno, Pinhasi, and Onica converted certain of its personal property.

A person who, without authority, intentionally exercises control over the property of another person and thereby interferes with the other person's right of possession has committed a conversion and is liable for the value of the property. The key elements of conversion are (1) the plaintiff's possessory right or interest in the property and (2) the defendant's dominion over the

---

[93] *Shamrock Power Sales, LLC v Scherer*, 2016 WL 7647597, at *8 (S.D.N.Y. Dec. 8, 2016), *report and recommendation adopted*, 2017 WL 57855 (S.D.N.Y. Jan. 4, 2017)

property or interference with it in derogation of the plaintiff's rights.[94] The plaintiff need only

prove that the defendant interfered with the plaintiff's right to possess the subject property; the

plaintiff need not prove that the defendant took ownership of the property or benefited from it.[95]

The element of dominion or control may be satisfied by a showing that the defendant

intentionally destroyed the property.[96] Intangible property in the form of electronic records that

were stored on a computer or server may be the subject matter of a conversion action.[97]

As I explained earlier, United Realty claims that after Verschleiser was no longer

employed by it, Verschleiser and Del Forno, Pinhasi and/or Onica, either directly or by

knowingly providing substantial assistance to Verschleiser, in the course of the first RICO

predicate act of wire fraud or mail fraud I previously discussed, took control of United Realty's

email exchange server beginning December 2, 2013, then copied for themselves certain

computer files, including .pst files, from that server, and then deleted those files, depriving

United Realty of their data, by reason of which Verschleiser and Del Forno, Pinhasi and/or Onica

assumed and continued to assume the rights of ownership over such personal property of United

Realty to the exclusion of its rights in such property, as a result of which United Realty suffered

substantial damages. A .pst file contains the backup data for its associated email account.

United Realty claims that Verschleiser and Del Forno, Pinhasi and/or Onica, either directly or by

knowingly providing substantial assistance to Verschleiser, deleted, and thereby deprived United

---

[94] *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50, 827 N.Y.S.2d 96, 100 (2006)

[95] *Hillcrest Homes, LLC v. Albion Mobile Homes, Inc.*, 117 A.D.3d 1434, 1436, 984 N.Y.S.2d 755, 758 (4th Dept. 2014)

[96] *Jim Henson Productions, Inc. v. John T. Brady & Assocs., Inc.*, 867 F. Supp. 175, 191 (S.D.N.Y. 1994) (internal citation omitted)

[97] *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292-93, 832 N.Y.S.2d 873, 879 (2007)

Realty of the following .pst files:

1. Jacob_Frydman_12-06-2013.pst

2. Eli_Verschleiser_12-06-2013.pst

3. URPA_Backup_ Joseph_Santacruz_12-01-2013.pst

4. Asher_Gulko_12-06-2013.pst

5. Monica_Frydman_12-06-2013.pst

6. Cathy_Larson_12-08-2013.pst

7. Jacob_Frydman_12-09-2013.pst

In order to find the defendant responsible for conversion, you must first decide whether the plaintiff has proved, by a preponderance of the evidence, that the defendant, deleted certain computer files, including one or more of the .pst files I just listed, from United Realty's email exchange server. If you find that the defendant did not delete those files, then you need proceed no further and should find in favor of that defendant.

Should you find that the defendant did delete the files, you must then decide whether the plaintiff has proved, by a preponderance of the evidence, that such deletion was intentional. If you find that defendant did not act intentionally, then you need proceed no further and should find in favor of the defendant.

Should you find that the defendant acted intentionally, you must then decide whether the plaintiff has proved, by a preponderance of the evidence, that it did not authorize the defendant to delete the files. If you find that the plaintiff authorized the defendant to do so, then you need proceed no further and should find in favor of the defendant.

Should you find that the defendant intentionally deleted the files without the plaintiff's permission, then you must decide whether the plaintiff has proved, by a preponderance of the

evidence, that the defendant's actions in doing so excluded the plaintiff from exercising its rights over the files.  If you find that defendant's actions in doing so was not to the exclusion of the plaintiff's property rights to the files, then you need proceed no further and find in favor of the defendant.

*Authority*: N.Y. Pattern Jury Instr.--Civil 3:10 (modified); Joint Proposed Jury Instructions in *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp LLC*, U.S.D.C., S.D.N.Y., 08 civ. 4810 (October 12, 2017), Doc. 171 (hereafter "*Pure Power* Proposed Jury Instructions"), at p. 55, together with the cases cited in the footnotes to this section

### Damages

The fact that I instruct you on the law of damages as it relates to a breach of duty of loyalty claim must not be taken as a suggestion that you should find for the plaintiff on its conversion claim.  It is for you to decide on the evidence presented and the rules of law I have given you whether the plaintiff is entitled to recover from the defendant.

The owner of personal property which is lost, injured, or destroyed by the wrongful act of another is entitled to recover from the wrongdoer damages for the amount that will compensate the owner for the actual losses sustained, provided such loss is the natural, reasonable, and proximate result of the wrongful act.  If personal property is destroyed, the plaintiff is entitled to recover its value, which ordinarily is its market value.[98]

In instances where someone has converted, destroyed, or lost the only embodiment of computer file that did not have an ascertainable market price, an award of damages may be based on evidence of the cost or estimated cost required to reproduce the computer file, such as the cost of programming hours.[99]

---

[98] N.Y. Jur. 2d *Damages* § 81

[99] *Veeco Instruments, Inc. v. Candido,* 70 Misc. 333, 335-36, 334 N.Y.S.2d 321, 324 (Sup. Ct. Nassau Co. 1972).

*Authority*:  the treatise and case cited in the footnotes to this damages section

## IV.     POST-TRIAL JURY INSTRUCTIONS CONTINUED

### PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 33

**Jury to Disregard Court's View**

I have not expressed nor have I intended to intimate any opinion as to which witnesses

are or are not worthy of belief, what facts are or are not established or what inference or

inferences should be drawn from the evidence.  If any expression of mine has seemed to indicate

an opinion relating to any of these matters, I instruct you to disregard it.  You are, I repeat, the

exclusive, sole judges of all of the questions of fact submitted to you and of the credibility of the

witnesses.

Your authority, however, is not to be exercised arbitrarily; it must be exercised with

sincere judgment, sound discretion, and in accordance with the rules of law which I give you.  In

making your determination of the facts in this case, your judgment must be applied only to that

which is properly in evidence.  Arguments of counsel are not in evidence, although you may give

consideration to those arguments in making up your mind on what inferences to draw from the

facts which are in evidence.

From time to time the court has been called upon to pass upon the admissibility of certain

evidence, although I have tried to do so, as far as it was practicable, out of your hearing.  You

have no concern with the reasons for any such rulings and you are not to draw any inferences

from them.  Whether offered evidence is admissible is purely a question of law in the province

of the court and outside the province of the jury.  In admitting evidence to which objection has

been made, the court does not determine what weight should be given to such evidence, nor does

it pass on the credibility of the evidence.  Of course, you will dismiss from your mind,

completely and entirely, any evidence which has been ruled out of the case by the court, and you

will refrain from speculation or conjecture or any guesswork about the nature or effect of any

colloquy between court and counsel held out of your hearing or sight.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 71.01, at 71-5

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 34

**Review Principles Stated**

You will recall that at the beginning of the trial I stated for you certain principles so that you could have them in mind as the trial progressed. Briefly, they were that you are bound to accept the law as I give it to you, whether or not you agree with it. You are not to ask anyone else about the law. You should not consider or accept any advice about the law from anyone else but me. As members of the jury, you are the sole and exclusive judges of the facts. Since you are the sole and exclusive judges of the facts, I do not mean to indicate any opinion as to the facts or what your verdict should be. The rulings I have made during the trial are not any indication of my views of what your decision ought to be or as to whether or not the plaintiff has proved his or its case. You are to draw no inference from the fact that upon occasion I asked questions of certain witnesses. Those questions were intended only for clarification or to expedite matters and certainly were not intended to suggest any opinions on my part as to the verdict you should render, or whether any of the witnesses may have been more credible than any other witnesses. You are expressly to understand that the court has no opinion as to the verdict you should render in this case. Furthermore, you may not draw any inference from an unanswered question nor consider testimony which has been stricken from the record in reaching your decision. Any notes that any of you took are to be used solely to assist the note-taking juror and are not to substitute for his or her recollection of the evidence in the case. The fact that a particular juror has taken notes entitles that juror's view to no greater weight than those of any other juror and his or her notes are not to be shown to any other juror during your deliberations.

*Authority*: N.Y. Pattern Jury Instr. --Civil 1:21 (modified)

**Additional Review Principles Stated – Witness Credibility**

You have had the opportunity to observe all the witnesses. It is now your job to decide how believable each witness was in his or her testimony. You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

You are being called upon to resolve various factual issues raised by the parties in the face of very different pictures painted by both sides. In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence which may help you decide the truth and importance of each witness's testimony.

How do you determine where the truth lies? You watched the witness testify. Everything a witness said or did on the witness stand counts in your determination. How did the witness impress you? Did the witness appear to be frank, forthright and candid, or evasive and edgy as if hiding something? How did the witness appear; what was the witness's demeanor - that is, his or her carriage, behavior, bearing, manner and appearance while testifying? Often it is not what a person says but how he or she says it that moves us.

You should use all tests for truthfulness that you would use in determining matters of importance to you in your everyday life. You should consider any bias or hostility the witness may have shown for or against any party as well as any interest the witness has in the outcome of the case. You should consider the age, the appearance, the manner of the witness as the witness testified, the opportunity and ability the witness had to see, hear and know the things about which he or she testified, the accuracy of his or her memory, his or her candor or lack thereof, his or her intelligence, the reasonableness and probability of his or her testimony, its consistency or lack of consistency and its corroboration or lack of corroboration with other credible testimony,

and other evidence that may have contradicted the witness' testimony.

In other words, what you must try to do in deciding credibility is to size up a witness in light of his or her demeanor, the explanations given and all of the other evidence in this case. Always remember that you should use your common sense, your good judgment and your own life experience.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 76.01, at 76-1

**Additional Review Principles Stated – Preponderance of the Evidence**

Also, the plaintiff must have proven the elements of each of his or its claims against the defendant by a preponderance of the evidence, but need not have proven more than a preponderance.

To establish by the preponderance of the evidence means to prove that something is more likely so than it is not so. In other words, a preponderance of the evidence in this case means such evidence as, when considered and compared to that opposed to it, has more convincing force, and produces in your mind a belief that what is sought to be proved is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may, unless otherwise previously instructed, consider the testimony of all witnesses, regardless of who may have called them, all exhibits received in evidence, regardless of who may have produced them, and all stipulations of fact.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 104:01 (modified); 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 73.01, at 73-2 (modified)

196

**Additional Review Principles Stated – Impeachment of Witnesses, Discrepancies in Testimony**

You should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact; or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony he or she gave during the trial.

You may be guided by the appearance and conduct of a witness, or by the manner in which a witness testifies, or by the character of the testimony given, or by evidence contrary to the testimony given.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. Consider each witness' intelligence, motive and state of mind, and demeanor or manner while on the stand. Consider the witness' ability to observe the matters as to which he or she has testified, and whether he or she impresses you as having an accurate recollection of these matters. Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

A witness may be discredited or impeached by contradictory evidence; or by evidence that some other time the witness has said or done something or has failed to say or do something which is inconsistent with the witness' present testimony.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement

was simply an innocent lapse of memory or an intentional falsehood; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.  Discrepancies in a witness' testimony or between his testimony and that of others do not necessarily mean that the witness' entire testimony should be discredited.

*Authority*: Pure Power Proposed Jury Instructions, at pp. 84-85 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 35

**Falsus in Uno**

If you find that any witness has willfully testified falsely as to any material fact, that is as to an important matter, the law permits you to disregard completely the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything. You are not required, however, to consider such a witness as totally "unbelievable." You may accept so much of his or her testimony as you deem true and disregard what you feel is false. By the processes which I have just described to you, you, as the sole judges of the facts, decide which of the witnesses you will believe, what portion of their testimony you accept and what weight you will give to it.

*Authority*: N.Y. Pattern Jury Instr.--Civil 1:22

PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 36

**Admission by a Party -- By Statement**

Testimony has been introduced that (plaintiff, defendant) made a statement to AB at [*time and place*] concerning [*material fact*].  (Plaintiff, defendant) denies that he, she made such a statement (or, admits that he, she made such a statement, but says [*state explanation offered*]).  If you find that (plaintiff, defendant) made such a statement and that (he, she) thereby admitted [*material fact*], you may consider that statement as evidence of _____.

In deciding whether such a statement was made, you will apply the rules I have already given you about the evaluation of testimony.  You may accept either party's version of what happened in whole or in part or you may accept a part of the versions given by both.  In deciding how much weight you will give to the statement, if any, you can consider (*[insert as appropriate:]* ( the words used, the person to whom the statement was made, the time that passed between the making of the statement and the occurrence, all of the other circumstances and conditions existing at the time and place, and the other facts in evidence, as well as the reasonableness of the (plaintiff's, defendant's) explanation of the statement).  You may consider the statement to be conclusive and binding on (plaintiff, defendant), or you may ignore it altogether, or you may give it a weight between those two extremes, as you find proper under all the circumstances.

*Authority*: N.Y. Pattern Jury Instr.--Civil 1:55 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 37

**Interested Witness -- Generally**

The individual plaintiff and the individual defendants testified before you. As parties to the action, all are interested witnesses.

An interested witness is not necessarily less believable than a disinterested witness. The fact that he or she is interested in the outcome of the case does not mean that he or she has not told the truth. It is for you to decide from the demeanor of the witness on the stand and such other tests as your experience dictates whether or not the testimony has been influenced, intentionally or unintentionally, by his or her interest. You may, if you consider it proper under all of the circumstances, not believe the testimony of such a witness, even though it is not otherwise challenged or contradicted. However, you are not required to reject the testimony of such a witness, and may accept all or such part of his or her testimony as you find reliable and reject such part as you find unworthy of acceptance.

*Authority*: N.Y. Pattern Jury Instr.--Civil 1:91 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 38

**All Available Evidence Need Not Be Produced**

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial. No party has an obligation to present cumulative testimony. Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in the case.

You are not to rest your decision on what some absent witness who was not brought in might have testified to, or what he or she might not have testified to.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 105:11 (modified); *Pure Power* Proposed Jury Instructions, at p. 86

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 39

**Summaries and Charts Admitted as Evidence**

Plaintiffs (and Defendants) have presented exhibits in the form of charts and summaries. I decided to admit these summaries and charts in place of the underlying documents that they represent in order to save time and avoid unnecessary inconvenience. You should consider these charts and summaries as you would any other evidence.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 74.06, at 74-11 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 40

**Use of Depositions as Evidence**

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by attorneys for the parties to the case. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented in writing under oath or on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, and weighed, and otherwise considered by you, insofar as possible, in the same way as if the witness had been present and had testified from the witness stand.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 105:02

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 41

**Consider Only Testimony and Exhibits**

In deciding this case, you may consider only the exhibits which have been admitted in evidence, the testimony of the witnesses as you have heard it in this courtroom or as there has been read to you testimony given in a deposition, and stipulations of fact. However, arguments, remarks, and summation of the attorneys are not evidence nor is anything that I now say or may have said with regard to the facts, evidence.

*Authority*: N.Y. Pattern Jury Instr.--Civil 1:25 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 42

**Answers to Interrogatories**

Plaintiffs have introduced into evidence certain interrogatories—that is, questions together with answers signed and sworn to by the other party. A party is bound by its sworn answers.

By introducing an opposing party's answers to interrogatories, the introducing party does not bind itself to those answers. The introducing party may challenge the opposing party's answers in whole or in part or may offer contrary evidence.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 104:72

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 43

**Agents of Corporation**

A corporation or limited liability company may act only through natural persons as its agents or employees.  In general, agents or employees of a corporation may bind the corporation by their acts and declarations made while acting within the scope of their authority delegated to them by the corporation, or within the scope of their duties as employees of the corporation.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 108:01 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 44

**Juror's Use of Professional Expertise**

Although as jurors you are encouraged to use all of your life experiences in analyzing testimony and reaching a fair verdict, you may not communicate any personal professional expertise you might have or other facts not in evidence to the other jurors during deliberations. You must base your discussions and decisions solely on the evidence presented to you during the trial and that evidence alone. You may not consider or speculate on matters not in evidence or matters outside the case.

*Authority*: N.Y. Pattern Jury Instr.--Civil 1:25A

V.     **CLOSING INSTRUCTIONS**

**PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 45**

**Duty to Deliberate**

In a few minutes you will retire to the jury room to decide the case. In order to prevail on a particular claim, the plaintiff you are considering must sustain his or its burden of proof as I have explained to you with respect to each element of that claim. If you find that the plaintiff has succeeded on any particular claim, you should return a verdict in his or its favor on that claim. If you find that the plaintiff failed to sustain the burden on any element of the claim, you should return a verdict against him or it on that claim. Similarly, if you find that the defendant you are considering failed to sustain his or its burden of proof with respect to any element of a particular affirmative defense, you must return a verdict against the defendant on that affirmative defense.

This case should be considered and decided by you as an action between parties of equal standing in the community, of equal worth, and holding the same or similar situations in life. Individuals and corporations stand equal before the law and are entitled to the same fair trial at your hands.

I have now outlined for you the rules of law that apply to this case and the processes by which you weigh the evidence and decide the facts. Your function—to reach a fair decision from the law and the evidence—is an important one. When you are in the jury room, listen to each other, and discuss the evidence and issues in the case among yourselves. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for himself or herself, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not

bound to surrender your honest convictions concerning what the truth is and the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. While each of you must decide the case for yourself and not merely consent to the decision of your fellow jurors, you should examine the issues and the evidence before you with candor and frankness, and with proper respect and regard for the opinions of each other. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth. Remember in your deliberations that the dispute between the parties is, for them, a very important matter. They and the court rely upon you to give full and conscientious deliberation and consideration to the issues and evidence before you. By so doing, you carry out to the fullest your oaths as jurors to truly try the issues of this case and render a true verdict.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender his or her conscientious beliefs solely for the purpose of returning a unanimous verdict.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 78.01, at 78-3 (modified); N.Y. Pattern Jury Instr.--Civil 1:28 (modified)

**PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 46**

**Communications Between Court and Jury During Jury's Deliberations**

If it becomes necessary during your deliberations to communicate with me, you may send a note by the court deputy, signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me by any means other than a signed writing. I will never communicate with any member of the jury on any subject touching the merits of the case otherwise than in writing, or orally here in open court.

The court deputy too, as well as all other persons, is forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person—not even to me—how the jury stands, numerically or otherwise, on the questions before you, until after you have reached a unanimous verdict.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 106.08 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 47

**Right to See Exhibits and Hear Testimony**

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If, in the course of your deliberations, your corrective recollection of any part of the testimony should fail, or you have any question about my instructions to you on the law, you have the right to return to the courtroom for the purpose of having such testimony read to you or have such question answered. Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony should likewise be made to me in a note given to the court deputy, signed by your foreperson or by one or more members of the jury. In any event, do not tell me or anyone else how the jury stands on any issue or how you are divided until after a unanimous verdict is reached.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 78.01, at 78-1 (modified); N.Y. Pattern Jury Instr.--Civil 1:24 (modified)

**PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 48**

**Evidence in Electronic Format**

Exhibits received in evidence capable of being displayed electronically will be provided to you in that form. You will be able to view them in the jury room. Necessary equipment will be available to you in the jury room.

A court technician will show you how to operate the equipment; how to locate and view the exhibits on the equipment. You will also be provided with a paper list of all exhibits received in evidence. Again, you may request a paper copy of any exhibit received in evidence by sending a note to me signed by your foreperson and given to the court deputy. If you need additional equipment or supplies or if you have questions about how to operate the equipment, you may send a note to the court deputy signed by your foreperson. Do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires maintenance or instruction, a court technician may enter the jury room with the court deputy present for the sole purpose of assuring that the only matter discussed is the technical problem. When the court technician or any nonjuror is in the jury room, the jury must not deliberate. No juror may say anything to the court technician or any nonjuror other than to describe the technical problem or to seek information about operating the equipment. Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the equipment in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the equipment for any other purpose. At my direction, technicians have taken steps to ensure that the equipment does not permit access to the Internet or to any "outside" website, database, directory, game, or other material. Do not attempt to alter the equipment to obtain access to such materials. If you

discover that the equipment provides or allows access to such materials, you must inform the court immediately and refrain from viewing such materials.

Do not remove the equipment or any electronic data *[disk]* from the jury room, and do not copy any such data.

*Authority*: 3 Kevin F. O'Malley et al., Fed. Jury Prac. & Instr. (6th ed.) § 104:55 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 49

**Selection of Foreperson, Special Verdict and Return of Verdict**

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations, send out any notes and speak for you here in open court. His or her vote is entitled to no greater weight than that of any other juror.

I have prepared a special verdict form for you to use in recording your decision and have had it distributed to you. The special verdict form is made up of questions concerning the important issues in this case. Again, these questions principally are to be answered "yes" or "no." Your answers must be unanimous and must reflect the conscientious judgment of each juror. You should answer every question, except where the verdict form indicates otherwise. Please do not add anything that is not called for by the verdict form.

I will now read the special verdict form:


After a unanimous decision has been reached, you will record your answers on one copy of the verdict form. The foreperson will fill in, date and sign the form. Then each juror will sign the bottom of it and the foreperson will notify the court deputy that a verdict has been reached. Do not give the verdict form to the court deputy. The foreperson should place it in an envelope and bring it with you when you return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by the foreperson in open court and officially recorded, it ordinarily cannot be revoked.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 78.01, at 78-5; 78-9 (modified); *Pure Power* Proposed Jury Instructions, at p. 88 (modified)

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 50

**Verdict Forms -- Jury's Responsibility**

Nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in any way or manner any suggestion or hint as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

## PLAINTIFFS' PROPOSED REQUEST TO CHARGE NO. 51

**Juror Oath**

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice or sympathy and without fear, solely upon the evidence in the case and the applicable law. You are not to be swayed by rhetoric or emotional appeals. I know that you will do this and reach a just and true verdict.

*Authority*: 4 L. Sand et al., Modern Federal Jury Instructions (Civil) ¶ 71.01, at 71-4 (modified)