UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

UNITED REALTY ADVISORS, LP, ET AL.,

                    Plaintiffs,         14-cv-5903 (JGK)

      - against -

ELI VERSCHLEISER, ET AL.,

                    Defendants.
————————————————————————————

JACOB FRYDMAN, ET AL.,

                    Plaintiffs,         14-cv-8084 (JGK)

      - against -

                              OPINION AND ORDER

ELI VERSCHLEISER, ET AL.,

                    Defendants.
————————————————————————————

JOHN G. KOELTL, District Judge:

    The plaintiffs, Jacob Frydman, United Realty Advisors, LP, and Prime United Holdings, LLC, move for an award of attorney's fees and costs in connection with these consolidated cases, which this Court has described as "the latest chapter in a long-running and acrimonious dispute between . . . Frydman" and his former business partner, defendant Eli Verschleiser. Frydman v. Verschleiser, 172 F. Supp. 3d 653, 658 (S.D.N.Y. 2016). The plaintiffs specifically seek $1,936,651.75 in attorney's fees and costs pursuant to the fee provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.,

and the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 <u>et</u> <u>seq.</u>, based on a judgment obtained after a jury trial in 2022.

For the reasons set forth below, the plaintiffs' motion for attorney's fees and costs (ECF No. 614) is **granted**, but only to the extent of an award of fees and costs in the amount of **$306,970.52**.

## I.

The Court assumes familiarity with the prolonged history of this case, which has been described in a number of prior opinions, <u>see, e.g.,</u> ECF Nos. 126, 366, 371, 590, including, most recently, the Court's May 18, 2023 Memorandum Opinion and Order denying the defendant's postjudgment motion, <u>see</u> ECF No. 630 ("May 18, 2023 Opinion").[1] Briefly, the plaintiffs commenced these cases in 2014. The actions were consolidated in May 2015, and on July 13, 2015, the plaintiffs filed their Consolidated Second Amended Complaint, ECF No. 71 ("Complaint" or "Compl."). The 480-paragraph Complaint contained 20 counts asserting various federal and New York state-law claims against ten named defendants, all of which related to the plaintiffs' allegations that Verschleiser, with the assistance of others, engaged in a coordinated campaign to harm Frydman and his companies after Frydman ousted Verschleiser from their shared

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text. Citations to the docket generally refer to ECF entries in the lead case, No. 14-cv-5903. Citations to ECF entries in the consolidated case, No. 14-cv-8084, are prefaced with a reference to that docket number.

real estate business. The plaintiffs sought injunctive relief and hundreds of millions of dollars in damages, including, as relevant here, (1) $160 million in RICO damages, "trebled to not less than $480 million," and (2) an estimated $160 million in compensatory damages, plus punitive damages, for the SCA claim. See, e.g., Compl. ¶ 354; id., Prayer for Relief, ¶¶ (i)-(ii).

Not long after the Complaint was filed, this Court observed that "[e]ach party has used judicial and extra-judicial scorched earth practices to torment the other party." Frydman, 172 F. Supp. 3d at 658. That observation applied not only to these cases, but also to the general history of litigation between the parties. Indeed, as these cases progressed, it became clear that they were only part of an array of vexatious legal proceedings, including state court lawsuits and arbitrations, litigated between these parties in the past decade. See, e.g., Jan. 5, 2015 Tr., No. 14-cv-8084, ECF No. 31, 33-34 (referring to at least seven distinct lawsuits that the parties had filed against one another).

Over the course of eight years of litigation in these cases, most of the defendants were dismissed, and both sides repeatedly shuttled in new attorneys. Eventually, the plaintiffs sought and secured a default judgment against the defendant Multi Capital Group of Companies ("Multi Group"), an entity affiliated with Verschleiser. See ECF No. 475. Trial was initially scheduled for mid-2018 (at which point, the parties made extensive pretrial

3

submissions), but then was adjourned several times until a final trial date was set in late 2022. Between October 24, 2022, and November 7, 2022, the plaintiffs finally tried their surviving claims against the two remaining defendants, Verschleiser and Ophir Pinhasi, before a jury.

This Court's May 18, 2023 Opinion summarized the jury verdict as follows:

> After deliberations, the jury found in Pinhasi's favor on all of the claims against him, and it also found in Verschleiser's favor on the plaintiffs' state-law claims for libel per se, trade libel, and intentional infliction of emotional distress. However, the jury unanimously determined that Verschleiser had committed the following violations of federal and state law: violation of and conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 et seq.; violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; violation of the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, 2707; misappropriation of trade secrets; breach of contract; tortious interference with existing contractual relations; tortious interference with prospective business relations; and conversion. See Trial Tr. ("Tr.") 1127-33. The jury determined that all of these violations, except for the violation of the ECPA, caused some form of injury to the plaintiffs. Id.; see also id. 1129.
>
> The jury awarded a total of $2,133,005 in damages on the claims for which Verschleiser was found liable. That amount includes: $33,000 in damages for the violations of the federal computer hacking statutes that caused injury to the plaintiffs; another $1.4 million in compensatory damages on the state-law claim for misappropriation of trade secrets; nominal damages of $1 for the RICO violations; nominal damages of $1 on each of the other state-law claims resolved in the plaintiffs' favor, namely the claims for conversion, tortious interference with existing contractual relations, tortious interference with prospective

business relations, and breach of contract; and an award
of $700,000 in punitive damages. Id. 1133-34.

May 18, 2023 Opinion at 3-4.

After resolving various objections to the proposed judgment,
the Court entered final judgment in these consolidated cases on
November 25, 2022. See Final Judgment ("Judgment"), ECF No. 591.
The Judgment provides that the plaintiffs are entitled to
$3,234,906.04 from Verschleiser, which, as set forth in the May
18, 2023 Opinion, consists of:

> (1) the jury's award of $33,000 in damages on the federal
> computer hacking claims; (2) the jury's award of $1.4
> million in damages on the misappropriation of trade
> secrets claim; (3) the jury's award of $1 in nominal
> damages on each of the other successful state-law
> claims, for a total of $4; (4) the jury's award of $1 in
> nominal damages under RICO, trebled to $3 pursuant to 18
> U.S.C. § 1964(c); (5) the award of $700,000 in punitive
> damages; and (6) $1,101,899.04 in prejudgment interest
> on the total damages awarded for the state-law claims,
> calculated at a rate of 9% per year for the requested
> period (from February 10, 2014, to November 7, 2022).

May 18, 2023 Opinion at 5.

The final judgment also provides that the amount of any
attorney's fees and costs to be awarded pursuant to RICO's fee
provision, 18 U.S.C. § 1964(c), and the SCA's fee provision, 18
U.S.C. § 2707(c), "shall be established by [separate] motion."
See Judgment at 4-5. Moreover, in light of the default judgment
obtained against Multi Group, the final judgment reflects that
Multi Group is "jointly and severally liable with Verschleiser"

for the $3 in trebled RICO damages and for any attorney's fees awarded "pursuant to 18 U.S.C. § 1964(c)." Id. at 6.

In December 2022, Verschleiser filed a postjudgment motion for relief from the final judgment pursuant to Federal Rules of Civil Procedure 50, 59, and 60, which this Court recently denied in full. See May 18, 2023 Opinion at 22. In that same month, the plaintiffs filed the motion at issue here, which seeks attorney's fees and costs pursuant to Federal Rule of Civil Procedure 54. See ECF No. 614.

The plaintiffs' motion seeks a total award of $1,936,651.75 in attorney's fees and costs. The plaintiffs represent that this award would cover, in addition to certain expert witness payments, the fees and expenditures of four separate sets of attorneys who served as plaintiffs' counsel at various points in the litigation. Those four sets of attorneys are: (1) Mr. Lewis Fischbein and his law firm, Lewis S. Fischbein, P.C.; (2) Mr. Neal Brickman and his law firm, The Law Offices of Neal Brickman, P.C. ("Brickman"); (3) Herrick Feinstein LLP ("Herrick"); and (4) Eckert Seamans Cherin & Mellott, LLC ("Eckert").

**II.**

As a threshold matter, the parties dispute whether the plaintiffs are entitled to a fee award at all. The plaintiffs argue that they are entitled to fees and costs pursuant to RICO's fee provision, 18 U.S.C. § 1964(c), and the SCA's fee provision,

18 U.S.C. § 2707(c). The defendant[2] contends that any such award would be "improper" because the damages obtained for the RICO claims and the SCA claim do not "demonstrate entitlement" to fees. Def.'s Opp'n, ECF No. 622, at 4, 8.

The defendant's argument is misplaced. Beginning with the SCA, the relevant statutory text provides that "[i]n the case of a successful action to enforce liability under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the court." 18 U.S.C. § 2707(c). This "language -- [which] employ[s] the word 'may' -- makes an award of attorney's fees discretionary, not mandatory, in a 'successful action.'" Vista Mktg., LLC v. Burkett, 812 F.3d 954, 977 (11th Cir. 2016). The defendant suggests that a fee award under the SCA would be improper because $33,000 in actual damages is trivial "as compared to the amount sought." Def.'s Opp'n at 10. But the SCA's only prerequisite to an award of fees is a "successful action to enforce liability under this section," 18 U.S.C. § 2707(c), and the plaintiffs -- who obtained both an SCA liability finding and

---

[2] The opposition papers state that "[d]efendants Eli Verschleiser . . . and Ophir Pinhasi" oppose the plaintiffs' fee motion. Def.'s Opp'n, ECF No. 622, at 4. It is not at all clear why Pinhasi is included in the opposition, because the final judgment reflects that the jury "returned a verdict in favor of . . . Pinhasi on all counts," and accordingly, he cannot be held liable for any portion of a fee award in these cases. Judgment at 4. Rather, as stated explicitly in the final judgment, any fee award is to be entered against Verschleiser and Multi Group. Id. at 4-6. Because the opposition makes no argument regarding Multi Group, all references to "the defendant" in this Opinion refer to Verschleiser.

related damages as to Verschleiser -- have plainly satisfied that requirement. See Vista Mktg., 812 F.3d at 967, 978 (explaining that "the SCA contemplates liability for attorney's fees, even in the absence of actual damages," and observing that a jury verdict finding the defendant liable for "intentional[] [and] willful[]" SCA violations was "enough to successfully 'enforce liability' under the SCA"). Accordingly, this Court may, in its discretion, award "reasonable" attorney's fees and costs to the plaintiffs in connection with their SCA claim. 18 U.S.C. § 2707(c).

The plaintiffs also seek fees and costs pursuant to the following RICO provision:

> Any person injured in his business or property by reason
> of a violation of section 1962 of this chapter may sue
> therefor in any appropriate United States district court
> and shall recover threefold the damages he sustains and
> the cost of the suit, including a reasonable attorney's
> fee . . . .

18 U.S.C. § 1964(c). In contrast to the SCA's fee provision, which uses permissive language, Section 1964(c) "mandate[s] an award" of reasonable fees whenever its requirements are met. Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1168 (2d Cir. 1993).

The defendant contends that such an award would be improper in this case because the plaintiffs "failed to demonstrate RICO injury or RICO damages," and instead recovered only $1 in nominal damages (trebled to $3 in the judgment). Def.'s Opp'n at 8; see id. at 6-7. However, the first part of that assertion -- that the plaintiffs failed to prove RICO injury -- is untrue. Based on the

8

evidence presented at trial, the jury returned a verdict in which it specifically found that the defendant's "violation of [RICO]" and participation in a "conspiracy to violate [RICO]" "cause[d] injury to [the] plaintiffs." Tr. 1127-28. The jury's award of nominal damages does not cast doubt on this explicit finding of RICO injury. Instead, it merely indicates that the jury adhered to this Court's instruction to "award nominal damages if, upon finding that some injury resulted from a given unlawful act," the jury could not "compute monetary damages" with reasonable certainty. Id. 1002.

Under these circumstances, the mandatory language of Section 1964(c) requires an award of reasonable attorney's fees. As the defendant's own opposition papers point out, "Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act," Holmes v. Sec. Invs. Prot. Corp., 503 U.S. 258, 267 (1992), and accordingly, Section 1964(c) and Section 4 of the Clayton Act contain "virtually identical . . . mandatory fee provision[s]," Stochastic, 995 F.2d at 1168 (citing U.S. Football League v. Nat'l Football League, 887 F.2d 408, 412 (2d Cir. 1989)).[3] The Second Circuit Court of

---

[3] The text of Section 4 of the Clayton Act provides, in relevant part, as follows:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an

Appeals interpreted the Clayton Act's materially identical language in U.S. Football League, which is directly relevant here. In U.S. Football League, a trial jury found that the defendant's "monopolization" of the "major league professional football market injured the [plaintiff]," but awarded only $1 in nominal damages, trebled to $3, for that antitrust injury. 887 F.2d at 410-11. The Second Circuit Court of Appeals held that this result compelled a reasonable fee award, because "[i]t is clear from the plain meaning of [S]ection 4 [of the Clayton Act] that an injury is all that is required for an award of attorney's fees." Id. at 411. Put differently, "[a]n injury having been found, the awarding of attorney's fees to the [plaintiff] was compulsory" -- regardless of whether the plaintiff obtained actual or nominal damages for that injury. Id. Indeed, the Second Circuit Court of Appeals was clear that "[t]he award of only nominal damages to the [plaintiff] does not affect its right to attorney's fees" under Section 4 of the Clayton Act. Id.

Thus, there is no merit to the defendant's argument that the plaintiffs cannot recover fees under RICO's identically worded fee provision. See 18 U.S.C. § 1964(c). Because the jury found that the defendant's RICO violations caused injury to the

---

    agent, without respect to the amount in controversy, and shall
    recover threefold the damages by him sustained, and the cost
    of suit, including a reasonable attorney's fee.

15 U.S.C. § 15.

plaintiffs, Section 1964(c) makes an award of reasonable attorney's fees "compulsory." <u>U.S. Football League</u>, 887 F.2d at 411. The fact that the plaintiffs "only received nominal damages . . . may be a factor used in reducing a fee award, but it does not affect the entitlement to an award." <u>Id.</u> at 411-12.[4]

In short, this Court has the discretion to award fees and costs in connection with the plaintiffs' SCA claim, <u>see</u> 18 U.S.C. § 2707(c), and the plaintiffs are entitled to reasonable fees and costs in connection with their RICO claims, <u>see</u> 18 U.S.C. § 1964(c). The defendant's arguments that the plaintiffs cannot recover any attorney's fees and costs at all are unfounded.

## III.

While it is clear that the plaintiffs can make their fee request under RICO and the SCA, resolving that dispute does not end the inquiry into the proper amount of fees and costs to be awarded. Pursuant to the express language of both the RICO fee provision and the SCA fee provision, any fees awarded to the

---

[4] Of the various cases cited in the defendant's opposition, the only case that concerns the application of RICO's mandatory fee provision is <u>Aetna Casualty & Surety Co. v. Liebowitz</u>, 730 F.2d 905 (2d Cir. 1984). But that precedent does not support the defendant's position. <u>Aetna</u> held that a civil RICO plaintiff is not entitled to attorney's fees under Section 1964(c) "for obtaining injunctive relief, as distinguished from damages, or for a plaintiff's successfully negotiating a settlement of his claim." 730 F.2d at 907. Rather, the fee provision of Section 1964(c) is triggered only where a plaintiff obtains "a final decision on the merits" and some form of damages. <u>Id.</u> at 908-09 (relying, in part, on Section 4 of the Clayton Act to interpret Section 1964(c)). That is precisely the outcome that the plaintiffs obtained here.

plaintiffs in connection with their RICO and SCA claims must be "reasonable." 18 U.S.C. §§ 1964(c), 2707(c).

To determine a reasonable fee award, district courts must calculate the "presumptively reasonable fee." Simmons v. N.Y.C. Transit Auth., 575 F.3d 170, 172 (2d Cir. 2009). "The starting point for determining the presumptive reasonable fee is the lodestar amount, which is the product of a reasonable hourly rate and the reasonable number of hours required by the case." Alicea v. City of New York, 272 F. Supp. 3d 603, 608 (S.D.N.Y. 2017). "To arrive at a reasonable fee, courts consider, among other factors, the factors set forth in Johnson v. Ga. Highway Express Inc., 488 F.2d 714, 717–719 (5th Cir. 1974)." Id. (citing Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 186 n.3 (2d Cir. 2008)).[5] District courts also "consider the rates charged by attorneys of comparable skill, experience, and reputation in the community." Nature's

---

[5] These factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Arbor Hill, 522 F.3d at 186 n.3.

12

Enters., Inc. v. Pearson, No. 08-cv-8549, 2010 WL 447377, at *9
(S.D.N.Y. Feb. 9, 2010).

"In ruling on applications for fees, district courts must
examine the hours expended by counsel and the value of the work
product of the particular expenditures to the client's case."
DiFilippo v. Morizio, 759 F.2d 231, 235 (2d Cir. 1985). "Hours
that are excessive, redundant, or otherwise unnecessary, are to
be excluded . . . and in dealing with such surplusage, the court
has discretion simply to deduct a reasonable percentage of the
number of hours claimed as a practical means of trimming fat
from a fee application." Kirsch v. Fleet St., Ltd., 148 F.3d
149, 173 (2d Cir. 1998).

As the fee applicants, the plaintiffs in this case "bear[]
the burden of documenting the hours reasonably spent by counsel,
and the reasonableness of the hourly rates claimed." Alicea, 272
F. Supp. 3d at 609 (quoting Allende v. Unitech Design, Inc., 783
F. Supp. 2d 509, 512 (S.D.N.Y. 2011)).

The plaintiffs seek a total award of $1,936,651.75, which
encompasses the following amounts associated with the plaintiffs'
various attorneys: (1) $623,780 in fees and $288.33 in costs for
Mr. Fischbein; (2) $261,296.50 in fees and $12,837 in costs for
Herrick; (3) $266,331.88 in fees for Mr. Brickman and his firm;

and (4) $563,271.50 in fees and $20,914.75 in costs for Eckert.[6] The requested award of costs also includes "expert witness fees" incurred for the work of Berkeley Research Group ("Berkeley") and K2 Intelligence ("K2") in amounts of $88,605 and $109,612.50, respectively. Pls.' Memo., ECF No. 615, at 12.

For many reasons, the plaintiffs' request for nearly $2 million in fees and costs, made pursuant to statutes under which the plaintiffs recovered only $33,003 in damages ($3 in trebled RICO damages and $33,000 for computer hacking), goes well beyond what is reasonable. As a general matter, "[t]he fact that . . . attorney's fees are provided for by statute is not a license for either undisciplined prosecution of a case or unfettered billing practices." Hines v. 1025 Fifth Ave. Inc., No. 14-cv-3661, 2015 WL 4006126, at *7 (S.D.N.Y. June 30, 2015). And those are just some of the issues that warrant a substantial fee reduction in these cases. As set forth below, from the outset of the actions, the plaintiffs employed litigation conduct that inevitably fueled a needless increase in attorney time and effort over the lifespan

---

[6] The plaintiffs have failed to provide a chart or summary anywhere in their fee application that compiles all of these requested fees and costs in one place. Therefore, the Court has gathered these numbers from the following sources: (1) Mr. Fischbein's fees of $623,780 and costs of $288.33, see Fischbein Decl., ECF No. 614-4, ¶ 3; (2) Herrick's fees of $261,296.50, see Frydman Decl., ECF No. 614-5, ¶ 7, and costs of $12,837, see Pls.' Memo., ECF No. 615, at 12; (3) Mr. Brickman's fees of $266,331.88, see Brickman Decl., ECF No. 614-3, ¶ 3; (4) Eckert's fees of $563,271.50 and costs of $20,914.75, see Shienvold Decl., ECF No. 614-2, ¶ 6; and (5) expert witness fees in amounts of $88,605 and $109,612.50, see Frydman Decl. ¶¶ 27-28.

of this years-long dispute. Moreover, the plaintiffs' results on their RICO and SCA claims, while favorable, pale in comparison to the tremendous damages awards that the plaintiffs pursued for the entirety of the litigation. In addition to these considerations, which apply to the litigation as a whole, the specific fee requests for each of the plaintiffs' four sets of attorneys are deficient or unreasonable for a variety of reasons. Those reasons include, among others, failures to substantiate attorney hours, vague and inadequate time entries, and excessive, duplicative, or redundant billing. Some of the fee requests also fail to exclude attorney hours that were plainly devoted to the plaintiffs' other matters and litigations, or that are otherwise not reasonably attributable to the favorable judgment on the RICO and SCA claims. All of these considerations are addressed in detail below.

**A.**

The plaintiffs argue in their motion that the defendant's obstructionist tactics throughout this litigation justify their request for nearly $2 million in fees and costs. However, while the defendant certainly bears some responsibility for needlessly increasing the hours expended on these actions, the plaintiffs themselves are not blameless. The plaintiffs have also engaged in unproductive and ill-advised litigation conduct that inevitably inflated the amount of attorney time devoted to these cases. See, e.g., Jan. 5, 2015 Tr., No. 14-cv-8404, ECF No. 31, 36, 42 (noting

that "appalling litigation tactics" and "unproductive litigation
tactics . . . have characterized the interactions between the
parties"); Feb. 17, 2015 Tr., No. 14-cv-8404, ECF No. 43, 11
("[B]oth sides have abused the litigation process."); Feb. 2,
2017 Tr., ECF No. 274, 46 (referring to certain "tactics" of the
plaintiffs "that were not to be applauded").

As just one example, on the very same day that this Court
gave the plaintiffs in the first action (No. 14-cv-5903) leave to
amend their complaint, the plaintiffs separately commenced the
second action (No. 14-cv-8084), filing a new complaint containing
allegations that were plainly related to those at issue in the
first action. See Oct. 7, 2014 Order, ECF No. 17; Compl., 14-cv-
8084, ECF No. 1. This conduct, which the Court described as the
"quintessential multiplication of proceedings," Jan. 5, 2015 Tr.
9, overcomplicated this dispute from the outset and had ripple
effects on time and effort expended throughout the litigation.

Indeed, some excessiveness is attributable to the fact that
the plaintiffs, across the two consolidated cases and with the
assistance of various attorneys, asserted and pursued multiple
claims against multiple defendants, including claims of dubious
merit. See, e.g., Jan. 5, 2015 Tr. 12 (cautioning the plaintiffs
that "multiplying the proceedings, the arguments, the claims,
the causes of action" was not an efficient litigation strategy).
Many of those claims were dismissed throughout the litigation,

some voluntarily and others on motions, and the only defendant
to proceed to trial alongside Verschleiser was found not liable
on every claim asserted against him. Ultimately, the plaintiffs
failed to succeed against any defendants other than Verschleiser
(and as to him, only in part) and Multi Group (but only based on
a default). The plaintiffs and their attorneys "should not be
rewarded for multiplying the proceedings and bringing unsuccessful
claims against multiple defendants," which "prolonged the
litigation, and the time it took for the plaintiff[s] to have
[their] case heard by a jury." Alicea, 272 F. Supp. 3d at 611.

Moreover, to the extent the plaintiffs did succeed on their
claims against Verschleiser, that success was limited. As relevant
here, from the moment they commenced these actions and all the
way through trial, the plaintiffs consistently claimed that they
were entitled to hundreds of millions of dollars in damages on
their RICO and SCA claims. See, e.g., Joint Pretrial Order, ECF
No. 575, at 10, 14 (plaintiffs asserting that the actual damages
"on their RICO claims" were "believe[d] to be not less than $771
million," and that the damages for the "claimed violations of the
SCA" were "believe[d] to be not less than $160 million"). But
after roughly nine years of contentious litigation, during which
these plaintiffs had ample opportunity to develop and evaluate
their case, the plaintiffs ultimately failed to prove the amount
of RICO damages with reasonable certainty. The jury awarded only

17

$1 in nominal damages, which was trebled to $3. See U.S. Football
League, 887 F.2d at 411-12 (explaining, with respect to the fee
provision on which 18 U.S.C. § 1964(c) was based, that a recovery
of only "nominal damages . . . may be a factor used in reducing
a fee award," and affirming a 20% fee reduction applied on those
grounds). The plaintiffs also obtained just $33,000 for the proven
hacking violations, a far cry from the estimated $160 million in
SCA damages. These results underscore the unreasonableness of the
plaintiffs' fee request: for a combined recovery of $33,003 on the
RICO and SCA claims, the plaintiffs seek nearly $2 million in fees
pursuant to the RICO and SCA fee provisions. Cf. Arbor Hill, 522
F.3d at 186 & n.3 (noting that "the amount involved in the case
and the results obtained" are among the factors relevant to
whether a fee is reasonable).

In short, the plaintiffs' litigation approach undoubtedly
resulted in an unnecessary increase in attorney hours across all
of the plaintiffs' claims, including the RICO and SCA claims on
which the plaintiffs eventually prevailed. And, in the end, the
results obtained on those claims in this nine-year-old litigation
were limited. For both reasons, an across-the-board reduction in
the plaintiffs' overall fee award is warranted. See, e.g., Alicea,
272 F. Supp. 3d at 611-12 (applying 30% fee reduction in light of
excessive billing, due in part to a litigation strategy that was
inconsistent with "prosecuting the case expeditiously to obtain a

recovery expeditiously"); <u>Tucker v. Mukasey</u>, No. 03-cv-3106, 2008 WL 2544504, at *2 (S.D.N.Y. June 20, 2008) (applying 30% reduction in light of the fact that the "[p]laintiffs' success in obtaining judgments of $100,001, although significant . . . , was limited in comparison to the extensive relief demanded"); <u>Schermerhorn v. Hall</u>, No. 92-cv-4801, 1995 WL 494011, at *6 (S.D.N.Y. Aug. 17, 1995) (applying 40% reduction based on "the limited success of the claims," for which the plaintiffs sought $12 million and obtained only $5, and noting that the plaintiffs' addition of unmeritorious claims based on "personal animosities" "consumed a great deal of trial and pre-trial time"); <u>see also</u> <u>Charles v. Seinfeld</u>, No. 18-cv-1196, 2022 WL 889162, at *7 (S.D.N.Y. Mar. 25, 2022) ("The Court has broad authority to make across-the-board percentage cuts in hours . . . to arrive at the reasonable hours expended."). The Court will therefore apply a reduction of **40%** to the total fees ultimately awarded in this litigation, after accounting for the attorney-specific reductions discussed below.

**B.**

The plaintiffs' request for attorney's fees encompasses specified amounts paid or owed to (1) Mr. Fischbein ($623,780), (2) Herrick ($261,296.50), (3) Mr. Brickman ($266,331.88) and (4) Eckert ($563,271.50). All of those requested fees must be reduced (or, in some instances, disallowed entirely) for various reasons. Each request is addressed in turn below.

## 1.

First, the plaintiffs seek legal fees paid to Mr. Fischbein, a commercial litigator with over 45 years of legal experience. See Fischbein Decl., ECF No. 614-4, ¶¶ 4-6. Mr. Fischbein began representing these plaintiffs in mid-December 2014 and formally withdrew in October 2019, but he has continued to provide legal services to the plaintiffs. Id. ¶¶ 2, 20.

The plaintiffs' motion explains that Mr. Fischbein was paid pursuant to a series of fee arrangements across four different periods: (1) in the second half of December 2014, Mr. Fischbein billed at an hourly rate of $400, see id. ¶ 7; (2) from January 1, 2015, to December 31, 2016, Mr. Fischbein was paid based on an annual retainer of $275,000 "for all [the plaintiffs'] matters," id. ¶ 10, including multiple matters beyond this litigation; (3) from January 1, 2017, to October 15, 2018, Mr. Fischbein was paid based on a reduced annual retainer of $180,000, again "for all [the plaintiffs'] matters," id. ¶ 13; and (4) from October 16, 2018, to the present, Mr. Fischbein billed at various hourly rates, ranging from $250 to $400 per hour, id. ¶ 18. For all but the last of these four distinct periods, the fees sought for Mr. Fischbein's work must be disallowed.

Mr. Fischbein's hours for the first period, December 2014, must be excluded from any fee award because those hours are not reasonably attributable to the pursuit of a favorable judgment

on the plaintiffs' RICO and SCA claims. Rather, as Mr. Fischbein states and as an invoice submitted with his declaration confirms, Mr. Fischbein's "time charges [for this period] principally reflect work performed in connection with preparing an order to show cause application for a preliminary injunction and a temporary restraining order" ("TRO") that would "prohibit[] the further dissemination of confidential documents . . . stolen from [United Realty] and/or its affiliate Cabot Lodge Securities, LLC . . . by then-defendant Albert Akerman." Id. ¶ 8; see Fischbein Decl., Ex. A, ECF No. 614-4, at 11-14.[7] It is true, as Mr. Fischbein points out, that this Court "subsequently granted the temporary restraining order sought" in "early January 2015." Fischbein Decl. ¶ 8; see Jan. 5, 2015 TRO & Order to Show Cause, ECF No. 46. But that prospective injunctive relief, which was granted based on a showing that the information at issue "was obtained in violation of contractual and fiduciary duties," Jan. 5, 2015 Tr. 77-78, did not touch on the merits of the RICO and SCA claims or otherwise play a role in advancing those claims toward a favorable final judgment. Simply put, the fees incurred for Mr. Fischbein's work in December

---

[7] Citations to the exhibits attached to the Fischbein declaration, as well as to the exhibits attached to the Frydman, Brickman, and Shienvold declarations, use the pagination in the ECF ribbon stamped at the top of each page.

2014 are not properly a part of the fees reasonably expended on the RICO and SCA claims.[8]

With respect to the second and third periods listed above, the plaintiffs have failed to sustain their "burden of documenting the hours reasonably spent by counsel." Alicea, 272 F. Supp. 3d at 609. During these periods, Mr. Fischbein worked on retainers of $275,000 and $180,000 -- which covered work performed not only for this litigation but also for various other matters in which Mr. Fischbein represented these plaintiffs -- and Mr. Fischbein's declaration concedes that he does "not have time records for such period[s]." Fischbein Decl. ¶¶ 10, 13. Rather, Mr. Fischbein has estimated that 60% of his hours in the second period (from January 2015 through December 2016) and another 50% of his hours in the third period (from January 2017 through mid-October 2018) should be "allocate[d]" to these cases, id. ¶¶ 10, 13, but the plaintiffs have not provided any documentation to substantiate these claims.[9]

_____

[8] In any event, as discussed on the record at the TRO hearing, the initial TRO application in question (filed on the day before New Year's Eve) asserted six different bases for emergency relief, five of which were withdrawn on the day before the hearing. See, e.g., Jan. 5, 2015 Tr. 12-13, 36, 125. The Court made clear at the time that it was an "unproductive litigation tactic" to "make six claims, five of which have no merit," just to "drop" the "meritless claims" after forcing opposing counsel to respond over a holiday. Id. 36. The Court would not award fees to the plaintiffs now for time and effort largely expended on that tactic. Cf. Alicea, 272 F. Supp. 3d at 612 (noting that parties and attorneys "should not be rewarded for engaging in unreasonable efforts or attempts to play hardball").

[9] The sole exception for this entire timeframe (January 2015 to mid-October 2018) is a single-page invoice for court reporting services,

It is impossible for this Court to verify the hours allegedly spent on these cases, or to evaluate the reasonableness of the work that was performed, without any supporting records at all.[10] Mr. Fischbein's declaration states that the lack of time records is "on account of" the retainer arrangement, see id. ¶¶ 10, 13, but the fact of a fixed annual retainer is no justification for the failure to maintain and provide even basic documentation of the work performed on these cases. See Kirsch, 148 F.3d at 173 ("Applications for fee awards should generally be documented by contemporaneously created time records that specify . . . the date, the hours expended, and the nature of the work done."). Because the plaintiffs have failed to provide any means of substantiating the work performed during the second and third periods described above (spanning January 1, 2015, to October 15, 2018), the request for fees incurred in that timeframe is denied.

---

which, along with Mr. Fischbein's travel fare for trial, will be addressed in connection with the plaintiffs' request for costs.

[10] The lack of any supporting documentation is especially troublesome here because, during the two time periods at issue, Mr. Fischbein represented the plaintiffs alongside Herrick (who formally replaced Mr. Fischbein as counsel of record for some time), and later alongside Mr. Brickman's firm. See Fischbein Decl. ¶¶ 12, 17. While those other attorneys appear to have kept basic time records for these periods, Mr. Fischbein did not. The lack of such records deprives this Court of the ability to examine the division of labor between Mr. Fischbein and the plaintiffs' other attorneys, and to determine whether the overlapping involvement of Mr. Fischbein and those attorneys resulted in duplicative, redundant, or otherwise unnecessary work.

For the fourth period of Mr. Fischbein's work, which spanned mid-October 2018 through the end of these cases, the plaintiffs seek $94,200 in fees. Fischbein Decl. ¶ 18. While Mr. Fischbein's hourly rates during this period were themselves reasonable, the billed time included in the plaintiffs' fee request is not. The first set of time entries submitted in support of this request, dated November 2018 through September 2021, reflects an inordinate amount of time (over 108 hours) spent on drafting questions for Frydman's direct testimony. See Fischbein Decl., Ex. C, ECF No. 614-4, at 18-25. And the fee motion provides no insight at all on the extent to which those questions were used in the trial held over one year later. The plaintiffs also rely on (1) a series of emails between Mr. Fischbein and the plaintiffs, and (2) a list of time entries related to the trial, in order to substantiate Mr. Fischbein's work from 2022. See id. at 26-29. But the emails plainly aggregate Mr. Fischbein's work on this litigation with his work in other matters, making it impossible to discern the number or reasonableness of the hours expended in connection with the RICO and SCA claims. See id. at 26-28 (referring repeatedly to the "EVUNP v. Frydman case" and to the "JFURTI and EVUNP state court cases"). And, while Mr. Fischbein states that he served as a "trial consultant" to Eckert, most of the trial-related time entries reflect only that he "attend[ed] trial" alongside trial counsel. See Fischbein Decl. ¶ 19; id., Ex. C at 29. Mr.

Fischbein did not play any role in actually trying these cases
before the jury, and neither Mr. Fischbein's declaration nor his
time entries provide a detailed description of the work performed
as part of that consultation. See Abdell v. City of New York,
No. 05-cv-8453, 2015 WL 898974, at *5 (S.D.N.Y. Mar. 2, 2015)
(reducing hours to account for the presence of nonparticipating
lawyers at trial, and noting that multiple lawyers "had a right
to attend the trial, but that does not mean that they have a
right to be compensated for their time there").

In light of these deficiencies, ambiguities, and clear
indications of excessive billing, a 50% reduction of the fees
requested for Mr. Fischbein's fourth period of work is warranted.
This reduction is necessary to ensure that the fee award excludes
any hours spent on other litigations or on excessive and redundant
work, and instead reflects only those hours reasonably expended
in pursuit of the RICO and SCA claims. Thus, the proposed award of
$94,200 for Mr. Fischbein's efforts since mid-October 2018 is
reduced to **$47,100**, and for all of the other reasons discussed
above, the remainder of the plaintiffs' request for fees related
to Mr. Fischbein's work is denied.

### 2.

The plaintiffs also seek fees in connection with the work of
the Herrick law firm. This request is rejected in full, because it
is unreasonable, inadequately supported, and difficult to credit

in light of the relationship between the plaintiffs and the
Herrick firm.

Herrick represented the plaintiffs in this litigation from
September 2016 to mid-December 2017, at which point, the law firm
withdrew from its role as counsel due to "disputes" that caused the
"attorney-client relationship [to] . . . dissolve[]." ECF No. 370.
Notably, the plaintiffs' fee application fails to include any
affidavit from Herrick itself, and it appears that Herrick was
not involved in the preparation of this motion at all. Instead,
the only affidavit related to the Herrick fee request comes from
Frydman, who states that he engaged Herrick in 2016 "to handle
discovery matters on behalf of the corporate plaintiffs."
Frydman Decl., ECF No. 614-5, ¶ 6.

Frydman's declaration is devoid of any detailed explanation
as to how the work of Herrick contributed to the ultimate result
on the plaintiffs' RICO and SCA claims, and the Court lacks any
information directly from Herrick that would provide insight on
this point. Moreover, the Herrick invoices appended to Frydman's
declaration do not permit a meaningful assessment of whether the
work performed was reasonably related to the RICO and SCA claims
in these cases, to the extent such work was related to these cases
at all. The time entries in Herrick's invoices plainly include
work related to several other matters in which Herrick represented
these plaintiffs, including an arbitration proceeding and state

court actions.[11] Other entries are vague and ambiguous, making it

impossible to discern whether the work performed was related to

this litigation, and if so, whether it was reasonably attributable

to the RICO and SCA claims specifically. The plaintiffs have not

made any representation that they have parsed Herrick's invoices

to filter out time entries unrelated to this case and to the RICO

and SCA claims in particular, and it is clear on the face of those

invoices that the plaintiffs have not done so.

The issues just described are already enough to cast serious

doubt on the propriety of the plaintiffs' request for fees related

to Herrick. See, e.g., Hines, 2015 WL 4006126, at *5, *7 (cutting

fees drastically where the "plaintiffs . . . failed to summarize,

organize, or categorize [counsel's] billing records to assist the

Court in analyzing the time spent" throughout their litigation).

But the fee request is especially troubling in light of the nature

of the relationship between Herrick and these plaintiffs, which

deteriorated substantially after this Court struck the plaintiffs'

expert reports on hacking and damages because they were untimely.

See Frydman v. Verschleiser, No. 14-cv-8084, 2017 WL 1155919

---

[11] Specifically, other materials submitted with Frydman's declaration
make clear that Herrick represented these plaintiffs in (1) an
arbitration proceeding involving Verschleiser, from at least October
2016 to May 2017, and (2) state court litigation involving
Verschleiser, beginning in at least May 2017. See Frydman Decl., Ex.
3, ECF No. 614-8, at 5 (¶ 9); see also EVUNP Holdings LLC v. Frydman,
Index No. 650841/2014 (N.Y. Sup. Ct. filed May 1, 2014); JFURTI, LLC v.
Verschleiser, Index No. 650803/2014 (N.Y. Sup. Ct. filed Apr. 14,
2014). The Herrick invoices attached to Frydman's declaration include
repeated references to these matters.

(S.D.N.Y. Mar. 27, 2017). Herrick subsequently moved to withdraw as plaintiffs' counsel, and a conference on the motion revealed that the plaintiffs had "[t]hreatened" to initiate "a potential malpractice action against Herrick," but that they would wait to determine whether their case was adversely affected as a result of Herrick's conduct. Nov. 28, 2017 Conf. Tr., ECF No. 373, at 2, 12; see, e.g., id. at 6 (plaintiffs stating that the "precluding [of] the expert reports" and "testimony at trial" of "the hacking expert and the damages expert" was "the result of the Herrick law firm missing a deadline[,] and that constituted malpractice"); id. at 12 (plaintiffs explaining that they had "threatened to sue but only if [they] suffer[ed] damages as a result" of Herrick's conduct). Indeed, the plaintiffs have contended that Herrick's actions did, in fact, undermine their ability to prove computer hacking and damages at trial and have sued Herrick for over $1.1 billion in damages arising from alleged malpractice in this case. See Compl., NYSECF Doc. No. 3, Frydman v. Herrick, Feinstein LLP, Index No. 150679/2023 (N.Y. Sup. Ct. filed May 5, 2023).[12] In essence, then, the plaintiffs are seeking fees paid to Herrick

---

[12] This Court may take judicial notice of the plaintiffs' state court action and the pleadings filed there. See Kinsey v. N.Y. Times Co., No. 18-cv-12345, 2020 WL 1435141, at *3 (S.D.N.Y. Mar. 23, 2020) (citing Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006)), aff'd, 991 F.3d 171 (2d Cir. 2021).

on the grounds that such work was reasonable and essential to their success on the RICO and SCA claims, when at the very same time, those plaintiffs are suing Herrick for impeding those very same claims. These inherently contradictory positions reinforce the conclusion that compensating the plaintiffs with fees for Herrick's work would be unreasonable.

In view of all the above, it is clear that the requested fees for Herrick's work should not be included as part of the fees and costs reasonably expended in obtaining a favorable judgment on the RICO and SCA claims. The request for those fees is denied in full.

**3.**

Next, the plaintiffs request fees for the efforts of the Brickman firm and its managing partner, Mr. Brickman, who began serving as plaintiffs' counsel on January 16, 2018. See Brickman Decl., ECF No. 614-3, ¶¶ 1, 4. The plaintiffs hired Mr. Brickman and his firm for the primary purposes of preparing for trial and trying the case. Id. ¶ 7. Trial was initially scheduled for 2018 but later adjourned several times.

Mr. Brickman, who has litigated and tried commercial cases for about 40 years, initially agreed to "prepare for trial and try the case for a set fee of $152,000, calculated at a discounted rate of $500." Id. ¶¶ 4-6, 7. Once his time charges exceeded the flat fee, Mr. Brickman continued to bill the clients at an hourly rate of $500. Id. ¶ 7. Mr. Brickman worked on these cases with

four other Brickman attorneys, including associates and partners with up to 40 years of litigation experience, all of whom billed for their time at a rate of $400 per hour. See id. ¶ 8; Brickman Decl., Ex. B, ECF No. 614-3, at 73-82.

The hourly rates charged for Mr. Brickman and the other attorneys at his firm are reasonable in light of the fees awarded for similar firms in comparable cases. Moreover, a substantial portion of the Brickman firm's requested fee should be allowed, because Mr. Brickman has provided invoices and time records that reflect significant trial preparation, and it is plain that the plaintiffs' trial counsel in 2022 (Eckert) relied on much of that work. See, e.g., Brickman Decl. ¶ 10 (stating that Eckert "used the overwhelming bulk of [the] pretrial order and . . . requests to charge"); Joint Pretrial Order at 1 (noting that, with a few exceptions, "[e]very other part of the proposed [pretrial] order remains unchanged" as compared to the 2018 version on which the Brickman firm worked, see ECF No. 393).

However, a fee reduction is needed to account for issues apparent on the face of the billing records. First, many of the time entries in those records refer only to general tasks, like "legal research" and "continu[ing] trial preparation" -- without giving any additional detail as to the substance of the work performed. See generally Brickman Decl., Ex. A, ECF No. 614-3, at 7-17. Such "vague descriptions . . . do not provide courts with

30

an adequate basis upon which to determine the reasonableness of the services and hours expended." Tucker, 2008 WL 2544504, at *1-2 (reducing fees to account for "vaguely-worded time entries," even where other entries were "sufficiently detailed"). Second, a sizeable portion of the entries plainly refer to tasks that are unrelated to obtaining a favorable judgment on the RICO and SCA claims, including settlement negotiations and preparation for a default judgment application that was never filed in these cases. See, e.g., Brickman Decl., Ex. A at 30, 34-35, 62-64 (settlement); id. at 65-66 (default judgment time entries, all dated 2020).[13] To account for these vague and excessive time entries, the Court applies a 20% reduction to the attorney's fees requested for Mr. Brickman and his firm, yielding an award of **$213,065.50**.

**4.**

Finally, the plaintiffs seek fees for the work of Eckert, a large national law firm that the plaintiffs hired in April 2022 to serve as trial counsel. See Shienvold Decl., ECF No. 614-2, ¶¶ 4, 7. At that time, the trial was scheduled for June 2022; the trial date was then adjourned, and Eckert tried the case on the plaintiffs' behalf from October 24, 2022, to November 7, 2022.

---

[13] The only default judgment relevant to this fee application at all (and the only default judgment obtained in these cases) is the one that was entered against Multi Group in October 2018, see ECF No. 475, long before the time entries described here.

The Eckert team that worked on these cases consisted of a "core group" of three litigation partners, who received "support from other attorneys" and staff, including five other partners, one senior attorney, three associates, and at least five legal support professionals and paralegals.[14] Id. ¶ 8. The "core group" of partners included: (1) Adam Shienvold, a commercial litigator with over 20 years of experience, who served as lead trial counsel, id. ¶ 9; (2) Steven Kramer, a commercial litigator with over 30 years of experience, who assisted in trial preparation and served as second chair during trial, id. ¶ 10; and (3) Casey Alan Coyle, a former partner with over 10 years of experience, who helped to prepare for trial until his departure in August 2022, id. ¶ 11. For the legal services of these three partners and the other Eckert attorneys, Eckert billed the plaintiffs at a blended rate of $450,

---

[14] Specifically, in addition to the "core group" of partners (Adam Shienvold, Steven Kramer, and Casey Alan Coyle), Eckert's declaration identifies partners Bridget Montgomery, Gabriel Vincent Tese, and Morgan McCord as members of the plaintiffs' team. See Shienvold Decl. ¶ 12(a)-(c). The declaration omits Mark Stewart and Derek Illar, two additional partners who are plainly listed as timekeepers on Eckert's billing records for this matter -- yielding a total of eight partners. See, e.g., Shienvold Decl., Ex. 2, ECF No. 614-2, at 46, 65, 112 (a subset of invoice summaries listing Stewart or Illar as timekeepers). The other timekeepers on the billing records include the three associates and five paralegals or legal support professionals listed in Eckert's declaration, see Shienvold Decl. ¶ 12(d)-(e), as well as several Eckert personnel who are not listed in the declaration, including one senior attorney (John Wertelet) and three other Eckert employees (Matthew Ward, Robert Fenimore, and Thomas Vail, all of whom appear to be paralegals or legal support staff based on their billing rates). See, e.g., Shienvold Decl., Ex. 2 at 65, 78. Overall, the plaintiffs' Eckert team included eight partners, one senior attorney, three associates, and anywhere from five to eight paralegals and legal support staff.

which reflected the firm's standard rates of $350 to $820 per hour for partners and $230 to $435 for associates.

"A blended rate is meant to account for the different billing rates of partners and associates by taking an average of the two." Bikur Cholim, Inc. v. Vill. of Suffern, No. 05-cv-10759, 2011 WL 13382668, at *2 (S.D.N.Y. June 3, 2011) (quoting McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund, 450 F.3d 91, 98 (2d Cir. 2006)). Although the Second Circuit Court of Appeals has not explicitly endorsed the use of a blended rate, see McDonald, 450 F.3d at 98, "courts in this Circuit have awarded attorneys' fees using blended rates" where appropriate. Pig Newton, Inc. v. Bds. of Dirs. of Motion Picture Indus. Pension Plan, No. 13-cv-7312, 2016 WL 796840, at *4 (S.D.N.Y. Feb. 24, 2016) (collecting cases); First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc., No. 10-cv-696, 2013 WL 950573, at *7 (E.D.N.Y. Mar. 12, 2013) (collecting cases). Eckert's blended rate in this case exceeds the rates that courts have found to be appropriate for similarly situated associates. But the plaintiffs' Eckert team was unusually partner-heavy, with eight partners (and one senior attorney) compared to just three associates, and the available time records show that partners performed a clear majority of the legal work on these cases. The blended hourly rate is lower than the reasonable rate that many of these experienced partners otherwise could have

33

charged to the plaintiffs in this litigation. Thus, on balance, the blended rate is reasonable under the circumstances of this case.

Nevertheless, a substantial fee reduction is necessary because the number of hours that Eckert devoted to this litigation was unreasonably excessive. First, it is plain that the matter was overstaffed. Over the course of Eckert's nine-month representation of the plaintiffs (from April through December 2022, the timeframe covered in the submitted time records), Eckert assigned at least 12 different attorneys -- including eight partners -- and a number of paralegals and other legal support staff to these cases. Courts routinely reduce fee awards for this sort of overstaffing, given the excess that invariably results from the needless involvement of too many attorneys. See, e.g., Houston v. Cotter, 234 F. Supp. 3d 392, 404-06 (E.D.N.Y. 2017) (collecting cases where "district and appellate courts . . . pared hours based on overstaffing"); Gen. Elec. Co. v. Compagnie Euralair, S.A., No. 96-cv-0884, 1997 WL 397627, at *4 (S.D.N.Y. July 3, 1997) ("It is well recognized, of course, that when more lawyers than are necessary are assigned to a case, the level of duplication of effort increases.").

The overstaffing is particularly unjustified in light of the fact that Eckert inherited much of prior counsel's trial-related work product and research. As noted with respect to Mr. Brickman's fees, Eckert's 2022 pretrial filings borrowed heavily from prior counsel's 2018 pretrial order and substantive requests to charge;

indeed, Eckert adopted and used the very same witness and exhibit lists that plaintiffs' prior counsel had submitted several years before. Compare ECF Nos. 393-2, 393-6 (2018 lists), with No. 14-cv-8084, ECF Nos. 431-2, 431-6 (2022 lists). Given that so many significant tasks related to trial were already complete, it is difficult to see why such a large Eckert team was necessary.

The Court appreciates that Eckert was hired to represent the plaintiffs toward the end of this long-running dispute, and that the firm had to catch up on many years of litigation in order to try the case effectively. But dividing up this work among so many Eckert attorneys and professionals almost certainly created more inefficiency, not less, and increased the risk of duplication -- not only of each other's efforts, but also of the efforts of prior counsel. That is on top of the redundancies that inevitably resulted from the plaintiffs' replacement of trial counsel and the related need to transition primary responsibility for the case from one law firm to another. Cf. Severstal Wheeling, Inc. v. WPN Corp., No. 10-cv-954, 2016 WL 1611501, at *4 (S.D.N.Y. Apr. 21, 2016) (noting that "within large-scale litigation drawn over a period of several years, there are inherent inefficiencies and redundancies that occur with respect to the time expended on a case employing numerous attorneys, which are outside the scope of compensable attorneys' fees").

To account for Eckert's overstaffing and for the other inefficiencies and redundancies discussed above, a 60% reduction in the proposed fee for Eckert's work is warranted. Accordingly, the plaintiffs may recover **$225,308.60** for Eckert's fees.

* * *

In short, the specific fees requested for each of the plaintiffs' four sets of attorneys must be reduced substantially for a variety of reasons, including, among others discussed above, deficient or completely absent time records, excessive or redundant lawyering, and a repeated failure to exclude hours that were spent on other cases or that were otherwise not reasonably attributable to the plaintiffs' favorable judgment on the RICO and SCA claims. Those specific reductions yield a total fee of $485,474.10. That amount is in turn subject to the 40% across-the-board reduction described earlier, which is warranted in light of the excess that invariably resulted from the plaintiffs' litigation conduct, as well as the plaintiffs' limited success on their RICO and SCA claims. Accordingly, the plaintiffs are entitled to a total award of attorney's fees in the reduced amount of **$291,284.46**.

## C.

Finally, the plaintiffs seek an award of $231,968.75 in costs, which encompasses costs from Herrick, Mr. Fischbein, and Eckert, as well as expert witness fees paid to K2 and Berkeley.

36

"A court will generally award those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." Alicea, 272 F. Supp. 3d at 613 (citing LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998)). "The fee applicant bears the burden of adequately documenting and itemizing the costs requested." Id.

Some of the plaintiffs' requested costs are not recoverable at all. To begin, for the reasons set forth above with regard to Herrick's fees, the request for Herrick's costs is unreasonable and must be excluded entirely. Likewise, the plaintiffs are not entitled to Mr. Fischbein's costs, which, based on the limited documentation provided, appear to include (1) a single payment for court reporting services, and (2) travel fare for the trial. Mr. Fischbein and the plaintiffs do not provide any context or explanation for the one-page court reporting invoice attached to Mr. Fischbein's declaration.[15] And, as discussed in relation to Mr. Fischbein's fee request, the fee application does not shed any light on the specific role that Mr. Fischbein played at trial,

---

[15] To the extent the purpose of the invoice can be discerned, it appears to reflect a payment for a February 17, 2015 transcript regarding a motion to hold nonparty Akerman in contempt for violating the January 2015 TRO discussed above. See Fischbein Decl., Ex. B, ECF No. 614-4, at 16; see also Feb. 17, 2015 Tr., 14-cv-8084, ECF No. 43. For all of the reasons explained earlier with regard to that TRO, any such cost is not part of the costs reasonably expended on the RICO and SCA claims.

making it impossible to determine whether his travel costs were reasonably incurred.

Moreover, the plaintiffs' request for "expert witness fees" paid to K2 and Berkeley -- which amount to nearly $200,000 -- is unreasonable. Pls.' Memo. at 12. Those fees were incurred for the work of a hacking expert and damages expert, whose expert reports were appropriately stricken for untimeliness in early 2017. See Frydman, 2017 WL 1155919, at *1, *4. As a result of that ruling, the plaintiffs were barred from using the expert reports or the experts' testimony through the remainder of these proceedings, including at trial. And, while the plaintiffs and their lawyers assert that the experts' work product was still helpful to them, they provide no details at all regarding how that work product was actually used. Without that explanation, it cannot be said that the fees paid to excluded expert witnesses are part of the reasonable costs incurred in furtherance of the RICO and SCA judgments. Those expert witness fees are excluded in full.

Finally, the plaintiffs seek an award of Eckert's costs, totaling $20,914.75. Because the bulk of those costs appear to have been incurred during the trial, see Shienvold Decl., Ex. 2, ECF No. 614-2, at 113-16, the Court applies only a 15% reduction to account for the effects of duplicative or otherwise unnecessary costs resulting from the clear overstaffing on these cases. See, e.g., Houston, 234 F. Supp. 3d at 413 (reducing costs that were

38

likely inflated due to overstaffing). Another 10% reduction is warranted to eliminate costs that are "generally not recoverable," such as meals. Alicea, 272 F. Supp. 3d at 613; see, e.g., Shienvold Decl., Ex. 2 at 79, 113-15 (listing hundreds of dollars in charges on meals). Thus, the requested costs for Eckert are reduced to **$15,686.06.**

In light of all the above, the plaintiffs are entitled to a total award of **$15,686.06** in costs.

**CONCLUSION**

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, those arguments are either moot or without merit.

For the foregoing reasons, the plaintiffs' motion for an award of attorney's fees and costs pursuant to 18 U.S.C. § 1964(c) and 18 U.S.C. § 2707(c) is **granted.** The plaintiffs are awarded attorney's fees in the reduced amount of **$291,284.46,** and costs in the reduced amount of **$15,686.06,** for a total award of fees and costs of **$306,970.52.** Pursuant to the Judgment, Verschleiser and Multi Group are jointly and severally liable for that award.

The Clerk is respectfully directed to close ECF No. 614.

**SO ORDERED.**

Dated:    **New York, New York**
            **June 23, 2023**

                             **John G. Koeltl**
                       **United States District Judge**